1                                        VOL. 2 PAGES 221 - 450

2                             UNITED STATES DISTRICT COURT

3                            NORTHERN DISTRICT OF CALIFORNIA

4        BEFORE THE HONORABLE NATHANAEL M. COUSINS, MAGISTRATE JUDGE

5        AMCO INSURANCE COMPANY,        )
                                        )
6                     PLAINTIFF,        )
                                        )
7         VS.                           )          NO. C 10-1257 NC
                                        )
8        EUREKA OXYGEN COMPANY,         )
         ET AL.,                        )
9                                       )
                      DEFENDANTS.       )
10       _____)

11                                      SAN FRANCISCO, CALIFORNIA
                                        WEDNESDAY, MAY 9, 2012
12

13       **APPEARANCES**:

14       FOR PLAINTIFF:           LONG & LEVIT LLP
                                  465 CALIFORNIA ST., SUITE 500
15                                SAN FRANCISCO, CA  94104
                           BY:   **JOHN B. HOOK**
16                               **JOHN BRENDAN SULLIVAN**
                                 **J. MICHAEL HIGGINBOTHAM**
17                                ATTORNEYS AT LAW

18
         FOR DEFENDANT            LEWIS BRISBOIS BISGAARD & SMITH
19       EUREKA OXYGEN:           ONE SANSOME STREET
                                  SUITE 1400
20                                SAN FRANCISCO, CA  94104
                           BY:   **HELEN LEE GREENBERG**
21                               **SHAWN ADRIAN TOLIVER**
                                 **ATTORNEYS AT LAW**
22

23               **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

24       REPORTED BY:            JAMES YEOMANS, CSR #4039, RPR
                                 OFFICIAL REPORTER
25                      COMPUTERIZED TRANSCRIPTION BY ECLIPSE

1 __APPEARANCES__:  **(CONTINUED)**

2 FOR DEFENDANT   NISSON, PINCIN, HILL
  ELLEBRECHT:     P.O. BOX 992710

3           REDDING, CA  96099
        BY: **DUANE HORACE TIMMONS**

4          **ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  WEDNESDAY, MAY 9, 2012                                    8:30 A.M.

2          (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE

3  PRESENCE OF THE JURY:)

4          **THE COURT:**  JURY IS NOT PRESENT.

5          THE ISSUE, THE PREMIERE ISSUE WE'VE GOT THIS MORNING

6  IS THE MOTION TO LIMIT PERKINS' TESTIMONY.  THERE'S SEVERAL

7  ISSUES PRESENTED.

8          ONE, IS RELIABILITY AND RULE 702, THE SECOND IS

9  WHETHER HIS TESTIMONY MIGHT BE DUPLICATIVE OR CUMULATIVE TO THE

10 TESTIMONY OF CARLSEN, RIDINGS.

11         THESE 132 AND 133 FILED YESTERDAY.  I WANT TO START

12 WITH AMCO JUST TO EXPLAIN WHAT THE PROPOSED TESTIMONY IS FROM

13 MR. PERKINS.

14         **MR. SULLIVAN:**  IT'S GOING TO BE LIMITED TO ORIGIN AND

15 CAUSE OF FIRE.  FIRE BEHAVIOR IN GENERAL.  IT WILL NOT BE

16 DUPLICATIVE OF CARLSEN, I DON'T BELIEVE.

17         **THE COURT:**  ALL RIGHT.  IS HE GOING TO -- ARE YOU

18 PROPOSING HE'LL TESTIFY ABOUT THE ANSUL SYSTEM, THE ALIGNMENT

19 OF NOZZLES, THE SIZE OF THE NOZZLES, THE MOVEMENT OF THE

20 NOZZLES?

21         **MR. SULLIVAN:**  I DON'T THINK HE'LL BE TESTIFYING

22 SPECIFICALLY ABOUT ANY OF THAT.  PERKINS WILL NOT BE, CARLSEN

23 WILL BE.

24         **THE COURT:**  WE'RE FOCUSING ON PERKINS.  YOU'RE

25 PLANNING TO HAVE CARLSEN GO BEFORE PERKINS, RIGHT?

1          **MR. SULLIVAN:** YES.

2          **THE COURT:** IN SOME SENSE THE QUESTION OF

3    DUPLICATIVENESS IT WOULD BE HARD TO KNOW FOR SURE UNTIL WE'VE

4    HEARD CARLSEN AND WE START TO WEIGH INTO THIS.

5          IN THE PRETRIAL STATEMENT FILED ON APRIL 25TH, WHICH

6    IS A SUPPLEMENTAL PRETRIAL STATEMENT, PERKINS WAS IDENTIFIED AS

7    A REBUTTAL WITNESS. SO WHAT HAS CHANGED THAT MOVES PERKINS

8    FROM BEING A REBUTTAL WITNESS TO NOW BEING A WITNESS IN YOUR

9    CASE IN CHIEF?

10          **MR. SULLIVAN:** I THINK, THE TERM REBUTTAL WITNESS, I

11   THINK WE WERE ALLOWED TO DESIGNATE HIM AS A REBUTTAL WITNESS

12   FOLLOWING THE CHANGE IN THE O'CONNOR OPINION.

13          AND, I THINK, REALLY WHAT IT WAS THERE WAS NO ISSUE

14   ABOUT WHERE THE FIRE STARTED UNTIL THAT REVISED O'CONNOR

15   OPINION.

16          SO, I THINK, THAT HAD BEEN AN ISSUE FROM THE OUTSET OF

17   THE CASE WE WOULD HAVE JUST DISCLOSED AN ORIGIN AND CAUSE

18   PERSON ON JANUARY 30TH, BUT SINCE IT WAS NOT, HE WAS NOT

19   DESIGNATED THEN.

20          **THE COURT:** WHY IN THE FILING APRIL 25TH WAS HE STILL

21   IDENTIFIED AS REBUTTAL WITNESS AND NOT AS A -- BY THEN WE

22   ALREADY HAD PRETRIAL CONFERENCE, I DON'T UNDERSTAND WHAT -- WHY

23   NOW IT'S BECOME A TRIAL WITNESS IN YOUR CASE IN CHIEF, WHAT'S

24   CHANGED BETWEEN THE 25TH AND NOW?

25          **MR. SULLIVAN:** I THINK, WE WERE USING THE TERM THAT

1  WAS IN YOUR ORDER ON THE MOTION IN LIMINE.  AND I DON'T THINK

2  WE -- WAS PROBABLY POORLY PHRASED.  I DON'T THINK IT WAS

3  INTENDED TO MEAN HE WOULD APPEAR AS A REBUTTAL WITNESS IN

4  TRIAL, REALLY JUST OPPOSING THE CORBO NEW OPINION.

5      HE WAS DISCLOSED TO REBUT CORBO'S NEW OPINION IN

6  GENERAL.  SINCE WE HAVE THE BURDEN OF PROOF WE FIGURED WE

7  SHOULD PROBABLY GET THE FIRST SHOT AT EXPLAINING TO THE JURY

8  WHERE THE FIRE STARTED.

9      **THE COURT:**  WELL, YOU'RE RIGHT THERE, BECAUSE YOU

10 MIGHT NOT GET A SECOND SHOT.  IT IS YOUR BURDEN AND IF IT'S

11 SOMETHING YOU NEED TO PROVE, THEN I UNDERSTAND WHY YOU WANT TO

12 PUT HIM ON.

13     IT'S A QUESTION OF WHETHER THAT LATE IDENTIFICATION IS

14 PREJUDICIAL IN SOME WAY TO EUREKA AND MS. ELLEBRECHTS.

15     MR. TOLIVER, WHAT ARE YOUR THOUGHTS ON THE TIMING

16 ISSUE?

17     **MR. TOLIVER:**  THANK YOU, YOUR HONOR.

18     I BELIEVE, IT IS INAPPROPRIATE TO PRESENT THIS

19 REBUTTAL -- DISCLOSED REBUTTAL EXPERT IN THE CASE IN CHIEF.

20     PER THIS COURT'S ORDER HE WAS ONLY ALLOWED INTO THE

21 CASE TO REBUT SPECIFIC OPINIONS RELATIVE TO CAUSE AND ORIGIN,

22 AND IN HIS DEPOSITION HE VOLUNTEERED A LOT OF LAY OPINION ABOUT

23 THE ANSUL SYSTEM AND CONSUMED A LOT OF TIME PROFFERING HIS

24 SPECULATION FROM WHICH HE MERELY ADOPTED LAY OPINIONS FROM KEN

25 RIDINGS, WHICH IS IMPROPER.

1        SO WE WANT TO MAKE SURE THAT AMCO UNDERSTANDS THAT

2   WHENEVER AND, IF EVER, MR. PERKINS TESTIFIES THAT HE'S NOT TO

3   TESTIFY REGARDING ISSUES WITH THE ANSUL SUPRESSION SYSTEM.

4        WITH RESPECT TO YOUR HONOR QUESTION WE BELIEVE THAT

5   IS APPROPRIATE THAT MR. PERKINS NOT BE ALLOWED TO TESTIFY IN

6   THE CASE IN CHIEF.  HE WAS NOT DESIGNATED AS SUCH, HE IS A

7   REBUTTAL EXPERT SOLELY ON CAUSE AND ORIGIN.

8        AND WITH RESPECT TO AMCO'S POSITION CAUSE AND ORIGIN

9   HAS NEVER BEEN DETERMINED CONCLUSIVELY, IT'S BEEN AN ONGOING

10  ANALYSIS.

11       SO WHY THEY CHOSE NOT TO DISCLOSE THE CAUSE AND ORIGIN

12  EXPERT PRIOR WE DON'T HAVE AN EXPLANATION FOR THAT.  BUT THIS

13  IS A REBUTTAL EXPERT AND SHOULD NOT BE PERMITTED TO TESTIFY IN

14  THE CASE IN CHIEF.

15       **THE COURT:**  YOU DID DEPOSE HIM WITHOUT HIS OPINION

16  ABOUT THE CAUSE AND ORIGIN OF THE FIRE; IS THAT CORRECT?

17       **MR. TOLIVER:**  WE DID, THAT'S CORRECT.

18       **MR. SULLIVAN:**  IF I MAY, I THINK, THE REASON WE DIDN'T

19  DISCLOSE HIM, AND THIS GOES BACK TO THE REVISING REQUEST FOR

20  ADMISSION NUMBER FOUR THAT THE FIRE STARTED IN THE FRYER.

21       I THINK, EVERYBODY IS WORKING UNDER THE IMPRESSION THE

22  FIRE STARTED IN THE VAT OF THE FRYER AND MAYBE THAT WAS -- I

23  DON'T THINK IT WAS MISTAKE, I THINK THAT WAS EVERYBODY'S

24  POSITION BEFORE NEW COUNSEL CAME IN.

25       THEN THEY WERE ALLOWED TO AMEND THAT REQUEST FOR

1    ADMISSION, SO THAT WAS NO LONGER A STIPULATED FACT.

2            THEY WERE ALSO ALLOWED TO DISCLOSE THIS NEW OPINION

3    ABOUT THE FIRE STARTING IN THE PILOT LIGHT ON, I WOULD SAY, SIX

4    WEEKS AFTER THE DEADLINE FOR EXPERT WITNESS DISCLOSURE.

5            AND SO THAT'S WHAT CREATED THIS ISSUE, AND I TOLD

6    MR. TOLIVER LAST WEEK WHEN WE WERE TRYING TO SCHEDULE THE

7    DEPOSITION WE WERE PROBABLY GOING TO CALL HIM TUESDAY OR

8    WEDNESDAY, THERE WAS NO OBJECTION AT THAT POINT THAT, NO, YOU

9    CAN'T CALL HIM IN YOUR CASE IN CHIEF.

10           **THE COURT:**  ALL RIGHT.  LET ME TALK ABOUT THE NEXT

11   ISSUE, THE PHOTOS THAT WERE REFERENCED YESTERDAY.  THAT I

12   UNDERSTAND AMCO PROPOSING TO SUBMIT WITH THE TESTIMONY OF

13   MR. PERKINS, HAVE YOU CONFERRED FURTHER ABOUT THOSE PHOTOS?

14           **MR. SULLIVAN:**  NO.  WE'VE NOT HEARD BACK.

15           **THE COURT:**  MS. TOLIVER, I GAVE YOU A CHANCE TO

16   EVALUATE THEM BEFORE HEARING YOUR OBJECTION, SO LET ME HEAR

17   YOUR ANALYSIS NOW.

18           **MR. TOLIVER:**  THANK YOU.  THE PHOTOGRAPHS THAT WE

19   RECEIVED YESTERDAY MORNING THAT ARE PROFFERED TO BE EXHIBITS IN

20   THIS CASE, THEY'VE HAD THESE PHOTOGRAPHS FOR A LONG TIME.

21           MR. PERKINS WAS INVOLVED IN THE CASE BACK IN 2008.  HE

22   WAS ORIGINAL RETAINED BY CECILWARE AND PRESENT AT THOSE

23   INSPECTIONS.

24           THE PHOTOGRAPHS ARE CUMULATIVE, THEY'RE DUPLICATIVE,

25   THEY ADD NO ADDITIONAL VALUE.  UNDER 403 AND 404 IT'S AN UNDUE

1    CONSUMPTION OF TIME AND NOT VALUABLE TO THE CASE.

2          SO WE OBJECT ON ALL OF THOSE GROUNDS.  AND IF THE

3    COURT WOULD PERMIT I WOULD LOVE TO RESPOND FURTHER RELATIVE TO,

4    UNLESS THE COURT DECIDED ALREADY, THE EARLIER ISSUE ON PERKINS.

5          **THE COURT:**  FURTHER WORD ON THAT, BUT LET'S FOCUS ON

6    THE PHOTOGRAPHS FOR A MOMENT.

7          ALL RIGHT.  SO, MR. SULLIVAN.

8          **MR. SULLIVAN:**  THAT'S NOT TRUE, WE DIDN'T HAVE THE

9    PHOTOS FOR FOUR YEARS.  I THINK, WE'RE REWRITING HISTORY A

10   LITTLE BIT.

11         THIS BECAME AN ISSUE ON MARCH 7TH WHEN THEY DISCLOSED

12   THIS CORBO OPINION.  YOU GRANTED US PERMISSION TO GO GET AN

13   EXPERT WITNESS IN MR. PERKINS TO REBUT OR TO, I GUESS, WE

14   INTERPRETED TO CONTRADICT THAT OPINION.  THAT HAD BECOME A NEW

15   ISSUE WHERE THE FIRE HAD STARTED.

16         SO WE DIDN'T HAVE THOSE PICTURES FOUR YEARS AGO.  WE

17   RECEIVED THOSE PICTURES SHORTLY AFTER WE RETAINED MR.  PERKINS.

18   WE GAVE THOSE PICTURES TO EUREKA'S COUNSEL TWO DAYS AFTER WE

19   DISCLOSED THE REPORT WHEN MR. PERKINS WAS DEPOSED.

20         I DON'T THINK IT'S FAIR TO ALLOW US TO DESIGNATE A

21   WITNESS THAT LATE AND NOT USE HIS PHOTOGRAPHS.

22         **THE COURT:**  WHEN WERE THE PICTURES TAKEN?

23         **MR. SULLIVAN:**  THEY WERE TAKEN DECEMBER OF 2008 BY

24   MR. PERKINS.

25         **THE COURT:**  ALL RIGHT.  AND WHAT DO THEY ADD TO THE

1    TRIAL THAT WE DON'T ALREADY HAVE FROM THE PHOTOGRAPHS THAT ARE

2    IN EVIDENCE?

3          **MR. SULLIVAN:**  WELL, MR. PERKINS THEY'RE CLEAR SOME OF

4    THEM ARE DIFFERENT THAN THE PHOTOS MR. RIDINGS TOOK.  IF HE HAS

5    TO HE'LL HAVE TO RELY ON MR. RIDINGS' PHOTO.

6          WE PREFER HE RELY ON HIS OWN PHOTOS BECAUSE HE WAS

7    THERE TO INVESTIGATE THE ORIGIN AND CAUSE OF THE FIRE.  THAT'S

8    WHAT IT ADDS, IT WILL BETTER HELP THE JURY UNDERSTAND WHERE THE

9    FIRE STARTED.

10         **THE COURT:**  ALL RIGHT.  DO YOU HAVE A COPY OF THEM

11   THAT I CAN SEE?

12         **MR. SULLIVAN:**  SURE.  THE WAY I HAVE SET UP FIVE

13   COPIES OF EACH, DO YOU WANT A COMPLETE SET?

14         **THE COURT:**  HOW MANY PHOTOS ARE THERE?

15         **MR. SULLIVAN:**  I THINK, THERE'S 10.

16         **THE COURT:**  I'D LIKE TO SEE ONE COMPLETE SET.

17         **MR. SULLIVAN:**  OKAY.  THESE WERE TAKEN WHEN WORKING

18   FOR SOMEONE ELSE, NOT US.  OBVIOUSLY, HE DIDN'T GO OUT AND TAKE

19   THESE PICTURES THE LAST MONTH BECAUSE THE SCENE WOULD NOT LOOK

20   THE SAME.

21         **THE COURT:**  170 THIS YELLOW THING IS THAT THE TAB

22   PLACED ON THE FRYER?

23         **MR. SULLIVAN:**  PARDON ME?

24         **THE COURT:**  THIS PICTURE 170 IT'S GOT A YELLOW

25   SOMETHING, YELLOW ON TOP OF IT, IS THAT SOMETHING ADDED BY AN

1   EXPERT?

2          **MR. SULLIVAN:**  THAT SHOWS WHERE THE LASER WAS POINTED,

3   THAT WAS ADDED AT THE INSPECTION.  THAT WASN'T ADDED BY PHOTO

4   SHOP OR ANYTHING.

5          **THE COURT:**  SOMETHING ADDED TO THE FRYER AFTER THE --

6          **MR. SULLIVAN:**  WHEN THEY DID THE LASER TEST WE TALKED

7   ABOUT YESTERDAY.  THAT'S WHERE THE LASER WAS POINTED.

8          **THE COURT:**  HERE'S HOW I'M GOING TO RULE ON THIS.

9          I AM GOING TO EXCLUDE 170 AND I'M ALSO GOING TO

10  EXCLUDE FIGURE 31 FROM YESTERDAY'S TESTIMONY.  BOTH OF THOSE

11  SHOWED THIS YELLOW TAB THAT CAME FROM THE LASER TEST THAT I

12  EXCLUDED FROM MR. RIDINGS TESTIMONY AS BEING BOTH SOMETHING HE

13  DID NOT HAVE EXPERTISE IN AND RULE 702 TO TESTIFY ABOUT, BUT

14  ALSO UNRELIABLE ANALYSIS, AND IT'S ALSO -- IN THE WAY IT'S BEEN

15  PRESENT SOMETHING LIKELY TO CONFUSE THE JURY.

16         NOW, CONSIDER FURTHER LIMITING INSTRUCTION, BUT WHAT

17  I'M GOING TO DO RIGHT NOW, IS I'M GOING TO STRIKE FIGURE 31 AND

18  REMOVE THAT FROM THE EVIDENCE TO BE CONSIDERED BY THE JURY.

19         I'M NOT GOING TO PERMIT EXHIBIT 170 EITHER AND I'M NOT

20  GOING TO PERMIT ANY FURTHER TESTIMONY ABOUT THE LASER TEST

21  BASED ON THE FACT THAT WHAT I'VE HEARD SO FAR AND IN THE RECORD

22  IT'S NOT A RELIABLE TEST AND THERE'S NOT BEEN ANY EXPERTS TO

23  TESTIFY ABOUT IT.

24         **MR. SULLIVAN:**  IF I MAY, MIKE CARLSEN WHOSE GOING TO

25  TESTIFY ON THE ANSUL SYSTEM RELIED ON THOSE PHOTOGRAPHS AND HE

1    CAN GIVE AN EXPLANATION OF HOW THOSE TESTS HAPPENED.

2         AND, NO, HE WASN'T THERE, BUT WHAT HE'S GOING TO SAY,

3    IT'S NOT VERY DIFFICULT TO PUT A LASER ON THE NOZZLE.  IN FACT,

4    THERE'S ONLY ONE WAY THE LASER GOES ON THE NOZZLE.

5         HE RECEIVED THESE PICTURES FROM MR. RIDINGS AND

6    UNDERSTOOD THAT YELLOW DOT REPRESENTED WHERE THE LASER WAS

7    POINTING WHEN THE ANSUL TECHNICIAN WHO INSPECTED THE FIRE PUT

8    THE LASER ON THE NOZZLE.  THAT'S PART OF WHAT HE RELIED ON FOR

9    HIS OPINION.

10        **THE COURT:**  I UNDERSTAND THAT, BUT HE'S NOT GOING

11   TESTIFY TO THAT BECAUSE I'M ORDERING THAT EVIDENCE EXCLUDED AS

12   BEING AN UNRELIABLE TEST.

13        HE'S NOT MED THE BURDEN UNDER RULE 702 TO ESTABLISH

14   THE JURY SHOULD HEAR ABOUT IT WITHOUT BEING CONFUSED ABOUT IT.

15        **MR. SULLIVAN:**  IF I MAY,I THINK OUR POINT IT'S NOT A

16   TEST, IT'S NOT AN OPINION, IT'S AN OBSERVATION.  I SAW THE

17   ANSUL TECHNICIAN PUT THE LASER ON AND THIS WHERE THE LASER

18   POINTED.  I DON'T UNDERSTAND.

19        **THE COURT:**  I DISAGREE.  IT'S A POST FIRE ANALYSIS

20   THAT YOUR VARIOUS EXPERTS PERFORMED, AND YESTERDAY MR. RIDINGS

21   ATTEMPTED TO MAKE AN OPINION ABOUT THAT.

22        I FOUND THAT HE WAS NOT QUALIFIED TO OPINE, BUT ALSO

23   THE METHOD OF ANALYSIS I FIND TO BE UNRELIABLE.  AND I RULE

24   UNDER 702 TO BE THE GATEKEEPER AND I'M GOING TO KEEP THAT

25   EVIDENCE OUT BASED ON WHAT I HEARD, AND THAT'S INCLUDING FOR

1    MR. CARLSEN, MR. PERKINS AND MR. RIDINGS.

2          **MR. TOLIVER:**  THANK YOU, YOUR HONOR.  YOUR HONOR, I

3    HAVE --

4          **THE COURT:**  SORRY, ONE MORE THING, BUT I WILL ALLOW

5    THE OTHER PHOTOGRAPHS TO BE ADMITTED IF THERE'S A PROPER

6    FOUNDATION LAID FOR THEM, EXCEPT FOR 170.

7          BUT JUST TO BE CLEAR NOT GOING TO PERMIT MR.  PERKINS

8    TO TESTIFY ABOUT THE LASER TESTING.  I'M NOT GOING TO PERMIT

9    MR. PERKINS TO TESTIFY ABOUT THE ALIGNMENT OF THE NOZZLES, THE

10   SIZE OF THE NOZZLES, THE MOVEMENT OF THE NOZZLES, THOSE ARE ALL

11   ISSUES THAT EITHER NOT IN HIS AREA OF EXPERTISE OR CUMULATIVE

12   OF OTHER WITNESSES.

13         AND AS I UNDERSTAND YOUR PROFFER THEY ARE NOT ISSUES

14   INVOLVING THE ORIGIN AND CAUSE OF THE FIRE, SO I'LL PERMIT HIM

15   TO TESTIFY IF THE FOUNDATION IS LAID ABOUT THE ORIGIN AND CAUSE

16   OF THE FIRE AND I WILL PERMIT HIM TO TESTIFY IN YOUR CASE IN

17   CHIEF.  SO THAT'S MY RULING.

18         **MR. SULLIVAN:**  BUT IF I MAY, JUST TO GO BACK TO

19   CARLSEN BECAUSE IT'S GOING TO PROBABLY COME UP THIS MORNING.

20   HIS TESTIMONY IS GOING TO BE, HE CAN LOOK AT -- ONE OF THE

21   PICTURES WE FLASHED UP YOU CAN SEE WHERE THE NOZZLE KIND OF

22   COMES DOWN AND IS POINTED IN MIDDLE OF THE FRYERS.  FROM THAT

23   HE DECIDED THE NOZZLE WAS MISALIGNED.

24         BUT HE ALSO LOOKED AT OTHER PHOTOS TO LOOK THIS AND

25   ONE IS THIS PHOTO OF THIS LASER THAT HE WAS TOLD WHEN AN ANSUL

1    REPRESENTATIVE PUT ON THE NOZZLE AND WHERE IT SHOWED, AND I

2    THINK HE'S ENTITLED TO RELY ON THAT.  I THINK, HE'S ENTITLED TO

3    TELL THE JURY HE RELIED ON THAT.

4         **THE COURT:**  I DISAGREE.  I'M ORDERING IT EXCLUDED.

5    HE'S NOT GOING TO TESTIFY ABOUT THAT AND IF -- SO, THAT'S MY

6    RULING.

7         **MR. SULLIVAN:**  I MEAN, I UNDERSTAND WE CAN'T SHOW IT

8    UP THERE.  CAN HE SAY I RELIED ON PHOTOS WHAT I WAS TOLD IS A

9    LASER TEST CONDUCTED THERE?

10        **THE COURT:**  I'M NOT GOING TO PERMIT TESTIMONY TO THE

11   JURY ABOUT THE LASER TEST.

12        **MR. SULLIVAN:**  SO HE CAN'T EVEN REFERENCE THAT HE

13   REVIEWED THESE PHOTOGRAPHS?

14        **THE COURT:**  HE CAN REFERENCE HE REVIEWED PHOTOGRAPHS,

15   BUT WE'RE NOT GOING TO HAVE FIGURE 31 OR FIGURE 170 BEFORE THE

16   JURY, SO IT'S CONFUSING, IT'S GOING TO BE CONFUSING TO THE JURY

17   TO TALK ABOUT PHOTOGRAPHS I'M GOING TO INSTRUCT THE JURY TO

18   DISREGARD.

19        IF HE GOES INTO IT INADVERTENTLY I MIGHT GIVE IT A

20   MORE FULL INSTRUCTION TO THE JURY ABOUT THEIR DISREGARDING OF

21   THE EVIDENCE.  SO THAT'S THE DANGER HE'LL BE LURKING IN IF WE

22   GET INTO THAT TESTIMONY.

23        **MR. SULLIVAN:**  BUT I UNDERSTAND THAT EVIDENCE IS NOT

24   ADMISSIBLE, I UNDERSTAND -- CAN HE TELL THE JURY THESE ARE --

25   THIS IS ONE OF THE OTHER THINGS HE RELIED ON BESIDES JUST

1    LOOKING AT THIS WAS THE RESULTS OF A LASER TEST THAT I

2    UNDERSTOOD WAS CONDUCTED THERE?

3         **THE COURT:**  NO, HE'S NOT GOING TO BE TESTIFYING ABOUT

4    THE ANSUL SYSTEM.  YOU'RE TALKING ABOUT MR. CARLSEN?

5         I AM AT THIS MOMENT NOT GOING TO PERMIT HIM TO TESTIFY

6    ABOUT THE LASER TEST, SO IF THERE'S SOME OTHER WAY MAYBE YOU

7    CAN LAY A FOUNDATION FOR IT.

8         LOOKING AT IT, THAT'S FINE, BUT I'M NOT GOING TO HAVE

9    HIM -- MR. RIDINGS WAS NOT PERMITTED TO TESTIFY ABOUT IT, I'M

10   NOT GOING TO HAVE INCONSISTENT POSITION AS TO MR. CARLSEN.

11        **MR. SULLIVAN:**  CAN HE SAY HE RELIED ON PHOTOS THAT

12   SHOWED A LAY LASER TEST AND NOT GET INTO THE PHOTOS?

13        **THE COURT:**  NO.

14        **MR. SULLIVAN:**  HE CAN'T MAKE ANY REFERENCE TO THOSE

15   PHOTOS THAT HE RELIED?

16        **THE COURT:**  HE MAY NOT REFER TO THE LASER TEST.

17        ANYTHING FURTHER?

18        **MR. TOLIVER:**  YES, YOUR HONOR.  THANK YOU VERY MUCH.

19   AMCO -- STRIKE THAT.  I APOLOGIZE.

20        EUREKA OXYGEN RENEWS THE 702 MOTION TO EXCLUDE

21   MR. CARLSEN WHICH IS PREVIOUSLY DENIED WITHOUT PREJUDICE.  THE

22   BASIS FOR THAT RENEWED MOTION -- HERE'S THE PROFFER OF PROOF.

23        MR. CARLSEN NEVER SAW THE FIRE SCENE, HE NEVER SAW THE

24   EQUIPMENT, THE INSTRUMENTALITIES OR THE ANSUL SYSTEM, NEVER

25   INSPECTED ANY OF THE EQUIPMENT, HE RELIES ONLY ON TWO THINGS,

1   PHOTOGRAPHS AND THE INADMISSIBLE LAY OPINION OF KEN RIDINGS AS

2   THE BASIS FOR HIS OPINION.

3          HE ACKNOWLEDGES HE HAS NO KNOWLEDGE OF ANY ALIGNMENT

4   CONDITION AT THE TIME OF THE FIRE.  HE HAS NO BASIS TO PROFFER

5   ANY OPINIONS THAT WILL BE HELPFUL TO THIS JURY.  HE RELIED

6   SOLELY ON WHAT AN EXPERT SHOULD NOT RELY UPON INADMISSIBLE LAY

7   OPINION ABOUT EXPERT ISSUES.

8          **THE COURT:**  I'LL CONTINUE TO DENY THAT WITHOUT

9   PREJUDICE.  GOES TO THE WEIGHT AND YOU'LL HAVE A CHANCE TO

10  CROSS-EXAMINE THE WITNESS ON THOSE ISSUES.

11         **MR. TOLIVER:**  THANK YOU.

12         **THE COURT:**  ANYTHING ELSE WE NEED TO CONSIDER?

13         **MR. HOOK:**  NO, YOUR HONOR.  THE ONLY THING IS, WITH

14  REGARD TO THE PHOTOS, WE THINK WOULD BE LESS CONFUSING IF WE

15  SUBMITTED NEW PHOTOGRAPHS WITHOUT THE CAPTIONS AND JUST LEAVE

16  THE OTHER ONES THERE, OTHERWISE GETS TOO CONFUSING.  SO WE WILL

17  SUBMIT NEW PHOTOGRAPHS WITHOUT THE CAPTIONS.

18         **THE COURT:**  OBVIOUSLY, NOT OBVIOUSLY, I EXPECT EUREKA

19  WOULD AGREE TO HAVE THE PHOTOGRAPHS WITHOUT THE CAPTIONS; IS

20  THAT CORRECT?

21         **MS. GREENBERG:**  YES, YOUR HONOR.

22         **THE COURT:**  AND I HAVE NOW ORDERED FIGURE 31 TO BE

23  STRICKEN, RESUBMITTED PHOTOS FIGURE 31 IN THE PHOTOGRAPH

24  REMOVED AND THE CAPTION IN ITS ENTIRETY.

25         **MR. SULLIVAN:**  POINT OF CLARIFICATION.  YOU TOLD ME

1   TWO OF THE PHOTOS I GAVE YOU, YOU READ ME THE NUMBERS, CAN'T

2   COME IN, I DID NOT WRITE IT DOWN.

3            **THE COURT:**  170 IS THE ONE YOU JUST HANDED UP TO ME

4   THAT I'M SAYING IS EXCLUDED.  FIGURE 31 WHICH IS PART OF THE

5   EXHIBIT 6 YESTERDAY I'M ALSO ORDERING EXCLUDED.

6            **MS. GREENBERG:**  AND, YOUR HONOR, JUST IN REGARDS TO

7   FIGURE 30, THIS ALSO HAS THE LASER IN IT, THE LIGHT FROM THE

8   LASER, ON THE SAME GROUNDS.

9            **THE COURT:**  CAN I SEE YOUR COPY OF IT?

10           **MS. GREENBERG:**  SURE.

11           **THE COURT:**  YOU'RE SAYING --

12           **MS. GREENBERG:**  ON THE SAME GROUNDS.

13           **THE COURT:**  THE SPOT ON THE TOP OF THE FRYER SHOWS IT.

14           **MS. GREENBERG:**  RIGHT.

15           **THE COURT:**  I'M GOING TO EXCLUDE FIGURE 30 FOR THE

16  SAME REASON.  THANK YOU FOR BRINGING THAT TO MY ATTENTION.

17  I'LL PASS -- ARE THESE A COPY I CAN KEEP?

18           **MR. SULLIVAN:**  I GAVE YOU ONE OF EACH.

19           **THE COURT:**  YES.  YOU DON'T NEED THOSE BACK?

20           **MR. HIGGINBOTHAM:**  POINT OF CLARIFICATION, ON EXHIBITS

21  YESTERDAY WE SAID WE WERE GOING TO SUBSTITUTE SOME PHOTOS, I

22  WOULD LIKE TO SAY WE'RE GOING TO LEAVE THE PHOTOS -- WE'RE JUST

23  GOING TO ADD NEW -- THE ONES THAT ARE MARKED FOR IDENTIFICATION

24  WILL STAY JUST MARKED FOR IDENTIFICATION.

25           **THE COURT:**  THAT'S FINE.  AT THE END WE'LL NEED TO

```
 1   MAKE SURE THE EXHIBITS ACTUALLY GO TO THE JURY ARE ONES THAT

 2   HAVE BEEN ADMITTED.  IF YOUR REVISING ONES THAT CAME IN

 3   YESTERDAY TO TAKE OUT THE CAPTION THAT SHOULD BE AND EASY

 4   PROCESS.

 5            MR. HIGGINBOTHAM:  POINT OF LEVITY, IF I MAY?

 6            THE COURT:  YES.

 7            MS. GREENBERG:  I'M ALREADY LAUGHING.

 8            MR. TOLIVER:  I'M GOING TO PAY ATTENTION TO THIS ONE.

 9            MR. HIGGINBOTHAM:  MY LASER FAILED YESTERDAY SO I

10   NEEDED A NEW ONE, SO I GO TO LONG'S THIS MORNING TO THE

11   BUSINESS SECTION, THE OFFICE SUPPLY SECTION.

12            THE COURT:  WE'RE OFF THE RECORD.

13                    (RECESS TAKEN.)

14       (PROCEEDINGS HELD IN OPEN COURT, JURY PRESENT.)

15            THE COURT:  WE'LL RESUME WITH MR. WILLIAMS ON THE

16   STAND.

17            COME ON UP, MR. WILLIAMS.  YOU'RE STILL UNDER OATH

18   FROM YESTERDAY.

19                    DIRECT EXAMINATION

20   BY MR. HIGGINBOTHAM:  Q.  GOOD MORNING, MR. WILLIAMS.

21   A.  GOOD MORNING.

22   Q.  I'M GOING TO TAKE YOU BACK TO THE 2001 YOU WENT TO LAS

23   VEGAS AND YOU ATTENDED THREE DAYS OF INSTRUCTION AT THE ANSUL

24   SCHOOL; IS THAT CORRECT?

25   A.  TWO TO THREE DAYS.
```

1  Q.  AND AS A RESULT OF THOSE TWO TO THREE DAYS INSTRUCTION YOU

2  BECAME CERTIFIED BOTH FOR INSTALLATION OF THE ANSUL SYSTEM, YOU

3  BECAME CERTIFIED FOR SERVICING OF THE ANSUL SYSTEMS AND YOU

4  BECAME CERTIFIED FOR MAINTENANCE OF THE ANSUL SYSTEM; IS THAT

5  CORRECT?

6  A.  YES, SIR.

7  Q.  BASED ON YOUR INSTRUCTIONS AND TEACHINGS FROM THE ANSUL AND

8  BASED UPON YOUR CERTIFICATION, WOULD YOU AGREE WITH ME THAT IF

9  THE NOZZLE IS POINTED AWAY FROM THE CENTER OF THE APPLIANCE IT

10  WOULD INHIBIT THE EFFECTIVENESS OF THE ANSUL SYSTEM?

11      MS. GREENBERG:  OBJECTION, YOUR HONOR, CALLS FOR

12  EXPERT OPINION.

13      THE COURT:  OVERRULED.

14      YOU CAN ANSWER.

15      THE WITNESS:  THE ANGLE CHANGES DEPENDING ON THE TYPE

16  OF APPLIANCE.  THE FRYER IT WOULD BE AIMED IN THE CENTER.

17  BY MR. HIGGINBOTHAM:  Q.  SO YOU AGREE WITH ME THAT IF A

18  FRYER -- IF THE NOZZLE IS NOT POINTED IN THE CENTER OF THE

19  FRYER, YOU AGREE WITH ME AS A CERTIFIED ANSUL SERVICE AND

20  MAINTENANCE TECHNICIAN IT WOULD INHIBIT THE EFFECTIVENESS OF

21  THE SYSTEM?

22  A.  I BELIEVE SO.

23  Q.  THANK YOU.  WOULD YOU ALSO AGREE BASED ON THAT SAME

24  CERTIFICATION, THE SAME TESTING, THE SAME CERTIFICATION FROM

25  ANSUL, THAT IF THE NOZZLES ARE DIRTY WITH GREASE THAT THAT ALSO

```
 1   WOULD INHIBIT THE EFFECTIVENESS OF THE ANSUL SYSTEMS?

 2           MS. GREENBERG:  OBJECTION.  CALLS FOR EXPERT OPINION.

 3           THE COURT:  OVERRULED.

 4           YOU CAN ANSWER.

 5           THE WITNESS:  DEPENDS ON THE AMOUNT OF GREASE, NOT HOW

 6   DIRTY THEY ARE.  THEY HAVE A SCREEN INSIDE OF THEM THAT'S MADE

 7   TO CATCH DEBRIS.

 8   BY MR. HIGGINBOTHAM:  Q.  SO DEPEND ON THE AMOUNT OF GREASE,

 9   BUT A LARGE AMOUNT OF GREASE, OR DIRT, OR ANYTHING ELSE THAT

10   CLOGS THE FILTER, YOU WOULD AGREE WITH ME WOULD INHIBIT THE

11   EFFECTIVENESS OF THE ANSUL SYSTEM?

12   A.  AT SOME POINT, YES.

13   Q.  WHAT DO YOU MEAN SOME POINT?

14   A.  THE GREASE ACCUMULATION WOULD HAVE TO BE EXTENSIVE,

15   COMPLETELY CLOGGED.  NO PARTIALLY CLOGGED.

16   Q.  SO PARTIALLY CLOGGED NOZZLE WOULD BE AS EFFECTIVE AS ONE

17   THAT ISN'T CLOGGED AT ALL, IS THAT YOUR TESTIMONY?

18   A.  STILL DISCHARGE CHEMICAL.  IF THE SCREEN HAS ENOUGH -- IF

19   IT'S NOT COMPLETELY CLOGGED IT WILL STILL ALLOW CHEMICAL TO

20   COME THROUGH.

21   Q.  I UNDERSTAND NOT COMPLETELY CLOGGED SOME CHEMICAL CAN COME

22   THROUGH, MY QUESTION REALLY IS, WOULD IT INHIBIT THE

23   EFFECTIVENESS, I'M NOT SAYING WON'T TOTALLY WORK, BUT IF YOUR

24   NOZZLE IS CLOGGED WOULD YOU AGREE WITH ME THAT THE ABILITY TO

25   DISPERSE THE ENTIRE AMOUNT OVER THE AREA INTENDED WOULD BE
```

1   SOMEWHAT INHIBITED?

2   **A.** IF THE NOZZLE WAS CLOGGED, YES.

3   **Q.** WOULD YOU ALSO AGREE WITH ME, THAT IF THE NOZZLE IS

4   UNDERSIZED, AGAIN, BASED ON YOUR CERTIFICATION, WOULD YOU ALSO

5   AGREE WITH ME YOU HAVE AN UNDERSIZED NOZZLE IT WOULD LIKEWISE

6   INHIBIT THE EFFECTIVENESS OF THE ANSUL SYSTEMS?

7   **A.** YES.

8   **Q.** I THINK, YOU TOLD ME JUST NOW 2001 YOU RECEIVED YOUR

9   CERTIFICATION, I THINK YOU SAID IN 2010 YOU TOOK THE COURSE

10  ON-LINE; IS THAT CORRECT?

11  **A.** YES, SIR.

12  **Q.** DID YOU RECEIVE A RECERTIFICATION IN 2010?

13  **A.** YES, SIR.

14  **Q.** SO YOU PASSED THE TEST ON-LINE?

15  **A.** I RECEIVED MY CERTIFICATE AND MY CERTIFICATION.

16  **Q.** ISN'T IT TRUE, THAT ANSUL REQUIRES RECERTIFICATION EVERY

17  THREE YEARS?

18  **A.** I DON'T KNOW THREE YEAR OR FIVE YEARS, I BELIEVE IT'S THREE

19  YEARS TO BE CERTIFIED.

20  **Q.** TO BE CERTIFIED?

21  **A.** TO BE CERTIFIED BY ANSUL, I BELIEVE, IT'S EVERY THREE

22  YEARS.

23  **Q.** SO EVERY THREE YEARS, SO AM I CORRECT THEN, THAT THE

24  CERTIFICATION YOU OBTAINED IN 2001 ALLOWED YOU TO BE CERTIFIED

25  BY ANSUL FOR 2001, 2002, 2003; IS THAT CORRECT?

1    **A.**  IF I RECEIVED IT IN 2001, YES.

2    **Q.**  YOU SAID MIGHT BE 2002?

3    **A.**  MIGHT BE 2002.

4    **Q.**  AND THE RECERTIFICATION IN 2010 ALLOWS YOU TO BE CERTIFIED

5    2010, 2011, 2012?

6    **A.**  YES, SIR.

7    **Q.**  SO IS IT A FAIR STATEMENT THEN, FOR THE YEARS 2004, 2005,

8    2006, 2007, 2008 YOU WERE NOT CERTIFIED?

9    **A.**  I DIDN'T HOLD CURRENT CERTIFICATE, NO.

10   **Q.**  WHY IS THAT?

11   **A.**  WE HAD OTHERS THAT WERE CERTIFIED THAT WE WORK WITH AT THE

12   SAME TIME.  SOMEONE HAS ALWAYS HELD CURRENT CERTIFICATE WITH

13   EUREKA OXYGEN.  AND YOU'RE NOT REQUIRED BY STATE LAW TO BE

14   CERTIFIED BY ANSUL TO SERVICE ANSUL SYSTEMS.

15   **Q.**  YOU WERE THE ONLY PERSON THAT'S CERTIFIED IN PARTICULAR

16   ANSUL SYSTEM DURING THE YEARS -- STRIKE THAT QUESTION.

17          WHEN DID YOU FIRST START SERVICING THE ANSUL SYSTEM AT

18   THIS GRILL, WHERE YOU WERE THE PERSON IN CHARGE OF THE SERVICE

19   AND MAINTENANCE?

20   **A.**  FIRST TIME SERVICED BY MYSELF?

21   **Q.**  YES.

22   **A.**  PROBABLY WITHIN TWO YEARS.  AFTER 2001.  SO BY 2000 I WAS

23   MOST LIKELY SERVICING THE SYSTEM BY MYSELF.

24   **Q.**  AND FROM 2003 UNTIL MAY OF 2008 WHEN WAS THE LAST

25   INSPECTION SERVICE PRIOR TO THE FIRE, 2003 TO 2008 WERE YOU THE

1    ONLY PERSON FROM EUREKA OXYGEN THAT SERVICED AND MAINTAINED THE

2    SYSTEM AT THE GRILL?

3    **A.**  I BELIEVE SO, YES.

4    **Q.**  SO THEN IS IT A FAIR STATEMENT, THAT YOU WERE CERTIFIED

5    WHEN YOU FIRST INSPECTED THE SYSTEM ROUGHLY 2003, BUT THERE WAS

6    A PERIOD OF MANY YEARS THEREAFTER YOU WERE NOT CERTIFIED WHEN

7    YOU INSPECTED AND SERVICED THE SYSTEM, IS THAT A CORRECT

8    STATEMENT?

9    **A.**  YES.

10   **Q.**  NOW, THE CERTIFICATION YOU DID RECEIVE ALLOWS YOU TO ALSO

11   INSTALL THE ANSUL 102 SYSTEM; IS THAT CORRECT?

12   **A.**  YES, SIR.

13   **Q.**  FROM THE TIME YOU RECEIVED THE CERTIFICATION UNTIL THE DATE

14   OF THE FIRE, WE MAY HAVE DONE THIS YESTERDAY BUT I FORGET, HOW

15   MANY ANSUL 102 SYSTEMS HAVE YOU INSTALLED?

16   **A.**  THE SAME PERIOD OF TIME WE SPOKE OF YESTERDAY?  WHEN I

17   BECAME MANAGER AND DID INSTALLATION STARTING IN 2005 THROUGH

18   2008 IT WAS AROUND 60 SYSTEMS TOTAL UP TO THIS POINT.

19           SO I'M GOING TO ESTIMATE MAYBE 25 SYSTEMS, THE SYSTEM

20   INSTALLATIONS, NOT INCLUDING REMODELS WHICH SOMETIMES CAN BE AS

21   INVOLVED AS A SYSTEM INSTALLATION.  SO PROBABLY 25 INSTALLS IN

22   THREE YEARS.

23   **Q.**  NOW, DOES THE INSTALLATION REQUIRE MORE THAN ONE TECHNICIAN

24   OR IS IT SOMETHING YOU DO ON YOUR OWN?

25   **A.**  IT'S ALMOST ALWAYS AT LEAST TWO TECHNICIANS.

1    **Q.** I'D LIKE TO PUT UP ON THE SCREEN EXHIBIT 6, FIGURE 2,

2    PLEASE.

3           **THE COURT:** OKAY.

4    **BY MR. HIGGINBOTHAM:** **Q.** IT'S NOT APPARENT FROM THESE

5    PHOTOGRAPH BUT THESE THAT I'M SHOWING HERE THEY CONNECT TO

6    ANOTHER HORIZONTAL PIPE; IS THAT CORRECT?

7    **A.** YES, SIR.

8    **Q.** THAT'S PART OF THE SYSTEM YOU INSTALLED, IS THAT HORIZONTAL

9    PIPE?

10   **A.** THE SUPPLY LINE WE CALL IT.

11   **Q.** AND THESE VERTICAL DROPS OFF THE SUPPLY LINE WHAT DO YOU

12   CALL THOSE?

13   **A.** APPLIANCE DROPS.

14   **Q.** AND YOU AGREE WITH ME THAT THIS PHOTOGRAPH FIGURE 2 SHOWS

15   THAT THESE -- I'M SORRY, WHAT DO YOU -- CALLED APPLIANCE DROPS?

16   **A.** APPLIANCE. APPLIANCE DROPS. SORRY.

17   **Q.** THE APPLIANCE DROPS SHOWN IN FIGURE 2 ARE INSTALLED

18   VERTICALLY OFF THE HORIZONTAL SUPPLY LINE, CORRECT?

19   **A.** CORRECT.

20   **Q.** GO TO FIGURE 17, EXHIBIT 6, PLEASE. WE HAVE FIGURE 17 OF

21   EXHIBIT 6 IN FRONT OF US, AND WOULD YOU AGREE WITH ME THAT

22   WE'RE LOOKING AT THE RIGHT SIDE OF THE COOKING LINE AND THIS

23   HERE IS NOZZLE NUMBER THREE?

24   **A.** YES.

25   **Q.** AND DOES THIS FIGURE SHOW THAT NOZZLE NUMBER THREE YOU -- I

1   KNOW YOU DIDN'T INSTALL THIS, BUT DOES THIS FIGURE SHOW AT THE

2   END OF NOZZLE NUMBER THREE THE NOZZLE ITSELF IS NOT VERY

3   FOLDED, IT'S BEEN DIRECTLY DOWN INTO THE WHATEVER I BELIEVE IS

4   THE GRILL?

5   **A.**  APPEARS SO.

6   **Q.**  AND THAT'S PART OF YOUR INSTALLATION PROCEDURE, YOU CAN --

7   WHEN YOU USE A VERTICAL DROP FOR THE APPLIANCE DROP, WHEN YOU

8   ACTUALLY INSTALL THE NOZZLE YOU CAN CONNECT IT IN SUCH A WAY

9   AND POINT IT TO WHERE YOU WANT IT TO GO, TRUE?

10  **A.**  I WOULD ELBOW LOWER WITH A NOZZLE SWIVEL.

11  **Q.**  WERE ANY NOZZLE SWIVELS USED AT THE GRILL?

12  **A.**  I DON'T BELIEVE SO.

13  **Q.**  SO THEY WERE FIXED?

14  **A.**  THEY WERE HARD PIPED, I BELIEVE, PIPE ELBOWS.  PIPE ELBOWS.

15  **Q.**  PIPE ELBOW MEANS THAT YOU CAN'T MANUALLY MOVE AND ADJUST

16  THE NOZZLE WITH YOUR HAND, TRUE?

17  **A.**  NOT USUALLY.

18  **Q.**  LET'S LOOK AT FIGURES 23, PLEASE.  HAVE YOU SEEN THESE

19  PHOTOS BEFORE, SIR?

20  **A.**  YES.

21  **Q.**  WHEN IS THE FIRST TIME YOU SAW THESE PHOTOS, DO YOU RECALL?

22          **MS. GREENBERG:**  OBJECTION, JUST TO THE EXTENT MAY CALL

23  FOR ATTORNEY-CLIENT COMMUNICATION.

24          **THE COURT:**  OVERRULED.

25          YOU MAY ANSWER.

1          **THE WITNESS:**  NOT THAT LONG AGO.  TOOK A LONG TIME

2     BEFORE I WAS SHOWN PICTURES.

3     **BY MR. HIGGINBOTHAM:  Q.**  IS IT FAIR STATEMENT THEN, FROM THE

4     DAY OF THE FIRE UNTIL NOT TOO LONG AGO, ROUGHLY WHAT TWO

5     MONTHS?

6     **A.**  MAYBE LONGER, MAYBE NOVEMBER, DECEMBER.

7     **Q.**  LET'S USE THAT THEN, FROM THE DATE OF THE FIRE IN '08 UNTIL

8     NOVEMBER, DECEMBER OF '11, YOU HADN'T VISITED THE SCENE, YOU

9     HADN'T VIEWED ANY EQUIPMENT AND YOU DIDN'T LOOK AT ANY PHOTOS,

10    IS THAT A FAIR STATEMENT?

11    **A.**  THAT'S A FAIR STATEMENT.

12         **THE COURT:**  MR. HIGGINBOTHAM, IF YOU'RE NOT REFERRING

13    TO AN EXHIBIT ON THE SCREEN, SO THAT ALL OUR JURORS CAN HEAR

14    YOU IF YOU CAN MAYBE SPEAK INTO THE MICROPHONE.  KEEP YOUR

15    VOICE UP, SO THAT ALL THE JURORS CAN HEAR YOU.  I THINK THAT

16    WILL BE APPRECIATED.

17         **MR. HIGGINBOTHAM:**  THANK YOU.  THE PROBLEM IS I BLOCK

18    THE SCREEN.

19    **Q.**  LET ME BACK UP.  WE'RE NOW BACK TO FIGURE 23 OF EXHIBIT 6

20    AND WE'VE ALREADY ESTABLISHED WE HAVE THIS VERTICAL DROP ON

21    NOZZLE ONE, THERE'S AN ELBOW AND THEN THE NOZZLE ITSELF IS

22    PLACED VERTICALLY ALSO, CORRECT?

23    **A.**  YES.

24    **Q.**  I'M GOING TO SHOW YOU A SERIES OF FIVE PICTURES, I'D LIKE

25    TO SHOW YOU ALL FIVE AT ONCE I WOULD, BUT THE QUESTIONS GOING

1   TO BE THE SAME.  SO LET ME ASK THE QUESTION.  THE FIRST PHOTO

2   AND I'LL REPEAT IT WITH EACH PHOTOGRAPH.

3           IF WE COULD HAVE EXHIBIT 6, FIGURE 2, PLEASE.

4           DOES THIS PHOTOGRAPH CORRECTLY DEPICT THE ORIENTATION

5   OF THE DROPS AND NOZZLES WHEN YOU LAST INSPECTED ON MAY 23RD

6   2008?

7   **A.**  I CAN'T BE SURE.

8   **Q.**  WELL, BASED ON WHAT YOU CAN SEE THERE, ANY REASON THAT YOU

9   CAN ADVISE US AND THE JURY OF ANY CHANGES THAT ARE OBVIOUS TO

10  YOU BETWEEN WHEN YOU LAST SAW IT ON YOUR LAST INSPECTION UP

11  UNTIL TODAY?

12  **A.**  IT'S DIFFICULT TO SAY WITH A PICTURE.

13  **Q.**  LET'S LOOK AT --

14  **A.**  POSSIBLE THAT THINGS CHANGED.

15  **Q.**  WELL, IT'S POSSIBLE?

16  **A.**  POSSIBLE THE NOZZLE ORIENTATION CHANGED.

17  **Q.**  ANYTHING IN HERE TO SUGGEST THAT THERE WAS A CHANGE IN

18  NOZZLE ORIENTATION BASED ON FIGURE 2?

19  **A.**  I CAN'T DETERMINE ANY CHANGES.

20  **Q.**  LET'S LOOK AT -- I'M SORRY, YOU CANNOT DETERMINE ANY

21  CHANGES BASED ON THIS PHOTOGRAPH, CORRECT?

22  **A.**  NOT BASED ON THIS PHOTOGRAPH.

23  **Q.**  LET'S LOOK AT FIGURE 17, SAME EXHIBIT 6.  WE LOOKED AT THIS

24  BEFORE RIGHT SIDE OF THE COOKING LINE, THAT'S NOZZLE NUMBER

25  THREE, DOES FIGURE 17 CORRECTLY DEPICT THE ORIENTATION OF THE

1   APPLIANCE DROPS AND THE NOZZLE NUMBER THREE WHEN YOU LAST

2   INSPECTED ON MAY 23RD 2008?

3   **A.**  I CAN'T BE SURE.

4   **Q.**  WELL, TELL US WHY YOU CAN'T BE SURE?

5   **A.**  I CAN'T TELL THE ORIENTATION IS CORRECT WITHOUT A LASER

6   POINTER ON THE SITE.  IT'S HARD TO TELL FROM A PICTURE.

7   **Q.**  WELL, BASED ON -- HOW MANY TIMES DID YOU GO TO THE GRILL TO

8   PERFORM YOUR INSPECTION SERVICES BETWEEN THE TIME YOU FIRST

9   STARTED AND THE DATE OF THE FIRE?

10  **A.**  FIRST STARTED EMPLOYMENT, FIRST TIME EVER PART OF A --

11  **Q.**  FROM THE FIRST TIME YOU WERE THERE UNTIL MAY 23RD OF '08,

12  HOW MANY TIMES DID YOU VISIT AND INSPECT EITHER AS APPRENTICE

13  OR ON YOUR OWN, INSPECT THIS GRILL?

14  **A.**  THERE'S SEVEN YEARS, MAYBE 14 TIMES POSSIBLY.

15  **Q.**  SO YOU HAD 14 TIMES AND HOW LONG DOES EACH INSPECTION TAKE?

16  **A.**  APPROXIMATELY AN HOUR.

17  **Q.**  SO YOU'VE HAD 14 HOURS TO LOOK AT THE SYSTEM OVER A SPAN OF

18  TIME, SO BASED ON YOUR REVIEW OF THE SYSTEM, FACT YOU WERE

19  CERTIFIED OVER CERTAIN PERIOD OF TIME, LOOKING AT THE PICTURE

20  CAN YOU TELL US BASED ON YOUR MEMORY WHETHER WHAT WE SEE HERE

21  IN NOZZLE THREE AS SHOWN IN THIS PHOTOGRAPH IS THE SAME AS IT

22  APPEARED THE LAST TIME YOU WERE AT THE GRILL?

23          **MS. GREENBERG:**  OBJECTION, YOUR HONOR.  RELEVANCE,

24  BASED ON 403, THESE PHOTOGRAPHS WERE TAKEN.

25          **THE COURT:**  OVERRULED.

1           YOU MAY ANSWER.

2           **THE WITNESS:**  I DON'T RECALL.  I DON'T RECALL IF

3    THAT'S THE WAY THE NOZZLE WERE.

4    **BY MR. HIGGINBOTHAM:  Q.**  YOU JUST DON'T RECALL?

5    **A.**  I DON'T RECALL.  I KNOW THEY WERE COVERED EACH WITH ONE

6    NOZZLE, BUT I DON'T RECALL HOW THE ELBOWS WERE, IF THERE WERE

7    TWO ELBOWS, ONE ELBOW, I DON'T RECALL.

8    **Q.**  LET'S LOOK AT PHOTO NUMBER 23, PLEASE, SAME EXHIBIT 6.

9    HERE WE HAVE THE APPLIANCE DROPS WE TALKED ABOUT EARLIER, THIS

10   IS NOZZLE CAP EIGHT, NUMBER ONE.  SAME QUESTION TO YOU, DOES

11   FIGURE 23 CORRECTLY DEPICT THE ORIENTATION OF THE DROPS AND

12   NOZZLES WHEN YOU LAST INSPECTED 05/23/08?

13   **A.**  I CAN'T TELL THE ANGLES, I DON'T SEE APPLIANCES UNDERNEATH

14   THEM.

15   **Q.**  SO YOU NEED TO SEE THE APPLIANCE UNDERNEATH TO ANSWER THAT

16   QUESTION?

17   **A.**  THAT WOULD HELP.

18   **Q.**  LET'S LOOK AT FIGURE 27, PLEASE.  MR.

19           WILLIAMS, WOULD IT HELP IF I ACTUALLY PUT THE

20   PHOTOGRAPH IN FRONT OF YOU RATHER THAN YOU LOOKING AT THE

21   SCREEN?  WOULD THAT ASSIST YOU?

22   **A.**  WOULD IT HELP?

23   **Q.**  WITH COUNSEL'S PERMISSION SHOW COPIES OF THE PICTURES TO

24   MR. WILLIAMS.  START WITH PHOTO NUMBER TWO WE TALKED ABOUT

25   EARLIER, IT'S NOT ON THE SCREEN NOW, AND THE QUESTION WAS, DOES

1   THIS PHOTO YOU HAVE NOW IN FRONT OF YOU HELP YOU ANSWER THE

2   QUESTION AS TO WHETHER THE ORIENTATION OF THE NOZZLE, THE DROPS

3   WERE THE SAME AS THEY WERE WHEN YOU LAST INSPECTED THEM ON MAY

4   23RD '08?

5           **MS. GREENBERG:**  OBJECTION, YOUR HONOR.  BASED ON 403,

6   I THINK THIS IS MISLEADING TO THE JURY AND CALLS FOR

7   SPECULATION.  THESE PHOTOGRAPHS WERE TAKEN IN DECEMBER OF 2008,

8   HE'S ALREADY TESTIFIED TO THE FACT HE WAS NOT OUT THERE AFTER

9   THE FIRE.

10          **THE COURT:**  OVERRULED.

11          YOU MAY ANSWERS, TO THE EXTENT YOU KNOW.

12          **THE WITNESS:**  I CAN'T BE SURE THEY'RE IN THE SAME

13  ORIENTATION AS THEY WERE THE LAST TIME I SERVICED IT.

14  **BY MR. HIGGINBOTHAM:  Q.**  LET'S THEN TURN TO FIGURE 17.

15          JOHN, IF YOU COULD PUT 17 UP, PLEASE.

16          AND I KNOW I'M RE-ASKING THESE QUESTIONS, BUT I WANT

17  THE PHOTOS DIRECTLY IN FRONT OF YOU.  HERE WE HAVE FIGURE 17

18  AGAIN, RIGHT SIDE OF THE COOK LINE, NOZZLE NUMBER THREE, WE

19  TALKED EARLIER ABOUT THE ELBOW AND THE FACT IT'S NOT

20  NON-VERTICAL, LOOKING AT THE PHOTO IN FRONT OF YOU, WHICH IS A

21  BETTER PICTURE SAME QUESTION, DOES PHOTO 17 CORRECTLY DEPICT

22  THE ORIENTATION OF THE DROPS AND THE NOZZLES WHEN YOU LAST

23  INSPECTED ON MAY 28TH 2008?

24  **A.**  I CAN'T BE SURE THEIR CORRECT ORIENTATION AS THE LAST TIME

25  I SERVICED THE SYSTEM.

1    **Q.**  GO TO 23, JOHN.  I HAVE THE LARGER PHOTO IN FRONT OF YOU.

2           HERE WE ARE LOOKING AGAIN AT NOZZLE ONE, THE ELBOW,

3    THE VERTICAL NOZZLE, AND MY QUESTION TO YOU, LOOKING AT --

4    HOPEFULLY A BETTER PICTURE, DOES THAT PICTURE CORRECTLY DEPICT

5    THE ORIENTATION OF THE DROPS AND THE NOZZLES WHEN YOU LAST

6    INSPECTED ON MAY 23RD '08?

7    **A.**  CAN'T BE SURE THEIR CORRECT ORIENTATION.

8    **Q.**  IS THERE ANYTHING ABOUT THAT PHOTOGRAPH WHICH SUGGESTS TO

9    YOU THEY'RE NOT IN THE SAME LOCATION AS WHEN YOU LAST VISITED?

10          **MS. GREENBERG:**  OBJECTION.  CALLS FOR SPECULATION.

11          **THE COURT:**  OVERRULED.

12          **THE WITNESS:**  THE ONLY WAY I CAN DETERMINE THE

13   POSITION IS A LASER POINTER.  I CAN'T SAY THEY'RE IN THE SAME

14   POSITION AS I WAS THERE LAST.

15   **BY MR. HIGGINBOTHAM:  Q.**  PHOTO 27, PLEASE, JOHN.

16          LOOKING AT PHOTOGRAPH 27, AGAIN WE'RE LOOKING AT

17   NOZZLE NUMBER ONE ON THE LEFT, DOES THIS PHOTO CORRECTLY DEPICT

18   THE ORIENTATION OF THE DROPS AND NOZZLES WHEN YOU LAST

19   INSPECTED ON 5/23/08?

20   **A.**  I CAN'T BE SURE.

21   **Q.**  AND WHY CAN'T YOU BE SURE SINCE YOU VISITED THIS SITE 14

22   SEPARATE TIMES?

23   **A.**  BECAUSE YOU CAN'T CONFIRM NOZZLES ARE CORRECTLY ORIENTED

24   WITHOUT A LASER POINTER.

25   **Q.**  CAN YOU SEE ANYTHING IN THE PHOTOGRAPH WHICH SUGGESTS TO

1  YOU THAT THEY ARE NOT IN THE SAME POSITION AS WHEN YOU LAST

2  VISITED THE SITE?

3  **MS. GREENBERG:**  OBJECTION.  ASKED AND ANSWERED.

4  **THE COURT:**  OVERRULED.

5  **THE WITNESS:**  IT APPEARS FROM THE PICTURE THAT THE

6  FRYER NOZZLE IS NOT COMPLETELY CENTERED.  AGAIN, I CAN'T BE

7  SURE WITHOUT CONFIRMING WITH A LASER POINTER.

8  **BY MR. HIGGINBOTHAM:  Q.**  WHEN YOU SAY IT APPEARS IT'S NOT

9  COMPLETELY CENTERED, WHAT DO YOU MEAN?

10  **A.**  I'M LOOKING AT THE PICTURE FROM AN ANGLE, THAT YOU CAN'T BE

11  SURE EXACTLY WHERE THAT NOZZLE IS POINTING TO.  COULD BE

12  2 INCHES THIS WAY, 1 INCH THE OTHER WAY.  MIGHT NOT BE THE

13  SAME.

14  **Q.**  FIGURE 32, PLEASE.  HERE WE HAVE ALL THREE NOZZLES, SHOWING

15  NOZZLE NUMBER THREE ON THE RIGHT, DOES THIS PICTURE DEPICT HOW

16  THE NOZZLES WERE ORIENTED THE LAST TIME YOU VISITED ON MAY 23RD

17  '08?

18  **A.**  I REMEMBER THEM BEING IN THAT ORDER, BUT NOT HOW THEY WERE

19  ORIENTED.

20  **Q.**  WHAT DOES THAT MEAN?

21  **A.**  FROM LEFT TO RIGHT THREE NOZZLES.

22  **Q.**  YES.

23  **A.**  BUT NOT THE NOZZLES ARE STILL IN THE SAME POSITION.

24  **Q.**  IS THERE ANYTHING IN THIS PHOTOGRAPH THAT SUGGESTS TO YOU

25  THAT THEY ARE -- THAT THE NOZZLES ARE ALIGNED DIFFERENTLY THAN

1    WHEN YOU LAST INSPECTED ON MAY 23RD '08?

2    **A.**  I CAN'T BE SURE FROM THE PICTURE.

3    **Q.**  ALL RIGHT.  LET'S LOOK AT PHOTO NUMBER 28.  NOW, THIS

4    PHOTOGRAPH IS LOOKING DIRECTLY INTO THE NORTH WALL, CORRECT?

5    **A.**  YES.

6    **Q.**  WE SEE WHAT WE CALL FRYER ONE, THE SMALL FRYER, FRYER TWO

7    THE INVOLVED FRYER, DO YOU SEE THAT?

8    **A.**  YES.

9    **Q.**  ABOVE THAT DO YOU SEE THE VERTICAL DROP FROM THE PIPE AND

10   THE VERTICAL DROP FROM THE NOZZLE ONE, DO YOU SEE THAT?

11   **A.**  YES, SIR.

12   **Q.**  NOW, DOES THIS PHOTOGRAPH -- STRIKE THAT.

13            A MINUTE AGO YOU SAID YOU COULDN'T REALLY TELL BECAUSE

14   YOU WOULD NEED TO SEE A PHOTO HEAD ON TO GET A CORRECT PICTURE?

15   **A.**  TO GET A BETTER IDEA.

16   **Q.**  SO DOES PHOTO NUMBER 32 CORRECTLY DEPICT THE ORIENTATION OF

17   THE DROPS AND NOZZLES WHEN YOU LAST INSPECTED ON 5/23/08?

18   **A.**  DOESN'T APPEAR TO ME THAT THE NOZZLES CENTERED ON THE

19   FRYER.  BUT THEN AGAIN I CAN'T BE SURE WITHOUT A LASER POINTER.

20   **Q.**  WHAT YOU'RE SAYING, IS THAT IF YOU LOOK AT THE NOZZLE HERE

21   AND DRAW A STRAIGHT LINE DOWN IT LOOKS LIKE IT'S HITTING THE

22   LEFT EDGE OF THE FRYER, CORRECT?

23   **A.**  IT APPEARS TO BE.

24   **Q.**  AND IS THAT THE WAY IT WAS WHEN YOU INSPECTED ON 5/23/08?

25   **A.**  NO.

1  **Q.**  WHERE WAS IT WHEN YOU INSPECTED ON 5/23/08?

2  **A.**  CENTERED ON THE FRYER.

3  **Q.**  SO IS IT YOUR TESTIMONY THEN, THAT BETWEEN THE TIME YOU

4  INSPECTED AND THE TIME THIS PHOTO WAS TAKEN SOMEONE MOVED THE

5  NOZZLE, IS THAT WHAT YOUR SUSPICION IS?

6          **MS. GREENBERG:**  OBJECTION.  CALLS FOR SPECULATION.

7          **THE COURT:**  OVERRULED.

8          **THE WITNESS:**  SOMEONE OR SOMETHING HAPPENED WITH THE

9  NOZZLE.  I BELIEVE.

10  **BY MR. HIGGINBOTHAM:  Q.**  YOU BELIEVE.  YOU HAVE NO KNOWLEDGE?

11  **A.**  I HAVE NO KNOWLEDGE.

12  **Q.**  THANK YOU.  LET'S PUT EXHIBIT 7 UP, PLEASE.  NEXT SHOW YOU

13  THREE EXHIBITS, EXHIBIT 79, AND THESE I THINK YOU'VE ALREADY

14  IDENTIFIED, THESE ARE THE INSPECTION REPORTS OF 5/18/07,

15  11/21/07 AND 5/23/08.  AND WE HAVE THE FIRST ONE UP NOW.  IT'S

16  HARD FOR US TO READ.

17          WOULD YOU READ ITEM NUMBER ONE ON THE INSPECTION

18  REPORT?

19  **A.**  NUMBER ONE, ALL APPLIANCES PROPERLY COVERED WITH CORRECT

20  NOZZLES.

21  **Q.**  SO THE PHRASE PROPERLY COVERED MEANS WHAT TO YOU AS THE

22  CERTIFIED INSPECTOR?

23  **A.**  IT'S A TWO PART CHECK, IF YOU WILL.  PROPERLY COVERED WOULD

24  MEAN THEY'RE PROPERLY ORIENTED AND PROPERLY AIMED.  AND CORRECT

25  NOZZLES, CORRECT TYPE OF NOZZLE.

1   **Q.**  DOES PROPERLY COVERED INCLUDE THE HEIGHT OF THE NOZZLE

2   ABOVE THE APPLIANCE?

3   **A.**  YES.

4   **Q.**  SO THERE ARE TWO THINGS YOU HAVE TO DO, THREE THINGS I

5   THINK YOU SAID, PROPERLY COVERED THE CORRECT NOZZLES MEANS THE

6   PROPER HEIGHT, THE PROPER NOZZLE AND THE PROPER AIM, IS THAT

7   TRUE?

8   **A.**  YES.

9   **Q.**  SO IF I UNDERSTOOD YOUR TESTIMONY YESTERDAY, WHEN YOU FIRST

10  SERVICED THIS ANSUL SYSTEM ON YOUR OWN AND YOU WERE IN CHARGE

11  OF SERVICING, YOU CHECKED THE HEIGHT, YOU CHECKED THE NOZZLE,

12  AND I FORGOT WHAT THE OTHER ONE WAS?

13  **A.**  APPLIANCES.

14  **Q.**  THANK YOU.  THE AIM, YOU CHECKED THE HEIGHT, THE AIM AND

15  THE NOZZLE THE FIRST TIME THAT YOU YOURSELF WERE IN CHARGE OF

16  THE INSPECTION, IS THAT TRUE?

17  **A.**  THAT'S CORRECT.

18  **Q.**  THEREAFTER, AS I UNDERSTAND IT, YOU NEVER CHECKED THE

19  HEIGHT, THE AIM OR THE CORRECT NOZZLE, IS THAT WHAT YOU'RE

20  SAYING?

21  **A.**  NOTHING EVER CHANGED, SO, NO, I DIDN'T CHECK THEM AGAIN.  I

22  DIDN'T MEASURE THE NOZZLE ANGLE OR MEASURE NOZZLE ANGLE TO GO

23  THROUGH WHETHER THE NOZZLE WAS THE CORRECT ONE, IT HAD BEEN

24  VERIFIED.

25  **Q.**  SO, AGAIN, THE FIRST TIME THAT YOU DID THIS WAS IN, I THINK

1   YOU SAID WITHIN TWO YEARS AFTER YOU STARTED, ROUGHLY '02, '03?

2   **A.**  YES, SIR.

3   **Q.**  SO '02, '03 WHEN YOU WERE IN CHARGE OF THE INSPECTION YOU

4   CHECKED THE HEIGHT, THE AIM AND WHETHER THE NOZZLE WAS CORRECT,

5   AND THEREAFTER YOU NEVER CHECKED IT AGAIN, IS THAT TRUE?

6          **MS. GREENBERG:**  OBJECTION.  I THINK MISSTATES HIS

7   TESTIMONY.  COUNSEL KEEPS STAYING AIM, HE SAYS APPLIANCE.

8          **THE COURT:**  OVERRULED.  YOU CAN SPEAK FOR YOURSELF.

9          **THE WITNESS:**  THE APPLIANCES NEVER CHANGED, SO I

10  DIDN'T HAVE TO MAKE SURE THE NOZZLE WAS STILL RIGHT OR SO, NO,

11  I DIDN'T CHECK THE NOZZLE HEIGHTS AND WHETHER THEY WERE COVERED

12  WITH THE CORRECT NOZZLES, THAT'S BEEN DONE.

13  **BY MR. HIGGINBOTHAM:  Q.**  AND ALSO THE AIM YOU ALREADY CHECKED

14  THAT ONCE, YOU DIDN'T CHECK IT AGAIN, CORRECT?

15  **A.**  CHECKED THE NOZZLE AIM EVERY INSPECTION.

16  **Q.**  SO THE THINGS THAT YOU DIDN'T CHECK, LET'S CALL THE '02 '03

17  INSPECTION, THE FIRST TIME, THE REMAINING ROUGHLY 12 OR 13

18  TIMES THAT YOU INSPECTED YOU NEVER CHECK THE HEIGHT AND YOU

19  NEVER CHECK WHETHER THE NOZZLE WAS CORRECT, IS THAT A TRUE

20  STATEMENT?

21  **A.**  IT'S TRUE.

22  **Q.**  SO IF I UNDERSTAND YOU CORRECTLY THEN, DURING THE 12 OR 13

23  TIMES, LET ME TELL YOU HOW I DID THE MATH, TWICE A YEAR WAS THE

24  INSPECTION, CORRECT?

25  **A.**  SURE.

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1  **Q.** YOU STARTED '02, '03, UP UNTIL MAY OF '08 THAT'S EITHER 12

2  OR 13 INSPECTION, YOU AGREE WITH THAT?

3  **A.** RIGHT IN THERE, YES.

4  **Q.** SO YOU INSPECTED IT ONCE, AND THEN FOR THE NEXT 11, 12, OR

5  13 TIMES YOU ASSUMED THAT THE HEIGHT AND THE NOZZLES WERE

6  CORRECT, YOU DIDN'T CHECK THEM, IS THAT A CORRECT STATEMENT?

7  **A.** THAT'S CORRECT.

8  **Q.** THE BOTTOM OF THIS FORM -- BEFORE WE DO THAT, I ALSO HAVE

9  IN FRONT OF YOU EXHIBITS 7, PARDON ME, 8 AND 9, WHICH ARE THE

10  NEXT TWO INSPECTION REPORTS.  SINCE THERE ARE ONLY THREE WE

11  HAVE ALL THREE IN FRONT OF US.

12      WOULD YOUR ANSWER BE THE SAME TO THE SERIES OF

13  QUESTIONS REGARDING THE FOLLOWING TWO INSPECTION REPORTS.  THAT

14  YOU NEVER CHECKED THE NOZZLE TYPE OR THE HEIGHT DURING THOSE

15  INSPECTIONS?

16  **A.** YES.

17  **Q.** NOW, IF WE LOOK AT THE BOTTOM OF EXHIBIT NUMBER 7, I WOULD

18  LIKE FOR YOU TO READ FOR ME, PLEASE READ FOR THE JURY THE TWO

19  THINGS, I WANT YOU TO READ ALOUD IT'S HARD FOR US TO READ, BUT

20  I'LL SHOW THE POINTER UP HERE, SAYS ON THIS DATE, WOULD YOU

21  READ THAT ALOUD, PLEASE?

22  **A.** ON THIS DATE THE RANGE FIRE SUPPRESSION SYSTEM WAS

23  INSPECTED AND OPERATIONALLY TESTED IN ACCORDANCE WITH THE FIRE

24  SUPPRESSION SYSTEM REQUIREMENTS PA17 OR 17A COMMA, 96 AND THE

25  MANUFACTURING MANUAL WITH RESULTS INDICATED ABOVE.

1          **MS. GREENBERG:**  YOUR HONOR, OBJECTION, WHAT'S

2    INDICATED ON THE SCREEN AND WHAT MR. WILLIAMS JUST READ APPEARS

3    TO BE A DIFFERENT DOCUMENT.

4          **THE COURT:**  I AGREE, SO WHY DON'T YOU REPHRASE WITH

5    CLARITY AS TO WHICH EXHIBIT YOU'RE REFERRING TO.

6          **MR. HIGGINBOTHAM:**  I WAS REFERRING TO EXHIBIT NUMBER 7

7    AND THAT'S WHAT UP NOW, JOHN?  I THINK YOU READ FROM.

8          **THE WITNESS:**  NUMBER 8.

9          **MR. HIGGINBOTHAM:**  I THINK SO, MY FAULT.  IT'S ON THE

10   BACK.  LET'S TRY AGAIN, WE HAVE EXHIBIT NUMBER 7 IN FRONT OF

11   YOU.

12         **MR. SULLIVAN:**  WHAT NUMBER IS IT RW?

13         **MR. HIGGINBOTHAM:**  ONE.

14   **Q.**  WHY DON'T YOU BLOWUP THE DATE IN THE UPPER RIGHT HAND

15   CORNER, MAKE SURE WE'RE LOOKING AT THE SAME DOCUMENT.  5/18/07,

16   IS THAT IN FRONT OF YOU, SIR?

17   **A.**  YES, SIR.

18   **Q.**  SO LET'S START AT THE BOTTOM OF THAT PAGE.

19   **A.**  ON THIS DATE THE ABOVE SYSTEM WAS TESTED AND INSPECTED AND

20   IN ACCORDANCE WITH PROCEDURES OF THE PRESENTLY ADOPTED EDITIONS

21   OF NFPA 17 COMMA 17A COMMA 96, AND THE MANUFACTURER'S MANUAL

22   WAS OPERATING ACCORDING TO THE PROCEDURES OF THE RESULTS

23   INDICATED ABOVE.

24   **Q.**  IS THERE ANYTHING IN NFPA 17, 17A, 96, OR THE ANSUL MANUAL

25   WHICH ALLOWS YOU TO CHECK THE BOX THAT YOU CHECKED THESE

1    APPLIANCES, IS THERE ANYTHING ALLOWS YOU TO ASSUME THAT THEY

2    HAVEN'T CHANGED?

3    **A.**  MAYBE NOT IN THAT VERBIAGE.

4    **Q.**  CHOOSE YOUR VERBIAGE?

5    **A.**  MY VERBIAGE WOULD BE I VERIFIED THE NOZZLES ARE CORRECT FOR

6    APPLIANCES, THE APPLIANCES DID NOT CHANGE, THEREFORE, THEY WERE

7    STILL THE CORRECT NOZZLES.

8    **Q.**  CHECKED THAT ONCE, BUT FOR THE NEXT 12 OR 13 TIMES YOU

9    ASSUME THEY WERE THE SAME, MY QUESTION TO YOU IS, BY MAKING

10   THAT ASSUMPTION IS THAT IN COMPLIANCE WITH THE PROCEDURES SET

11   FORTH IN NFPA 17, 17A, 96, OR THE ANSUL MANUAL?

12   **A.**  NO, ASSUMING NOT SUPPOSE TO ASSUME.

13   **Q.**  LET'S LOOK AT THE BOTTOM OF THIS PAGE, PLEASE.  STILL ON

14   EXHIBIT 7.  WOULD YOU READ ALOUD STARTING WITH THE WORDS THE

15   ABOVE SERVICE TECHNICIAN?

16   **A.**  THE ABOVE SERVICE TECHNICIAN CERTIFIES THAT THE SYSTEM WAS

17   PERSONALLY INSPECTED AND FOUND CONDITIONS TO BE AS INDICATED ON

18   THIS REPORT.

19   **Q.**  SO WHEN YOU USE THE TERM CERTIFIED THE SYSTEM WAS

20   PERSONALLY INSPECTED, IS THAT A TRUE STATEMENT SINCE YOU DID

21   NOT ACTUALLY CHECK THE HEIGHT AND NOZZLE TYPE ON AT LEAST 13

22   OCCASIONS?

23   **A.**  I'M SORRY, REPEAT THE QUESTION?

24   **Q.**  IS THAT A TRUE STATEMENT WHERE YOU SAY, FIRST OF ALL, YOU

25   SIGNED THIS REPORT, RIGHT?

1   A.  YES, SIR.

2   Q.  SO WHERE IT SAYS THE ABOVE SERVICE TECHNICIAN, THAT'S YOU,

3   MR. WILLIAMS, RIGHT?

4   A.  YES.

5   Q.  SO IT SAYS MR. WILLIAMS CERTIFIES THE SYSTEM WAS PROPERLY

6   INSPECTED AND FOUND CONDITIONS TO BE AS INDICATED IN THE

7   REPORT, RIGHT?

8   A.  YES.

9   Q.  SO WHEN YOU CERTIFIED THE SYSTEM YOU WERE CERTIFYING

10  SOMETHING THAT YOU HADN'T ACTUALLY CHECKED ON AT LEAST 12 OR 13

11  OCCASIONS, CORRECT?

12  A.  I CHECKED IT AND NOTHING CHANGED, SO I DID NOT RECHECK THE

13  NOZZLE TYPE FROM THAT POINT FORWARD.

14  Q.  AND THE SAME LANGUAGE IS USED ON EXHIBIT 8 AND EXHIBIT 9

15  REGARDING THOSE TWO SENTENCES THAT YOU JUST READ TO US, RIGHT?

16  YOU CAN READ THEM SEPARATELY IF YOU WISH.

17  A.  THE VERBIAGE -- ON THIS DATE THE VERBIAGE HERE?

18  Q.  YES.

19  A.  WORDED DIFFERENTLY.

20  Q.  WHICH ONE?  LET'S GO TO 8.

21  A.  THIS IS 9.

22  Q.  COMPARE 7 AND 8, ARE THEY THE SAME?

23  A.  NO, VERBIAGE IS DIFFERENT ON 7 AND 8.

24  Q.  WOULD YOU READ 8 FOR US?  WOULD YOU PUT EXHIBIT 2 UP THERE.

25  A.  THE ON THIS DATE?

1   **Q.**  YES.

2   **A.**  ON THIS DATE A RANGE HOOD FIRE SUPPRESSION SYSTEM WAS

3   INSPECTED AND OPERATIONALLY TESTED IN ACCORDANCE WITH FIRE

4   SUPPRESSION SYSTEM REQUIREMENTS OF NFPA 17 OR 17A COMMA 96, AND

5   THE MANUFACTURER'S MANUAL COMMA WITH RESULTS INDICATED ABOVE.

6   **Q.**  AND THE NEXT SENTENCE BELOW READS THE SAME, RIGHT, YOUR

7   CERTIFICATION, RIGHT?

8   **A.**  THE ABOVE TECHNICIAN?

9   **Q.**  YES.

10  **A.**  YES.

11  **Q.**  AND, AGAIN, YOU WERE THE PERSON THAT MADE THAT STATEMENT,

12  YOU WERE THE ONE THAT CERTIFIED IT, CORRECT?

13  **A.**  YES, SIR.

14  **Q.**  AND LET'S COMPARE THE LANGUAGE ON 9.  IS THERE A CHANGE?

15  **A.**  THE ABOVE TECHNICIAN AGAIN?

16  **Q.**  JUST COMPARE WITH 8, DOES IT READ THE SAME, IF IT DOES WE

17  DON'T --

18  **A.**  AT THE VERY BOTTOM, YES, IT'S THE SAME.

19  **Q.**  LET'S GO BACK TO 7, PLEASE.  WHICH IS ONE, JOHN, THANK YOU.

20          THIS THE CHECKLIST, AGAIN IT'S HARD FOR US TO READ,

21  BUT WHAT DOES ITEM NUMBER FOUR READ?

22  **A.**  NUMBER FOUR, SYSTEM INSTALLED IN ACCORDANCE WITH THE

23  MANUFACTURER UL LISTING.

24  **Q.**  THAT BOX WAS CHECKED BY YOU, CORRECT?

25  **A.**  YES.

1  **Q.**  SO WHAT DID YOU DO TO DETERMINE THAT THE SYSTEM WAS

2  INSTALLED IN ACCORDANCE WITH THE ABBREVIATION MFG IS

3  MANUFACTURER, CORRECT?

4  **A.**  YES.

5  **Q.**  MANUFACTURER UL, WHAT DID YOU DO TO DETERMINE THAT THE

6  SYSTEM WAS INSTALLED WITH THE MANUFACTURER'S UL LISTING?

7  **A.**  THERE'S NUMEROUS DETERMINATIONS THAT WERE ALL MADE THE

8  FIRST TIME I SERVICED THE SYSTEM ALONE, AND MADE SURE THAT ALL

9  THE COMPONENT WERE CORRECT, ET CETERA.

10  **Q.**  NOW, THE UL LISTING, WHAT IS UL, FIRST OF ALL?

11  **A.**  UNDERWRITERS LABORATORY.

12  **Q.**  WHAT IS THE UL LISTING FOR THIS ANSUL SYSTEM?

13  **A.**  UL 300 LAB CHEMICAL FIRE SUPPRESSION SYSTEM.

14  **Q.**  SO WHAT DOES -- THE STATEMENT THEN READS, IS THAT YOU

15  DETERMINE THE SYSTEM WAS INSTALLED IN ACCORDANCE WITH THE

16  MANUFACTURER'S UL300 LISTING, CORRECT?

17  **A.**  YES, SIR.

18  **Q.**  YOU ONLY DID THAT ONCE WHEN YOU FIRST TESTED THE SYSTEM; IS

19  THAT CORRECT?

20  **A.**  YES.

21  **Q.**  SO ON THE REMAINING 11, 12, 13 TIMES EVEN THOUGH YOU

22  CHECKED THAT BOX, YOU DID NOT DETERMINE THE SYSTEM WAS

23  INSTALLED IN ACCORDANCE WITH UL?

24  **A.**  IT HAD BEEN DETERMINED.

25  **Q.**  RIGHT.  YOU ASSUMED NOTHING CHANGED?

1    **A.**  I VERIFIED NOTHING CHANGED.  NO APPLIANCES.

2    **Q.**  LET'S LOOK AT NUMBER 17, PLEASE.  AGAIN, ON EXHIBIT 7.

3    WOULD YOU READ THAT, PLEASE?

4    **A.**  I'M SORRY, WHAT NUMBER?

5    **Q.**  17.

6    **A.**  NUMBER 17, CLEAN NOZZLES.

7    **Q.**  AND THE BOX IS CHECKED?  EACH TIME YOU SERVICED EITHER THE

8    13 OR 14 TIMES, DID YOU CLEAN ALL FIVE NOZZLES?

9    **A.**  YES.

10   **Q.**  TELL US WHAT YOU DID TO CLEAN THE NOZZLES?

11   **A.**  WE CLEANED THE OUTSIDE OF THE NOZZLES BY HAND WITH A RAG.

12   VERIFIED THE NOZZLE CAP IN PLACE.  IF IT'S NOT IN PLACE YOU

13   HAVE TO ASSUME THE NOZZLE IS CLOGGED, REMOVE THE NOZZLE, REMOVE

14   THE SCREEN, IF NECESSARY, AND I BLOW DRY AIR, DRY NITROGEN

15   THROUGH AN ADAPTOR THAT FITS THE NOZZLE, SO THAT ALL GREASE IS

16   BLOWN OUT OF THE NOZZLE AND CLEAN THE SCREEN.  PUT IT BACK

17   TOGETHER, IF NECESSARY.

18   **Q.**  I THINK AS PART OF YOUR ANSWER YOU SAID IN THE CLEANING

19   PROCESSING IF THE CAP IS MISSING YOU ASSUME THE NOZZLE IS

20   CLOGGED, CORRECT?

21   **A.**  YES, YOU HAVE TO.

22   **Q.**  I'M GOING TO SHOW PHOTO FIGURE 35.  CAN YOU IDENTIFY WHAT'S

23   SHOWN IN THIS PHOTOGRAPH?

24   **A.**  IT'S A --

25           **MS. GREENBERG:**  OBJECTION.  CALLS FOR SPECULATION.

1        **THE COURT:**  OVERRULED.

2          **THE WITNESS:**  FIRE SYSTEM NOZZLE.

3     **BY MR. HIGGINBOTHAM:   Q.**   IDENTIFY THE PARTS TOP TO BOTTOM?

4     **A.**  THE NOZZLE TOP, NOZZLE BUSHING IN THE MIDDLE, NOZZLE SCREEN

5     IN THE BOTTOM.

6     **Q.**  AND IS THAT THE COMPLETE DISASSEMBLY OF ANY BEGIN NOZZLE,

7     HAS THREE PARTS TO IT?

8     **A.**  YES.  I'M SORRY, THE NOZZLES HAVE CHANGED SINCE THEN, THE

9     SCREEN IS DIFFERENT THERE'S NO BUSHING.

10    **Q.**  SINCE THE FIRE?

11    **A.**  COMPONENTS CHANGED SOME TIME AFTER THIS FIRE SYSTEM WAS

12    INSTALLED.  NEW MODELS.

13    **Q.**  I HAVE BEFORE YOU FIGURE 36, HAVE YOU SEEN THIS PICTURE

14    BEFORE TODAY?

15    **A.**  I SAW IT YESTERDAY, I BELIEVE.

16    **Q.**  AND BASED ON YOUR TRAINING, YOUR CERTIFICATION, ET CETERA,

17    WOULD YOU CONSIDER THAT TO BE A CLOGGED NOZZLE?

18         **MS. GREENBERG:**  OBJECTION.  CALLS FOR SPECULATION.

19         **THE COURT:**  OVERRULED.

20         **THE WITNESS:**  IT'S A DIRTY NOZZLE, I WOULD HAVE TO

21    INSPECT TO DETERMINE IF IT WAS CLOGGED.

22    **BY MR. HIGGINBOTHAM:   Q.**   IF YOU SAW THAT NOZZLE AS PART OF

23    YOUR JOB WOULD YOU CLEAN IT?

24    **A.**  ABSOLUTELY.

25    **Q.**  YOU CLEAN IT WHY?  BECAUSE YOU'RE WORRIED IT WOULDN'T BE AS

```
1   EFFECTIVE AS IF IT WERE PERFECTLY CLEAN, RIGHT?

2   A.  I WOULD CLEAN IT BECAUSE IT'S MY JOB TO MAKE SURE IT'S

3   CLEAN.  I DON'T KNOW HOW EFFECTIVE THE NOZZLE WOULD BE.

4   Q.  DURING THE 13 AND 14 TIMES THAT YOU INSPECTED THE NOZZLES,

5   HAVE YOU EVER SEEN -- DID YOU EVER SEE A WITNESS -- A NOZZLE --

6   NOT A NOZZLE -- A FILTER THAT LOOKED LIKE THIS ON FIGURE 36?

7   A.  I DON'T RECALL AT THE CANDY STICK EVER SEEING ONE IN THAT

8   CONDITION, NO.

9   Q.  NOW, I THINK YOU SAID EARLIER THAT IF THE CAP IS NOT IN

10  PLACE YOU HAVE TO MAKE AN ASSUMPTION THAT THE NOZZLE IS DIRTY,

11  RIGHT?

12  A.  YES, YOU CAN'T BE SURE HOW LONG THAT NOZZLE CAP WAS

13  MISSING.  THE NOZZLE MOST LIKELY CLOGGED.

14  Q.  YOU CAN TAKE THAT DOWN.

15       WOULD YOU AGREE WITH ME THAT THE INDUSTRY GUIDELINES

16  THAT FORM THE BASIS OF THE INSPECTION REPORTS THAT WE'VE BEEN

17  LOOKING AT ARE INCLUDED IN THE ANSUL MANUAL AND THE VARIOUS

18  NFPA SECTIONS THAT WE READ?

19  A.  NFPA AND THE MANUAL?

20  Q.  YES.

21  A.  THEY HAVE DIFFERENCES.

22  Q.  BUT THE GUIDELINES THAT YOU FOLLOWED INCLUDE BOTH THE ANSUL

23  MANUAL AND NFPA 17, 17A AND 96, CORRECT?

24  A.  THE ANSUL MANUAL SOMETIMES HAS OTHER REQUIREMENTS BESIDES

25  17A AND 96 ARE GENERAL REQUIREMENTS AND ANSUL SPECIFIC TO THE
```

1   ANNUAL SYSTEM.  THEY ARE NOT ALWAYS ON -- IN LINE WITH ONE

2   ANOTHER.

3   **Q.**  I'D LIKE TO READ FROM YOUR DEPOSITION, PLEASE, DEPOSITION

4   PAGE 61, LINES 20 TO 25.

5        **THE COURT:**  TRYING TO CROSS-EXAMINE HIM WITH THAT, IF

6   SO, CAN SOMEBODY SHOW ME?

7        **MR. HIGGINBOTHAM:**  SORRY.

8        **MS. GREENBERG:**  SORRY, WHAT PAGE?

9        **MR. HIGGINBOTHAM:**  61, 20 TO 25.  MAY I APPROACH, YOUR

10  HONOR.

11       **THE COURT:**  YES.  THANK YOU.

12       IS THIS IN MATERIALS ALREADY SUBMITTED?  BEFORE I OPEN

13  IT UP IS THIS SOMETHING YOU'VE ALREADY GOTTEN IN YOUR EXHIBITS

14  SOMEWHERE?

15       I DON'T SEE IT'S THE SAME QUESTION.  YOU'LL HAVE TO

16  CLARIFY HIS TESTIMONY.

17  **BY MR. HIGGINBOTHAM:  Q.**  MR. WILLIAMS, ARE THERE ANY INDUSTRY

18  GUIDELINES OR STANDARDS INSPECTING THE ANSUL SYSTEM OR THE FIRE

19  SUPPRESSION SYSTEM GENERALLY?

20  **A.**  GENERALLY NFPA 17A NOT HAVE THE SAME REQUIREMENTS AS THE

21  ANSUL MANUAL HAS.  I'M SORRY, MAYBE I MISUNDERSTOOD.  OTHER

22  GENERAL REQUIREMENTS FOR THE ANSUL SYSTEM.

23  **Q.**  ARE THERE ANY INDUSTRY GUIDELINES OR STANDARDS FOR

24  INSPECTING THE ANNUAL SYSTEM OR FIRE SUPPRESSION SYSTEMS

25  GENERALLY?

1    **A.**  I DON'T UNDERSTAND WHAT GENERALLY MEANS.

2    **Q.**  DO YOU RECALL YOU ANSWERED THAT QUESTION YES IN YOUR

3    DEPOSITION?

4    **A.**  I MUST HAVE ANSWERED A QUICK YES WITHOUT THINKING IT

5    THROUGH.

6    **Q.**  IS THE FOLLOW-UP QUESTION I ASKED, WHAT ARE THEY, IN OTHER

7    WORDS, WHAT ARE THE INDUSTRY GUIDELINES, DO YOU RECALL THAT

8    QUESTION IN YOUR DEPOSITION?

9    **A.**  I DON'T.

10   **Q.**  LET ME READ YOUR ANSWER.  LET ME READ BOTH, IF I MAY, YOUR

11   HONOR?

12        **THE COURT:**  IF YOU'RE ASKING HIM ABOUT WHAT HE

13   TESTIFIED BEFORE, YOU CAN SHOW HIM WHAT YOU'RE ASKING HIM.

14        **MR. HIGGINBOTHAM:**  SHOW HIM?

15        **THE COURT:**  YES.

16   **BY MR. HIGGINBOTHAM:   Q.**  SHOWING YOU CONDENSED VERSION, YOUR

17   TRANSCRIPT SHOWING YOU PAGE 61, LINES 20 THROUGH 25.

18   **A.**  YES, I REMEMBER.

19   **Q.**  SO MY QUESTION IS, THE INDUSTRY GUIDELINES ARE SET FORTH ON

20   THE INSPECTION REPORT, CORRECT?

21   **A.**  THIS INSPECTION REPORT?

22   **Q.**  YES.

23   **A.**  YES.  ANSUL REQUIRES OTHER THINGS THAT ARE NOT ON THIS

24   REPORT, THIS IS A GENERAL REPORT.  THIS IS A GENERAL SOMEWHAT

25   GENERIC REPORT, IF YOU WILL.  ANSUL REQUIRES SOME THINGS THAT

1   ARE NOT ON THIS.  THIS IS NOT AN ANSUL REPORT.

2   **Q.**  THE REPORT THAT YOU USED TO INSPECT, DID YOU RELY ON THE

3   ANSUL MANUAL?

4   **A.**  YES.

5   **Q.**  AND ARE ALL OF THE ANSUL REQUIREMENTS SET FORTH ON YOUR

6   INSPECTION REPORT?

7   **A.**  NO.

8   **Q.**  WHAT ANSUL REQUIREMENTS ARE NOT ON YOUR INSPECTION REPORT?

9   **A.**  REPLACEMENT OF NOZZLE CAPS, VERIFICATION OF THE FUSIBLE

10  LINK DETECTION SYSTEM, MINIMUM MAXIMUM DISTANCES TO THE

11  ACTIVATION, CONTROLS BOX OF THE ANSUL SYSTEMS.  THOSE ARE TWO

12  THAT COME TO MIND.

13  **Q.**  YOU SAID REPLACEMENT OF THE, CAPS THAT'S INCLUDE IN THE

14  ANSUL DOCUMENT BUT NOT INCLUDED IN YOUR INSPECTION REPORT?

15  **A.**  IT'S NOT INCLUDED IN THE INSPECTION REPORT OR 17A, THERE'S

16  NO NOZZLE REPLACEMENT REQUIREMENT.

17  **Q.**  AND DURING YOU'RE INSPECTION DO YOU RELY ON THE NFPA

18  GUIDELINES, NATIONAL FIRE PROTECTION ASSOCIATION, IN PARTICULAR

19  NFPA GUIDELINES 17, 17A AND 96?

20  **A.**  NO, I RELY ON THE ANSUL MANUAL.

21  **Q.**  EVEN THOUGH EARLIER WE SHOWED YOUR CERTIFICATION, THAT THE

22  SYSTEM IS TESTED AND INSPECTED IN ACCORDANCE WITH THE NFPA 17,

23  17A AND 96, IS THAT AN INCORRECT STATEMENT?

24  **A.**  DISCREPANCIES BETWEEN ANSUL MANUAL AND 17A.  SO I WOULD

25  SAY, YES, THEY'RE NOT CONSISTENT AND ABOVE ALL USING ANSUL

1   MANUAL IT'S AN ANSUL SYSTEMS.

2   **Q.**  SO WHEN YOU CERTIFIED THAT THE SYSTEM WAS TESTED AND

3   INSPECTED IN ACCORDANCE WITH THE NFPA 17, 17A AND 96, YOU MADE

4   THAT CERTIFICATION, THAT WAS NOT A TRUE STATEMENT?

5   **A.**  THE ANSUL MANUAL SAYS THAT, IT IS WRITTEN IN ACCORDANCE

6   WITH 17A.  THE ANSUL MANUAL SHOULD COVER ALL THOSE NFPA

7   STANDARDS FOR CERTIFICATION 17, 17A AND 96.  THE ANSUL MANUAL

8   FAR MORE DETAILED, INCLUSIVE OF THOSE, IF APPLICABLE INCLUSIVE

9   OF THOSE NFPA STANDARDS.

10  **Q.**  WHEN YOU MADE THE CERTIFICATION ON 14 SEPARATE OCCASIONS,

11  ROUGHLY, DID YOU REVIEW NFPA 17, 17A OR 96 BEFORE YOU CERTIFIED

12  YOU TESTED IN ACCORDANCE WITH THE NFPA SECTIONS?

13  **A.**  IF I COULD FIND THE ANSWER IN THE ANSUL MANUAL I WOULD

14  REFER TO 17, BUT I DON'T RECALL INSTANCES WHERE I REFERRED TO

15  17 FOR SERVICE AT THE CANDY STICK.

16  **Q.**  THE QUESTION WAS, PRIOR TO THE TIME YOU SIGNED THESE

17  CERTIFICATIONS ON ROUGHLY 14 DIFFERENT OCCASIONS, DID YOU

18  REVIEW THE NFPA MANUALS, SPECIFICALLY SECTION 17, 17A AND 96,

19  BEFORE YOU CERTIFIED IT WAS TESTED IN ACCORDANCE WITH THE NFPA

20  SECTIONS?

21  **A.**  YES, I REVIEWED 17, 17A AND 96.

22        **MR. HIGGINBOTHAM:**  YOUR HONOR, I REFER TO DEPOSITION

23  TESTIMONY PAGE 64, 25, THROUGH 65, SIX.

24        **THE COURT:**  APPEARS TO ME TO BE A DIFFERENT QUESTION.

25  **BY MR. HIGGINBOTHAM:  Q.**  MR. WILLIAMS, DO YOU RECALL ANYTIME

1   PRIOR TO THE FIRE THAT OCCURRED ON SEPTEMBER 18TH 2008, THAT

2   YOU REVIEWED THE NFPA GUIDELINES TO DETERMINE WHETHER YOU WERE

3   IN COMPLIANCE WITH THEM WITH REGARD TO THE INSPECTION OF THE

4   FIRE SUPPRESSION SYSTEM?

5   **A.**  I'M FAMILIAR WITH NFPA 17, 17A AND 96, I WOULDN'T SAY I

6   REVIEWED THEM RIGHT BEFORE I WENT IN AND SERVICED THE FIRE

7   SYSTEM, BUT I REVIEWED THEM BEFORE I EVER STARTED SERVICING

8   SYSTEMS.

9   **Q.**  MAY I READ THE QUESTION AND ANSWER, YOUR HONOR, FROM YOUR

10  DEPOSITION PAGES 64, LINE 25 THROUGH PAGE 65 LINE 6.

11          AT THE TIME YOU GAVE THESE ANSWERS YOU WERE UNDER

12  OATH, DO YOU UNDERSTAND THAT?

13  **A.**  YES.

14  **Q.**  HERE'S THE QUESTION:  "OKAY.  DO YOU RECALL ANYTIME PRIOR

15  TO THE FIRE, WHEN I SAID THE FIRE I'M REFERRING TO THE FIRE

16  OCCURRING ON SEPTEMBER 18TH 2008, THAT YOU REVIEWED THE NFPA

17  GUIDELINES TO DETERMINE WHETHER YOU WERE COMPLYING WITH THEM

18  WITH REGARD TO INSPECTION OF THE FIRE SUPPRESSION SYSTEMS?

19          "ANSWER:  NOT THAT I RECALL."

20          DOES THAT REFRESH YOUR MEMORY YOU DID NOT REVIEW THE

21  STANDARDS AT ANY TIME PRIOR TO THE FIRE?

22  **A.**  I DON'T RECALL THE SPECIFIC.

23          **MS. GREENBERG:**  OBJECTION.  MISCHARACTERIZING THE

24  TESTIMONY.

25          **MR. HIGGINBOTHAM:**  I DIDN'T HEAR THE OBJECTION.

1      **MS. GREENBERG:**  OBJECTION, MISCHARACTERIZING THE

2  TESTIMONY.

3      **THE COURT:**  OVERRULED.

4      **THE WITNESS:**  I DON'T RECALL SPECIFIC TIME READING THE

5  MANUALS BEFORE THE INSPECTION AT CANDY STICK, I WAS FAMILIAR

6  WITH THE MATERIAL.

7  **BY MR. HIGGINBOTHAM:  Q.**  DID YOU CONSULT THE ANSUL MANUAL

8  BEFORE ANY INSPECTION?

9  **A.**  CONSISTENTLY REVIEWED THE MANUAL.

10  **Q.**  PARDON?

11  **A.**  CONSISTENTLY REVIEWING THE ANSUL MANUAL.

12      **MR. HIGGINBOTHAM:**  YOUR HONOR, DEPOSITION TESTIMONY

13  PAGE 62 LINE 24 THROUGH PAGE 63 LINE FIVE.

14      **THE COURT:**  THOSE ARE DIFFERENT QUESTIONS THAN WHAT

15  YOU ASKED HERE IN COURT.

16  **BY MR. HIGGINBOTHAM:  Q.**  DO YOU RECALL CONSULTING THE ANSUL

17  CATALOG OR THE MANUAL IN CONNECTION WITH ANY INSPECTION YOU DID

18  AT CANDY STICK?

19  **A.**  MOST LIKELY ON MY DETERMINATION OF WHETHER THE FIRST TIME I

20  SERVICED THE FIRE SYSTEM BY MYSELF I WOULD HAVE HAD TO REFER TO

21  THE ANSUL MANUAL TO MAKE SURE THE SYSTEM WAS INSTALLED.

22      **MR. HIGGINBOTHAM:**  MAY I READ QUESTION AND ANSWER,

23  YOUR HONOR?

24      **THE COURT:**  YOU MAY.

25      **MR. HIGGINBOTHAM:**  AT YOUR DEPOSITION TAKEN ON MARCH

1    24TH 2011 YOU -- I'LL GIVE YOU THE QUESTION AND ANSWER YOU GAVE

2    UNDER OATH.

3                "QUESTION:  OKAY.  DO YOU RECALL CONSULTING THE ANSUL

4    CATALOG, WHAT DO YOU CALL IT MANUAL?

5                "ANSWER:  MANUAL.

6                "QUESTION:  IN CONNECTION WITH ANY INSPECTION YOU DID

7    AT CANDY STICK?

8                "ANSWER:  NO, THE SYSTEM WAS VERY STRAIGHTFORWARD AND

9    A VERY SIMPLE LAYOUT."

10               DO YOU RECALL GIVING THAT TESTIMONY?

11   **A.**  YES.

12   **Q.**  SO YOUR ANSWER ON THE STAND TODAY WAS YOU REVIEWED IT AND

13   YOUR ANSWER AT YOUR DEPOSITION WAS THAT YOU DID NOT REVIEW IT,

14   WHICH IS CORRECT?

15   **A.**  THAT I REVIEWED IT.

16   **Q.**  WHY DID YOU SAY NO DURING YOUR DEPOSITION?

17   **A.**  I MIGHT HAVE BEEN THINKING ABOUT DURING THE SERVICES.  AND

18   NOT ALL THE WAY BACK TO THE VERY FIRST TIME I SERVICED THE

19   SYSTEM BY MYSELF.

20   **Q.**  READ THE QUESTION AGAIN.

21               "DO YOU RECALL CONSULTING THE ANSUL CATALOG, WHAT DO

22   YOU IT MANUAL?

23               YOUR ANSWER, MANUAL.  QUESTION GOES ON --

24               **THE COURT:**  COUNSEL, WE DON'T NEED TO HEAR IT AGAIN.

25   MOVE ON.

1          **MR. HIGGINBOTHAM:**  ALL RIGHT.

2     **Q.**  NOW, YESTERDAY WE ESTABLISHED THERE ARE FORMS THAT ARE

3     MISSING SUPPOSED TO KEEP THEM FIVE YEARS, WE ONLY HAVE THREE IN

4     FRONT OF US, SO IF -- SUPPOSED TO INSPECT EVERY SIX MONTHS

5     THERE SHOULD BE 10 FORMS OVER A FIVE YEAR PERIOD, DO YOU AGREE

6     WITH THAT SO FAR?

7     **A.**  YES.

8     **Q.**  WE DON'T HAVE THE FORMS WITH US, BUT TO THE BEST OF YOUR

9     MEMORY WERE THE OTHER SEVEN FORMS IN THE SAME FORMAT AS WHAT WE

10    HAVE SHOWN THE JURY HERE TODAY?

11    **A.**  I BELIEVE THEY'RE VERY SIMILAR.  BUT AS WE SEEN TODAY THE

12    VERBIAGE CAN BE A LITTLE BIT DIFFERENT.  DOWN AT THE BOTTOM.

13    **Q.**  IN TERMS OF WHAT YOU CERTIFIED THE LANGUAGE IS A LITTLE

14    DIFFERENT, CORRECT?

15    **A.**  YEAH, IT MAY HAVE BEEN -- THE OLDER FORMS MIGHT NOT HAVE

16    BEEN AS DETAILED.

17    **Q.**  BUT IN TERMS OF THE CHECKLIST, WERE YOU CHECKING THE SAME

18    ITEMS ON THOSE FORMS THAT WE DON'T HAVE IN FRONT OF US?

19    **A.**  I WOULD SAY, YES.

20    **Q.**  AS PART OF YOUR INSPECTION OF THE ANSUL SYSTEMS, DO YOU

21    RECALL NOTIFYING MS. ELLEBRECHT OF A GREASE BUILD UP YOU WERE

22    CONCERNED ABOUT?

23    **A.**  WE SPOKE OF RECENT ACCUMULATION.

24    **Q.**  THE GREASE ACCUMULATION CONCERNED YOU, DIDN'T IT?

25    **A.**  TO A DEGREE.

| | |
|---|---|
| 1 | **Q.** YOU CONSIDERED IT POSSIBLY A DANGEROUS CONDITION THE GREASE |
| 2 | BUILD UP? |
| 3 | **MS. GREENBERG:** OBJECTION. MAY CALL FOR EXPERT |
| 4 | OPINION. |
| 5 | **THE COURT:** OVERRULED. |
| 6 | **THE WITNESS:** I DON'T KNOW HOW MUCH GREASE IS TOO MUCH |
| 7 | GREASE OR WHAT COULD BE CONSIDERED DANGEROUS. |
| 8 | **BY MR. HIGGINBOTHAM: Q.** DID YOU WARN MS. ELLEBRECHT, DID YOU |
| 9 | CONSIDER IT TO BE DANGEROUS? |
| 10 | **A.** NO. |
| 11 | **Q.** YOU DID NOT? |
| 12 | **A.** I DID NOT WARN HER. |
| 13 | **Q.** DID YOU HAVE ANY COMMUNICATIONS WITH MS. ELLEBRECHT ABOUT |
| 14 | YOUR CONCERN ABOUT THE AMOUNT OF GREASE THAT YOU OBSERVED? |
| 15 | **A.** YES, WE SPOKE OF GREASE BUILD UP. NEED TO CLEAN THE HOOD. |
| 16 | **Q.** DO YOU RECALL HER TESTIMONY YESTERDAY THAT SHE NEVER WAS |
| 17 | TOLD ANY SUCH THING BY YOU? |
| 18 | **A.** I DO. |
| 19 | **Q.** AND I TAKE IT YOU DISAGREE WITH HER SWORN TESTIMONY? |
| 20 | **A.** I THINK SHE MISREMEMBERS. |
| 21 | **Q.** THIS CONCERN YOU HAD ABOUT THE GREASE BUILD UP DID YOU EVER |
| 22 | WRITE IT DOWN ANYWHERE? |
| 23 | **A.** NO. |
| 24 | **Q.** LET'S PULL UP EXHIBIT 17, PLEASE. NOW, AFTER ITEM 37, IF |
| 25 | YOU COULD HIGHLIGHT THAT JOHN. NOW, YOU HAVE EXHIBIT 7 IN |

1   FRONT OF YOU, WE HIGHLIGHTED IT ON THE BOARD, ON THE SCREEN,

2   THIS DATE ON THIS STATEMENT, ON THIS REPORT SAYS NOTE

3   DISCREPANCIES OR DEFICIENCIES BELOW, DO YOU SEE THAT?

4   **A.**  YES, SIR.

5   **Q.**  AND THAT LANGUAGE APPEARED ON EACH FORM THAT YOU FILLED OUT

6   DURING THOSE 14 VISITS; IS THAT CORRECT?

7   **A.**  YES.

8   **Q.**  AND ANY TIME DID YOU WRITE DOWN ON ANY OF THE FORMS THAT

9   YOU FELT THERE WAS A BUILD UP OF GREASE?

10  **A.**  I DON'T BELIEVE SO.

11  **Q.**  DID YOU WRITE ANY LETTERS, OTHER THAN USE OF THE FORM, DID

12  YOU WRITE ANY LETTERS TO MRS. ELLEBRECHT VOICING YOUR CONCERN

13  ABOUT THE BUILD UP OF GREASE?

14  **A.**  NO.

15  **Q.**  DID YOU NOTIFY THE FIRE DEPARTMENT?

16  **A.**  NO.

17  **Q.**  NOW, THE FORM WE'VE BEEN LOOKING AT, PARTICULARLY THE ITEM

18  RIGHT HERE WHERE IT SAYS NOTE NO DISCREPANCIES OR DEFICIENCIES

19  BELOW, THAT FORM HAS NOW BEEN CHANGED, CORRECT?

20  **A.**  THAT DOESN'T SAY NO DISCREPANCIES DEFICIENCIES BELOW

21  ANYMORE?

22  **Q.**  HAS THE FORM CHANGED SINCE THE DATE OF THE FIRE?

23  **A.**  YES, THE VERBIAGE ON TOP SAYS PRE-ENGINEERED FIRE SYSTEM

24  INSTEAD OF JUST RANGE HOOD SYSTEM REPORT.

25  **Q.**  ANY OTHER CHANGES YOU RECALL TO THIS FORM?

1   **A.** NOT THAT I CAN RECALL. MOST LIKELY THE SAME.

2   **Q.** I'D LIKE TO READ FROM THE DEPOSITION TRANSCRIPT, PAGE 131

3   LINE 19 THROUGH PAGE 132 LINE 10.

4         **MS. GREENBERG:** YOUR HONOR, JUST AN OBJECTION WITH

5   REGARD TO THE LINEUP, THE QUESTIONING REGARDS TO THIS AS BASED

6   ON FEDERAL RULES OF EVIDENCE 4077.

7         **THE COURT:** THAT'S SUSTAINED.

8   **BY MR. HIGGINBOTHAM:** **Q.** MR. WILLIAMS, WE'VE TALKED ABOUT THE

9   CAPS AND I THINK YOU TESTIFIED THAT THE CAPS HAVE TO BE PRESENT

10  TO PROTECT THE NOZZLE FROM BEING CLOGGED WITH GREASE, DO YOU

11  RECALL THAT TESTIMONY?

12  **A.** YES.

13  **Q.** HOW OFTEN DOES ANSUL REQUIRE THAT THOSE CAPS BE CHANGED?

14  **A.** NOT SUPPOSED TO BE OLDER THAN ONE YEAR OLD.

15  **Q.** DO YOU RECALL THAT WHEN YOU WERE FIRST ASKED THAT QUESTION

16  YOU SAID YOU DIDN'T KNOW HOW LONG OR HOW OFTEN THEY WERE

17  SUPPOSED TO BE CHANGED?

18  **A.** YES, I REMEMBER THAT. I DON'T BELIEVE THE QUESTION WAS

19  ASKED IN THAT SAME WAY.

20        **MR. HIGGINBOTHAM:** YOUR HONOR, PAGE 133, LINE SEVEN

21  THROUGH 20.

22        **THE COURT:** THOSE QUESTIONS ARE UNCLEAR AS TO THE TIME

23  YOU'RE REFERRING TO, SO ON THE SAME BASIS AS THE LAST OBJECTION

24  I'M NOT GOING TO LET YOU READ THOSE INTO THE RECORD. YOU CAN

25  ASK THE QUESTIONS.

1    **BY MR. HIGGINBOTHAM:  Q.**  MR. WILLIAMS, REFERRING TO THE NOZZLE

2    CAPS, HOW OFTEN ARE THESE NOZZLE CAPS SUPPOSED TO BE CHANGED OR

3    ARE THEY SUPPOSED TO BE CHANGED?

4              **MS. GREENBERG:**  OBJECTION.  ASKED AND ANSWERED.

5              **THE COURT:**  SUSTAINED.  COUNSEL, ARE YOU ASKING ABOUT

6    AT THE TIME HE DID THE INSPECTION OR ARE YOU TALKING ABOUT

7    UNDER THE CURRENT POLICIES?  CLARIFY WHEN YOU'RE REFERRING TO.

8              **MR. HIGGINBOTHAM:**  YES.

9    **Q.**  DURING THE TIME THAT YOU PERFORMED THESE INSPECTIONS FROM

10   ROUGHLY '02 THROUGH '08, DID YOU HAVE AN UNDERSTANDING AS TO

11   HOW OFTEN THE NOZZLE CAPS WERE SUPPOSED TO BE CHANGED?

12   **A.**  YES, I DID.

13   **Q.**  WHAT WAS YOUR UNDERSTANDING?

14   **A.**  CAN'T BE OLDER THAN ONE YEAR.  ACCORDING TO THE ANSUL

15   MANUAL.

16   **Q.**  IS THERE ANY REQUIREMENT THAT THEY BE CHANGED ON ANY

17   PARTICULAR TIME PERIOD, AS FAR AS YOU KNOW?

18   **A.**  THEY CAN BE REPLACED AS NECESSARY OR IT'S NOT NECESSARILY A

19   YEAR COMES UP AND YOU REPLACE THEM.  YOU REPLACE THEM AS

20   NECESSARY, COULD BE FOR VARIOUS REASONS.

21   **Q.**  THE QUESTION IS, IS THERE ANY REQUIREMENT, REFERRING TO

22   ANSUL, ANY REQUIREMENT THEY BE CHANGED ANY PARTICULAR TIME

23   PERIOD, AS FAR AS YOU KNOW?

24   **A.**  IT CAN'T BE OLDER THAN ONE YEAR.

25             **MR. HIGGINBOTHAM:**  MAY I READ FROM PAGE 133, LINES 11

1   THROUGH 13, YOUR HONOR?

2           **THE COURT:**  YOU MAY.

3           **MR. HIGGINBOTHAM:**  THIS IS FROM YOUR DEPOSITION ON

4   MARCH 24TH 2011.

5           "IS THERE ANY REQUIREMENT THAT THEY, REFER TO NOZZLE

6   CAPS, THEY BE CHANGED ON ANY PARTICULAR TIME PERIOD, AS FAR AS

7   YOU KNOW?

8           "ANSWER:  NOT THAT I KNOW."

9   **Q.**  WAS THAT YOUR TESTIMONY IN MARCH OF 2011?

10  **A.**  YES.

11  **Q.**  AND YOU WERE TELLING THE TRUTH AT THAT TIME?

12  **A.**  I THOUGHT I REFERRED TO EACH SERVICE.

13  **Q.**  PARDON ME?

14  **A.**  I THOUGHT I REFERRED TO EACH SEMIANNUAL SERVICE, I DIDN'T

15  THINK THE QUESTION OUT ENTIRELY.  REQUIREMENT EVERY SERVICE TO

16  REPLACE CAPS.

17  **Q.**  AT THE TIME YOU ANSWERED THE QUESTION YOU DID NOT KNOW OF

18  ANY ANSUL REQUIREMENT THAT THEY BE CHANGED ON A YEARLY BASIS,

19  ISN'T THAT A TRUE STATEMENT?

20  **A.**  THAT'S NOT TRUE.

21  **Q.**  THE QUESTION WAS, IS THERE ANY REQUIREMENT THAT THEY BE

22  CHANGED ON ANY PARTICULAR TIME PERIOD?

23          **MS. GREENBERG:**  OBJECTION, YOUR HONOR.  ASKED AND

24  ANSWERED.

25          **THE COURT:**  SUSTAINED.

1   BY MR. HIGGINBOTHAM:  Q.  DOES THE ANSUL MANUAL REQUIRE THAT

2   THE CAPS BE REPLACED ONCE A YEAR?

3            MS. GREENBERG:  OBJECTION.  ASKED AND ANSWERED.

4            THE COURT:  OVERRULED.

5            THE WITNESS:  THE CAPS CAN'T BE MORE THAN ONE YEAR

6   OLD.  THEY COULD BE REPLACED AS NEEDED.

7   BY MR. HIGGINBOTHAM:  Q.  I'M TALKING ABOUT THE MANUAL, DOES

8   THE ANSUL MANUAL REQUIRE THAT THEY BE CHANGED AT ANY PARTICULAR

9   TIME?

10  A.  THEY'RE SUPPOSED TO BE CHANGED, SO THAT ALL THE CAPS --

11  NONE OF THEM ARE OVER A YEAR OLD.

12           MR. HIGGINBOTHAM:  YOUR HONOR, FROM EXHIBIT 5 IN YOUR

13  BINDER I HAVE INVOICES DATED FROM SEPTEMBER 20, 2000 THROUGH

14  NOVEMBER OF '07, AND I BELIEVE PLAINTIFF'S 5 IN EVIDENCE IS THE

15  INVOICE FOLLOWING THE NOVEMBER '07 DATE.  I HAVE GROUPED THESE

16  TOGETHER, WHAT I PROPOSE IS MARK THEM AS A GROUP EXHIBIT BUT

17  HAVE HIM IDENTIFY AND VERIFY EACH ONE.

18           THE COURT:  ANY OBJECTION TO THAT?

19           MS. GREENBERG:  NO OBJECTION.

20           THE COURT:  PROCEED.

21  BY MR. HIGGINBOTHAM:  Q.  MR. WILLIAMS, I'M GOING TO HAND YOU A

22  COPY OF WHAT'S BEEN MARKED AS EXHIBIT 10 FOR IDENTIFICATION.  I

23  BELIEVE THERE ARE 21 PAGES, I WANT TO STREAMLINE THIS AS MUCH

24  AS POSSIBLE.

25           I'M GOING TO ASK YOU WHETHER EACH OF THESE PAGES IS A

1    TRUE AND CORRECT COPY OF AN INVOICE SENT TO EUREKA OXYGEN, CAN

2    YOU DO THAT FOR ME?

3    **A.**  YES, SIR.

4    **Q.**  THANK YOU.  MAYBE I WASN'T CLEAR.

5    **A.**  GO THROUGH EACH ONE?

6    **Q.**  YEAH, BEFORE WE CAN MOVE IT INTO EVIDENCE THEY NEED TO BE

7    AUTHENTICATED AS TRUE AND CORRECT COPY OF INVOICES.

8    **A.**  SURE, I'M SORRY.  I THOUGHT YOU WERE GOING TO READ THE

9    INVOICE NUMBER OFF.

10         WE WENT THROUGH THIS AT DEPOSITION, BUT THERE WAS SOME

11   ITEMS THAT WERE REDACTED.  AND I WAS ASKED BY YOU WHAT THOSE

12   ITEMS WERE.

13         I BELIEVE, WOULD BE PERSONAL NOTES, NOTES TO SELF.

14   AFTER THE INVOICE WAS SIGNED SOMEONE WRITE IN THERE THE BEST

15   TIME FOR SERVICE, PERSONAL NOTES.

16         SO I DON'T KNOW EXACTLY WHAT IS UNREDACTED, BUT IT'S A

17   COPY THAT I SAW IN DEPOSITION.

18   **Q.**  RIGHT.

19   **A.**  YES, THEY ARE ALL TRUE AND CORRECT COPIES.

20   **Q.**  I ALSO PLACED IN FRONT OF YOU HOPEFULLY THE LAST ONE WHICH

21   IS ALREADY IN EVIDENCE AS PLAINTIFF'S 5, THIS IS DATED MAY 23RD

22   '08, WOULD YOU ACKNOWLEDGE THAT?

23   **A.**  YES.

24         **MR. HIGGINBOTHAM:**  I MOVE EXHIBIT 10 INTO EVIDENCE,

25   YOUR HONOR.

1        **THE COURT:**  ANY OBJECTION?

2        **MS. GREENBERG:**  NO OBJECTION YOUR HONOR.

3        **THE COURT:**  EXHIBIT 10 WILL BE ADMITTED INTO EVIDENCE.

4                              (PLAINTIFF'S EXHIBIT 10

5                               RECEIVED IN EVIDENCE)

6        **MR. HIGGINBOTHAM:**  THANK YOU.

7    **Q.**  THESE INVOICES SPAN THE TIME FROM SEPTEMBER 20TH OF THE

8    YEAR 2000 THROUGH MAY --

9    **A.**  23RD.

10   **Q.**  23RD OF '08, CORRECT?

11   **A.**  YES.

12   **Q.**  DURING THAT ROUGHLY EIGHT OR NINE YEAR PERIOD DID THE

13   INVOICES REFLECT HOW MANY NOZZLE WERE PURCHASED?

14   **A.**  I'M SORRY, NOZZLES?

15   **Q.**  I'M SORRY, THANK YOU.  HOW MANY CAPS, NOZZLE CAPS WERE

16   PURCHASED?

17   **A.**  THEY REFLECT ONLY ONE CAP.

18   **Q.**  SO IN THAT EIGHT OR NINE YEAR PERIOD THE INVOICES

19   THEMSELVES ONLY REFLECT THAT ONE CAP WAS PURCHASED, CORRECT?

20   **A.**  YES.

21   **Q.**  THAT APPEARS ON THE VERY LAST INVOICE?

22   **A.**  YES.

23   **Q.**  MAY 23RD '08 INVOICE?

24   **A.**  YES.

25   **Q.**  SO WOULD YOU AGREE WITH ME, THAT DURING THAT SAME PERIOD

1   SINCE THERE ARE FIVE NOZZLES REPLACED ONCE A YEAR THERE SHOULD

2   BE INVOICES FOR A MINIMUM OF 35 NOZZLE CAPS APPEARING ON THE

3   INVOICES, DO YOU AGREE WITH THAT?

4   **A.** THEY WOULD HAVE APPEARED ON THE INVOICES?

5   **Q.** YES.

6   **A.** NO.

7   **Q.** WHY NOT?

8   **A.** BECAUSE WE GIVE AWAY NOZZLE CAPS, VERY INEXPENSIVE, WE

9   DON'T CHARGE FOR THEM VERY OFTEN.

10  **Q.** DO YOU HAVE ANY RECORD WHATSOEVER OF GIVING AWAY NOZZLE

11  CAPS TO MS. ELLEBRECHT?

12  **A.** I HAVE NO RECORD.

13  **Q.** DO YOU HAVE ANY MEMORY?

14  **A.** NOT SPECIFICALLY.  I DON'T REMEMBER THE MOMENT, THE DAY I

15  GAVE HER THE NOZZLE CAP, NO.

16  **Q.** ARE YOU AWARE OF A REQUIREMENT WITH THE STATE FIRE MARSHAL

17  THAT INVOICES SHALL REFLECT EVERYTHING THAT'S BEEN REPLACED ON

18  THE FIRE SUPPRESSION SYSTEM?

19  **A.** NOT AWARE OF THAT.

20  **Q.** SO YOUR EXPLANATION AS TO WHY THESE INVOICES ONLY REFLECT

21  ONE NOZZLE CAP BEING REPLACED, YOUR RECOLLECTION IS MAYBE, BUT

22  YOU DON'T REMEMBER, YOU MAY HAVE GIVEN SOME TO HER FOR FREE, IS

23  THAT YOUR TESTIMONY?

24  **A.** YES.

25  **Q.** LET'S GO BACK TO PHOTO 28.  I PUT FROM EXHIBIT 6 FIGURE 28

1   UP ON -- WOULD YOU LIKE A FRESH COPY YOURSELF?

2   **A.**  YEAH, SURE.

3   **Q.**  OKAY.  LOOKING AT AGAINST THE NORTH WALL OF THE LEFT SIDE

4   OF THE COOKING LINE, CORRECT?

5   **A.**  YES, SIR.

6   **Q.**  JUST ORIENTATION PURPOSES HERE WE HAVE NOZZLE NUMBER ONE,

7   RIGHT?

8   **A.**  YES.

9   **Q.**  AND WE HAVE THE SMALLER OF THE TWO FRYERS AND TO THE RIGHT

10  OF THAT THE LARGER OF THE TWO FRYERS WHICH IS CALLED THE

11  INVOLVED FRYER, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  YOU HAVE THE ORIENTATION NOW?

14  **A.**  YES.

15  **Q.**  WHEN YOU FIRST STARTED MAKING YOUR VISITS, EITHER AS AN

16  APPRENTICE OR AS THE PERSON IN CHARGE, AS YOU FIRST STARTED

17  MAKING YOUR VISITS TO THE GRILL WAS FRYER NUMBER ONE

18  OPERATIONAL?

19  **A.**  I DON'T RECALL, I DON'T BELIEVE SO.

20  **Q.**  DO YOU HAVE ANY MEMORY AS TO WHEN IT WAS TAKEN OUT OF

21  SERVICE?

22  **A.**  NO, I DO NOT.

23  **Q.**  MR. WILLIAMS, DO YOU AGREE WITH ME THAT THE PURPOSE OF THE

24  INSPECTIONS IS TO MAKE SURE THAT THE ANSUL SYSTEM WILL

25  EXTINGUISH THE FIRE IF IT HAPPENED?

1   **A.**  IT'S DESIGNED TO WHEN ACTIVATED TO SUPPRESS THE FIRE.  NOT

2   NECESSARILY EXTINGUISHED IT.

3         **MR. HIGGINBOTHAM:**  YOUR HONOR, PAGE 20, LINES 18 TO

4   25.  PARDON ME, 18 TO 22.

5         **MS. GREENBERG:**  SORRY, WHAT PAGE?

6         **MR. HIGGINBOTHAM:**  PAGE 20.

7         **THE COURT:**  DIFFERENT QUESTION.

8         **MR. HIGGINBOTHAM:**  LET ME ASK THE QUESTION.

9   **Q.**  AND PART OF THE INSPECTION REPORT SHOWN AS EXHIBIT 1, SHOWS

10  EXHIBIT 1 IN YOUR DEPOSITION WHICH IS NOW EXHIBIT 7, WHY DON'T

11  YOU TAKE THAT IN FRONT OF YOU.

12  **A.**  OKAY.

13  **Q.**  YOU HAVE THE CORRECT DOCUMENT IN FRONT OF YOU NOW?

14  **A.**  ONE DATED 5/18/07?

15  **Q.**  YES.

16  **A.**  YES.

17  **Q.**  AND PART OF THE INSPECTION REPORT SHOWN IN EXHIBIT 1 WHICH

18  YOU HAVE IN FRONT OF YOU, TO MAKE SURE THAT THE ANSUL SYSTEM IS

19  OPERATING PROPERLY AND WILL EXTINGUISH A FLAME IF ACTIVATED; IS

20  THAT CORRECT?

21  **A.**  NO, SUPPOSE TO SUPPRESS IT.

22        **MR. HIGGINBOTHAM:**  MAY I READ THE QUESTION AND ANSWER,

23  YOUR HONOR?

24        **THE COURT:**  YES.

25        **MR. HIGGINBOTHAM:**  QUESTION DURING YOUR DEPOSITION ON

1    MARCH 24TH 2011.

2              "QUESTION:  OKAY.  AND PART OF THE INSPECTION REPORT

3    SHOWN AS EXHIBIT 1 IS TO MAKE SURE THAT THE ANSUL SYSTEM IS

4    OPERATING PROPERLY AND WILL EXTINGUISH A FLAME IF ACTIVATED; IS

5    THAT CORRECT?

6              "ANSWER:  YES, SIR."

7          YOU RECALL ANSWERING YES TO THAT QUESTION?

8    **A.**  I DO.

9    **Q.**  SO AT THE TIME OF YOUR DEPOSITION THE WORD EXTINGUISH WAS

10   USED AND NOW YOU'RE SAYING IT SHOULD HAVE BEEN SUPPRESSED?

11   **A.**  SHOULD HAVE BEEN.

12   **Q.**  BUT YOU'RE NOT BACKING AWAY FROM THE ANSWER YOU GAVE DURING

13   YOUR DEPOSITION, ARE YOU?

14   **A.**  I AM BACKING AWAY FROM THAT.

15   **Q.**  YOU ARE.

16             THAT'S ALL I HAVE, YOUR HONOR.

17         **THE COURT:**  ALL RIGHT.  LADIES AND GENTLEMEN, WE'VE

18   GOT A CRIMINAL PROCEEDING A SHORT ONE AT 11:00 O'CLOCK, SO MY

19   FEELING YOU CAN HANG IN FOR ANOTHER 20 MINUTES JUST TO CONTINUE

20   SOME CROSS-EXAMINATION AND WE'LL TAKE OUR BREAK ABOUT 10:50.

21             SO LET'S HAVE CROSS-EXAMINATION BY EUREKA.

22         **MS. GREENBERG:**  THANK YOU, YOUR HONOR.

23                        **CROSS-EXAMINATION**

24   **BY MS. GREENBERG:  Q.**  MR. WILLIAMS, YESTERDAY COUNSEL ASKED

25   YOU IN REGARDS TO EUREKA OXYGEN THE COMPANY IS ESSENTIALLY FOUR

1    LOCATIONS, DO YOU RECALL THAT TESTIMONY?

2    **A.**  I DO.

3    **Q.**  HOW MANY EMPLOYEES DOES EUREKA OXYGEN EMPLOY?

4    **A.**  ALL FOUR LOCATIONS?

5    **Q.**  ALL FOUR LOCATIONS.

6    **A.**  20, 25, 30.

7    **Q.**  AND THAT VARIES FROM ADMINISTRATIVE PEOPLE WHO DO

8    ADMINISTRATIVE WORK AND TECHNICIANS, CORRECT?

9    **A.**  DELIVERY PERSONS, YES.

10   **Q.**  AND EUREKA OXYGEN DID NOT INSTALL THE SUPPRESSION SYSTEM

11   LOCATED INSIDE THE CANDY STICK GRILL, CORRECT?

12   **A.**  CORRECT.

13   **Q.**  THERE'S BEEN SOME TESTIMONY WITH SOME PHOTOGRAPHS

14   DESCRIBING THE PIPING THAT THE SUPPRESSION SYSTEM IS ATTACHED

15   TO AS ARC PIPING, CAN YOU DESCRIBE TO ME THE PIPING, WHAT IT'S

16   MADE OF AND ESSENTIALLY WHETHER IT CAN BE MOVED OR NOT AND HOW

17   IT CAN BE MOVED?

18   **A.**  IT'S HARD PIPING, THE PIPE ITSELF IS HARD, IT'S NOT A

19   FLEXIBLE LINE.  IT'S SCHEDULED 14, I BELIEVE, BLACK PIPE.  IT'S

20   ATTACHED TO THE HOOD WITH BRACKETS IN THIS CASE.

21          THE BRACKETS HAVE LITTLE CLAMPS, LITTLE ROUND CLAMPS

22   THAT CLAMP AROUND THE PIPING TO HOLD IT IN PLACE.  SORRY, HOW

23   IT COULD BE MOVED?

24   **Q.**  LET ME ASK YOU THIS.  THE ELBOW -- YOU WERE SHOWN SOME

25   PICTURES OF THE ELBOWS ATTACHED AT THE END OF AT LEAST TWO OF

1   THE NOZZLES AT THE CANDY STICK GRILL, DO YOU RECALL THAT?

2   **A.**   YES.

3   **Q.**   THE ELBOWS THERE CAN THOSE BE MOVED WITH PRESSURE?

4   **A.**   YES, SOMETIMES IT CAN.

5   **Q.**   IN MAY OF 2008 YOUR TESTIMONY IS THAT YOU CONFIRMED THAT

6   THE POINT -- THE NOZZLE ABOVE THE FRYER POINTED TO THE CENTER

7   OF THE FRYER, CORRECT?

8   **A.**   CORRECT.

9   **Q.**   AND WHAT'S THE PROCESS BY WHICH YOU DETERMINED THAT THE

10   NOZZLE WAS CENTERED TO THE POINT -- WAS POINTED TO THE CENTER

11   OF THE FRYER IN MAY EVER 2008?

12   **A.**   WE USE A -- I USE A LASER POINTER.  IT'S A DEVICE THAT HAS

13   AN ADAPTOR, A PLASTIC ADAPTOR WITH A RUBBER O RING HELPS TO

14   HOLD IT ON THE NOZZLE.

15        SO THAT AFTER IT'S CONNECTED TO A LASER, THE LASER'S

16   TURNED ON BY TWISTING THE LASER AROUND THE SITE THE RED BEAM

17   TURNS ON.  ONCE YOU'VE DONE THAT, ONCE I'VE DONE THAT I TAKE

18   THE AFTER PART AND SLIDE IT ONTO -- IT GOES OVER TOP OF THE

19   NOZZLE, KIND OF CLIPS IN, AND ONCE IT'S CLIPPED IN TO MAKE SURE

20   IT'S OPERATING RIGHT I ROTATE IT IN A CIRCLE MAKE SURE THE BEAM

21   STAYS CENTERED OR THAT BEAM STAYS WHERE IT IS, DOESN'T MOVE

22   AROUND WHEN YOU ROTATE THE LASER.

23        SOME ADAPTORS IF THEY'RE NOT MANUFACTURED RIGHT, THEY

24   AREN'T QUITE ROUND WHERE THEY ATTACH TO THE NOZZLE, SO WHEN YOU

25   SPIN IT WILL KIND OF GO IN A WOBBLY CIRCLE.  EVEN THOUGH YOU

1    PUT IT ON, THAT DOT MIGHT NOT BE TRUE.  YOU HAVE TO MAKE SURE

2    YOUR ADAPTOR SLIDE ONTO THE NOZZLE IS FUNCTIONING THE WAY IT'S

3    SUPPOSED TO.

4    **Q.**  AND IF THE PLASTIC ADAPTOR IS NOT FUNCTIONING PROPERLY IT

5    COULD BE OFF BY HOW MUCH IN YOUR EXPERIENCE?

6    **A.**  MAYBE THREE OUR FOUR INCHES.

7    **Q.**  OKAY.  THERE WAS SOME QUESTIONING BY COUNSEL IN REGARD TO

8    SOME ASSUMPTIONS SUPPOSEDLY YOU MADE DURING THE SERVICE, EACH

9    SERVICE THAT YOU DID BIANNUALLY.  NOW, THE CANDY STICK GRILL

10   IT'S ESSENTIALLY A RESTAURANT KITCHEN, YOU WALK IN AND YOU CAN

11   ESSENTIALLY SEE THE COOKING APPLIANCES PRETTY EVIDENTLY,

12   CORRECT?

13   **A.**  CORRECT.

14   **Q.**  DID YOU AT ANY POINT IN TIME DURING THE SERVICE, DID THE

15   FRYER CHANGE, WAS THERE EVER A NEW COOKING APPLIANCE PUT IN

16   THERE?

17   **A.**  NO.

18   **Q.**  WAS THE SAME APPLIANCE?

19   **A.**  THE SAME APPLIANCE FROM MY RECOLLECTION.

20        **MS. GREENBERG:**  THOSE ARE ALL FOR NOW.  THANK YOU.

21        **THE COURT:**  MR. TIMMONS, DO YOU HAVE ANY QUESTIONS?

22        **MR. TIMMONS:**  ACTUALLY, I DO.  BUT I'LL BE BRIEF, OF

23   COURSE.

24                    **CROSS-EXAMINATION**

25   **BY MR. TIMMONS:  Q.**  YOU AGREE, SIR, THAT THERE ARE IN EVIDENCE

1    HERE YOU'VE SEEN THREE SERVICE INVOICES FOR INSPECTIONS OF THE

2    ANSUL SYSTEM AT THE CANDY STICK?

3    **A.**  YES.

4    **Q.**  AND ON NONE OF THOSE IS THERE ANY REFERENCE TO GREASE, AM I

5    CORRECT ABOUT THAT?

6    **A.**  CORRECT.

7    **Q.**  AND EVERY TIME YOU SIGNED ONE OF THOSE INSPECTION REPORTS

8    APART OF YOUR DECLARATION AT THE BOTTOM, YOUR SIGNATURE WAS

9    THERE WERE NO DEFICIENCIES; IS THAT CORRECT?

10   **A.**  IT'S CORRECT.

11              **MR. TIMMONS:**  THAT'S ALL I HAVE.  SIR, THANK YOU VERY

12   MUCH.

13              **THE COURT:**  THANK YOU, MR. TIMMONS.

14              ANY FURTHER REDIRECT FROM AMCO?

15              **MR. HIGGINBOTHAM:**  NO, YOUR HONOR.

16              **THE COURT:**  MAY MR. WILLIAMS BE EXCUSED THEN?

17              **MR. HIGGINBOTHAM:**  SUBJECT TO RECALL.

18              **THE COURT:**  THANK YOU, MR. WILLIAMS.

19                        (WITNESS EXCUSED.)

20              **THE COURT:**  AMCO PLEASE CALL IT'S NEXT WITNESS.

21              **MR. SULLIVAN:**  CAN I STEP OUTSIDE TO GRAB THEM.

22                        (PAUSE IN PROCEEDINGS.)

23              **THE COURT:**  YES.  WE'LL TAKE OUR MORNING BREAK NOW

24   SINCE WE'RE BETWEEN WITNESSES AND WE'LL COME BACK IN 10

25   MINUTES.

1              (RECESS TAKEN.)

2           (PROCEEDINGS RESUMED.)

3       **MS. GREENBERG:**  WE MEET CONFERRING ABOUT TIMING OF

4  THINGS, WE WERE JUST NOTIFIED PLAINTIFFS MAY CONCLUDE THEIR

5  CASE TODAY.

6          WE HAVE WITNESSES TRAVELING FROM EUREKA, WE'RE TRYING

7  TO CALL THEM RIGHT NOW TO GET THEM ALL HERE BY TOMORROW

8  MORNING.  IF WE END EARLIER BY 4:00 TODAY WE'RE REQUESTING WE

9  START TOMORROW MORNING.

10       **THE COURT:**  THAT'S FINE.

11       **MR. HIGGINBOTHAM:**  I HAVE NO PROBLEM WITH THAT.

12       **THE COURT:**  LET'S GET OUR JURY.

13        (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

14       **THE COURT:**  WERE BACK ON THE RECORD.

15       AMCO'S NEXT WITNESS.

16                    **MICHAEL CARLSEN**,

17  CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

18  TESTIFIED AS FOLLOWS:

19       **THE WITNESS:**  I DO.

20       **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL YOUR

21  LAST NAME FOR THE RECORD.

22       **THE WITNESS:**  MICHAEL ROBERT CARLSEN, C-A-R-L-S-E-N.

23                 **DIRECT EXAMINATION**

24  BY MR. SULLIVAN:  **Q.**  GOOD MORNING, MR. CARLSEN.

25  **A.**  GOOD MORNING.

1   **Q.**  CAN YOU PLEASE TELL THE JURY WHERE YOU LIVE?

2   **A.**  I LIVE IN PETALUMA, CALIFORNIA.

3   **Q.**  CAN YOU TELL THEM WHERE YOU WENT TO MY SCHOOL?

4   **A.**  CASA GRANDE HIGH SCHOOL IN PETALUMA.

5   **Q.**  HOW MANY YEARS HAVE YOU SPENT IN THE FIRE SUPPRESSION

6   BUSINESS?

7   **A.**  34 YEARS.

8   **Q.**  CAN YOU TELL THE JURY WHAT YOUR FIRST JOB IN THAT INDUSTRY

9   WAS?

10  **A.**  MY FIRST JOB WAS WORKING FOR MY FATHER'S FIRE EQUIPMENT

11  COMPANY IN SAN FRANCISCO CALLED TRIANGLE FIRE EXTINGUISHER

12  SERVICE.  WORKED THERE SERVICING PORTABLE FIRE EXTINGUISHERS

13  AND INSPECTIONS, THAT SORT OF THING.

14  **Q.**  HOW LONG DID YOU WORK THERE FOR?

15  **A.**  I WORKED THERE UNTIL 1986.

16  **Q.**  AND WHAT YEAR DID YOU SAY YOU STARTED THERE?

17  **A.**  APPROXIMATELY '76.

18  **Q.**  WHY DID YOU LEAVE TRIANGLE FIRE EXTINGUISHER?

19  **A.**  BETTER OPPORTUNITY AT BROOKS EQUIPMENT COMPANY, MY FATHER

20  WAS THE OWNER OF TRIANGLE FIRE AND HE SAW THIS OPPORTUNITY TO

21  COME ALONG AND SAID YOU SHOULD TAKE IT, BROOKS IS A NATION-WIDE

22  WHOLESALER, DISTRIBUTOR FIRE EQUIPMENT.  SAID IT WAS A GOOD

23  OPPORTUNITY.

24  **Q.**  SO YOU JOINED BROOKS EQUIPMENT IN 1986?

25  **A.**  CORRECT.

1   Q.   AND DID YOU HAVE A TITLE WHEN YOU STARTED THERE?

2   A.   YEAH, I WAS THE SHOP MANAGER.

3   Q.   DID THAT TITLE EVER CHANGE?

4   A.   NO.

5   Q.   AND YOU EXPLAIN TO THE JURY WHAT YOUR DUTIES AND

6   RESPONSIBILITIES WERE AS THE SHOP MANAGER AT BROOKS EQUIPMENT?

7   A.   WELL, I RAN THE EMERYVILLE SHOP, THEN I ALSO DID TRAININGS

8   FOR THE PEOPLE IN THE CHARLOTTE, NORTH CAROLINA AND ATLANTA,

9   GEORGIA SHOP.

10  Q.   CAN YOU DESCRIBE WHAT YOU MEAN WHEN YOU SAY YOU RAN THE

11  SHOP?

12  A.   I TOOK CARE OF ALL THE -- EVERYTHING THAT HAD TO DO WITH

13  THE SHOP FACILITY.  I HAD -- AT DIFFERENT TIMES I HAD PEOPLE

14  UNDERNEATH ME THAT WORKED FOR ME.

15       I MADE SURE THAT WE KEPT UP TO THE DOT STANDARDS AND

16  THAT SORT OF THING.  DOT THE DEPARTMENT OF TRANSPORTATION THAT

17  REGULATES THE TESTING OF THE CYLINDERS.

18  Q.   WE MAY HAVE TOUCHED ON THIS BRIEFLY, WHAT EXACTLY WAS IT

19  THAT BROOKS EQUIPMENT DOES?

20  A.   BROOKS EQUIPMENT IS A NATIONAL WHOLESALER DISTRIBUTOR OF

21  FIRE EQUIPMENT.  THEY SELL TO RETAILERS.

22  Q.   WHILE YOU WERE AT BROOKS EQUIPMENT DID THEY DO ANY WORK

23  INVOLVING FIRE SUPPRESSION SYSTEMS?

24  A.   THEY DID.

25  Q.   DESCRIBE THAT FOR THE JURY?

1   **A.** THEY SOLD A SYSTEM CALLED THE FSI, IT WAS A BRIEF RUN. IT

2   WAS A -- ONE WHERE THEY HAD SOLE MARKET SHARE OF THIS

3   PARTICULAR PRODUCT. AND I WAS ON THE TRAINING END OF THAT,

4   TRAINING RETAIL CUSTOMERS ON HOW TO INSTALL AND SERVICE THE FSI

5   SYSTEM.

6   **Q.** CAN YOU EXPLAIN WHAT THE FSI SYSTEM WAS?

7   **A.** A DRY CHEMICAL FIRE SUPPRESSION SYSTEM FOR RANGE HOODS,

8   KITCHEN RANGE HOODS, THE COMMERCIAL KITCHENS. IT WOULD

9   DISCHARGE DRY CHEMICALS, SODIUM BICARBONATE BASE CHEMICAL.

10  WE'VE SINCE MOVED ON TO UL 300 WET AGENTS NOW, BUT AT THE TIME

11  IT WAS FSI WAS ON THE MARKET.

12  **Q.** AND WHILE YOU WERE AT BROOKS EQUIPMENT CAN YOU DESCRIBE THE

13  TYPE OF TRAINING YOU PROVIDE REGARDING FSI SYSTEM?

14  **A.** WE WOULD PROVIDE TRAINING TO RETAIL KITCHEN INSTALLERS,

15  SYSTEM INSTALLERS, AND WE WOULD SHOW THEM HOW TO USE THE FSI

16  SYSTEM, HOW TO INSTALL IT AND HOW TO SERVICE AND MAINTAIN IT.

17  **Q.** DO YOU RECALL APPROXIMATELY HOW MANY TRAININGS YOU GAVE

18  REGARDING THAT SYSTEM DURING YOUR TIME AT BROOKS EQUIPMENT?

19  **A.** IT ONLY RAN FOR ABOUT A YEAR. I THINK, I GAVE ABOUT SIX

20  TRAININGS.

21  **Q.** AND AT SOME POINT YOU LEFT BROOKS EQUIPMENT?

22  **A.** I DID.

23  **Q.** CAN YOU TELL THE JURY WHY YOU LEFT BROOKS EQUIPMENT?

24  **A.** BROOKS EQUIPMENT COMPANY WAS OWNED BY A GENTLEMAN WHO I

25  ADORED AND IN 1997 OR SO HE SOLD THE COMPANY TO A LARGE

1    CORPORATION AND THINGS KIND OF CHANGED.

2            SO I HAD AN OPPORTUNITY TO PURCHASE A COMPANY IN SANTA

3    ROSA CALLED FIRE SAFETY SUPPLY.  IT WAS ANSUL DISTRIBUTOR,

4    WHICH WAS A PLUS.  HE WAS A CUSTOMER OF MINE WHEN I WAS AT

5    BROOKS.

6            WITH BROOKS BLESSING THEY BASICALLY GAVE ME ALL THE

7    SHOP EQUIPMENT TO AGREE TO BE CONSULTANT FOR FIVE YEARS AFTER

8    THE FACT.  THEY GAVE ME THE SHOP EQUIPMENT AND I MOVED IT UP TO

9    SANTA ROSA AND REOPENED FIRE SAFETY SUPPLY.

10           JOINED MY FATHER'S COMPANY, I PURCHASED MY FATHER'S

11   COMPANY AND JOINED IT TO FIRE SAFETY SUPPLY AND THE REST IS

12   HISTORY.

13   **Q.**  AND, I THINK, YOU STATED THAT FIRE SAFETY SUPPLY COMPANY IS

14   LOCATED IN SAN THE ROSA, COULD YOU TELL THE JURY WHAT REGION IT

15   SERVICES?

16   **A.**  WE HAVE ALL NORTHERN CALIFORNIA, BASICALLY, BUT OUR MAIN

17   AREA IS SONOMA COUNTY, SAN FRANCISCO, MENDOCINO COUNTIES.  WE

18   HAVE COUNTIES FROM FRESNO, NORTH OF FRESNO UP TO THE OREGON

19   BORDER, EXCLUDING SACRAMENTO.  THOSE WERE OUR TERRITORIES FOR

20   ANSUL.

21   **Q.**  WHAT TYPE OF SERVICES DOES FIRE SAFETY SUPPLY COMPANY

22   PROVIDE?

23   **A.**  WE INSTALL, SERVICE, MAINTAIN FIRE SUPPRESSION SYSTEMS.  WE

24   SERVICE PORTABLE FIRE EXTINGUISHERS, WE ALSO MAINTAIN AND DO

25   TENANT IMPROVEMENT ON FIRE SPRINKLER SYSTEMS.

1   **Q.**  DO YOU WORK THERE EVERYDAY?

2   **A.**  I DO.

3   **Q.**  AND YOU WORKED THERE FIVE DAYS A WEEK SINCE 1999?

4   **A.**  SINCE 1999.

5   **Q.**  DO YOU HAVE A PARTICULAR TITLE THERE?

6   **A.**  I'M THE PRESIDENT.

7   **Q.**  YOU EXPLAIN TO THE JURY WHAT YOUR DUTIES AND

8   RESPONSIBILITIES WERE WHEN YOU STARTED THE COMPANY IN 1999?

9   **A.**  YES, WHEN I STARTED THE COMPANY IN 1999 I WAS INVOLVED IN

10  PRETTY MUCH EVERY ASPECT OF THE BUSINESS, INCLUDING

11  ADMINISTRATIVE, BUT ALSO DESIGN, INSTALLATION OF FIRE

12  SUPPRESSION SYSTEMS, SELLING AND SERVICING OF PORTABLE FIRE

13  EXTINGUISHERS AND SPRINKLER INSPECTIONS AS WELL.

14  **Q.**  I THINK YOU MENTIONED THREE DIFFERENT THINGS, COULD YOU

15  DESCRIBE WHAT YOU MEAN BY DESIGNING A FIRE SUPPRESSION SYSTEM?

16  **A.**  WELL, THERE'S PRE-ENGINEERED SYSTEMS, WHICH MEANS THE

17  MANUFACTURER PUTS TOGETHER A MANUAL PRE-ENGINEERED THAT THAT

18  SYSTEM WILL DO WHAT IT'S SUPPOSED TO DO, IF IT'S INSTALLED AND

19  MAINTAINED ACCORDING TO THE MANUAL.

20          SO AND THEN MY PART OF DESIGNING THAT IS WITHIN THE

21  MANUAL, THE PARAMETERS OF THE MANUAL, I WILL DESIGN, DRAW

22  DRAWINGS FOR FIRE DEPARTMENTS SUBMITTALS TO INSTALL THAT

23  SYSTEM.

24  **Q.**  AND WHAT IS THE DIFFERENCE BETWEEN DESIGNING A SYSTEM AND

25  INSTALLING A SYSTEM?

1     **A.**   THE DESIGN PORTION OF IT IS PUTTING IT DOWN ON PAPER.

2     BASICALLY, EVALUATING THE HAZARD, DRAWING OF THE PLANS TO PUT

3     THAT SYSTEM IN PROPERLY.

4              AND THEN INSTALLATION PORTION OF IT IS WHEN THE

5     TECHNICIANS OR MYSELF, I'M ALSO A TECHNICIAN, GO OUT AND

6     INSTALL THE SYSTEM ACCORDING TO THE DESIGNER'S DESIGN.

7     **Q.**   AND WHAT DOES IT MEAN TO SERVICE A FIRE SUPPRESSION SYSTEM?

8     **A.**   IT'S TO PERFORM SEMIANNUAL, ANNUAL AND 12 YEAR, SIX YEAR

9     AND 12 YEAR MAINTENANCE ON THE SYSTEM.

10    **Q.**   AND IN TERMS OF THE DESIGNING SYSTEM, SINCE 1999

11    APPROXIMATELY HOW MANY FIRE SUPPRESSION SYSTEMS HAVE YOU

12    DESIGNED?

13    **A.**   PROBABLY IN THE AREA OF 200, 250.

14    **Q.**   HOW MANY FIRE SUPPRESSION SYSTEMS HAVE YOU INSTALLED?

15    **A.**   I PERSONALLY BEEN INVOLVED IN PROBABLY 100, 125 SYSTEM

16    INSTALLS.

17    **Q.**   HOW MANY HAVE YOU SERVICED?

18    **A.**   GOSH, OVER FIVE, 600 I WOULD IMAGINE IN THAT TIME PERIOD.

19    **Q.**   DID ANY OF THESE FIRE SUPPRESSION SYSTEMS INVOLVE

20    SUPPRESSION SYSTEMS IN KITCHENS?

21    **A.**   YES.

22    **Q.**   HOW MANY?

23    **A.**   I WOULD SAY, 90 PERCENT OF THEM.

24    **Q.**   AND DID ANY INVOLVE ANSUL SYSTEMS?

25    **A.**   YES.

1    **Q.**   HAVE YOU EVER INSTALLED AN ANSUL SYSTEM?

2    **A.**   YES.

3    **Q.**   CAN YOU ESTIMATE HOW MANY ANSUL SYSTEMS YOU INSTALLED?

4    **A.**   OF THE 90 PERCENT THAT ARE RESTAURANT COMMERCIAL KITCHEN

5    SYSTEMS I WOULD SAY 90 PERCENT OF THEM ARE ANSUL.

6    **Q.**   AND THE SAME WOULD APPLY TO THE NUMBER OF FIRE SYSTEMS YOU

7    SERVICED, CORRECT?

8    **A.**   CORRECT.  WE SERVICE MAYBE A LITTLE LOWER NUMBER BECAUSE WE

9    SERVICE SOME SYSTEMS WE DIDN'T PUT IN, BUT IN OUR MARKET AREA I

10   WOULD SAY 85 PERCENT OF THE SYSTEMS ARE ANSUL SYSTEMS.

11   **Q.**   HAVE YOU EVER SERVICED AN R102 SUPPRESSION SYSTEM MADE BY

12   ANSUL?

13   **A.**   YES.

14   **Q.**   DO YOU HAVE AN UNDERSTANDING ABOUT HOW THAT SYSTEM WORKS?

15   **A.**   YES.

16   **Q.**   AND HOW DID YOU LEARN HOW THAT SYSTEM WORKED?

17   **A.**   I LEARNED FROM GOING TO ANSUL SCHOOL.  THEY HAVE TRAININGS

18   PERIODICALLY THROUGHOUT THE COUNTRY TO TRY TO MAKE IT FIT FOR

19   EVERYONE THEY COME TO OUR FACILITY.  WE HAVE THREE YEAR SERVICE

20   OR TRAINING FROM ANSUL.  CERTIFICATE GOOD FOR THREE YEARS, THEN

21   AFTER THAT YOU'RE TO GET A NEW CERTIFICATE?

22         SO I'VE GONE TO PROBABLY SIX OF THOSE TRAININGS FOR

23   THE R102 SYSTEM.

24   **Q.**   OKAY.  ASIDE FROM TRAININGS SPECIFIC TO THE R102 SYSTEM,

25   HAVE YOU EVER TAKEN ANY CLASS, SEMINAR RELATED TO FIRE

1  SUPPRESSION SYSTEMS IN GENERAL?

2  **A.**  YES.

3  **Q.**  HOW MANY?

4  **A.**  I WOULD SAY, PROBABLY AN ADDITIONAL 10 OR 12 DIFFERENT

5  TYPES OF SYSTEMS.

6  **Q.**  WHO PROVIDES THESE CLASSES?

7  **A.**  THE MANUFACTURERS.

8  **Q.**  CAN YOU DESCRIBE OR CAN YOU LIST THE MANUFACTURERS WHOSE

9  CLASSES YOU ATTENDED?

10  **A.**  SURE, I'VE BEEN TO AMREX, I'VE BEEN TO PYROCHEM, I'VE BEEN

11  TO BUCKEYE AND I'VE BEEN TO ANSUL.

12  **Q.**  AND HAVE YOU -- DO YOU POSSESS ANY LICENSES?

13  **A.**  YES.  WE'RE CALIFORNIA C16 CONTRACTOR AND A GENERAL D

14  CONTRACTOR.

15  **Q.**  AND THE FIRST ONE YOU SAID A CALIFORNIA C16 LICENSE, WHAT

16  IS THAT?

17  **A.**  THAT IS A FIRE SUPPRESSION.  IT'S FIRE SPRINKLER AND

18  SPECIAL HAZARD INSTALLATION.

19  **Q.**  WHAT DOES THAT ALLOW YOU TO DO?

20  **A.**  IT ALLOWS US TO INSTALL, DESIGN FIRE SUPPRESSION SYSTEMS,

21  INCLUDING SPRINKLER SYSTEMS.

22  **Q.**  YOU PERSONALLY POSSESS THAT LICENSE, CORRECT?

23  **A.**  CORRECT.

24  **Q.**  AND YOU ALSO SAID YOU POSSESS A GENERAL CONTRACTOR'S

25  LICENSE?

1    **A.**   YES.

2    **Q.**   WHAT DOES THAT ALLOW YOU TO DO?

3    **A.**   THAT ALLOWS YOU TO OVERSEE CONSTRUCTION.

4    **Q.**   AND YOU PERSONALLY --

5    **A.**   AND PERFORM GENERAL CONSTRUCTION.

6    **Q.**   YOU PERSONALLY POSSESS THAT LICENSE?

7    **A.**   YES.

8    **Q.**   AND HAVE YOU RECEIVED ANY CERTIFICATIONS FROM ANY FIRE

9    SUPPRESSION COMPANIES?

10   **A.**   YES.

11   **Q.**   WHICH ONES?

12   **A.**   WELL AMOREX, PYROCHEM, ANSUL AND BUCKEYE.

13   **Q.**   AND HOW OFTEN HAVE YOU -- HOW MANY TIMES HAVE YOU BEEN

14   CERTIFIED BY ANSUL?

15   **A.**   FOUR DIFFERENT TYPES OF SYSTEMS?

16   **Q.**   CORRECT.

17   **A.**   PROBABLY 12 I WOULD IMAGINE.

18   **Q.**   AND CAN YOU EXPLAIN THE PROCESS FOR GETTING CERTIFIED TO

19   SERVICE OR INSTALL THE R102 SUPPRESSION SYSTEM?

20   **A.**   YES.  YOU GO TO A TWO DAY, DAY AND A HALF TO TWO DAY

21   SEMINAR PERFORMED BY ANSUL AND AT THE END OF THAT SEMINAR YOU

22   TAKE A TEST AND YOU PASS THE TEST YOU ARE -- YOU RECEIVE A

23   CERTIFICATE OF COMPLETION.

24   **Q.**   YOU ATTENDED THAT SEMINAR?

25   **A.**   YES.

1    **Q.**  HOW MANY TIMES?

2    **A.**  SIX, I THINK, ABOUT FIVE TO SIX.

3    **Q.**  AND DOES ANSUL REQUIRE YOU TO BE CERTIFIED TO SERVICE THEIR

4    SYSTEMS?

5    **A.**  YES, THEY DO.

6    **Q.**  HOW OFTEN DO YOU HAVE TO GET RECERTIFIED TO SERVICE AND

7    R102 SYSTEM?

8    **A.**  EVERY THREE YEARS.

9    **Q.**  HAVE YOU DONE THAT SINCE 1999?

10   **A.**  YES.

11   **Q.**  HAVE YOU EVER PROVIDED ANY TRAINING RELATED TO FIRE

12   SUPPRESSION SYSTEMS?

13   **A.**  YES.

14   **Q.**  CAN YOU DESCRIBE THAT TRAINING?

15   **A.**  YES, I HAVE A PYROCHEM SYSTEM AND A R102 ANSUL SYSTEM MOCK

16   SET UP IN OUR CLASSROOM.  WE HAVE A CLASSROOM WITH POWER POINT

17   PRESENTATION.

18          I'VE DONE TRAININGS FOR HAJ, WHICH IS THE AUTHORITY

19   HAVING JURISDICTION OR FIRE INSPECTORS, WHOEVER WOULD BE

20   APPROVING PLANS WE DO TRAININGS FOR THEM, AS WELL AS OTHER FIRE

21   EQUIPMENT COMPANIES BECAUSE WE SELL TO THEM AS WELL.  SO WE

22   HAVE TRAININGS FOR THOSE FOLKS AS WELL.

23   **Q.**  I THINK YOU MAY HAVE TOUCHED ON THIS, SOMETIMES THOSE

24   SESSIONS INVOLVE ANSUL SYSTEMS?

25   **A.**  YES, SPECIFICALLY R102 AND PYROCHEM, THE ANSUL R102 AND

1   KITCHEN 92 PYROCHEM.

2   **Q.**  ARE YOU A MEMBER OF ANY ORGANIZATIONS RELATED TO YOUR

3   CAREER.

4   **A.**  YES.  I'M AN NFPA MEMBER, WE RECEIVE THEIR -- ALL OF THEIR

5   DOCUMENTS EVERY YEAR, WE KEEP RENEWING OUR SUBSCRIPTION.  I'M A

6   MEMBER OF THE AMERICAN FIRE SPRINKLER ASSOCIATION AND MEMBER OF

7   CALSAFE.

8   **Q.**  IF YOU COULD -- PROBABLY SHOULD HAVE TOUCHED ON THIS

9   EARLIER, CAN YOU DESCRIBE FOR THE JURY WHAT YOU DO WHEN YOU

10  SERVICE AN ANSUL SYSTEM, THE STEPS YOU TAKE?

11  **A.**  THE STEPS YOU TAKE ARE, FIRST OF ALL, YOU DISARM THE SYSTEM

12  BECAUSE IT'S ARMED AND READY TO GO, SO YOU HAVE TO DISARM IT,

13  AND THEN YOU GO THROUGH ALL THE COMPONENTS OF THE SYSTEM TO

14  MAKE SURE EVERYTHING IS WORKING PROPERLY.

15          WE FOLLOW THE ANSUL MANUAL, THERE SEVERAL STEPS

16  INVOLVED I CAN GO INTO ALL OF THEM.

17  **Q.**  NOT YET.

18  **A.**  PRETTY INVOLVED.

19          **MR. SULLIVAN:**  YOUR HONOR, I TENDER HIM AS AN EXHIBIT

20  WITNESS REGARDING THE INSTALLATION AND MAINTENANCE AND

21  OPERATION OF FIRE SUPPRESSION SYSTEMS IN GENERAL AND

22  SPECIFICALLY THE ANSUL R102 SYSTEM.

23          **THE COURT:**  ANY OBJECTION OR OPPORTUNITY TO

24  CROSS-EXAMINE MR. CARLSEN CONCERNING HIS?

25          **MR. TOLIVER:**  I DON'T BELIEVE HE'S QUALIFIED UNDER 702

1   AND 703.  HE HAS NO MORE QUALIFICATION OF MR. WILLIAMS.

2          **THE COURT:**  I'LL ALLOW CROSS-EXAMINATION YOUR

3   OBJECTION IS OVERRULED AT THIS POINT.  YOU WISH TO

4   CROSS-EXAMINE NOW OR WOULD YOU LIKE TO WAIT UNTIL FURTHER?

5          **MR. TOLIVER:**  I'LL WAIT.  SO THE TENDER PERMITTED AND

6   MAY PROCEED WITH THE EXAMINATION AND RESERVE THE CROSS-EXAM

7   UNTIL LATER.

8          **MR. SULLIVAN:**  THANK YOU, YOUR HONOR.

9   **Q.**  MR. CARLSEN, WERE YOU RETAIN TO PROVIDE EXPERT WITNESS'

10  TESTIMONY IN THE CASE?

11  **A.**  YES.

12  **Q.**  BY WHOM?

13  **A.**  BY AMCO.

14  **Q.**  ARE YOU BEING PAID FOR YOUR SERVICES?

15  **A.**  I AM.

16  **Q.**  BY WHOM?

17  **A.**  BY AMCO.

18  **Q.**  AND CAN YOU EXPLAIN TO THE JURY -- STRIKE THAT.

19          CAN YOU EXPLAIN TO THE JURY THE WORK YOU PERFORMED ON

20  THIS CASE SO FAR?

21  **A.**  I'VE REVIEWED DOCUMENTS, I'VE REVIEWED PHOTOS AND I SAT IN

22  ON A COUPLE OF DEPOSITIONS AND THAT SORT OF THING.

23  **Q.**  WELL, WHOSE DEPOSITION DID YOU SIT IN ON?

24  **A.**  ROSS WILLIAMS.

25  **Q.**  DID YOU --

| 1  | **A.**  TWICE. |

1    **A.**  TWICE.

2    **Q.**  YOU SAT ON TWO DIFFERENT SESSIONS OF HIS DEPOSITION?

3    **A.**  YES.

4    **Q.**  AND DID YOU REVIEW THE TRANSCRIPTS FROM THOSE DEPOSITIONS?

5    **A.**  I DID.

6    **Q.**  DID YOU EVER REVIEW ANY OF MR. WILLIAMS INSPECTION REPORTS

7    RELATED TO THE CANDY STICK RESTAURANT?

8    **A.**  YES.

9    **Q.**  AND FOR WHAT PURPOSE DID YOU REVIEW THOSE?

10   **A.**  I REVIEWED THEM TO SEE WHAT TYPE OF SERVICE WAS BEING DONE

11   AND WHAT TYPE OF NOTES WERE BEING TAKEN.

12   **Q.**  AND DID YOU REVIEW ANY OF THE INVOICES THAT EUREKA OXYGEN

13   PROVIDED TO MS. ELLEBRECHT AT THE CANDY STICK?

14   **A.**  YES.

15   **Q.**  FOR WHAT PURPOSE DID YOU REVIEW THOSE?

16   **A.**  THE SAME PURPOSE, TO SEE WHAT TYPES OF PRODUCT WAS BEING

17   SOLD AT THE JOB SITE AND WHAT THE TYPE OF NOTES WERE BEING

18   TAKEN ON THE FORM.

19   **Q.**  AND I THINK YOU MENTIONED THAT YOU REVIEWED PHOTOGRAPHS AS

20   WELL?

21   **A.**  YES.

22   **Q.**  AND DO YOU KNOW WHO TOOK THOSE PHOTOGRAPHS?

23   **A.**  KEN RIDINGS.

24   **Q.**  DID YOU RELY ON ANYTHING YOU TALKED ABOUT WITH KEN RIDINGS

25   ASIDE FROM THE FACT HE TOOK THOSE PHOTOGRAPHS?

1    **A.**  NO.

2    **Q.**  YOU FORMED THESE OPINIONS ON YOUR OWN?

3    **A.**  BASED UPON THE PHOTOGRAPHS.

4    **Q.**  DID YOU PREPARE A REPORT FOR THIS CASE?

5    **A.**  I DID.

6    **Q.**  YOU HAVE THAT IN FRONT OF YOU?

7    **A.**  I DO.

8    **Q.**  AND DO YOU HAVE ANY UNDERSTANDING IN GENERAL WHAT THE

9    INDUSTRY STANDARDS ARE FOR A TECHNICIAN SERVICING FIRE

10   SUPPRESSION SYSTEMS?

11   **A.**  YES.

12           **MR. TOLIVER:**  OBJECTION.  OVERBROAD.

13           **THE COURT:**  OVERRULED.

14           YOU CAN ANSWER.

15           **THE WITNESS:**  YES.  AT THE TRAININGS I DO, SOME OF THE

16   SEMINARS I'VE BEEN AT, WE DISCUSS BASIC INDUSTRY STANDARDS AND

17   INDUSTRY PRACTICES.  WE GO OVER SOME OF THE PITFALLS SOMEONE

18   MIGHT SEE IN THE FIELD AND TRY TO COME UP WITH STANDARD TO

19   COMBAT THEM.

20   **BY MR. SULLIVAN:  Q.**  YOU PARTICIPATE IN THESE DISCUSSIONS,

21   CORRECT?

22   **A.**  YES.

23   **Q.**  YOUR UNDERSTANDING WHEN YOU WERE CONTRIBUTING TO THESE

24   DISCUSSIONS COMES FROM YOUR EXPERIENCE IN THE FIRE SUPPRESSION

25   INDUSTRY?

1    **A.**  YES.  AND INDUSTRY KNOWLEDGE, YES.

2    **Q.**  DOES IT INCLUDE A -- YOUR REVIEW OF CERTAIN RULES AND

3    REGULATIONS?

4    **A.**  YES.

5    **Q.**  DOES IT INCLUDE ANY SECTIONS OF THE NFPA?

6    **A.**  YES.

7    **Q.**  AND I MAY HAVE SKIPPED AHEAD, PROBABLY BEEN TALKED ABOUT,

8    CAN YOU TELL THE JURY WHAT THE NFPA IS?

9    **A.**  NATIONAL FIRE PREVENTION ASSOCIATION AND THEY DEVELOPED

10   CODES AND STANDARDS FOR THE FIRE PROTECTION INDUSTRY.  BUT NOT

11   ONLY THAT, BUT EVERY BUILDING YOU WALK INTO ELECTRICAL

12   STANDARDS, PLUMBING STANDARDS, YOU NAME IT NFPA HAS SOMETHING

13   TO DO WITH IT.

14   **Q.**  DID YOU RELY ON ANY SPECIFIC SECTIONS OF THE NFPA?

15   **A.**  NFPA 17A.

16   **Q.**  AND HOW ABOUT THE ANSUL INSTALLATION MANUAL, DID YOU RELY

17   ON THAT TO FORM ANY OF YOUR OPINIONS?

18   **A.**  I DID.

19   **Q.**  BOTH OF THOSE ARE ATTACHED TO YOUR REPORT, CORRECT?

20   **A.**  CORRECT.

21   **Q.**  CAN YOU EXPLAIN TO THE JURY -- LET ME STRIKE THAT.

22        DO YOU HAVE AN OPINION REGARD WHETHER OR NOT MR.

23   WILLIAMS AND EUREKA OXYGEN COMPANY MET THE STANDARD OF CARE?

24   **A.**  I DO.

25        **THE COURT:**  MAKE SURE WE GOT NO OVERLAP BETWEEN

1    QUESTIONS AND ANSWERS.

2         TRY IT AGAIN.

3    BY MR. SULLIVAN:  Q.  ONE MORE TIME.  DO YOU HAVE ANY OPINION

4    REGARDING WHETHER OR NOT MR. WILLIAMS AND EUREKA OXYGEN COMPANY

5    MET THE STANDARD OF CARE IN SERVICING THE ANSUL R102 SYSTEM

6    THAT WAS AT THE CANDY STICK RESTAURANT?

7         MR. TOLIVER:  OBJECTION.  LACKS FOUNDATION.

8         THE COURT:  THE QUESTION IS WHETHER HE HAS OR NOT,

9    WHAT IT IS.  YOU CAN ANSWER THE QUESTION WHETHER YOU DO HAVE AN

10   OPINION OR NOT.

11        THE WITNESS:  I DO HAVE AN OPINION.

12   BY MR. SULLIVAN:  Q.  WHAT IS THAT OPINION?

13        MR. TOLIVER:  SAME OBJECTION.

14        THE COURT:  OVERRULED.

15        THE WITNESS:  MY OPINION IS THAT BASED UPON SOME OF

16   THE THINGS THAT I'VE LOOKED AT, THE THINGS WE'VE DISCUSSED, IS

17   THAT A LOT OF THE STANDARD PRACTICE THAT SHOULD HAVE BEEN

18   FOLLOWED WERE NOT FOLLOWED.

19   BY MR. SULLIVAN:  Q.  BY THINGS YOU DISCUSSED YOU MEAN THE

20   MATERIALS WE JUST WENT OVER?

21   A.  THE ANSUL --

22   Q.  YOU HAVE TO LET ME FINISH.  THE THINGS WE DISCUSSED AND NOT

23   DISCUSSIONS BETWEEN ME AND YOU, WHAT YOU JUST TOLD THE JURY

24   ABOUT WHAT YOU REVIEWED TO COME TO YOUR CONCLUSIONS, CORRECT?

25   A.  YES.

1    Q.  AND WHAT IS THE BASIS FOR YOUR OPINION THAT EUREKA OXYGEN

2    FELL BELOW STANDARD OF CARE?

3             BY BASIS WHY DO YOU HAVE THAT OPINION?

4             MR. TOLIVER:  OBJECTION, YOUR HONOR.  VAGUE, AMBIGUOUS

5    WITH RESPECT TO WHAT STANDARD OF CARE.

6             THE COURT:  THAT'S A STATE -- BE CLEAR ABOUT WHAT

7    YOU'RE ASKING.

8    BY MR. SULLIVAN:  Q.  YOU HAVE AN OPINION WHETHER OR NOT MR.

9    WILLIAMS AND EUREKA OXYGEN MET THE STANDARD OF CARE IN

10   SERVICING THE ANSUL SYSTEM FROM ROUGHLY 2003 TO 2008 CONCLUDING

11   WITH AN INSPECTION IN MAY?

12            THE COURT:  SAME OBJECTION SUSTAIN.  USE THE TERM

13   STANDARD OF CARE TWICE AND I'M NOT SURE WHAT YOU'RE REFERRING

14   TO.

15            MR. SULLIVAN:  OKAY.

16            THE COURT:  I'M NOT SURE THE WITNESS AND THE JURY ALSO

17   MAYBE CONFUSED, SO PLEASE BE CLEAR.

18   BY MR. SULLIVAN:  Q.  IS IT YOUR UNDERSTANDING THAT A FIRE

19   SUPPRESSION SYSTEM TECHNICIAN HAS A STANDARD OF CARE HE'S

20   SUPPOSE TO MEET WHEN HE SERVICES THE SYSTEM?

21   A.  YES.

22   Q.  AND IS IT YOUR UNDERSTANDING MR. WILLIAMS BREACHED THAT

23   STANDARD OF CARE?

24            MR. TOLIVER:  OBJECTION, YOUR HONOR.

25            MR. SULLIVAN:  WELL GET TO WHY.

1          **THE COURT:**  NO, SUSTAINED.

2     **BY MR. SULLIVAN:  Q.**  DO YOU HAVE ANY OPINION WHETHER OR NOT

3     MR. WILLIAMS PROPERLY ALIGNED THE NOZZLE OVER THE DEEP FAT

4     FRYER IN THE CANDY STICK RESTAURANT?

5          **MR. TOLIVER:**  OBJECTION, YOUR HONOR.  LACKS

6     FOUNDATION, ASSUMES FACTS NOT IN EVIDENCE.  AND 702 AND 703.

7          **THE COURT:**  OVERRULED.

8          **THE WITNESS:**  COULD YOU REPEAT?

9     **BY MR. SULLIVAN:  Q.**  YEAH.  DO YOU HAVE ANY OPINION REGARDING

10    WHETHER MR. WILLIAMS FAILED TO INSURE THE NOZZLE OF THE ANSUL

11    SYSTEM AT THE CANDY STICK RESTAURANT WAS PROPERLY ALIGNED TO

12    EXTINGUISH A FIRE IN THE DEEP FAT FRYER?

13    **A.**  YES.

14         **MR. TOLIVER:**  OBJECTION, YOUR HONOR.

15         **THE COURT:**  THE OBJECTION IS OVERRULED.  THE QUESTION

16    DOES HE HAVE AN OPINION.  I'LL GRANT THE ANSWER TO THE

17    QUESTION, BUT YOU'RE ON A TOPIC THERE WAS PRETRIAL RULING ON,

18    SO BE VERY CAREFUL ON IN YOUR NEXT QUESTIONS ON THIS TOPIC.

19         **MR. SULLIVAN:**  I DON'T -- I'M NOT TRYING TO GO TO

20    WHERE THAT RULING WAS, I'M JUST ASKING IF --

21         **THE COURT:**  PROCEED.  YOU'RE ON NOTICE.

22    **BY MR. SULLIVAN:  Q.**  IN -- WHEN A SERVICE TECHNICIAN OF A FIRE

23    SUPPRESSION SYSTEM EXAMINES THE SYSTEM, WHAT IS THE STANDARD OF

24    CARE THAT HE MUST USE TO INSURE THAT THE SYSTEM WILL FUNCTION

25    AS DESIGNED?

1          **MR. TOLIVER:**  VAGUE, AMBIGUOUS, OVERBROAD.

2          **THE COURT:**  SUSTAINED.

3     **BY MR. SULLIVAN:  Q.**  WHEN A SERVICE TECHNICIAN INSPECTS THE --

4     HOW THE NOZZLES ARE ALIGNED OVER THE FRYER -- LET ME STRIKE

5     THAT.

6          IN GENERAL WHEN A SERVICE TECHNICIAN FOR AN ANSUL

7     SYSTEMS IS INSPECTING THE NOZZLES TO INSURE THEY ARE PROPERLY

8     ASSIGNED OVER THE APPLIANCES THAT THEY ARE SUPPOSED TO BE

9     COVERING, IS IT YOUR UNDERSTANDING THAT THERE IS A CERTAIN

10    STANDARD OF CARE THAT THAT SERVICE TECHNICIAN MUST FULFILL?

11    **A.**  YES.

12    **Q.**  AND CAN YOU EXPLAIN WHAT THAT STANDARD IS?

13    **A.**  THE STANDARD IS THAT THE NOZZLE IS SPECIFIC TO A CERTAIN

14    APPLIANCE, AND THE POSITION OF THE NOZZLE VIA THE

15    MANUFACTURER'S MANUAL, IS REQUIRED TO BE IN A CERTAIN POSITION,

16    AND THE AIMING POINT IS REQUIRED TO BE IN A CERTAIN POSITION IN

17    ORDER FOR THAT NOZZLE TO MEET THE MANUFACTURER'S REQUIREMENT.

18    **Q.**  AND DO YOU KNOW WHY THAT IS?

19    **A.**  YES, BECAUSE THE NOZZLES ARE DESIGNED --

20          **MR. TOLIVER:**  OBJECTION, YOUR HONOR.  MOVE TO STRIKE

21    AFTER THE ANSWER YES AS NONRESPONSIVE.

22          **THE COURT:**  SUSTAINED.  YOU CAN CONTINUE WITH A NEW

23    QUESTION.

24          **MR. SULLIVAN:**  CAN I CONSULT WITH AN ATTORNEY FOR ONE

25    MOMENT?  10 SECONDS.

1          **THE COURT:**  YES.

2          **MR. TOLIVER:**  YOU WANT TO CONSULT WITH ME?

3                    (PAUSE IN PROCEEDINGS.)

4          **MR. SULLIVAN:**  SORRY, I APOLOGIZE FOR THAT.

5     **Q.**  MR. CARLSEN, DO YOU HAVE AN UNDERSTANDING WHAT THE TERM

6     STANDARD OF CARE MEANS?

7     **A.**  YES.

8     **Q.**  DO YOU HAVE AN UNDERSTANDING WHAT THAT TERM MEANS FOR A

9     TECHNICIAN IN THE FIRE SUPPRESSION BUSINESS?

10    **A.**  YES.

11    **Q.**  CAN YOU TELL ME WHAT THAT DEFINITION IS?

12    **A.**  DEFINITION STANDARD OF CARE WOULD BE FOLLOWING THE

13    MANUFACTURER'S REQUIREMENTS FOR SERVICING THAT SYSTEM OR ALSO

14    BE TO FOLLOW INDUSTRY STANDARD SUCH AS NFPA, WHO MAY OR MAY NOT

15    BE A GOVERNING BODY IN CERTAIN JURISDICTION, BUT THE

16    MANUFACTURERS OF THE FIRE SUPPRESSION SYSTEM RELY ON NFPA 17A

17    SPECIFICALLY TO DEVELOP THEIR PROCEDURES.

18    **Q.**  AND DO YOU HAVE AN OPINION REGARDING WHETHER OR NOT MR.

19    WILLIAMS MET THAT STANDARD OF CARE WITH RESPECT TO HIS WORK

20    SERVICING THE ANSUL SYSTEM IN THE CANDY STICK RESTAURANT?

21    **A.**  YES.

22    **Q.**  WHAT IS THAT OPINION?

23    **A.**  MY OPINION IS THAT HE DID NOT MEET THAT STANDARD OF CARE.

24    **Q.**  WHAT IS THE BASIS OF THAT OPINION?

25    **A.**  THE ALIGNMENT OF THE NOZZLES.

1              **MR. TOLIVER:**  OBJECTION, YOUR HONOR.  MOVE TO STRIKE,

2  LACKS FOUNDATION, ASSUMES FACTS NOT IN EVIDENCE.

3              **THE COURT:**  OVERRULED.

4  **BY MR. SULLIVAN:  Q.**  YOU WERE SAYING THE ALIGNMENT OF THE

5  NOZZLES, CAN YOU DESCRIBE FOR THE JURY WHY THE ALIGNMENT OF THE

6  NOZZLE LED TO YOU CONCLUDE MR. WILLIAMS DID NOT MEET THE

7  STANDARD OF CARE IN SERVICING THE ANSUL SYSTEM IN THE CANDY

8  STICK RESTAURANT?

9  **A.**  YES.

10  **Q.**  PLEASE EXPLAIN TO THE JURY?

11  **A.**  A COUPLE OF PHOTOS I LOOKED AT SHOWED --

12              **MR. TOLIVER:**  OBJECTION.

13              **THE COURT:**  SUSTAINED.

14              **MR. SULLIVAN:**  MAYBE I'LL PUT THE PHOTO UP THAT WE'RE

15  TALKING ABOUT AS NUMBER 28.

16              **THE COURT:**  RIGHT.

17              **MR. SULLIVAN:**  THERE'S NOTHING --

18              **THE COURT:**  CAUTION YOU TO BE VERY CAREFUL, YOU

19  WEREN'T VERY CAREFUL, IF YOU WANT TO PROCEED WITH EXHIBIT 28 GO

20  AHEAD.

21  **BY MR. SULLIVAN:  Q.**  MR. CARLSEN, HAVE YOU SEEN THIS PHOTO

22  BEFORE?

23  **A.**  YES.

24  **Q.**  DO YOU KNOW WHO TOOK IT?

25  **A.**  YES.

1   **Q.**  WHO?

2   **A.**  KEN RIDINGS.

3   **Q.**  AND DO YOU KNOW WHERE THAT PHOTO IS?

4   **A.**  YES.

5   **Q.**  WHERE?

6   **A.**  IT'S THE CANDY STICK RESTAURANT VIEWING OF TWO FRYERS.

7   **Q.**  IS IT YOUR UNDERSTANDING THAT THE BIG FRYER ON THE RIGHT IS

8   THE ONE THAT IS SUBJECT OF THIS LITIGATION?

9   **A.**  YES.

10  **Q.**  AND DO YOU HAVE AN OPINION REGARDING WHETHER OR NOT THAT

11  NOZZLE IS PROPERLY COVERING THAT FRYER?

12          **MR. TOLIVER:**  OBJECTION.  LACKS FOUNDATION.

13          **THE COURT:**  OVERRULED.

14          **THE WITNESS:**  YES.

15  **BY MR. SULLIVAN:  Q.**  WHAT IS THAT OPINION?

16  **A.**  THE OPINION IS THE -- ON THE OUTSIDE EDGE OF THE FRYER THE

17  NOZZLE IS RIGHT THERE, I BELIEVE, SOMEWHERE IN THAT AREA,

18  THERE'S THE EDGE OF THE FRYER AND IT'S POSITIONED ON THAT EDGE.

19  **Q.**  THE BASIS OF YOUR OPINION IS THIS PHOTOGRAPH, CORRECT?

20  **A.**  YES.

21  **Q.**  YOU CAN TELL FROM THIS PHOTOGRAPH THAT THAT NOZZLE NOT

22  PROPERLY ALIGNED?

23          **MR. TOLIVER:**  OBJECTION, YOUR HONOR.  SPECULATION,

24  HE'S LOOKING AT A PHOTOGRAPH THREE MONTHS AFTER THE FIRE.

25          **THE COURT:**  OVERRULED.  YOU CAN CROSS-EXAMINE HIM

1  ABOUT IT.

2          **MR. TOLIVER:**  WILL DO.  THANK YOU.

3          **THE COURT:**  YOU CAN REPHRASE THE QUESTION OR REPEAT

4  IT.

5  **BY MR. SULLIVAN:  Q.**  YOU CAN TELL FROM THIS PHOTOGRAPH ALONE

6  THAT THAT NOZZLE IS NOT PROPERLY ALIGNED OVER THAT DEEP FRYER,

7  CORRECT?

8  **A.**  YES.

9  **Q.**  WHY IS THAT?

10  **A.**  BECAUSE THE NOZZLE IS ON THE OUTSIDE EDGE AND IT'S POINTING

11  STRAIGHT DOWN.

12  **Q.**  WHERE SHOULD THE NOZZLE BE POINTING AT?

13  **A.**  SHOULD BE POINTED TOWARDS THE CENTER OF THE HAZARD.

14  **Q.**  YOU CAN TELL FROM THAT PHOTO IT'S NOT POINTED TOWARD --

15          **MR. TOLIVER:**  OBJECTION.  ASKED AND ANSWERED.

16          **THE COURT:**  OVERRULED.

17          **THE WITNESS:**  YES.

18  **BY MR. SULLIVAN:  Q.**  AND IN YOUR OPINION DOES THE FAILURE TO

19  PROPERLY ALIGN THAT NOZZLE, SO THAT IT'S POINTED AT THE MIDDLE

20  OF THE FRYER, FALL BELOW THE STANDARD OF CARE FOR A FIRE

21  SUPPRESSION TECHNICIAN?

22          **MR. TOLIVER:**  OBJECTION, LACKS FOUNDATION, ASSUMES

23  FACTS IN EVIDENCE, THAT WAS THE CONDITION OF THE SYSTEM AT THE

24  TIME OF THE FIRE OR AT THE TIME OF SERVICE IN MAY OF 2008.

25          **THE COURT:**  OVERRULED.

1          **THE WITNESS:** YES.

2     **BY MR. SULLIVAN:  Q.** OKAY. IN YOUR COMPANY'S -- IT'S YOUR

3     COMPANY WHICH YOU RUN, CORRECT?

4     **A.** YES.

5     **Q.** HOW MANY EMPLOYEES DO YOU HAVE?

6     **A.** I HAVE -- I JUST HIRED A COUPLE, I HAVE 11.  10, I'M SORRY.

7     **Q.** AND CAN YOU -- IS IT YOUR COMPANY'S CUSTOM AND PRACTICE TO

8     INSURE THAT A NOZZLE COVERING AN APPLIANCE IS POINTED TO THE

9     CENTER OF THAT APPLIANCE?

10    **A.** YES.

11    **Q.** WHY IS THAT?

12    **A.** BECAUSE IT'S SPECIFIC TO PUTTING THAT -- YOU WANT TO GET AS

13    MUCH AGENT AS YOU CAN ON THAT APPLIANCE.  IF YOU'RE OFF TO THE

14    SIDE ANY BIT THE PATTERN WILL SPRAY OFF -- AWAY FROM THE

15    DESIGNATED AREA.

16    **Q.** CAN YOU EXPLAIN THE STEPS THAT -- ACTUALLY STRIKE THAT.

17          IS IT YOUR OPINION THAT THE FAILURE TO PROPERLY ALIGN

18    THE NOZZLE OVER A FRYER SUCH AS IN FIGURE 28 CAN HAMPER THE

19    PERFORMANCE OF THE ANSUL SYSTEM IN EXTINGUISHING A FIRE?

20          **MR. TOLIVER:** OBJECTION, LACKS FOUNDATION, ASSUMES

21    FACTS NOT IN EVIDENCE, CALLS FOR SPECULATION.

22          **THE COURT:** OVERRULED.

23          YOU MAY ANSWER.

24          **THE WITNESS:** YES.

25    **BY MR. SULLIVAN:  Q.** HOW DOES IT DO THAT?

1    **A.**  WELL, AS I ALREADY EXPLAINED, IF THE NOZZLE IS OFF TO A

2    SIDE OR IT'S NOT SPECIFIC TO THE AREA YOU WON'T GET THE

3    CHEMICAL ON TO THE HAZARD THAT YOU WANT TO GET ON THE HAZARD,

4    ALIGNMENT THE NOZZLE IS CRITICAL.

5    **Q.**  YOU UNDERSTAND THE R102 SYSTEM IS DESIGNED TO EXTINGUISH A

6    FIRE, CORRECT?

7    **A.**  CORRECT.

8    **Q.**  AND IF IT'S -- YOU UNDERSTAND THAT IF IT'S -- THE R102

9    SYSTEM IS CORRECTLY ALIGNED AND EVERYTHING ELSE ABOUT THE

10   SYSTEM MAINTAINED PROPERLY IT WILL EXTINGUISH A FIRE, CORRECT?

11   **A.**  CORRECT.

12   **Q.**  WHEN YOU INSTALLED THESE SYSTEMS DO YOU INFORM YOUR CLIENTS

13   THAT THESE ARE INTENDED TO EXTINGUISH FIRES?

14   **A.**  YES.

15   **Q.**  AS OPPOSED TO JUST CONTAINING THE FIRE AND NOT COMPLETELY

16   PUTTING IT OUT?

17   **A.**  YES, IT IS DESIGNED TO PUT THE FIRE OUT.

18   **Q.**  DO YOU HAVE ANY OPINION REGARDING THE EFFECT OF THE

19   MISALIGNMENT IN THIS PICTURE OF THIS -- THIS MISALIGNMENT'S

20   EFFECT ON THE ABILITY OF THIS ANSUL SYSTEM TO EXTINGUISH A FIRE

21   IN THAT DEEP FAT FRYER?

22        **MR. TOLIVER:**  OBJECTION.  LACKS FOUNDATION, ASSUMES

23   FACTS NOT IN EVIDENCE, CALLS FOR SPECULATION AND ASKED AND

24   ANSWERED.

25        **THE COURT:**  OVERRULED.

1          **THE WITNESS:**  YES, I DO.

2     **BY MR. SULLIVAN:  Q.**  WHAT IS THAT OPINION?

3     **A.**  THE OPINION IS THE AGENT REQUIRED TO FORM A FILM COVERS THE

4     FRYER WAS NOT ENOUGH AGENT OR MAY NOT BE ENOUGH AGENT IF IT'S

5     MISALIGNED TO PUT THAT -- TO PUT THE BLANKET DOWN THAT NEEDS TO

6     SEAL.

7     **Q.**  THAT OPINION IS BASED ON YOUR REVIEW OF THIS PHOTOGRAPH,

8     CORRECT?

9     **A.**  YES.

10    **Q.**  AND YOUR WORK IN THE FIRE SUPPRESSION INDUSTRY, WHICH I

11    THINK YOU MENTIONED EARLIER INVOLVED OVER 200 DESIGNS, 125

12    INSTALLATIONS AND 500 TO 600 SERVICING OF FIRE SUPPRESSION

13    SYSTEMS, CORRECT?

14    **A.**  CORRECT.

15    **Q.**  AND IS THERE -- CAN YOU EXPLAIN HOW THE SUPPRESSION AGENT

16    SUPPOSED TO COME OUT OF THAT NOZZLE?

17    **A.**  THAT PARTICULAR NOZZLE IS A 230 NOZZLE, IT HAS TWO -- IT'S

18    RATED WITH TWO FLOWS AND IT HAS A 30-DEGREE PATTERN, SO THE

19    PATTERN -- SPRAY PATTERN WOULD BE 30 DEGREES.

20    **Q.**  THAT MEANS THAT'S 30 DEGREES OUT TO EACH SIDE, CORRECT?

21    **A.**  CORRECT.

22    **Q.**  SO IF THAT NOZZLE IS POINTED DOWN THEN LOOKS LIKE HALF IS

23    GOING GO IN THE DEEP FRYER AND THE OTHER HALF GOING TO GO IN

24    THE LITTLE FRYER, CORRECT?

25          **MR. TOLIVER:**  OBJECTION, INCOMPLETE HYPOTHETICAL,

1  CALLS FOR SPECULATION, LACKS FOUNDATION.

2       **THE COURT:**  OVERRULED.

3       **THE WITNESS:**  YES, WHATEVER PORTION IS NOT OVER THE

4  EDGE, AND IT APPEARS TO BE ON THE EDGE, WHATEVER PORTION IS NOT

5  OVER THE EDGE IS GOING TO BE OUTSIDE THE HAZARD AREA.

6  **BY MR. SULLIVAN:  Q.**  AND IF THE SUPPRESSION AGENT DOESN'T GET

7  ON THE FIRE IT CAN'T PUT THE FIRE OUT, CORRECT?

8  **A.**  CORRECT.

9  **Q.**  AND IF THE SUPPRESSION AGENT HAD BEEN OVER THE ENTIRE FRYER

10  IT WOULD -- LET ME STRIKE THAT.

11       IF THE NOZZLE OVER THAT DEEP FAT FRYER HAD BEEN

12  PROPERLY ALIGNED IT WOULD HAVE COVERED THE ENTIRE FRYER WITH

13  THE SUPPRESSION AGENT, CORRECT?

14  **A.**  CORRECT.

15  **Q.**  DID YOU ATTEND THE DEPOSITION OF MR. WILLIAMS?

16  **A.**  YES.

17  **Q.**  BOTH DAYS?

18  **A.**  YES.

19  **Q.**  AND ARE YOU AWARE HE TESTIFIED AT THAT DEPOSITION THAT HE

20  ACTUALLY CHECKED THE ALIGNMENT OF THE NOZZLE AT THE LAST

21  INSPECTION HE PERFORMED FOUR MONTHS BEFORE THE FIRE?

22       **THE COURT:**  COUNSEL, WERE NOT JUST GOING TO READ IN

23  PRIOR DEPOSITION, BUT YOU WANT TO ASK SOME QUESTIONS ABOUT IT,

24  YOU MAY.

25  **BY MR. SULLIVAN:  Q.**  WELL, SITTING THROUGH THAT DEPOSITION AND

1    HEARING HIS TESTIMONY DID THAT CAUSE YOU TO DOUBT YOUR OPINION

2    IN ANY WAY?

3    **A.**  NO.

4    **Q.**  WHY NOT?

5    **A.**  BECAUSE OF THE PHOTOS THAT I SEEN OF THIS PARTICULAR NOZZLE

6    AND THE TWO OTHER NOZZLES ON THAT SYSTEM THAT WERE ALSO

7    MISALIGNED THAT CAUSED ME TO DOUBT THE VALIDITY OF WHETHER OR

8    NOT THEY WERE -- WHETHER OR NOT THEY WERE ALIGNED PROPERLY.

9            **MR. SULLIVAN:**  IF I MAY.

10   **Q.**  HAVE YOU SEEN THIS PHOTO BEFORE?

11   **A.**  YES.

12   **Q.**  DOES THIS PHOTO DEPICT THREE NOZZLES?

13   **A.**  IT DOES.

14   **Q.**  THE ONE ON THE FAR LEFT IS COVERING THE DEEP FAT FRYER THAT

15   WE WERE JUST LOOKING AT, CORRECT?

16   **A.**  THAT'S CORRECT.

17   **Q.**  I THINK YOU MENTIONED THE OTHER NOZZLES COVERING THE

18   APPLIANCES WERE MISALIGNED AS WELL?

19   **A.**  YES.

20   **Q.**  CAN YOU START WITH THE ONE IN THE MIDDLE AND EXPLAIN TO

21   JURY HOW THOSE ONES ARE MISALIGNED?

22   **A.**  THE ONE IN THE MIDDLE IS OVER A TWO BURNER, THE APPLIANCE

23   BELOW THOSE TWO NOZZLES --

24           **MR. TOLIVER:**  OBJECTION, YOUR HONOR, 403.

25           **THE COURT:**  OVERRULED.

1          **THE WITNESS:**  BELOW THOSE TWO NOZZLES IS AN APPLIANCE,

2     IT'S A COMBINATION UNIT.  BASED ON THE PHOTO IT'S A TWO BURNER

3     GRATE ON THE LEFT WHICH WOULD BE CENTER AND THEN A FLAT TOP

4     GRIDDLE FOR COOKING HAMBURGERS ON THE FAR RIGHT CLOSEST TO US.

5          AND THE CENTER NOZZLE IS A 245 NOZZLE BASED UPON A

6     SKETCH DONE BY ANOTHER FIRE SUPPRESSION COMPANY THAT HAD DONE

7     THE -- EITHER THE INSTALLATION OR SERVICE THERE.  IT'S A 245

8     NOZZLE AND THAT NOZZLE WOULD BE APPROPRIATE IF THAT SHELF

9     WASN'T THERE.

10    **Q.**  THAT SHELF IS THERE?

11    **A.**  THAT SELF IS THERE.

12    **Q.**  WHAT APPLIANCE DOES THE THIRD NOZZLE COVER, THAT WOULD BE

13    THE NOZZLE ON THE FAR RIGHT, CORRECT?

14    **A.**  THAT IS A ONE END NOZZLE, IT ALSO WOULD BE APPROPRIATE IF

15    IT WERE OUT OF THE AREA OF THAT SHELF.  THE SHELF WAS NOT AN

16    OBSTRUCTION.

17    **Q.**  AND YOUR OPINION IS BASED ON THE ASSUMPTION THAT THIS

18    ACCURATELY DEPICTS WHAT THAT ANSUL SYSTEM LOOKED LIKE COVERING

19    THOSE APPLIANCES AT THE TIME OF THE FIRE, CORRECT?

20          **MR. TOLIVER:**  OBJECTION.  LACKS FOUNDATION, ASSUMES

21    FACTS NOT EVIDENCE.

22          **THE COURT:**  OVERRULED.

23          **THE WITNESS:**  YES.

24    **BY MR. SULLIVAN:  Q.**  AND DO YOU HAVE ANY CONCERN THAT MAYBE

25    THAT THE APPLIANCES OR THE NOZZLE IS MOVED?

1          **MR. TOLIVER:**  OBJECTION, YOUR HONOR.  VAGUE,

2     AMBIGUOUS, AND ASK FOR CLARIFICATION.  WHEN WE SAY TIME OF THE

3     FIRE ARE WE TALKING ABOUT AFTER THE FIRE AS DEPICTED IN THE

4     PHOTOGRAPHS OR BEFORE THE FIRE?

5          **THE COURT:**  SUSTAIN THE OBJECTION.  REPHRASE THE

6     QUESTION.

7     **BY MR. SULLIVAN:  Q.**  MY PREVIOUS QUESTION HAD TO DO WITH

8     WHETHER OR NOT YOU HAVE ANY CONCERN BASED ON THIS PHOTO THAT

9     MAYBE THE NOZZLE WAS MOVED FOLLOWING THE MAY 23RD 2008

10    INSPECTION?

11         **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION TO

12    THIS.  I'M NOT CONCERNED ABOUT THE WITNESS' CONCERNS, BUT HIS

13    OPINION AND ANYTHING ELSE THAT HE DID.

14    **BY MR. SULLIVAN:  Q.**  HAVE YOU EVER CONSIDERED WHETHER OR NOT

15    THAT NOZZLE COVERING THE DEEP FAT FRYER -- AND LET ME GO BACK

16    TO THAT PICTURE.

17         DO YOU HAVE ANY CONCERN THAT NOZZLE THAT'S SUPPOSED TO

18    BE COVERING THAT DEEP FAT FRYER WAS MOVED AFTER MR. WILLIAMS

19    MAY 23RD 2008 INSPECTION?

20         **MR. TOLIVER:**  GO AHEAD -- OBJECTION.

21         **THE COURT:**  SUSTAINED.

22         **MR. TOLIVER:**  SORRY.

23    **BY MR. SULLIVAN:  Q.**  DID YOU EVER CONSIDER WHETHER OR NOT

24    THERE WAS A POSSIBILITY THAT THAT NOZZLE COULD HAVE BEEN MOVED

25    AFTER MR. WILLIAMS MAY 23RD 2008 INSPECTION?

1          **MR. TOLIVER:**  403.  INCOMPLETE HYPOTHETICAL.

2          **THE COURT:**  OVERRULED.

3          NOT SURE I UNDERSTAND.

4  **BY MR. SULLIVAN:  Q.**  OKAY.

5  **A.**  DO I FEEL THAT IT WAS MOVED?

6  **Q.**  I'M NOT GOING TO ASK YOU THAT.

7          CAN YOU DESCRIBE FOR THE JURY THE DIFFERENT WAYS

8  AND -- LET ME STRIKE THAT.

9          CAN YOU DESCRIBE FOR THE JURY HOW YOU WOULD MOVE THAT

10  NOZZLE?

11  **A.**  THAT NOZZLE WOULD HAVE TO BE -- IT WOULD MOVE BACK AND

12  FORTH RELATIVELY EASY TOWARDS THE REAR OF THE HOOD AND TOWARDS

13  THE FRONT BECAUSE IT'S ON A TREE UP ABOVE.  EVERYTHING'S

14  CONNECTED AND GOES ACROSS.

15          IT WOULD NOT MOVE SIDE TO SIDE OR SWIVEL BECAUSE IF IT

16  WAS PROPERLY INSTALLED ALL THAT PIPING SHOULD BE VERY, VERY

17  TIGHT, AND THERE'S NO LEVERAGE TO SWIVEL IT BY HAND.  SO I

18  WOULD BELIEVE YOU WOULD BE -- NEED A WRENCH TO TURN THAT

19  NOZZLE.  THAT'S MY OPINION.

20  **Q.**  YOUR OPINION REGARDING THE MISALIGNMENT OF THE NOZZLE IS

21  NOT THAT IT'S MISALIGNED BACK AND FORTH IF YOU'RE LOOKING AT

22  THE PICTURE, IS THAT IT'S TOO FAR TO THE LEFT WHEN YOU'RE

23  LOOKING AT THE PICTURE, CORRECT?

24  **A.**  CORRECT.

25  **Q.**  I THINK, WHAT YOU JUST SAID IS THAT TO MOVE IT TO THE RIGHT

1   OR TO TWIST THE NOZZLE SO IT WAS COVERING THE CENTER OF THE

2   FRYER YOU WOULD NEED A WRENCH?

3   **A.**   THAT'S CORRECT.

4   **Q.**   THAT'S NOT SOMETHING SOMEONE COULD JUST DO BY USING THEIR

5   HAND AND MOVING IT, CORRECT?

6   **A.**   CORRECT.

7   **Q.**   AND DO YOU UNDERSTAND THAT A FIRE SUPPRESSION SERVICE

8   TECHNICIAN HAS A STANDARD OF CARE REGARDING THE REPLACEMENT OF

9   BLOW OFF CAPS?

10   **A.**   YES.

11   **Q.**   AND CAN YOU TELL THE JURY WHAT THAT STANDARD OF CARE IS?

12   **A.**   THE STANDARD OF CARE COME OUT OF ANSUL R102 MANUAL, THEY

13   REQUIRE A MINIMUM OF ANNUAL CHANGING OF THOSE NOZZLE CAPS.

14   MORE FREQUENTLY IF REQUIRED BASED UPON THE USAGE IN THE

15   KITCHEN, BUT MINIMUM OF ANNUAL.

16   **Q.**   AND DO YOU HAVE AN UNDERSTANDING OF WHY ANSUL WANTS THESE

17   BLOW OFF CAPS REPLACED AT A MINIMUM ONCE A YEAR?

18   **A.**   YES.

19   **Q.**   WHY IS THAT?

20   **A.**   THEY KEEP GREASE FROM WICKING UP INTO THE NOZZLE AND

21   CLOGGING IT, AND THEY TEND TO GET RUBBERY AND SOFT AS TIME GOES

22   ON.

23        THEY'RE MADE OUT OF A RUBBER COMPOUND AND AS HEAT AND

24   COOL, HEAT AND COOL HAPPENS THEY GET SOFT AND THEY TEND TO

25   ALLOW THE CEILING ACTION TO KIND OF GO AWAY AND GREASE CAN WICK

1    UP IN THERE, SO THEY WANT THEM DONE ANNUALLY.

2    **Q.** WHAT IS YOUR OPINION THAT MR. WILLIAMS DID NOT REPLACE THEM

3    ANNUALLY BASED ON?

4    **A.** BASED ON HIS TESTIMONY.

5    **Q.** ANYTHING ELSE?

6    **A.** YES, BASED ON THE REPORTS.

7    **Q.** AND WHAT REPORTS ARE THOSE?

8    **A.** THE REPORTS FROM EUREKA OXYGEN.

9    **Q.** DID YOU REVIEW ANY OF THE INVOICES AS WELL?

10   **A.** YES.

11   **Q.** AND DID YOUR COMPANY SELL THESE BLOW OFF CAPS WHEN THEY

12   INSTALL THEM OR THEY GIVE THEM AWAY?

13   **A.** WE SELL THEM.

14   **Q.** HOW MUCH DO YOU SELL THEM FOR?

15   **A.** THREE DOLLARS EACH.

16   **Q.** IN THE EVENT YOU WERE TO GIVE THEM AWAY WOULD YOU STILL

17   MAKE A NOTE OF THAT ON THE SERVICE REPORT OR THE INVOICE?

18   **A.** YES, WE WOULD.

19   **Q.** WHY WOULD YOU DO THAT?

20   **A.** TWO-FOLD.  ONE WOULD BE TO INVENTORY THE ITEMS, BUT ALSO TO

21   SHOW WHAT WE DID.

22   **Q.** AND IS IT YOUR COMPANY'S PRACTICE TO REPLACE BLOW OFF CAPS

23   ON AN ANSUL R102 SYSTEM ONCE A YEAR?

24   **A.** OUR POLICY SEMIANNUAL.  WE CHANGED THEM EVERY SIX MONTHS.

25   **Q.** WHY DO YOU DO THAT?

1   **A.**  TO MAKE SURE THE GREASE DOESN'T WICK INTO THE NOZZLE.

2   **Q.**  AND DO YOU UNDERSTAND THAT GREASE GETTING INTO THE WICK OF

3   THE NOZZLE WOULD HAMPER THE ABILITY OF THE ANSUL R102 SYSTEM TO

4   PUT OUT A FIRE IN AN APPLIANCE?

5   **A.**  YES, GREASE --

6         **MR. TOLIVER:**  OBJECTION.  LACKS FOUNDATION.

7   ASSUMPTION FACTS NOT IN EVIDENCE AND IT IS -- LACKS

8   QUALIFICATION UNDER 702, 703.

9         **THE COURT:**  OVERRULED.

10        **MR. TOLIVER:**  INCOMPLETE HYPOTHETICAL.

11        **THE COURT:**  OVERRULED.

12        YOU MAY ANSWER.

13        **THE WITNESS:**  YES, IT PREVENTS GREASE FROM WICKING

14  INTO THE OF ORIFICE OF THE NOZZLE.  SO, YEAH, GREASE WICKING IN

15  THERE GETTING INTO THIS MESH FILTER THAT DESIGNED TO FILTER

16  PIPE THINGS OUT OF THE AGENT TEND TO CLOG THE NOZZLES.

17  **Q.**  WHAT HAPPENED IF THE NOZZLES CLOG?

18  **A.**  LITTLE OR NO AGENT WILL COME OUT.

19  **Q.**  AND, I THINK, ATTACHED TO YOUR REPORT IS EXCERPTS OF THE

20  R102 RESTAURANT FIRE SUPPRESSION SYSTEM, CORRECT?

21  **A.**  YES.

22  **Q.**  MANUAL, I'M SORRY.  AND DOES THAT MANUAL -- DID YOU RELY ON

23  SECTION 13 OF THAT MANUAL TO FORM THIS OPINION?

24  **A.**  YES.

25  **Q.**  AND CAN YOU TELL US WHAT 13 SAYS?

1    **A.**  SAYS THAT THE ANSUL REQUIRES THE --

2    **Q.**  DO YOU HAVE IT IN FRONT OF YOU?  I CAN BRING IT TO YOU IF

3    YOU DON'T.

4    **A.**  YEAH.

5    **Q.**  I THINK, EXHIBIT B TO YOUR REPORT.

6    **A.**  SAYS, "REMOVE BLOW OFF CAP FROM NOZZLES, INSPECT EACH BLOW

7    OFF CAP AND REPLACE IF DETERIORATED, OR METAL BLOW OFF CAPS

8    MAKE CERTAIN SPRING CLIPS ROTATE FREELY ON CAP.  THEN IT SAYS

9    RUBBER BLOW OFF CAPS THAT HAVE BEEN INSTALLED IN THE SYSTEM FOR

10   ONE YEAR OR MORE MUST BE REPLACED."

11   **Q.**  YOU RELIED ON THAT IN FORMING YOUR OPINION MR. WILLIAMS

12   FAILURE TO REPLACE THOSE RUBBER CAPS ONCE A YEAR FELL BELOW THE

13   STANDARD OF CARE OF A FIRE SUPPRESSION TECHNICIAN?

14   **A.**  YES.

15   **Q.**  AND WE TALKED ABOUT THE MISALIGNMENT OF THE NOZZLES, HAVE

16   YOU REACHED ANY OPINION REGARDING WHETHER OR NOT MR. WILLIAMS

17   MET THE STANDARD OF CARE REGARDING THE SIZE AND THE TYPE OF THE

18   NOZZLES AT THE CANDY STICK RESTAURANT?

19   **A.**  YES.

20   **Q.**  AND WHAT IS THE STANDARD OF CARE A TECHNICIAN HAS IN

21   INSPECTING THE SIZE AND TYPE OF NOZZLE OF THE ANSUL SYSTEM?

22   **A.**  THE STANDARD OF CARE IS FOLLOWING THE ANSUL R120 DESIGN

23   MANUAL.

24   **Q.**  IT'S YOUR UNDERSTANDING MR. WILLIAMS DID NOT DO THAT?

25   **A.**  YES.

1    **Q.**  WHAT IS THAT UNDERSTANDING BASED ON?

2    **A.**  BASED ON THOSE PICTURES BEFORE THE 245 NOZZLE OVER THE TWO

3    BURNER RANGE IS INAPPROPRIATE WITH THE SHELF.

4              **MR. TOLIVER:**  OBJECTION, 403.

5         **THE COURT:**  OVERRULED.

6         **THE WITNESS:**  WITH THE SHELF YOU COULD USE A ONE END

7    NOZZLE OR 216 NOZZLE.

8    **BY MR. SULLIVAN:  Q.**  DO YOU HAVE AN OPINION REGARDING THE SIZE

9    AND THE TYPE OF NOZZLE THAT WAS -- I'M SORRY, THE SIZE AND TYPE

10   OF NOZZLE THAT WAS SUPPOSED TO BE COVERING THE DEEP FAT FRYER

11   THAT IS IN PICTURE 28?

12   **A.**  YES.

13             **MR. TOLIVER:**  LACKS FOUNDATION, ASSUMES FACTS NOT IN

14   EVIDENCE.

15        **THE COURT:**  OVERRULED.

16   **BY MR. SULLIVAN:  Q.**  WHAT IS THAT OPINION?

17   **A.**  THE OPINION IS BASED UPON THE INFORMATION GIVEN TO ME THE

18   FRYER WAS 16 AND A HALF BY 16 INCHES AND THE 230 NOZZLE WILL

19   NOT COVER A FRYER THAT SIZE.

20   **Q.**  I THINK, THIS WAS ENTERED INTO EVIDENCE ALREADY, THIS IS

21   PART OF EXHIBIT 6 FIGURE 34.

22             HAVE YOU SEEN THIS PICTURE BEFORE?

23   **A.**  YES.

24   **Q.**  AND ALTHOUGH IT MAY BE DIFFICULT TO READ FROM THAT FAR

25   AWAY, DOES THIS PICTURE DEPICT THE ANSUL 230 NOZZLE THAT WAS

1    COVERING THE DEEP FAT FRYER?

2    **A.**  YES, IT DOES.

3    **Q.**  WHY IS THAT NOT THE PROPER NOZZLE TO COVER THE DEEP FAT

4    FRYER?

5    **A.**  BECAUSE THE FRYERS -- THE FRY POT SIZE IS OUTSIDE THE

6    COVERAGE RANGE OF THAT NOZZLE.

7    **Q.**  WHAT DOES THAT MEAN?

8    **A.**  THAT MEANS PER ANSUL'S DESIGN MANUAL THAT NOZZLE IS NOT

9    APPROPRIATE FOR THAT FRYER.  IT HASN'T BEEN UL TESTED, HASN'T

10   PASSED THE UL LISTING TO USE THAT NOZZLE ON THAT FRYER.

11   **Q.**  WOULD USING THE -- SO THE NOZZLE TOO SMALL FOR THAT FRYER

12   IS WHAT YOU'RE SAYING?

13   **A.**  YES.

14   **Q.**  AND USING A NOZZLE THAT'S TOO SMALL TO COVER A FRYER WOULD

15   THAT HAMPER THE ANSUL SYSTEM'S ABILITY TO PUT OUT A FIRE IN

16   THIS FRYER?

17   **A.**  IN MY OPINION, YES.

18   **Q.**  WHY IS THAT?

19   **A.**  BECAUSE YOU WOULDN'T BE GETTING AS MUCH AGENT AS SHOULD BE

20   DESIGNED FOR THAT FRYER.

21   **Q.**  AND DOES YOUR COMPANY HAVE A CUSTOM AND PRACTICE OF

22   INSURING THAT THE PROPER SIZE AND NOZZLES COVERING THE

23   APPLIANCE BELOW IT?

24   **A.**  YES.

25   **Q.**  WHAT IS THAT CUSTOM AND PRACTICE?

1   **A.**   THE CUSTOM AND PRACTICE IS TO DO AN ASSESSMENT OF THE

2   HAZARD EVERY TIME YOU APPROACH IT, MAKING SURE THAT THINGS

3   HAVEN'T CHANGED.

4          SOMETIMES PEOPLE WILL SWITCH APPLIANCES, IT HAPPENS,

5   YOU KNOW.  SO THE STANDARD OF CARE IS TO GO IN THERE

6   RE-EVALUATE THE COOKING LINE, THE HAZARD THAT'S IN PLACE AND

7   MAKE SURE THE NOZZLES ARE APPROPRIATE FOR THAT HAZARD.

8   **Q.**   DO YOU HAVE ANY OPINION REGARDING WHETHER MR. WILLIAMS

9   SHOULD HAVE GIVEN MS. ELLEBRECHT ANY WARNINGS REGARDING GREASE

10  BUILD UP IN THAT KITCHEN?

11  **A.**   YES.

12  **Q.**   DOES THE SERVICE TECHNICIAN OF THE FIRE SUPPRESSION SYSTEM,

13  DOES THE STANDARD OF CARE REQUIRE THAT PERSON TO GIVE A CLIENT

14  A WARNING REGARDING EXCESSIVE GREASE?

15          **MR. TOLIVER:**  OBJECTION.  VAGUE, AMBIGUOUS.  LACKS

16  FOUNDATION.

17          **THE COURT:**  SUSTAINED.

18  **BY MR. SULLIVAN:  Q.**  WHAT IS THE STANDARD OF CARE FOR A

19  SERVICE TECHNICIAN IN THE FIRE SUPPRESSION SYSTEM IN TERMS OF

20  ADDRESSING GREASE OR OTHER CONDITIONS IN A KITCHEN THAT MAY

21  HAMPER THE ANSUL SYSTEM'S ABILITY TO PUT OUT A FIRE?

22          **MR. TOLIVER:**  OBJECTION.  VAGUE, OVERBROAD.

23          **THE COURT:**  SUSTAINED.

24          COUNSEL, ARE YOU ASKING WHAT THE ANSUL'S GUIDELINES

25  ARE FOR ADVISING CUSTOMERS OF GREASE BUILD UP?

1          **MR. SULLIVAN:**  I'LL START THERE.

2    **Q.**  WHAT ARE ANSUL'S GUIDELINES FOR ADVISING CUSTOMERS OF

3    GREASE BUILD UP?

4    **A.**  ANSUL HAS A BULLETIN THAT CAME OUT IN 2006, IT'S PART OF MY

5    REPORT, THAT STATES THAT THE GREASE IS -- EXCESSIVE GREASE

6    BEYOND THE REACH OF THE ANSUL SYSTEM IS A HAZARD IN KITCHENS

7    AND THAT YOU MUST REPORT IT IN WRITING TO THE OWNER.

8          AND IF THEY DON'T RESPOND TO THAT HAZARD AND CLEAN IT

9    UP, THEN YOU MUST GIVE THAT REPORT TO THE AUTHORITY HAVING

10   JURISDICTION.

11   **Q.**  DOES THE NFPA SAY ANYTHING ABOUT THAT?

12   **A.**  NFPA RECOMMENDS CLEANINGS, YES.

13   **Q.**  DOES THE NFPA MAKE ANY MENTION ABOUT ADVISING A CLIENT OF

14   WHAT THEIR DUTIES ARE TO MAINTAIN FIRE SUPPRESSION SYSTEM?

15   **A.**  WELL, THEY MAKE -- YES, WHAT -- HOW TO MAINTAIN IT, YES,

16   HOW TO INSPECT IT ON A MONTHLY BASIS, YES.  IT'S CALLED A QUICK

17   CHECK.  IT'S AN NFPA 17A.

18   **Q.**  DO YOU ADVISE YOUR CLIENTS OF THOSE REQUIREMENTS?

19   **A.**  WE DO.

20   **Q.**  AND, IN YOUR OPINION, BASED ON YOUR REVIEW OF THE NFPA AND

21   YOUR EXPERIENCE IN THE FIRE SUPPRESSION SYSTEM, DID MR.

22   WILLIAMS MEET THE STANDARD CARE IN TERMS OF ADVISING

23   MS. ELLEBRECHT OF HER DUTIES UNDER THE NFPA?

24   **A.**  JUST TO QUALIFY WHAT I SAID.  NFPA DOESN'T SAY THAT THE

25   TECHNICIAN HAS TO INFORM THE CLIENT.  BUT IN OUR OPINION THE

1    STANDARD OF CARE IT'S PART OF THE HAZARD YOU WANT TO EVALUATE

2    IT AND MAKE THEM KNOWN THAT IT'S A HAZARD.

3    **Q.**  CAN GREASE BUILD UP IN A KITCHEN PREVENT THE ANSUL SYSTEM

4    FROM PUTTING OUT A FIRE?

5           **MR. TOLIVER:**  INCOMPLETE HYPOTHETICAL.

6           **THE COURT:**  OVERRULED.

7           **THE WITNESS:**  SURE.

8    **BY MR. SULLIVAN:  Q.**  AND IF YOU WERE TO -- IF YOU WERE

9    SOMEBODY IN YOUR COMPANY WERE TO GO TO A KITCHEN AND SEE THERE

10   WAS EXCESSIVE GREASE BUILD UP THAT YOU THOUGHT COULD HAMPER THE

11   ANSUL SYSTEM'S ABILITY TO PUT OUT A FIRE IN AN APPLIANCE IN

12   THAT KITCHEN, WOULD YOU WARN YOUR CLIENT?

13          **MR. TOLIVER:**  INCOMPLETE HYPOTHETICAL.

14          **THE COURT:**  OVERRULED.

15          **THE WITNESS:**  YES, WE ACTUALLY HAVE A FORM THAT WE

16   HAVE OUR CLIENTS FILL OUT, UNDERSTANDING THEIR NFPA

17   REQUIREMENTS AND ALSO IF THERE'S EXCESSIVE GREASE OUR REPORTS

18   --

19          **MR. TOLIVER:**  OBJECTION, YOUR HONOR, NARRATIVE, MOVE

20   TO STRIKE AFTER THE ANSWER YES.

21          **THE COURT:**  OVERRULED.

22          **THE WITNESS:**  ON OUR REPORTS WE HAVE A CLEANLINESS OF

23   HOODS, DUCK AND FILTERS AS PART OF OUR SYSTEM SERVICE REPORT.

24          **THE COURT:**  COUNSEL, ABOUT A GOOD PLACE FOR A BREAK?

25          **MR. SULLIVAN:**  SURE.

1        **THE COURT:**  LET'S TAKE OUR LUNCH RECESS.  WE'LL RETURN

2   AT 1:45.

3        AND I REMIND YOU OF THE RESTRICTION ON YOUR

4   DELIBERATION UNTIL YOU'VE HEARD ALL THE EVIDENCE IN THE CASE.

5   THANK YOU.

6                        (RECESS TAKEN.)

7        (PROCEEDINGS HELD IN OPEN COURT, JURY NOT PRESENT).

8        **THE COURT:**  ANY MATTERS TO TAKE UP BEFORE THE JURY

9   RETURNS?

10        ALL RIGHT.  LET'S BRING THEM OUT.

11        (PROCEEDINGS HELD IN OPEN COURT, JURY PRESENT.)

12        **THE COURT:**  WELCOME BACK.  ALL RIGHT.  WE'LL RESUME

13   WITH MR. CARLSEN ON THE STAND.

14        AND, MR. CARLSEN, YOU REMAIN UNDER OATH.

15        **THE WITNESS:**  YES.

16        **MR. SULLIVAN:**  THANK YOU, YOUR HONOR.

17   **Q.**  MR. CARLSEN, WE TALKED BRIEFLY ABOUT WHAT THE EFFECT OF NOT

18   REPLACING THE BLOW OFF CAPS ONCE A YEAR WOULD BE, BEFORE WE GO

19   ANY FURTHER I'D LIKE TO SHOW YOU A PICTURE THAT'S BEEN

20   INTRODUCED INTO EVIDENCE.  THIS IS PART OF EXHIBIT 6, PICTURE

21   35.

22   **A.**  YES.

23   **Q.**  CAN YOU TELL ME WHAT THAT PICTURE DEPICTS?

24   **A.**  THAT'S THE PICTURE OF THE 230 NOZZLE THAT WAS OVER THE

25   FRYER.  AND IT'S TAKEN APART.

1           **MR. TOLIVER:**  OBJECTION.  LACKS FOUNDATION.  MOVE TO

2    STRIKE.

3           **THE COURT:**  OVERRULED.

4    **BY MR. SULLIVAN:  Q.**  IS THAT THAT SAME NOZZLE?

5    **A.**  YES, THAT'S THE MESH FILTER, WIRE MESH FILTER THAT'S INSIDE

6    THE NOZZLE.

7    **Q.**  AND IF -- DOES THAT FILTER APPEARED CLOG?

8    **A.**  YES.

9    **Q.**  IF YOU CAME ACROSS A FILTER THAT LOOKED LIKE THAT AT AN

10   INSPECTION YOU DID WHAT WOULD YOU DO?

11   **A.**  I WOULD REPLACE THE NOZZLE.

12   **Q.**  AND DOES THAT -- CAN YOU TELL WHAT THAT IS THERE?

13   **A.**  APPEARS TO BE GREASE.

14          **MR. SULLIVAN:**  I HAVE NO FURTHER QUESTIONS.  THANK

15   YOU, MR. CARLSEN.

16          **THE COURT:**  THANK YOU.

17          CROSS-EXAMINATION.

18          **MR. TOLIVER:**  THANK YOU, YOUR HONOR.

19                          **CROSS-EXAMINATION**

20   **BY MR. TOLIVER:  Q.**  GOOD AFTERNOON, MR. CARLSEN.  MY NAME IS

21   SHAUN TOLIVER.  HOW ARE YOU?

22   **A.**  GOOD.  THANK YOU.

23   **Q.**  WE NEVER BEFORE, HAVE WE?

24   **A.**  I DON'T THINK SO.

25   **Q.**  YOU NEVER TESTED THIS SCREEN, DID YOU?

1    **A.**  TESTING THAT SCREEN?  PHYSICALLY TESTING IT?

2    **Q.**  RIGHT.

3    **A.**  NO.

4    **Q.**  IN FACT, YOU'VE NEVER EVEN SEEN THAT SCREEN, HAVE YOU?

5    **A.**  PHYSICALLY SEEN IT, NO.

6    **Q.**  YOU'VE NEVER TOUCHED IT?

7    **A.**  NO.

8    **Q.**  YOU'VE NEVER DONE ANYTHING TO CONFIRM WHETHER OR NOT THAT'S

9    GREASE?

10   **A.**  NO.

11   **Q.**  CORRECT?

12          IS THAT CORRECT STATEMENT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  YOU ARE AWARE THAT THE BUILDING STRUCTURE BURNED DOWN

15   BECAUSE OF THIS FIRE OR, AT LEAST, A GOOD PORTION IT?

16   **A.**  YES.

17   **Q.**  YOU'RE AWARE THAT THE PORTION OF THE CEILING FELL DOWN AND

18   COLLAPSED?

19          DID YOU KNOW THAT?

20   **A.**  I WAS NOT AWARE OF THAT.

21   **Q.**  HAVE YOU EVER SEEN A FILTER AFTER A FIRE?

22   **A.**  YES.

23   **Q.**  FROM ONE OF THESE NOZZLES?

24   **A.**  YES.

25   **Q.**  THAT'S WHAT YOU'D EXPECT AFTER A FIRE, ISN'T IT?

1    **A.**  THAT'S NOT WHAT I WOULD EXPECT AFTER A FIRE.

2    **Q.**  ALL RIGHT.  MR. CARLSEN, YOU SAID THAT THIS R102

3    SUPPRESSION SYSTEM WILL EXTINGUISH A FIRE, DO YOU REMEMBER

4    THAT?

5    **A.**  YES.

6    **Q.**  HAVE YOU EVER SEEN THE MANUAL FOR R102 SUPPRESSION --

7    RESTAURANT FIRE SUPPRESSION SYSTEM?

8    **A.**  YES.

9    **Q.**  IS THIS -- MAY I APPROACH, YOUR HONOR?

10               **THE COURT:**  YES.

11   **BY MR. TOLIVER:**  **Q.**  SHOWING YOU THIS MANUAL, IS THIS AN R102

12   RESTAURANT FIRE SUPPRESSION SYSTEM ANSUL MANUAL?

13   **A.**  YES, IT IS.

14   **Q.**  WHAT DOES SUPPRESSION MEAN?

15   **A.**  WHAT DOES SUPPRESSION MEAN?

16   **Q.**  DO YOU KNOW?

17   **A.**  IT CAN MEAN TWO THINGS, BUT I THINK IN THE CASE OF THAT

18   MANUAL IT MEANS EXTINGUISH SUPPRESS.

19   **Q.**  WHAT DOES EXTINGUISH MEAN?

20   **A.**  PUT OUT.

21   **Q.**  EXTINGUISH MEANS PUT OUT?

22   **A.**  CORRECT.

23   **Q.**  SUPPRESSION MEANS TO HOLD-BACK, DOESN'T IT?

24   **A.**  NOT IN MY OPINION.

25   **Q.**  YOUR OPINION IS DIFFERENT THAN THE DICTIONARY DEFINITION?

1   **A.**  IN THE CASE OF THE ANSUL R102 MANUAL IT'S DIFFERENT.

2   **Q.**  NOW, THE ANSUL SYSTEM REQUIRES THERE BE AN EXTINGUISHER IN

3   ADDITION TO THE SUPPRESSION SYSTEM, DOESN'T IT?

4   **A.**  YES.

5   **Q.**  AND THE EXTINGUISHER HAS PLACARD THAT GOES WITH IT, DOESN'T

6   IT?

7   **A.**  YES.

8   **Q.**  THE PLACARD SAYS "DO NOT USE THIS EXTINGUISHER UNTIL AFTER

9   THE FIRE SUPPRESSION SYSTEM HAS ATTENUATED", DOESN'T IT?

10  **A.**  YES.

11  **Q.**  AND ATTENUATED MEANS SYSTEM ACTIVATED AND IT DISCHARGES

12  SUPPRESSANT?

13  **A.**  YES.

14  **Q.**  AND THE REASON FOR THAT PLACARD AND THAT EXTINGUISHER IS

15  BECAUSE THE SUPPRESSANT MAY OR MAY NOT PUT OUT THE FIRE, SO YOU

16  MAY HAVE TO USE AN EXTINGUISHER TO EXTINGUISH THE FIRE,

17  CORRECT?

18  **A.**  YOU MAY HAVE TO USE AN EXTINGUISHER.

19  **Q.**  THAT'S THE REASON THEY HAVE AN EXTINGUISHER?

20  **A.**  YES.

21  **Q.**  THAT'S THE REASON ANSUL REQUIRES THEY HAVE AN EXTINGUISHER?

22  **A.**  YES.

23  **Q.**  ALL RIGHT.  YOU'VE HEARD THE TERM RE-FLASHING?

24  **A.**  YES.

25  **Q.**  BACK IN THE BULLETIN YOU REFERENCED EARLIER IN RESPONSE TO

1  COUNSEL'S QUESTION IT TALKS ABOUT PROBLEMS WITH RE-FLASHING

2  AFTER THE SUPPRESSION SYSTEM ACTIVATES, RIGHT?

3  **A.**  CAN YOU SHOW ME THAT PARAGRAPH?

4  **Q.**  YOU KNOW WHAT RE-FLASHING IS?

5  **A.**  YES.

6  **Q.**  DESCRIBE FOR THE JURY WHAT RE-FLASHING IS?

7  **A.**  RE-FLASHING WOULD BE THE FIRE NOT BEING COMPLETELY

8  CONTAINED OR THE GASES BEING COMPLETELY CONTAINED AND THE HEAT

9  THAT IS STILL PRESENT CAUSING THE GASSES TO RE-COMBUST.

10  **Q.**  AND STARTS -- IGNITES ANOTHER FIRE?

11  **A.**  THAT'S WHAT RE-COMBUST IS.

12  **Q.**  I WANT TO MAKE SURE WE'RE TALKING ABOUT THE SAME THING.

13  **A.**  YES.

14  **Q.**  AFTER THE SUPPRESSION SYSTEM YOU COULD HAVE RE-FLASHING AND

15  HAVE MORE FIRE, CORRECT?

16  **A.**  SURE YOU COULD, YES.

17  **Q.**  EARLIER YOU TESTIFIED, AND I WROTE THIS DOWN, THAT THE 230

18  NOZZLE, THE ONE THAT WAS ON THE PIPE HANGING DOWN OVER THE

19  FRYER IN THIS RESTAURANT AT THE TIME OF THE FIRE, YOU SAID IT

20  WOULD COVER THE ENTIRE FRYER, DO YOU REMEMBER THAT?

21  **A.**  YES.

22  **Q.**  YOU'RE A HIGH SCHOOL GRADUATE AND AFTER HIGH SCHOOL YOU

23  STARTED WORKING WITH YOUR FATHER'S COMPANY?

24  **A.**  WHILE ATTENDING A JC FOR ONE YEAR AND DURING HIGH SCHOOL.

25  **Q.**  RIGHT, YOU WENT TO JUNIOR COLLEGE FOR ONE YEAR, BUT YOU

1    DIDN'T GET ANY DEGREES?

2    **A.**  NO.

3    **Q.**  YOU WORKED FOR YOUR FATHER UNTIL YOU WORKED FOR BROOKS

4    EQUIPMENT AS THE SHOP MANAGER?

5    **A.**  YES.

6    **Q.**  AND THAT'S -- THERE AT BROOKS IS WHERE YOU SOLD EQUIPMENT?

7    **A.**  AND SERVICED SOME OTHERS THAT CAME IN, YES.

8    **Q.**  YOU SOLD SUPPLIES, FOR INSTANCE, THE TYPE OF DOCUMENTS,

9    FORMS THAT WERE FILLED OUT BY EUREKA OXYGEN USE THE SAME TYPE

10   OF FORMS BROOKS SOLD?

11   **A.**  I'M NOT SURE ABOUT THAT.

12   **Q.**  YOU DON'T KNOW THAT?

13   **A.**  I DON'T REMEMBER SEEING THOSE.

14   **Q.**  EVENTUALLY YOU OPENED YOUR OWN COMPANY WHICH YOU NOW HAVE

15   CALLED FIRE SAFETY SUPPLY?

16   **A.**  YES.

17   **Q.**  YOU'RE THE OWNER OF THAT COMPANY?

18   **A.**  YES, IT IS A CORPORATION.

19   **Q.**  NOW, YOU WROTE IN YOUR REPORT -- YOU WERE HIRED BY AMCO

20   INSURANCE COMPANY?

21   **A.**  YES.

22   **Q.**  AND THEY'RE PAYING YOU TO BE HERE TODAY?

23   **A.**  YES.

24   **Q.**  THEY'RE PAYING YOU TO TESTIFY ON THEIR BEHALF?

25   **A.**  YES.

1   **Q.** YOU WROTE IN YOUR REPORT THAT YOU SPENT 34 YEARS IN THE

2   FIRE SUPPRESSION BUSINESS, DO YOU REMEMBER THAT?

3   **A.** YES.

4   **Q.** AND THEN YOU ALSO WROTE AND THAT YOUR OPINIONS ARE BASED ON

5   YOUR EXPERIENCE IN SERVICING ANSUL EQUIPMENT FOR 12 YEARS, DO

6   YOU REMEMBER THAT?

7   **A.** YES.

8   **Q.** AND THAT'S THE LAST 12 YEARS SINCE YOU LEFT BROOKS AND

9   OPENED UP YOUR OWN COMPANY?

10  **A.** YES.

11  **Q.** THAT'S WHEN YOU STARTED SERVICING EQUIPMENT?

12  **A.** 1999.

13  **Q.** SO YOU GOT ROUGHLY THE SAME EXPERIENCE THAT MR. WILLIAMS

14  HAS?

15  **A.** I DON'T KNOW WHAT HIS EXPERIENCE IS.

16  **Q.** YOU SAY YOU SERVICE NORTHERN CALIFORNIA UP TO OREGON?

17  **A.** YES.

18  **Q.** AND, IN FACT, YOUR COMPANY IS A DIRECT COMPETITOR OF EUREKA

19  OXYGEN?

20  **A.** IN WHAT WAY?

21  **Q.** YOU DO THE SAME THING THAT EUREKA OXYGEN DOES, YOU SERVICE

22  SUPPRESSION SYSTEMS AS DOES EUREKA OXYGEN?

23  **A.** YES.

24  **Q.** THEY'RE ONE YOUR COMPETITORS?

25  **A.** I'VE NEVER BUMPED INTO THEM, BUT, YES, THEY'RE IN THE SAME

```
1   GEOGRAPHICAL AREA.

2   Q.  IN FACT, THEY GOT A SMALL DIVISION CALLED PETALUMA OXYGEN

3   AND THAT DIVISION RECENTLY TOOK OVER A NUMBER OF YOUR COMPANY'S

4   PREVIOUSLY EXISTING ACCOUNTS, INCLUDING INFINION RACEWAY,

5   DIDN'T THEY?

6   A.  I'VE NEVER HEARD OF THEM.

7   Q.  NEVER HEARD OF INFINION RACEWAY?

8   A.  I'VE NEVER HEARD OF PETALUMA OXYGEN.

9   Q.  DID YOU LOSE INFINION RACEWAY ACCOUNT?

10  A.  I DON'T KNOW.  I DON'T THINK WE DID THE INFINION RACEWAY,

11  WE DID A RACE CAR REPAIR PLACE OUT THERE.  I DON'T KNOW IF WE

12  STILL DO IT OR NOT.

13  Q.  YOUR COMPANY STANDS TO BENEFIT BY YOU TESTIFYING AGAINST

14  EUREKA OXYGEN, DOESN'T IT?

15  A.  NOT TO MY KNOWLEDGE.

16  Q.  MR. CARLSEN, YOU SAID THAT IT'S YOUR PRACTICE TO ALWAYS

17  CONFIRM THE HAZARDS HAVE NOT CHANGED WHEN YOU'RE GOING TO A

18  SITE TO LOOK AT THE SUPPRESSION SYSTEM, DO YOU REMEMBER THAT?

19  A.  YES.

20  Q.  YOU SAID THAT'S WHAT YOU DO, AND, IN FACT, THAT YOU SAID IS

21  THE STANDARD OF CARE, RIGHT?

22  A.  YES.

23  Q.  AND, IN FACT, THAT'S WHAT RUSS WILLIAMS TESTIFIED THAT HE

24  DOES, ISN'T IT?

25  A.  I BELIEVE HE MAY HAVE, I DON'T RECALL.
```

1    **Q.**  YOU WERE AT HIS DEPOSITION?

2    **A.**  YES.

3    **Q.**  BOTH SESSIONS?

4    **A.**  YES.

5    **Q.**  AND YOU READ THE TRANSCRIPT SINCE?

6    **A.**  CAN YOU RE-ASK THE QUESTION?

7    **Q.**  HAVE YOU READ THE TRANSCRIPT OF THE DEPOSITION, THE WRITTEN

8    --

9    **A.**  YES.

10   **Q.**  -- WORDS?

11   **A.**  YES.

12   **Q.**  SO YOU'RE AWARE THAT THAT'S EXACTLY WHAT ROSS WILLIAMS SAYS

13   HE DOES AS WELL?

14   **A.**  WHAT IS IT THAT HE DOES AS WELL?

15   **Q.**  ALWAYS CONFIRMS THE HAZARDS HAVE NOT CHANGED?

16   **A.**  I DON'T RECALL THOSE EXACT WORDS.

17   **Q.**  ALL RIGHT.  MAYBE NOT IN THOSE EXACT WORDS, YOU UNDERSTAND

18   THAT'S HIS TESTIMONY, HE MAKES SURE THAT THE CONDITIONS HAVE

19   NOT CHANGED, RIGHT?

20   **A.**  I DON'T RECALL THAT.

21   **Q.**  NOW, YOU NEVER BEEN -- STRIKE THAT.

22          YOU WERE RETAINED BY AMCO IN ROUGHLY MARCH OF 2009?

23   **A.**  SOMEWHERE AROUND THERE.

24   **Q.**  YOU'VE NEVER BEEN RETAINED AS AN EXPERT IN ANY CASE EVER

25   BEFORE IN YOUR LIFE, HAVE YOU?

1    **A.**  NO, I HAVE NOT.

2    **Q.**  YOU'VE NEVER SERVED AS CONSULTANT IN ANY LAWSUIT AT ANY

3    POINT IN TIME IN YOUR LIFE, HAVE YOU?

4    **A.**  I HAVE NOT.

5    **Q.**  NOW, WITH RESPECT TO YOUR WORK IN THE CASE YOU HAVE NEVER

6    ONCES EVER BEEN TO THE CANDY STICK GRILL IN FERNDALE,

7    CALIFORNIA, CORRECT?

8    **A.**  I HAVE NOT.

9    **Q.**  YOU HAVE NEVER WENT TO THE SITE WHERE THE FIRE TOOK PLACE

10   TO LOOK AT ANYTHING, CORRECT?

11   **A.**  CORRECT.

12   **Q.**  OTHER THAN PHOTOGRAPHS YOU'VE NEVER SEEN ANY OF THE

13   COMPONENTS INVOLVED IN THE ANSUL SUPPRESSION SYSTEM, CORRECT?

14   **A.**  CORRECT.

15   **Q.**  YOU CERTAINLY NEVER EXAMINED ANY OF THOSE COMPONENTS, HAVE

16   YOU?

17   **A.**  PHYSICALLY, NO.

18   **Q.**  YOU UNDERSTAND THAT THE PHOTOGRAPHS THAT YOU'VE SEEN, THE

19   ONLY PHOTOGRAPHS YOU'VE SEEN WERE TAKEN AFTER THE FIRE?

20   **A.**  YES.

21   **Q.**  YOU KNOW WHEN THE FIRE WAS?

22   **A.**  I CAN'T RECALL THE DATE RIGHT NOW, IT WAS IN OCTOBER, I

23   BELIEVE.

24   **Q.**  HOW ABOUT SEPTEMBER, LET'S TRY SEPTEMBER?

25   **A.**  SEPTEMBER 2008.

1   Q.  THERE YOU GO.  OKAY.  AND THE PHOTOGRAPHS WERE TAKEN WHEN?

2   A.  I DON'T RECALL THE DATE.

3   Q.  YOU KNOW WHAT YEAR?

4   A.  I DON'T RECALL.

5   Q.  HOW ABOUT DECEMBER 2008?

6   A.  I RECALL THAT.

7   Q.  IF THAT WERE THE CASE THAT WOULD BE THREE MONTHS AFTER THE

8   FIRE; IS THAT CORRECT?

9   A.  YES.

10  Q.  YOU GAVE YOUR DEPOSITION IN THIS CASE, DO YOU REMEMBER

11  THAT?

12  A.  YES.

13  Q.  BECAUSE AS A HIRED EXPERT BY AMCO WE HAD THE RIGHT TO FIND

14  OUT WHAT YOU WERE GOING TO SAY, SO WE HAD TO PAY YOU MONEY TO

15  TAKE YOUR DEPOSITION TO FIND THAT OUT, DIDN'T WE?

16  A.  YES.

17  Q.  AND WHEN YOU GAVE YOUR DEPOSITION TESTIMONY IT WAS WITH A

18  COURT REPORTER TO TRANSCRIBE ALL THE WORDS, DO YOU REMEMBER

19  THAT?

20  A.  YES.

21  Q.  AND YOU AGREED TO GIVE YOUR MOST TRUTHFUL ACCURATE

22  TESTIMONY, DO YOU REMEMBER THAT?

23  A.  YES.

24  Q.  YOU DID DO THAT, DIDN'T YOU?

25  A.  YES.

1   Q.  ALL RIGHT.  SO WE UNDERSTAND FROM YOUR TESTIMONY THAT YOU

2   DO NOT KNOW HOW THE NOZZLE OVER THE FRYER WAS POSITIONED PRIOR

3   TO THE FIRE, CORRECT?

4   A.  I DO NOT.

5   Q.  THAT'S A CORRECT STATEMENT?

6   A.  YES.

7   Q.  YOU UNDERSTAND YOU DID NOT MEASURE THE ALIGNMENT OF SUBJECT

8   NOZZLE PRIOR TO THE FIRE, CORRECT?

9   A.  CORRECT.

10  Q.  YOU DID NOT MEASURE THE ALIGNMENT OF THE NOZZLE AFTER THE

11  FIRE, CORRECT?

12  A.  YES.

13  Q.  THAT'S A CORRECT STATEMENT?

14  A.  THAT'S A CORRECT STATEMENT.

15  Q.  AND YOU AGREE THAT YOU DON'T KNOW WHETHER THE SUPPRESSION

16  SYSTEM WOULD HAVE PUT OUT THIS PARTICULAR FIRE EVEN IF THE

17  NOZZLE WAS CENTER OR NOT CENTERED?

18  A.  THAT PARTICULAR NOZZLE, YES.

19  Q.  YOU AGREE WITH THAT STATEMENT AS WELL?

20  A.  YES.

21  Q.  YOU ALSO TESTIFIED THAT YOU DO NOT KNOW HOW THIS NOZZLE WAS

22  ALIGNED AT THE TIME THAT IT WAS LAST SERVICED BY MR. WILLIAMS

23  OF EUREKA OXYGEN IN MAY OF 2008, CORRECT?

24  A.  HOW IT WHAT ALIGNED AT THIS POINT IN TIME, NO, THAT'S

25  CORRECT.

1    **Q.**  THAT'S A CORRECT STATEMENT?

2    **A.**  YES.

3    **Q.**  YOU DO UNDERSTAND THE FIRE DEPARTMENT CAME TO EXTINGUISH

4    THE FIRE AFTER THE FIRE IN SEPTEMBER OF 2008, YES?

5    **A.**  YES.

6    **Q.**  BUT YOU TESTIFIED YOU DO NOT KNOW WHAT ACTIVITY THE

7    FIREFIGHTERS UNDERTOOK; IN OTHER WORDS, YOU DO KNOW HOW MUCH

8    WATER THEY SPRAYED IN THERE?

9    **A.**  CORRECT.

10   **Q.**  BUT YOU DID TESTIFY THAT YOU WERE SURE THAT THE

11   FIREFIGHTERS USED AN AX AND A PICK TO EXTINGUISH THAT FIRE, DO

12   YOU REMEMBER THAT TESTIMONY?

13   **A.**  I REMEMBER THE TESTIMONY AS BEING A QUESTION, THOSE WORDS

14   WERE USED AND I SAID ALL OF THOSE OR SOMETHING TO THAT EFFECT.

15   **Q.**  YOU WERE ASKED --

16   **A.**  I WOULDN'T BE SURPRISED IF ALL OF THOSE.

17   **Q.**  YOU WERE ASKED IF THE FIREFIGHTERS USED AN AX OR PICK, YOU

18   SAID I'M SURE THEY DID?

19   **A.**  I MAY HAVE SAID I'M SURE THEY USE ALL OF THOSE.  I DON'T

20   RECALL THE EXACT WORDING.

21   **Q.**  DO YOU STILL AGREE WITH THAT?

22   **A.**  I HAVE NO REASON TO BELIEVE THEY DIDN'T OR DID EITHER.

23   WOULDN'T SURPRISE ME.

24   **Q.**  YOU NEVER SPOKE WITH ANYONE FROM THE FIRE DEPARTMENT

25   REGARDING WHAT THEY USED TO EXTINGUISH THE FIRE, CORRECT?

1    **A.**  CORRECT.

2    **Q.**  AND YOU NEVER SPOKE WITH ANYONE FROM THE FIRE DEPARTMENT

3    REGARDING THEIR INVESTIGATION, CORRECT?

4    **A.**  CORRECT.

5    **Q.**  YOU DID SAY THAT NOZZLE CAN BE MOVED BACK AND FORTH RATHER

6    EASILY, DO YOU REMEMBER THAT?

7    **A.**  YES.

8    **Q.**  AND YOU SAID THERE'S AN ELBOW THAT'S ATTACHED TO THE NOZZLE

9    AND THAT IF THE ELBOW IS MOVED THAN THE POSITION THE NOZZLE

10   WOULD ALSO BE MOVED, DO YOU REMEMBER THAT TESTIMONY?

11   **A.**  SURE.  YES.

12   **Q.**  YOU TESTIFIED THAT IF YOU MOVE IT FRONT OR BACK, CHANGED

13   THE -- CHANGES THE POSITION OF IT, CORRECT?

14          **MR. SULLIVAN:**  I'M GOING TO OBJECT.  I DON'T THINK HE

15   CAN JUST READ HIS TESTIMONY IN THE RECORD, I THINK HE HAS TO

16   ASK HIM QUESTIONS.

17          **THE COURT:**  HE'S NOT.  OVERRULED.

18          **THE WITNESS:**  ASK THE QUESTION AGAIN.

19   **BY MR. TOLIVER:**  **Q.**  YOU AGREE IF YOU MOVE THE ELBOW FRONT TO

20   BACK IT CHANGES THE POSITION OF THE NOZZLE?

21   **A.**  THE ELBOW, THE ENTIRE PIPE BACK AND FORTH WOULD MOVE

22   POSITION OF THE NOZZLE, YES.

23   **Q.**  YOU AGREE YOU CANNOT QUANTIFY THE AMOUNT OF CHEMICAL

24   DISCHARGED THROUGH THIS PARTICULAR NOZZLE OVER THE FRYER AT THE

25   CANDY STICK RESTAURANT IN SEPTEMBER 2008, CORRECT?

1    A.  THAT'S CORRECT.

2    Q.  YOU DO AGREE THE SUPPRESSION SYSTEM ACTIVATED AND THAT THE

3    ENTIRE WET CHEMICAL DISCHARGED COMPLETELY, CORRECT?

4    A.  YES.

5    Q.  YOU DO NOT KNOW WHETHER THE FIRE SPREAD TO OTHER AREAS OF

6    THE RESTAURANT BEFORE THE FIRE SUPPRESSION ACTIVATED, CORRECT?

7    A.  OTHER AREAS OF THE RESTAURANT BEFORE IT ACTIVATED?

8    Q.  ANY AREAS OF THE RESTAURANT.  YOU DON'T KNOW WHETHER THE

9    FIRE SPREAD BEFORE THE FIRE SUPPRESSION SYSTEM ACTIVATED,

10   CORRECT?

11   A.  CORRECT.

12   Q.  LIKEWISE YOU DO NOT KNOW WHERE THE FIRE WAS IN THE CANDY

13   STICK GRILL AT THE TIME THE FIRE SUPPRESSION SYSTEM ACTIVATED,

14   CORRECT?

15   A.  CORRECT.

16   Q.  YOU GAVE A COUPLE OF OPINIONS REGARDING NOZZLES OVER THE

17   BURNERS, DO YOU REMEMBER THAT?

18   A.  YES.

19   Q.  THAT'S NOT THE SAME AS A NOZZLE OVER THE FRYER, WE'RE

20   TALKING ABOUT DIFFERENT NOZZLE?

21   A.  IT'S A DIFFERENT NOZZLE.

22   Q.  OKAY.  YOUR OPINION WAS THAT THE NOZZLE OVER THE BURNER

23   SHOULD HAVE BEEN THE 1F OR 260 RATHER THAN A 245 NOZZLE?

24   A.  YES.

25   Q.  ARE YOU AWARE, MR. CARLSEN, THAT WHEN THIS ANSUL SYSTEM WAS

```
1   INSTALLED 1F AND THE 260 WERE NOT AVAILABLE AT THAT TIME?

2   A.  WHEN WAS IT INSTALLED?  I'M NOT AWARE OF THAT.

3   Q.  WOULD THAT SURPRISE YOU TO LEARN THAT?

4   A.  NO, IT WOULDN'T SURPRISE ME.

5   Q.  YOU'RE ALSO AWARE, WHEN YOU SERVICE A SYSTEM YOU GO BY THE

6   CODE IN THE MANUAL AT THE TIME OF THE SERVICE, CORRECT?

7   A.  FOR THE PARTICULAR SYSTEM?

8   Q.  FOR ANY SYSTEM?

9   A.  YES.

10  Q.  TRUE FOR ANY SYSTEM?

11  A.  YES, THERE'S ENHANCEMENTS THAT COME ALONG.

12  Q.  TRUE WITH ANSUL AS WELL?

13  A.  CORRECT.

14  Q.  THE OPINIONS YOU OFFERED EARLIER WHEN YOU WERE ASKED BY

15  AMCO'S LAWYER ABOUT THE ALIGNMENT WERE BASED MERELY UPON

16  LOOKING AT A PHOTOGRAPH BECAUSE YOU NEVER MEASURED THE

17  ALIGNMENT OF ANY OF THE NOZZLES, CORRECT?

18  A.  CORRECT.

19  Q.  YOU HAVE NO INFORMATION AS TO WHETHER OR NOT ANY OF THE

20  MATERIALS SEEN IN THE PHOTOGRAPHS ARE IN THE SAME POSITION AS

21  WAS AT THE TIME OF THE FIRE, CORRECT?

22  A.  ANY OF THE ITEMS WERE IN THE SAME POSITION AS THEY WERE THE

23  TIME OF THE FIRE?

24  Q.  RIGHT.  YOU DON'T KNOW?

25  A.  I DON'T KNOW.
```

1    **Q.**  AND LIKEWISE YOU HAVE NO INFORMATION WHETHER OR NOT ANY OF

2    THE MATERIALS INVOLVING THE FIRE SUPPRESSION SYSTEM AND THE

3    APPLIANCES WERE IN SAME POSITION AS THEY WERE IN MAY OF 2008,

4    CORRECT?

5    **A.**  ASK THAT AGAIN?

6    **Q.**  SURE.  ALL YOU KNOW IS WHAT YOU SAW IN THE PHOTOGRAPHS THAT

7    WERE TAKEN IN DECEMBER OF 2008?

8    **A.**  YES.

9    **Q.**  YOU HAVE NO -- AND YOU TOLD US ALREADY YOU DON'T KNOW WHAT

10   IT LOOKED LIKE AT THE TIME OF THE FIRE IN SEPTEMBER THREE

11   MONTHS EARLIER, CORRECT?

12   **A.**  CORRECT.

13   **Q.**  AND YOU CLEARLY DON'T KNOW WHAT THE FIRE SUPPRESSION SYSTEM

14   LOOKED LIKE AND WHERE THE VARIOUS APPLIANCES WHERE AND HOW THEY

15   WERE ALIGNED SEVEN MONTHS EARLIER IN MAY OF 2008, CORRECT?

16   **A.**  CORRECT.

17   **Q.**  NOW, THERE'S SOME DISCUSSION ABOUT A SHELF, DO YOU REMEMBER

18   THAT?

19   **A.**  YES.

20   **Q.**  AND YOU WERE CRITICAL OF THE NOZZLES RELATIVE TO THE SHELF,

21   DO YOU REMEMBER THAT?

22   **A.**  YES.

23   **Q.**  YOU DO NOT KNOW HOW WIDE THAT SHELF IS, TRUE?

24   **A.**  I DO NOT KNOW HOW WIDE THAT SHELF IS, THAT'S CORRECT.

25   **Q.**  ALSO, HAVE NO IDEA HOW LONG THAT SHELF IS?

1    **A.** NO.  THAT'S CORRECT.  DIDN'T MEASURE ANYTHING.

2    **Q.** YOU DID NOT MEASURE ANYTHING AND NO MEASUREMENTS WERE GIVEN

3    TO YOU?

4    **A.** CORRECT.

5    **Q.** LET'S TALK ABOUT THE BLOW OFF CAPS.  ALL RIGHT.

6    **A.** SURE.

7    **Q.** YOU UNDERSTAND FROM BEING PRESENT AT MR. WILLIAMS

8    DEPOSITION THAT HE TESTIFIED THAT HE, IN FACT, CHANGED THE BLOW

9    OFF CAPS, CORRECT?

10   **A.** YES.

11   **Q.** EVEN THOUGH HE'S A COMPETITOR OF YOURS YOU HAVE NO

12   INFORMATION TO REFUTE THAT TESTIMONY, DO YOU?

13   **A.** I DON'T KNOW HE'S COMPETITOR OF MINE, BUT TO REFUTE THAT

14   TESTIMONY?

15   **Q.** TO REFUTE WHAT HE TESTIFIED TO IN DEPOSITION, HE CHANGED

16   THE BLOW OFF CAPS?

17   **A.** YES, I HAVE SOME OPINIONS AS TO WHAT THAT IS.

18   **Q.** NOT OPINIONS, INFORMATION?

19   **A.** INFORMATION, YES.

20   **Q.** YOU HAVE INFORMATION?

21          YOU WERE THERE AT SOME OF THE PRIOR SERVICES?

22   **A.** I'VE INFORMATION THAT WOULD LEAD ME TO BELIEVE THAT THEY

23   WEREN'T CHANGED.

24   **Q.** WERE YOU PRESENT WHEN THE SERVICES WERE DONE IN MAY OF

25   2008?

1    **A.** I WAS NOT THERE.

2    **Q.** WERE YOU PRESENT FOR ANY OF THE PRIOR SERVICES?

3    **A.** NO.

4    **Q.** ARE YOU AWARE MRS. ELLEBRECHT TESTIFIED IN THE CASE?

5    **A.** I AM.

6    **Q.** DO YOU KNOW WHO SHE IS?

7    **A.** SHE'S THE OWNER OF THE CANDY STICK AT THE TIME.

8    **Q.** WOULD IT SURPRISE YOU IF SHE'S NOT AWARE OF THE TIME WHEN

9    THEY WERE NOT CAPS, BLOW OFF CAPS ON THESE NOZZLES?

10   **A.** WOULD IT SURPRISE ME?

11   **Q.** THAT'S SURPRISE YOU?

12   **A.** NO, IT WOULDN'T SURPRISE YOU.

13   **Q.** WOULD YOU DEFER TO THE OWNER AND TO THE SERVICE TECHNICIAN

14   ABOUT WHETHER OR NOT CAPS WERE PRESENT SINCE THEY WERE ACTUALLY

15   THERE?

16   **A.** I BELIEVE IT.  I HAVE NO OPINION WHETHER THE CAPS WERE

17   THERE OR NOT THERE.

18   **Q.** THANK YOU VERY MUCH.  YOU JUMPED AHEAD.  I WAS GOING TO GET

19   THERE.

20   **A.** OKAY.

21   **Q.** BUT I LIKE THAT.

22          YOU AGREE, YOU HAVE NO OPINION, YOU DON'T KNOW WHETHER

23   THEY WERE THERE OR NOT, RIGHT?

24   **A.** CORRECT.

25   **Q.** NOW, YOU HAVE SERVICED ANSUL SYSTEMS IN THE PAST WITH YOUR

1   CUSTOMERS WHEN YOU'VE GONE TO THE RESTAURANT AND FOUND BLOW OFF

2   CAPS WERE MISSING?

3   **A.**  YES.

4   **Q.**  AND, IN FACT, WHEN THEY WERE MISSING YOU MADE IT A POINT TO

5   PUT THEM BACK ON, CORRECT?

6   **A.**  AFTER I CLEANED THE NOZZLE AND ALL THAT I PUT IT BACK ON.

7   **Q.**  IN FACT, YOU SAID IT'S YOUR POLICY TO CHANGE THE BLOW OFF

8   CAPS EVERY SIX MOST EVEN THOUGH ANSUL REQUIRES IT EVERY YEAR?

9   **A.**  YES.

10  **Q.**  GIVEN THE NUMBER OF SYSTEMS THAT YOU SERVICE AND NUMBER OF

11  NOZZLES AT THOSE VARIOUS RESTAURANT COMPANIES THAT'S MORE

12  INCOME FOR YOUR COMPANY, ISN'T IT?

13  **A.**  SURE.

14  **Q.**  THE NOZZLE CAP DESIGNED TO FALL AWAY WHEN THERE'S A FIRE

15  WHEN THE SYSTEM SUPPRESSES, CORRECT?

16  **A.**  YES.

17  **Q.**  IN FACT, WHEN THE SUPPRESSION SYSTEM DISCHARGES THE

18  CHEMICAL THROUGH THE NOZZLE IT FORCES THE NOZZLE CAP RIGHT OFF

19  THE NOZZLE?

20  **A.**  CORRECT.

21  **Q.**  AND, IN FACT, AS YOU TESTIFIED IN YOUR DEPOSITION IT WOULD

22  NOT SURPRISE YOU IF THESE NOZZLE CAPS WERE CONSUMED BY THIS

23  FIRE?

24  **A.**  NOT AT ALL.

25  **Q.**  LIKEWISE YOU WOULD NOT BE SURPRISED IF YOU CANNOT FIND ANY

1   RESIDUE OF THE NOZZLE CAP AROUND THE NOZZLE BECAUSE OF THE

2   MAGNITUDE OF THIS FIRE?

3   **A.**   IT WOULD NOT SURPRISE ME A BIT.

4   **Q.**   THE ANSUL FIRE SUPPRESSION SYSTEM THEY'RE DESIGNED TO

5   SUPPRESS CERTAIN TYPES OF FIRES?

6   **A.**   YES.

7   **Q.**   THEY'RE NOT GOING TO SUPPRESS ALL FIRES?

8   **A.**   CORRECT.

9   **Q.**   YOU TESTIFIED TO A GREESE LATENT VAPOR FIRE?

10  **A.**   CORRECT.

11  **Q.**   THAT FIRE HAS TO BE CONTAINED WITHIN A SPECIFIC PROTECTED

12  APPLIANCE, RIGHT?

13  **A.**   YES.  IT'S THE NOZZLES ARE COMPLIANT SPECIFIC, YES.  IN

14  THIS CASE.

15  **Q.**   AND AS YOU TESTIFIED TO EARLIER IF THAT FIRE IS ANYWHERE

16  ELSE IT'S UNPROTECTED, IT'S UNDER THE FRYER OR ANYWHERE ELSE

17  WHERE THE NOZZLE CANNOT SPRAY THE SUPPRESSANT WILL HAVE NO

18  EFFECT?

19  **A.**   WILL HAVE NO EFFECT.  IT MAY OR MAY NOT HAVE ANY EFFECT.

20  **Q.**   YOU WOULDN'T COUNT ON THE SUPPRESSANT TO FIGHT THE FIRE?

21  **A.**   I WOULD NOT.

22  **Q.**   GIVEN THE POSSIBILITY OF THE RE-FLASHING AND THE

23  EXTINGUISHER THAT WE HAVE, DOESN'T SURPRISE YOU OCCASIONALLY

24  THAT HAPPENS RE-FLASH OCCURS AND YOU HAVE TO USE EXTINGUISHERS

25  OR FIRE DEPARTMENT PERSONNEL HAVE TO COME AND PUT OUT THE FIRE?

1    A.  YES.

2    Q.  YOU HAVE NO IDEA HOW LONG THE FIRE HAD BURNED BEFORE THE

3    FEASIBLE LINK BROKE, CORRECT?

4    A.  TIME WISE, NO.

5    Q.  THAT'S A CORRECT STATEMENT, YOU HAVE NO IDEA?

6    A.  THE TIMING IS THAT WHAT YOU'RE ASKING?

7    Q.  YES, SIR.

8    A.  THE TIMING I HAVE NO IDEA.

9    Q.  OKAY.  YOU DO NOT KNOW HOW LONG IT TOOK FOR THE WET

10   CHEMICAL TO COMPLETELY DISCHARGE, ALL YOU KNOW IT DID FULLY

11   DISCHARGE?

12   A.  YES.

13   Q.  AND, IN FACT, IF THERE WERE SOME CLOGGING OF ONE OF THE

14   NOZZLES, IF THAT STOPPED DISCHARGE IT WOULD KEEP THE

15   SUPPRESSANT IN THAT PIPE, WOULDN'T IT?

16   A.  THERE'S OTHER NOZZLES IT COULD ESCAPE FROM.

17   Q.  FOR THAT PARTICULAR NOZZLE PIPE THERE WOULD BE CHEMICAL

18   DISCHARGE IN THAT PIPE, YOUR AWARE OF THAT, RIGHT?

19   A.  UNDER NORMAL CIRCUMSTANCES NO HEAT, YES.

20   Q.  AND THEN WHEN ONE WERE TO TAKEOFF THE NOZZLE LATER THAT

21   CHEMICAL WOULD THEN DISCHARGE BY GRAVITY?

22   A.  SURE.

23   Q.  YOUR AWARE THAT WAS NEVER THE CASE HERE?

24   A.  I DON'T KNOW IF THERE WAS ANY AGENT IN THE PIPE.

25   Q.  YOU HAVE NO INFORMATION AS TO WHETHER THE FIRE HAD SPREAD

1    TO OTHER AREAS BEYOND THE DEEP FRYER BEFORE THE FEASIBLE LINK

2    BROKE, AGREED?

3    **A.**  YES.

4    **Q.**  IN FACT, YOU HAVE NO INFORMATION AS TO HOW FAR THE FIRE HAD

5    SPREAD BY THE TIME THE SUPPRESSANT SYSTEM ACTIVATED, CORRECT?

6    **A.**  NO INFORMATION.

7    **Q.**  LET'S TALK ABOUT YOUR CRITICISM OF MR. WILLIAMS WITH

8    RESPECT TO WHAT HE TOLD HIS CUSTOMER MS. ELLEBRECHT.  OKAY.

9          YOU'RE CRITICAL HE DID NOT REPORT HER TO THE HEALTH

10   AND FIRE DEPARTMENT, DO YOU REMEMBER THAT?

11   **A.**  AFTER OTHER STEPS, YES.

12   **Q.**  THERE'S NO STATUTE OR LAW THAT MANDATES HE PROVIDES

13   WARNINGS REGARDING GREASE BUILD UP IN WRITING; IS THAT CORRECT?

14   **A.**  THAT'S CORRECT.

15   **Q.**  YOU, IN YOUR OWN EXPERIENCE, HAVE TESTIFIED THAT YOU

16   PROVIDE CUSTOMERS WITH ORAL WARNINGS ABOUT CLEANING THE GREASE

17   IN THEIR KITCHENS, DON'T YOU?

18   **A.**  WITH ORAL WARNINGS?

19   **Q.**  YES, SIR.

20   **A.**  COMBINED WITH A WRITTEN ONE.

21   **Q.**  YOU PROVIDE ORAL WARNINGS TO THEM?

22   **A.**  WE DO.

23   **Q.**  AND YOU HAD CUSTOMERS TELL YOU THEY'LL CLEAN THE GREASE

24   AFTER YOU'VE GIVEN THE ORAL WARNINGS?

25   **A.**  YES.

1   Q.  AND THEN YOU RETURNED TO FIND OUT THAT YOU HAVE TO WARN

2   THEM AGAIN BECAUSE IT'S NOT CLEAN STILL MORE GREASE, ISN'T THAT

3   CORRECT?

4   A.  WE HAD TO WARN PEOPLE MULTIPLE TIMES.

5   Q.  YOU THEN GO AND REPORT THAT CLIENT TO THE FIRE MARSHAL,

6   FIRE DEPARTMENT?

7   A.  WE HAVE SENT THE FORMS.

8   Q.  YOUR AWARE THAT THE FORMS THAT EUREKA OXYGEN GO TO THE SAME

9   ENTITIES?

10  A.  I'M NOT AWARE OF THAT.

11  Q.  WOULD THAT SURPRISE YOU?

12  A.  NO.

13  Q.  WERE YOU AWARE THE HEALTH INSPECTOR FROM THE CITY OF

14  FERNDALE ALSO CONDUCTED INSPECTIONS OF THIS KITCHEN?

15  A.  I'M NOT AWARE OF THAT.

16  Q.  YOU WOULD CONSIDER THE CITY OF FERNDALE HEALTH INSPECTOR AN

17  AUTHORITY, WOULDN'T YOU?

18  A.  I'M NOT SURE IF HE'S THAT AUTHORITY, BUT HE'S AN AUTHORITY,

19  YES.

20  Q.  WE'VE COVERED YOUR KNOWLEDGE ON THIS CASE, HAVEN'T WE?

21      YOU DON'T KNOW WHERE THE FIRE STARTED, YOU DON'T KNOW

22  WHERE THE FIRE WAS AT THE TIME SUPPRESSION SYSTEM ACTIVATED,

23  YOU DON'T KNOW WHETHER OR NOT THE FIRE WAS IN A PROTECTED AREA

24  OF THE FIRE SUPPRESSION SYSTEM AT THE TIME IT ACTIVATED, YOU

25  HAVE NO KNOWLEDGE THAT THE FIRE SUPPRESSION SYSTEM DID ANYTHING

```
 1   OTHER THAN ACTIVATE PROPERLY AS IT'S DESIGNED TO DO, IN FACT,

 2   YOU TESTIFIED THAT ALL THE DISCHARGED CHEMICALS CAME THROUGH

 3   THOSE NOZZLES, AS IT SHOULD HAVE?

 4         MR. SULLIVAN:  OBJECTING AS COMPOUND.

 5         THE COURT:  YOU CAN ANSWER THE QUESTION, IF YOU

 6   UNDERSTAND IT.

 7         THE WITNESS:  THAT'S NOT ALL TOTAL, BUT I'M NOT --

 8   BY MR. TOLIVER:  Q.  BUT THAT'S ALL TRUE WHAT I JUST SAID?

 9   A.  YES.

10         MR. TOLIVER:  NO FURTHER QUESTIONS AT THIS TIME.

11         THE COURT:  THANK YOU.

12         MR. TIMMONS, ANY QUESTIONS?

13         MR. TIMMONS:  NO QUESTIONS, YOUR HONOR.

14         THE COURT:  ANY REDIRECT?

15         MR. SULLIVAN:  JUST A FEW.  I'LL BE BRIEF.

16                    REDIRECT EXAMINATION

17   BY MR. SULLIVAN:  Q.  MR. CARLSEN, I THINK, THAT ONE OF THE

18   FIRST QUESTIONS MR. FOLEY ASKED YOU WAS WHETHER OR NOT IF THE

19   NOZZLE OVER THE FRYER THAT CAUGHT FIRE HAD BEEN ALIGNED

20   PROPERLY, WHETHER OR NOT THAT STILL WOULD HAVE BEEN ABLE TO PUT

21   OUT THE FIRE, CORRECT?

22   A.  I'M NOT SURE THAT WAS THE QUESTION, IF IT WAS COVERED THE

23   FRYER.

24   Q.  YOU ANSWERED -- WHAT WAS YOUR ANSWER?

25   A.  IF COVERING THE FRYER MEANING IT WOULD DISBURSE OVER THE
```

1   FRYER, THEN MY ANSWER WAS, YES, I WOULD.  I DIDN'T ASK TO

2   QUALIFY THE QUESTION.

3   **Q.**  AND EVEN IF THE NOZZLE HAD BEEN ALIGNED CORRECTLY, WOULD A

4   230 NOZZLE BE ABLE TO PROPERLY COVER THE FRYER OF THAT SIZE?

5   **A.**  NOT PROPERLY COVER IT, NO.

6   **Q.**  AND THE NEXT QUESTION HE ASKED YOU WAS WHETHER OR NOT YOU

7   KNEW WHETHER A 1F 245 NOZZLE WAS AVAILABLE WHEN THE ANSUL

8   SYSTEM WAS INSTALLED?

9   **A.**  I RECALL.

10   **Q.**  DO YOU KNOW HOW LONG A 1F 245 NOZZLE HAS BEEN AVAILABLE?

11   **A.**  I DON'T KNOW THE EXACT TIME IT CAME OUT.

12   **Q.**  DO YOU KNOW IF IT CAME OUT BEFORE MAY OF 2008?

13   **A.**  YES.

14   **Q.**  AND SO WOULD IT BE WITHIN -- LET ME STRIKE THAT.

15           WOULD IT FALL BELOW THE STANDARD OF CARE TO NOT

16   REPLACE A NOZZLE WHEN YOU GO TO SERVICE THE SYSTEM THAT IS THE

17   PROPER NOZZLE JUST BECAUSE THAT NOZZLE WASN'T AVAILABLE WHEN

18   THE SYSTEM WAS INSTALLED?

19   **A.**  I DON'T BELIEVE IT WOULD.  I THINK, WOULD FALL BELOW THE

20   STANDARD OF CARE.

21   **Q.**  BECAUSE YOU SHOULD INSPECT THE NOZZLE EVERY TIME YOU GO OUT

22   THERE IF YOU'RE GOING TO CHECK A BOX THAT SAYS YOU'RE GOING TO

23   INSPECT THE NOZZLE, CORRECT?

24   **A.**  THAT'S CORRECT.

25   **Q.**  IF YOU HAD INSTALLED THE SYSTEM BEFORE THE 1F 245 NOZZLE

1   WAS AVAILABLE, AND YOU WENT OUT LATER INSPECTED THAT SYSTEM AND

2   DETERMINED THAT WAS THE PROPER NOZZLE, WOULD YOU REPLACE THE

3   ORIGINAL NOZZLE WITH A 1F 245?

4   **A.**   THE 245 WAS THE NOZZLE THAT WAS THERE.   THE 1F NOZZLE IS

5   WHAT I WOULD REPLACE IT WITH.   I WOULD ORIENT IT OUT TO THE

6   FRONT WHERE THE SHELF WAS NOT AN OBSTRUCTION.

7   **Q.**   WE WENT OVER A LITTLE BIT ABOUT THE FACT THAT YOU DON'T

8   HAVE AN OPINION REGARDING WHETHER OR NOT THE BLOW OFF CAPS WERE

9   PRESENT BEFORE THE FIRE, CORRECT?

10  **A.**   I HAVE NO IDEA.

11  **Q.**   THAT'S NOT THE OPINION YOU OFFERED, IS IT?

12  **A.**   NO, IT'S NOT.

13  **Q.**   WHAT'S THE OPINION YOU OFFERED?

14          **MR. TOLIVER:**   OBJECTION.   ASKED AND ANSWERED.

15          **THE COURT:**   OVERRULED.

16          **THE WITNESS:**   THE OPINION I OFFERED WAS THAT THE CAPS

17  WERE NOT CHANGED AS FREQUENTLY AS THEY SHOULD HAVE BEEN.   AND

18  THE REASON FOR CHANGING THOSE AS FREQUENTLY, AT LEAST, IN AN

19  ANNUAL BASIS, WOULD BE TO KEEP GREASE OR ANY DEBRIS FROM

20  WICKING INTO THE NOZZLE.

21  **Q.**   LIKE THE TWO PICTURES WE SAW RIGHT AFTER LUNCH, CORRECT?

22          **MR. TOLIVER:**   OBJECTION.   INCOMPLETE HYPOTHETICAL,

23  CALLS FOR SPECULATION, LACKS FOUNDATION.

24          **THE COURT:**   OVERRULED.   YOU'RE RENEWING WHAT YOU

25  ALREADY DID.

1          **THE WITNESS:** YES.

2     **BY MR. SULLIVAN:  Q.** ONE FINAL QUESTION.  WHEN YOU DESIGN

3     THESE ANSUL SYSTEMS OR ANY FIRE SUPPRESSION SYSTEMS, YOU DESIGN

4     THEM TO PUT OUT A FIRE IN THE APPLIANCE BEFORE THAT FIRE

5     SPREADS?

6     **A.** I DON'T THINK I FOLLOW THE QUESTION.

7     **Q.** OKAY.  MR. TOLIVER MADE A POINT ABOUT MAYBE THE FIRE SPREAD

8     BEFORE THE ANSUL SYSTEM ACTIVATED?

9     **A.** I SEE WHAT YOU'RE SAYING.

10    **Q.** SO MY QUESTION IS, ARE THEY DESIGNED TO PUT OUT THE FIRE IN

11    THE APPLIANCE BEFORE IT SPREADS?

12    **A.** IDEALLY, YES.  THEY ARE DESIGNED -- THE LINK SHOULD MELT

13    BEFORE THE FIRE GETS WAY OUT OF HAND.  DEPENDING UPON THE

14    TEMPERATURE AND THE HOOD ABOVE BECAUSE ANY EXTRA HEAT IS GOING

15    TO CREATE MORE TEMPERATURE ABOVE THE APPLIANCE.

16          SO YOU LOOK AT THE HOOD, YOU MEASURE THE HEAT IN THE

17    HOOD WITH A HEAT GUN AND YOU DETERMINE WHAT WOULD BE THE

18    APPROPRIATE LINK FOR THAT APPLIANCE.  BECAUSE THE IDEA IS YOU

19    PUT A TOO HIGH OF A TEMPERATURE LINK ABOVE, SAY YOU PUT A CHAR

20    BROILER LINK ABOVE A GRIDDLE, A 500-DEGREE LINK IT'S GOING TO

21    TAKE FOREVER FOR THAT TO OFF AND IT WILL SPREAD.

22          BUT WITH THE PROPER LINKS AND EVERYTHING IT'S DESIGNED

23    TO GO OFF AND KEEP THAT FIRE CONTAINED.

24    **Q.** AND IF IT'S PROPERLY ALIGNED IT'S DESIGNED TO GO OFF AND

25    COVER THE ENTIRE APPLIANCE, CORRECT?

1   **A.**  DESIGNED TO COVER THE ENTIRE COOKING AREA OF THE APPLIANCE.

2   **Q.**  YOU DON'T HAVE RE-FLASHING, CORRECT?

3   **A.**  CORRECT.  IT'S SUPPOSE TO SAPONIFY ON THAT TO KEEP THE

4   RE-FLASH FROM HAPPENING.  THAT'S THE WHOLE KEY OF THE R102

5   SYSTEM.  IS THAT IT CREATES A FOAM BASE OVER THE -- COMBINED

6   WITH THE GREASE CREATES A FOAM BASE OVER THE GREASE AND KEEPS

7   IT COOL AND KEEPS IT FROM -- LEAP THE LADEN VAPORS FROM

8   ESCAPING AND RE-FLASHING.

9   **Q.**  HAS TO BE PROPERLY SERVICED TO DO THAT, CORRECT?

10  **A.**  YES.

11          **MR. SULLIVAN:**  THANK YOU.

12          **THE COURT:**  ANY FURTHER CROSS-EXAM?

13          **MR. TOLIVER:**  YES, YOUR HONOR.  THANK YOU.

14                      **RECROSS-EXAMINATION**

15  **BY MR. TOLIVER:  Q.**  MR. CARLSEN, YOU WERE ASKED BY ONE OF AMCO

16  LAWYERS ABOUT THE SCREEN, WHETHER IT HAD GREASE IN IT, SINCE

17  YOU'VE NEVER SEEN THE SCREEN, ONLY SEEN A PICTURE OF IT, NEVER

18  TOUCHED IT, YOU NEVER TESTED IT AND YOU CAN'T VERIFY ONE WAY OR

19  THE OTHER WHETHER THERE WAS, IN FACT, GREASE IN THAT SCREEN,

20  BUT IF WE ASSUME HYPOTHETICALLY THAT THERE IS, YOU UNDERSTAND

21  THAT THIS FIRE TOOK QUITE AWHILE TO EXTINGUISH AFTER IT WAS

22  DISCOVERED, AND THAT FROM THE FIRE FLAMES WOULD GO UP, FUMES GO

23  UP AND YOU UNDERSTAND THAT THE GREASE VAPORS AIRBORNE WOULD

24  ALSO GO UP, AND SINCE THE RUBBER BLOW OFF CAP AS YOU SAID HAS

25  ALREADY BLOWN OFF GREASE CAN THEN ESCAPE RIGHT UP RIGHT INTO

1   THAT NOZZLE, YOU AGREE WITH THAT?

2   **A.**   NOT TO THAT EXTENT THERE.

3   **Q.**   YOU AGREE THAT'S CERTAINLY POSSIBLE, ISN'T IT?

4   **A.**   WHAT'S CERTAINLY POSSIBLE?

5   **Q.**   GREECE FROM THE FIRE, VAPORS AIRBORNE RISE INTO THE NOZZLE?

6   **A.**   THE NOZZLE ORIFICE IS SO TINY.

7   **Q.**   LET'S GO BACK TO THE PURPOSE OF THE NOZZLE CAP THEN.  THE

8   PURPOSE OF THE NOZZLE CAP IS TO KEEP GREASE OUT OF THE NOZZLE?

9   **A.**   YES.

10   **Q.**   OKAY.  SO AND THAT'S --

11   **A.**   FOR SIX MONTHS.

12   **Q.**   NORMAL COOKING IN THE KITCHEN?

13   **A.**   YES.

14   **Q.**   GREECE COMES OFF OF THE GRIDDLE, THE BURNERS, THE FRYER, ET

15   CETERA?

16   **A.**   YES.

17   **Q.**   SO ONCES THAT NOZZLE CAP IS OFF YOU NO LONGER HAVE THAT

18   PROTECTION TO KEEP GREASE FROM GOING INTO THAT NOZZLE, NOW YOU

19   HAVE EXPOSED, NOW YOU HAVE A FIRE BURNING AND IT'S SURPRISING

20   THE GREASE WOULD THEN GET IN THAT NOZZLE SINCE IT NO LONGER HAS

21   THAT PROTECTIVE CAP, RIGHT?

22   **A.**   IT'S NOT SURPRISING THAT WHATEVER THE MATERIAL YOU'RE

23   EXPLAINING WOULD HAVE GOTTEN TO THAT NOZZLE TO A CERTAIN

24   EXTENT.

25   **Q.**   THAT MAKES SENSE?

1    A.   CERTAIN EXTENT, YES.

2    Q.   THAT SEEMS LOGICAL?

3    A.   TO A CERTAIN EXTENT.

4    Q.   LOGICAL TO YOU?

5    A.   YES, TO A CERTAIN EXTENT.

6    Q.   YOU WOULD EXPECT THAT?

7    A.   A SMALL AMOUNT, NOT THE AMOUNT I'VE SEEN ON THAT SCREEN.

8    Q.   YOU DON'T KNOW HOW LONG THE FIRE WAS, DO YOU?

9    A.   I DON'T KNOW HOW LONG.

10   Q.   CORRECT.  YOU DON'T KNOW HOW LONG IT BURNED PRIOR TO

11   FINALLY BEING EXTINGUISHED, DO YOU?

12   A.   NO, I DON'T.

13   Q.   YOU DON'T KNOW HOW LONG IT BURNED BEFORE THE SUPPRESSION

14   SYSTEM ACTIVATED, WE KNOW THAT, RIGHT?

15   A.   RIGHT.

16   Q.   YOU DON'T KNOW HOW LONG IT BURNED BEFORE SOMEONE DISCOVERED

17   THE FIRE, CORRECT?

18   A.   CORRECT.

19   Q.   WOULD IT SURPRISE YOU IT BURNED FOR AN HOUR?

20   A.   NO.

21   Q.   AND YOU DON'T KNOW HOW LONG IT BURNED WHILE THE

22   FIREFIGHTERS WERE IN THE PROCESS OF TRYING TO EXTINGUISH THAT

23   FIRE, CORRECT?

24   A.   I DON'T.

25   Q.   IF YOU'RE TO LEARN IT TOOK SEVERAL HOURS IN TOTAL TO

```
 1    EXTINGUISH THAT FIRE, IT WOULD BE A FAIR AMOUNT OF VAPORS,

 2    GREASE VAPORS GOING INTO THE AIR, WOULDN'T IT?

 3           CERTAINLY MUCH MORE THAN COOKING, WOULDN'T IT?

 4    A.  IF IT TOOK -- HOW MANY HOURS?

 5    Q.  SEVERAL HOURS.

 6    A.  YEAH, IT WOULD BE SIGNIFICANT AMOUNT.

 7    Q.  RE-FLASHING ISSUE THAT AMCO'S LAWYER ASKED YOU ABOUT, THE

 8    REASON THAT THE OWNER'S MANUAL TALKS ABOUT THIS ISSUE, ANSUL

 9    TALKS ABOUT THIS ISSUE THAT IS A POSSIBILITY?

10    A.  SURE.

11    Q.  THERE'S NO GUARANTEE?

12    A.  NOT IN ANYTHING, YES, THAT'S TRUE.

13    Q.  THAT'S WHY YOU HAVE EXTINGUISHERS?

14    A.  YES.

15    Q.  PUT OUT THE FIRE IN CASE RE-FLASHING OR IN CASE THE FIRE

16    WAS BEYOND THE SUPPRESSION SYSTEM WHEN IT ACTIVATED, CORRECT?

17    A.  YES.

18    Q.  AND NO ONE KNOWS, AT LEAST, AS FAR AS YOU KNOW, NO ONE

19    KNOWS WHETHER THERE'S RE-FLASHING IN THIS CASE, CORRECT?

20    A.  YES, NO ONE KNOWS.

21    Q.  AND LIKEWISE NO ONE KNOWS WHERE THE FIRE WAS IN THE

22    RESTAURANT, WHETHER IT'S OUTSIDE THE AREA OF A PROTECTIVE --

23    PROTECTED APPLIANCE OR NOT?

24    A.  THAT'S CORRECT.

25    Q.  NO ONE HAS THAT INFORMATION?
```

1    **A.**  THAT'S CORRECT.

2          **MR. TOLIVER:**  THANK YOU VERY MUCH.

3          **THE COURT:**  THANK YOU, MR. CARLSEN.  YOU MAY STEP

4    DOWN.

5          **THE WITNESS:**  THANK YOU.

6          **THE COURT:**  AMCO PLEASE CALL IT'S NEXT WITNESS.

7          **MR. SULLIVAN:**  GO OUTSIDE TO GET HIM.

8                          **DONALD PERKINS**,

9    CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

10   TESTIFIED AS FOLLOWS:

11         **THE WITNESS:**  YES.

12         **THE CLERK:**  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

13   NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

14         **THE WITNESS:**  MY NAME IS DONALD PERKINS.

15   P-E-R-K-I-N-S.

16                      **DIRECT EXAMINATION**

17   **BY MR. SULLIVAN:  Q.**  GOOD AFTERNOON, MR. PERKINS.

18   **A.**  GOOD AFTERNOON.

19   **Q.**  YOU PLEASE TELL THE JURY WHERE YOU LIVE?

20   **A.**  I LIVE UP IN SACRAMENTO AREA OF CALIFORNIA.

21   **Q.**  WHERE DO DID YOU GO TO HIGH SCHOOL?

22   **A.**  DOWN IN THE BAY AREA IN CAMPBELL NEAR SAN JOSE.

23   **Q.**  WHAT DID YOU DO AFTER YOU GRADUATED HIGH SCHOOL?

24   **A.**  GRADUATED ON A FRIDAY WENT TO BOOT CAMP MONDAY MORNING.

25   WAS QUICK, SPENT THE NEXT COUPLE OF YEARS IN THE NAVY IN THE

1   SUBMARINE SERVICE WORKING ON CONVENTIONAL AND NUCLEAR SUBS.

2   **Q.**  WHAT WAS YOUR RATE WHEN LEFT THE NAVY?

3   **A.**  TORPEDO MAN SECOND CLASS.

4   **Q.**  WHAT DID YOU DO AFTER YOU LEFT THE NAVY?

5   **A.**  I WENT TO WORK FOR THE PHONE COMPANY FOR A SHORT DURATION

6   OF TIME, THEN I WAS HIRED BY THE CAMPBELL FIRE DEPARTMENT.

7   **Q.**  YOU PLEASE GIVE THE JURY A BRIEF DESCRIPTION OF YOUR

8   PROFESSIONAL BACKGROUND FROM THEN ON?

9   **A.**  SURE.  SO I SPENT TWO YEARS WITH THE CAMPBELL FIRE

10  DEPARTMENT AS A FIREFIGHTER AND THEN -- IN 1965 TO 1967, AND

11  THEN I TOOK THE TEST AND PASSED THE TEST FOR SAN JOSE FIRE, SO

12  I WAS WITH SAN JOSE FIRE DEPARTMENT FROM 1967 TO 1994.  AND I

13  RETIRED WITH LITTLE OVER 26 YEARS IN SAN JOSE FIRE DEPARTMENT

14  AND RETIRED AGE 50.

15  **Q.**  WHAT WAS YOUR TITLE WHEN YOU FIRST JOINED THE SAN JOSE FIRE

16  DEPARTMENT?

17  **A.**  I WAS FIREFIGHTER.

18  **Q.**  CAN YOU DESCRIBE FOR THE JURY BRIEFLY WHAT YOUR DUTIES AND

19  RESPONSIBILITIES AS FIREFIGHTER WERE?

20  **A.**  BASICALLY, JUST SUPPRESSION FIRE FIGHTING AND GENERAL

21  INSPECTIONS WITHIN IN AROUND THE FIRE HOUSE THAT I WAS ASSIGNED

22  TO.

23  **Q.**  WHEN YOU SAY SUPPRESSION, IN YOUR OPINION, BASED UPON YOUR

24  CAREER AS FIRE FIGHTER, IS THERE ANY DIFFERENCE BETWEEN THE

25  TERM SUPPRESSION AND EXTINGUISHMENT?

1    **A.**  YOU SUPPRESS THE FIRE AND TAKE IT TO EXTINGUISHMENT.

2    PRETTY MUCH THE SAME, IN MY OPINION.

3    **Q.**  AND WHAT DID YOU DO AFTER YOU WERE A FIREFIGHTER, WHAT WAS

4    YOUR NEXT TITLE WITH THE FIRE DEPARTMENT?

5    **A.**  I WAS PROMOTED TO RANK OF ENGINEER THAT'S A DRIVER

6    POSITION, SO I GOT TO DRIVE THE FIRE ENGINE.

7    **Q.**  AND --

8    **A.**  TO THE FIRE SCENES, I -- THEN I PUMPED WATER AND DID THE

9    HYDRAULICS AND SUPPLYING THE HOSE LINES TO THE FIREFIGHTERS

10   FIGHTING THE FIRE.

11   **Q.**  WHAT DID YOU DO NEXT IN THE FIRE DEPARTMENT?

12   **A.**  NEXT I GOT FROM ENGINEER I WENT TO FIRE PREVENTION OFFICER,

13   SO I WORK IN THE FIRE PREVENTION BUREAU FOR ABOUT FOUR YEARS.

14   DOING PLAN CHECKING, RESIDENTIAL -- NOT RESIDENTIAL, COMMERCIAL

15   AND MERCANTILE INSPECTIONS OF BUSINESSES, AND THAT WAS ABOUT

16   FOUR YEARS.

17          THEN AT THE END OF THAT TERM I WAS ASSIGNED TO THE

18   ARSON UNIT THE CITY OF SAN JOSE.  SO I WAS AN ARSON FIRE

19   INVESTIGATOR FOR THE NEXT TWO YEARS.

20   **Q.**  BEFORE WE MOVE ON, JUST TO CLARIFY FOR THE JURY, WHAT DO

21   YOU MEAN BY PLAN CHECKING?

22   **A.**  PLAN REVIEW ON ALL INTERIOR ALTERATIONS AND NEW

23   CONSTRUCTION.  THE PLANS WOULD COME INTO OUR DEPARTMENT AND WE

24   WOULD CHECK THEM FOR FIRE PREVENTION RELATED CODES, MAKE SURE

25   THE EXITS WERE PROPERLY SPACED, THE EXIT SIGNS, EXTINGUISHERS,

1   SUPPRESSION EQUIPMENT, MEANING FIXED FIRE SYSTEMS IN

2   RESTAURANTS, SPRINKLER SYSTEMS, WE CHECK ALL THAT AND GO OUT IN

3   THE FIELD AND FIELD TEST THEM AND REPORT BACK AND SIGN OFF ON

4   THEIR PERMITS TO CONTINUE THE BUILDING.

5   **Q.**  I THINK, YOU SAID WHEN YOU JOINED THE FIRE PREVENTION UNIT

6   IN 1974?

7   **A.**  APPROXIMATELY, YES.

8   **Q.**  SAYS 1984, MAYBE A TYPO?

9   **A.**  IT MAYBE.  IT'S BEEN A LONG TIME.

10  **Q.**  AND YOU JOINED THE FIRE PREVENTION BUREAU AS A LIEUTENANT?

11  **A.**  THAT WAS OUR POSITION, YES.

12  **Q.**  CAN YOU DESCRIBE FOR THE JURY WHAT YOU DID AS A LIEUTENANT

13  IN THE FIRE PREVENTION BUREAU?

14  **A.**  WELL, AS A FIRE PREVENTION OFFICER YOU WERE -- I DID THE

15  INSPECTIONS AND PLAN REVIEW DURING THAT TIME FRAME.

16  **Q.**  THEN SOME POINT AFTER THAT YOU JOINED THE ARSON UNIT,

17  CORRECT?

18  **A.**  YES, THE LAST TWO YEARS I WAS ASSIGNED TO THE ARSON UNIT AS

19  PART OF THE SAN JOSE FIRE MARSHAL'S OFFICE.  THE ARSON UNIT IS

20  SEPARATE AND DISTINCT FROM FIRE PREVENTION, BUT STILL REPORT TO

21  THE FIRE MARSHAL.

22       SO I WAS ASSIGNED TO THE ARSON UNIT AS A FIRE INVESTOR

23  FOR TWO YEARS, FROM 1978 TO 1980.

24  **Q.**  DID YOUR DAY-TO-DAY ACTIVITIES CHANGE WHEN YOU JOINED THE

25  ARSON UNIT IN 1978?

1    A.   ABSOLUTELY.

2    Q.   WHAT DID YOU DO DURING THAT TWO YEAR TIME PERIOD?

3    A.   THERE WAS SIX OF US ASSIGNED TO THE ARSON UNIT, SO WE WERE

4    ON A 40 HOUR WORKWEEK, EIGHT HOUR SHIFTS, AND OUR WHOLE

5    RESPONSIBILITY WAS CAUSE AND ORIGIN OF FIRES WITHIN OUR CITY.

6    Q.   SO THAT WAS YOUR, ESSENTIALLY YOUR FULL-TIME JOB IN THE

7    FIRE DEPARTMENT?

8    A.   RIGHT, WE WERE DESIGNATED PEACE OFFICERS, SO PLAIN CLOTHES,

9    WE MADE ARRESTS, SEARCH AND SEIZURES AND ALL RELATED TO, NOT

10   ONLY FIRES, BUT MOST IMPORTANTLY TO ARSON, THE CRIME OF ARSON.

11   Q.   CAN YOU TELL THE JURY APPROXIMATELY HOW MANY FIRES YOU

12   INVESTIGATED DURING THAT TWO-YEAR PERIOD?

13   A.   SINCE I WAS THE NEW KID ON THE BLOCK 300 IN TWO YEARS I

14   REMEMBER.

15   Q.   ANY OF THOSE INVOLVE KITCHEN FIRES?

16   A.   SOME.

17   Q.   WHAT TYPE OF FIRES DID YOU INSPECT WHEN YOU WERE WITH THE

18   ARSON UNIT?

19   A.   EVERYTHING FROM VEHICLES, RECREATIONAL VEHICLES,

20   APARTMENTS, BUSINESSES, COMMERCIAL, RETAIL.

21   Q.   WHAT DID YOU DO AFTER YOU SERVED IN THE ARSON UNIT?

22   A.   THEN I WAS PROMOTED TO CAPTAIN, THAT WAS IN 1980.

23   Q.   AND THEN DID YOU REMAIN A CAPTAIN THEN UNTIL 1994?

24   A.   CORRECT.

25   Q.   AND AT THAT POINT YOU RETIRED FROM THE FIRE DEPARTMENT?

1    **A.**   YES.   BUT I HAD DIFFERENT ASSIGNMENTS FROM 1980 TO 1994.

2    **Q.**   WHAT WERE THOSE?

3    **A.**   WELL, MOST IMPORTANTLY I WAS REASSIGNED TO THE ARSON UNIT

4    IN 1984 AND FOR THE NEXT FOUR YEARS I WAS THE ARSON CAPTAIN IN

5    CHARGE OF THE ARSON UNIT.   SO I WAS SUPERVISOR FOR FIVE

6    INVESTIGATORS PLUS MYSELF.

7    **Q.**   AND WHAT DID YOU DO AS A SUPERVISOR?

8    **A.**   WELL, I BASICALLY ASSISTED BY OTHER INVESTIGATORS AND

9    CONDUCTED MY OWN INVESTIGATIONS.

10   **Q.**   YOU CONTINUED TO PERSONALLY INVESTIGATE A CAUSE AND ORIGIN

11   OF THE FIRES DURING THAT TIME?

12   **A.**   YES, SIR.

13   **Q.**   AND WHAT DID YOU DO AFTER THAT?

14   **A.**   I WENT BACK INTO THE FIRE STATION AND RETIRED IN 1994.

15   **Q.**   AND YOU ARE NOW WITH FIRE CAUSE ANALYSIS; IS THAT CORRECT?

16   **A.**   YES, SIR.

17   **Q.**   HOW LONG HAVE YOU BEEN WITH FIRE CAUSE ANALYSIS?

18   **A.**   I STARTED FIRE CAUSE ANALYSIS AS MY BUSINESS IN 1980 ON MY

19   DAYS OFF FROM THE FIRE DEPARTMENT, I WORKED AS A PRIVATE FIRE

20   INVESTIGATOR.

21   **Q.**   OKAY.   AND CAN YOU DESCRIBE FOR THE JURY WHAT YOU DO AS A

22   FIRE INVESTIGATOR?

23   **A.**   WELL, AS THAT TIME I WAS A SOLE PROPRIETOR AND WORKED FOR

24   INSURANCE COMPANIES AND LAW FIRMS DETERMINING THE ORIGIN AND

25   CAUSE OF A FIRE.   UPON THEIR ASSIGNMENT.

1    Q.  WHAT WOULD YOU -- HOW WOULD YOU GO ABOUT DETERMINING THE

2    ORIGIN AND CAUSE OF A FIRE?

3    A.  REALLY HASN'T CHANGED FROM DAY ONE, IT'S BASICALLY A

4    SYSTEMATIC APPROACH, GOING GENERALLY FROM THE LEAST AREA TO THE

5    GREATEST AREA OF DAMAGE AND ESTABLISHING AND AREA OF ORIGIN.

6            ONCE I'VE ESTABLISHED AN AREA OF ORIGIN OR WHERE THE

7    FIRE BEGAN, THEN I WOULD LOOK AT FIRE PATTERNS THAT WOULD TAKE

8    ME BACK TO WHAT WE CALL POINT OF ORIGIN OR IMMEDIATE AREA OF

9    FIRE ORIGIN.

10           IF WE HAD A BEDROOM FIRE AND A FIRE SPREAD OUT IN THE

11   HALLWAY I WOULD TAKE THIS TO THE BEDROOM THAT WOULD BE MY AREA

12   OF ORIGIN.

13           WITHIN THE BEDROOM IF THERE WAS A HEATER TOO CLOSE TO

14   THE BED OR ANOTHER APPLIANCE THAT COULD HAVE CAUSED THE FIRE,

15   THERE'S CERTAIN PATTERNS WITHIN THAT AREA THAT BRING ME TO THAT

16   POINT, THEN IDENTIFY THAT PARTICULAR ITEMS AS THE CAUSE OF MY

17   FIRE.

18   Q.  WHERE DID YOU LEARN THAT METHOD OF INSPECTING FIRE TO

19   DETERMINE THE ORIGIN AND CAUSE?

20   A.  THROUGH A NUMBER OF SCHOOLS.

21   Q.  AND IS THAT THE MANNER IN WHICH YOU INSPECTED THE ORIGIN

22   AND CAUSE OF FIRES WHEN YOU WERE WITH THE FIRE DEPARTMENT?

23   A.  IT IS TODAY.  SO SYSTEMATIC APPROACH GENERALLY OUTSIDE THE

24   TO INSIDE, THE LEAST DAMAGE TO THE GREATER OVERALL DAMAGE.

25   Q.  YOU USE THAT SAME APPROACH SINCE YOU FIRST JOINED THE FIRE

1   PREVENTION BUREAU?

2   **A.**  SINCE I BECAME AN INVESTIGATOR IN 1978, CORRECT, THAT WAS

3   TAUGHT AS WELL.

4   **Q.**  HOW MANY FIRES WOULD YOU STAY YOU INSPECT PER YEAR TODAY?

5   **A.**  GENERALLY SPEAKING I AVERAGE 80, 90 TO 100 FIRES A YEAR

6   THAT I INVESTIGATE AND I'VE BEEN DOING INVESTIGATIONS FOR OVER

7   34 YEARS, SO I'VE LOOKED AT WELL OVER 3,000 FIRES.

8   **Q.**  AND DID ANY OF THOSE FIRES INVOLVE KITCHENS?

9   **A.**  ABSOLUTELY.

10  **Q.**  DID ANY INVOLVE KITCHENS WITH FIRE SUPPRESSION SYSTEMS?

11  **A.**  YES.

12  **Q.**  DID ANY OF THESE INVOLVE FIRES THAT BEGAN IN KITCHEN

13  APPLIANCES?

14  **A.**  YES.

15  **Q.**  WHAT TYPE OF KITCHEN APPLIANCES?

16  **A.**  COMMERCIAL WISE IN FAST FOOD RESTAURANTS FROM SALAMANDERS

17  TO MATERIALS LEFT ON TOP OF THE GRIDDLE, AFTER HOURS CLEANING

18  UP AND LEFT A RAG ON THE GRIDDLE AND CAUSED THE FIRE, DEEP FAT

19  FRYERS, A HOST OF EQUIPMENT THAT'S ASSOCIATED WITH COMMERCIAL

20  KITCHENS.

21  **Q.**  YOU STILL WORK AT FIRE CAUSE ANALYSIS TO THIS DAY?

22  **A.**  I'M ONE OF THE OWNERS, YES.

23  **Q.**  CAN YOU EXPLAIN TO THE JURY SOME OF THE CLASSES OR SEMINARS

24  YOU ATTENDED RELATED TO YOUR WORK IN DETERMINING FIRE ORIGIN

25  AND CAUSE?

1    **A.**  I FIRST STARTED TAKING CLASSES THROUGH THE CALIFORNIA STATE

2    FIRE MARSHAL'S OFFICE, THEN THROUGH LOCAL COMMUNITY COLLEGES,

3    AND RECEIVED AN AS DEGREE IN FIRE SCIENCE.

4           AND THEN I STARTED -- AND PART OF THAT DEGREE ENTAILS

5    TWO CLASSES IN CAUSE AND ORIGIN OF FIRES, AND THERE'S THREE

6    COLLEGE UNITS AND 40 HOURS EACH OVER A SEMESTER.  SO THERE'S A

7    TOTAL OF FOUR CLASSES, I TOOK ALL FOUR OF THOSE.

8           AND THAT COMBINED WITH MY WORK IN THE FIRE SERVICE I

9    WAS GIVEN WHAT THEY CALL LEVEL TWO CERTIFICATION AS A FIRE

10   INVESTIGATOR.

11          FROM THERE I WENT TO THE FBI ACADEMY, POLICE ARSON

12   SCHOOL, I'VE BEEN TO ALCOHOL TOBACCO FIREARMS, EXPLOSIVE AND

13   FIRE INVESTIGATION SCHOOL ON THE EAST COAST.

14          I ATTENDED EMMITSBERG, MARYLAND IT'S THE NATIONAL FIRE

15   ACADEMY.  THEY HAVE A TWO WEAK CLASS ON CAUSE AND ORIGIN.  THEY

16   JUST COVER THE WHOLE GAMUT FROM FIRE BEHAVIOR, TO ORIGIN, TO

17   CAUSE, TO PARTICULAR ITEMS THAT MAY HAVE -- MAY LEAD US BACK TO

18   WHERE AND HOW THE FIRE BEGAN.

19   **Q.**  CAN YOU DESCRIBE FOR THE JURY ANY CERTIFICATIONS YOU

20   RECEIVED RELATED TO YOUR WORK IN DETERMINING THE ORIGIN AND

21   CAUSES OF FIRES?

22   **A.**  WELL, BESIDES THE FIRE MARSHAL GAVE US BACK IN THE EARLY

23   '80, AND THERE'S A GROUP THAT I BELONG TO CALL THE

24   INTERNATIONAL ASSOCIATION OF FIRE INVESTIGATORS, EACH STATE IN

25   OUR UNION, STATE OF CALIFORNIA FOR INSTANCE HAS A CHAPTER OF

1    INVESTIGATORS THAT BELONG TO THE INTERNATIONAL.

2          AND SO THERE'S A CERTIFICATION PROGRAM THAT THEY PUT

3    OUT IN 1980'S.  BASICALLY, YOU HAVE TO HAVE TESTIFIED IN COURT,

4    YOU NEEDED TO HAVE LOOKED AT OVER 150 FIRES.

5          SO MANY HOURS OF TRAINING AND EDUCATION IN CAUSE AND

6    ORIGIN OF FIRES.  THEN YOU TOOK AN ORAL BOARD AND YOU TOOK A

7    TEST.  ONCE YOU PASS ALL THAT YOU WERE GIVEN A CERTIFICATION OF

8    CERTIFIED FIRE INVESTIGATOR.

9    Q.  WHEN WERE YOU FIRST CERTIFIED?

10   A.  IN THE EARLY 80'S.

11   Q.  THEN YOU'VE BEEN RECERTIFIED SINCE?

12   A.  YES, THERE IS A RECERTIFICATION PROGRAM, SO EVERY FIVE

13   YEARS WE HAVE TO RESUBMIT ALL OUR QUALIFICATIONS AGAIN, PLUS

14   ALL THE TRAINING.  AND THEY REQUIRE US TO MAINTAIN ON A YEARLY

15   BASIS A CERTAIN AMOUNT OF TRAINING, HOURS OF TRAINING.

16         AND SO I'M CONTINUALLY GOING BACK AND TAKING CLASSES

17   WITH SEMINARS IN CAUSE AND ORIGIN OF FIRES.

18   Q.  ARE YOU A MEMBER OF ANY ORGANIZATIONS RELATED TO YOUR WORK

19   AS A ORIGIN AND CAUSE INVESTIGATOR FOR, I BELIEVE, YOU HAVE

20   YOUR REPORT IN FRONT OF YOU, CORRECT?

21   A.  YES, I DO.

22   Q.  IN CASE YOU CAN'T REMEMBER THEM.

23   A.  WELL, THE MAIN THING IS THE INTERNATIONAL ASSOCIATION OF

24   ARSON INVESTIGATORS, THE NFPA THE NATIONAL FIRE PROTECTION

25   ASSOCIATION, THE CALIFORNIA CONFERENCE OF ARSON INVESTIGATORS,

1    AND THE NORTHERN CALIFORNIA FRAUD INVESTIGATORS.

2          SO I'M -- THOSE ARE THE MAIN GROUPS THAT I PARTICIPATE

3    IN QUITE FREQUENTLY.

4    **Q.**  THE IAAI IS THE INTERNATIONAL ASSOCIATION OF ARSON

5    INVESTIGATORS?

6    **A.**  YES, SIR.

7    **Q.**  CAN YOU DESCRIBE YOUR INVOLVEMENT IN THAT ORGANIZATION?

8    **A.**  WELL, I HAVE OVER 30 YEARS WITH THAT ORGANIZATION AND FROM

9    TIME TO TIME I'VE TAKEN ON TRAINING, WORKING IN A TRAINING

10   COMMITTEES TO ASSIST THEM.

11         I ALSO WORK WITH ABOUT EIGHT OTHER INVESTIGATORS AND

12   INDIVIDUALS, AND WE PUT TOGETHER -- THE CHAIRMAN OF THIS

13   COMMITTEE, WE ACTUALLY WRITE THE TEST FOR NATIONAL

14   CERTIFICATION.

15         SO WE PULL TOGETHER, REMEMBER I TOLD YOU WE TOOK A

16   TEST, AND THAT TEST COMPRISED OF 150 QUESTIONS.  WE FORMED AND

17   WROTE OVER A THOUSAND QUESTIONS THAT GOES INTO THE DATABASE.

18         SO THAT WHEN THE FIRE INVESTIGATORS IT'S TIME FOR THEM

19   TO TAKE THE TEST WE PULL OUT 150 QUESTIONS.  SO THAT'S WHY NEED

20   FOR THREE YEARS AS ON A PART-TIME BASIS, OF COURSE, WE MEET AND

21   WRITE TESTS FOR THE NATIONAL CERTIFICATION PROGRAM.

22   **Q.**  HAVE YOU EVER HAD ANY WRITINGS RELATED TO FIRE CAUSE OR

23   ORIGIN PUBLISHED?

24   **A.**  YES.  THERE'S A COUPLE OF DOCUMENTS CALLED USERS MANUAL FOR

25   NFPA 921.  REMEMBER NFPA 921 IS THE NATIONAL FIRE PROTECTION

1   ASSOCIATION.  THE DOCUMENT NUMBER 921 IS THE GUIDE FOR FIRE

2   INVESTIGATORS TO CONDUCT THEIR ORIGIN AND CAUSE INVESTIGATIONS.

3   AND IT'S CALLED USERS MANUAL.

4           AND SO I, ALONG WITH SEVERAL OTHERS FOLKS, PUT

5   TOGETHER A DOCUMENT ON HOW TO USE THE DOCUMENT.  WE CALL IT THE

6   USER'S MANUAL.  NOT A GOOD NAME BUT IT WORKS.

7           AND SO WE JUST TAKE EACH PARAGRAPH AND WE DISSECT IT

8   AND WE SHOW PICTURES, AND SO IT'S TRAINING NEW FOLKS WHO ARE

9   INTERESTED IN FIRE INVESTIGATIONS ON HOW TO CONDUCT AND WORK

10  THEIR INVESTIGATIONS.

11          THE OTHER DOCUMENT I DID WAS THE CALIFORNIA EDUCATION

12  BAR AND THAT WAS COUPLE YEARS AGO.  AND I WROTE, ALONG WITH

13  THREE OTHER FOLKS, WE WROTE THE WHOLE CHAPTER ON CAUSE AND

14  ORIGIN OF INVESTIGATORS, EVIDENCE IN CRIMINAL -- I FORGET THE

15  NAME OF IT HERE.  EXCUSE ME.  SCIENTIFIC EVIDENCE IN CRIMINAL

16  CASES.

17          SO IT'S A TWO VOLUME DOCUMENT FOR PRACTICING LAWYERS

18  ON HOW THE INVESTIGATE FIRES AND WHAT WE GO THROUGH, SO THEY

19  CAN REVIEW THAT AND COME UP ON WHAT EXACTLY WE DO.

20  **Q.**  HAVE YOU EVER GIVEN ANY LECTURES RELATED TO FIRE ORIGIN OR

21  CAUSE?

22  **A.**  YES.  I'M ALSO A LIFE TIME -- HAVE MY LIFE TIME TEACHING

23  CREDENTIAL FOR THE STATE OF CALIFORNIA, SO I TEACH THE FIRE

24  INVESTIGATIONS CLASSES THROUGH THE STATE FIRE MARSHAL'S OFFICE.

25  **Q.**  HAVE YOU EVER TAUGHT ANYTHING RELATED TO FIRE ORIGIN AND

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179

1   CAUSE AT ANY SCHOOLS?

2   **A.**  IN EVERGREEN COMMUNITY COLLEGE, MISSION COLLEGE UP IN

3   SACRAMENTO, AMERICAN RIVER COLLEGE I TAUGHT CLASSES THERE, BUT

4   I ALSO FOUGHT CLASSES ON EVIDENCE COLLECTION, THE CRIMINAL

5   CASES.

6   **Q.**  CAN YOU DESCRIBE THE SUBJECT MATTER OF THE CLASS YOU

7   TAUGHT AT MISSION COLLEGE?

8   **A.**  INTRODUCTION TO FIRE SCIENCE AND ALSO CAUSE AND ORIGIN.

9   FIRE INVESTIGATION 1A AND 1B.

10  **Q.**  AND HOW ABOUT THE -- WAS IT THE SAME SUBJECT MATTER AT THE

11  AMERICAN RIVER COLLEGE?

12  **A.**  YES.

13  **Q.**  AND HAVE YOU EVER TESTIFIED AS AN EXPERT WITNESS BEFORE

14  REGARDING FIRE ORIGIN AND CAUSE?

15  **A.**  YES, SIR.

16         **MR. SULLIVAN:**  AND, YOUR HONOR, I WOULD TENDER

17  MR. PERKINS AS AN EXPERT WITNESS ON FIRE ORIGIN AND CAUSATION.

18         **THE COURT:**  ANY OBJECTION, ANY CROSS-EXAMINATION

19  DESIRED OR WANT TO WAIT UNTIL LATER?

20         **MR. TOLIVER:**  LATER.  THANK YOU.

21         **THE COURT:**  YOU MAY PROCEED.

22  **BY MR. SULLIVAN:**  **Q.**  MR. PERKINS, WERE YOU RETAINED TO PROVIDE

23  EXPERT WITNESS' TESTIMONY IN THE CASE?

24  **A.**  YES, I WAS.

25  **Q.**  BY WHOM?

1    **A.**   ORIGINALLY BY CECILWARE, A MANUFACTURER OF A DEEP FAT

2    FRYER.

3    **Q.**   AND WHO ARE YOU BEING PAID BY TODAY?

4    **A.**   BY AMCO.

5    **Q.**   AND ARE YOU BEING PAID FOR YOUR TIME HERE IN COURT TODAY?

6    **A.**   YES, SIR.

7    **Q.**   AND YOU TESTIFIED AS AN EXPERT WITNESS BEFORE, CORRECT?

8    **A.**   YES, SIR.

9    **Q.**   AND WOULD YOU SAY THAT YOU'RE CUSTOMARILY PAID FOR YOUR

10   TESTIMONY WHEN SERVING AS AN EXPERT WITNESS?

11   **A.**   YES, SIR.

12   **Q.**   AMCO NOT THE ONLY INSURANCE -- OR THE ONLY COMPANY THAT

13   EVER PAID YOU FOR EXPERT WITNESS' TESTIMONY, CORRECT?

14   **A.**   CORRECT.

15   **Q.**   AND REFERRING TO YOUR REPORT, CAN YOU EXPLAIN TO THE JURY

16   THAT WORK THAT YOU PERFORM ON THIS CASE THAT COME TO YOUR

17   OPINIONS?

18   **A.**   YES.  SO ORIGINALLY I WAS RETAINED BY CECILWARE AND I

19   INVESTIGATED THE FIRE IN DECEMBER OF 2008.  SO I WAS ACTUALLY

20   OUT THERE INVESTIGATING THE FIRE ON, I BELIEVE, IT WAS TWO DAYS

21   I WAS AT THE FIRE SCENE.  SO THIS IS APPROXIMATELY TWO MONTHS

22   AFTER THE FIRE HAD OCCURRED.

23   **Q.**   WERE THERE ANY OTHER PROFESSIONALS WHO WERE PRESENT ON THAT

24   DAY?

25   **A.**   YES, THERE WAS A FIRE INVESTIGATOR DON FERMER AND FIRE

1    INVESTIGATOR JOHN MILLER, THERE WERE ENGINEERS KEN REDINGS,

2    MICHAEL O'CONNOR WAS ANOTHER ENGINEER THAT WAS OUT THERE, AND

3    THERE WAS SOME OTHER ENGINEERS ASSOCIATED WITH THE ANSUL

4    SYSTEM.

5    **Q.**  AND WHAT ELSE DID YOU REVIEW TO COME TO YOUR OPINIONS THAT

6    YOU'RE GOING TO RENDER TODAY?

7    **A.**  BESIDES THE ORIGIN AND CAUSE INVESTIGATION THAT I DID, I

8    INTERVIEWED FIRST REPORTING PERSON, AS WELL AS FIREFIGHTERS ON

9    THE SCENE.

10   **Q.**  BEFORE WE MOVE ON, MAYBE YOU SHOULD DESCRIBE TO THE JURY,

11   IF YOU WILL, WHAT THE ORIGIN AND CAUSE INVESTIGATION IS THAT

12   YOU DID?

13   **A.**  DETERMINE THE ORIGINS OF THE FIRE TO BE THE RESTAURANT.

14   **Q.**  AND WHEN YOU SAY THE ORIGIN AND CAUSE INVESTIGATION, WHAT

15   DOES THAT INVESTIGATION ENTAIL, WHAT DO YOU LOOK AT?

16   **A.**  IT'S TWO PART PROCESS.  AGAIN, AS I SAID EARLIER, YOU

17   DETERMINE WHERE THE FIRE BEGAN, WHICH WAS IN THE RESTAURANT,

18   AND MORE SPECIFICALLY THE FIRE ORIGINATED WITHIN THE COOKING

19   LINE WITHIN THE RESTAURANT.

20        ONCE I ESTABLISHED THAT THEN I LOOKED FOR WHAT I CALL

21   IDENTIFYING POTENTIAL HEAT SOURCE THAT COULD HAVE CAUSED THE

22   FIRE.  I LOOK AT WHAT MY FUEL SOURCE IS, MEANING WHAT CAN BURN,

23   AND WHAT EVENT BROUGHT THE HEAT SOURCE AND THE FUEL SOURCE

24   TOGETHER TO GIVE ME MY FIRE.

25   **Q.**  ASIDE FROM THAT INVESTIGATION OF THE SCENE YOU JUST

1 DESCRIBED, YOU ALSO REVIEWED PHOTOGRAPHS THAT WERE TAKEN AT THE

2 SCENE?

3 **A.**   I REVIEWED PHOTOGRAPHS TAKEN BY OTHER INVESTIGATORS, I

4 REVIEWED ENGINEERING REPORTS AND FIRE REPORTS OF OTHER

5 INVESTIGATORS, I REVIEWED DEPOSITION MATERIAL, I REVIEWED THE

6 FIRE INCIDENT REPORTS FROM THE FERNDALE FIRE DEPARTMENT AND

7 FROM THE EUREKA FIRE DEPARTMENT.

8 **Q.**   TALK WITH ANY FIREFIGHTERS WHO WERE PRESENT DURING THE

9 FIRE?

10 **A.**   DURING THE INVESTIGATION PROCESS ON THOSE TWO DAYS ON

11 DECEMBER 2008 WE HAD A MEETING OVER AT THE FIRE DEPARTMENT

12 HALL, AND SO WE ACTUALLY SPOKE WITH THE FIREFIGHTERS ASKING

13 WHAT THEY SAW AND OBSERVED DURING THE INITIAL FIGHTING OF THE

14 FIRE.

15 **Q.**   AND AFTER PERFORMING THAT WORK DID YOU COME TO AN OPINION

16 ABOUT WHERE THE FIRE BEGAN?

17 **A.**   YES, SIR.

18 **Q.**   CAN YOU TELL THE JURY WHAT THAT OPINION IS?

19 **A.**   THE FIRE ORIGINATED IN THE DEEP FAT FRYER LOCATED ON WEST

20 END OF THE COOKING LINE.   THERE WAS TWO DEEP FAT FRYERS THERE,

21 A SINGLE ONE AND A DOUBLE ONE, AND THE SINGLE ONE WAS THE

22 AGAINST THE WEST WALL AND RIGHT NEXT TO IT, TOUCHING IT WAS THE

23 DOUBLE DEEP FAT FRYER, MANUFACTURED BY CECILWARE.   THE FIRE

24 BEGAN IN THAT PARTICULAR UNIT.

25 **Q.**   WHERE IN THAT PARTICULAR UNIT OF THE DEEP FAT FRYER THAT

1    FIRE BEGAN?

2    **A.**  IN THE VAT ITSELF WHERE THE OIL WAS CONTAINED.

3    **Q.**  CAN YOU DESCRIBE TO THE JURY WHAT THE VAT IS?

4    **A.**  THE VAT IS THE WHERE THE BASKET GOING TO, WELL, THAT'S HOT.

5    **Q.**  AND WE TALKED BRIEFLY ABOUT THE GENERAL INVESTIGATION YOU

6    TAKE SPECIFICALLY TO THIS FIRE, CAN YOU DESCRIBE THE

7    INVESTIGATION YOU MADE AND I THINK YOU REFERENCE THAT IT

8    STARTED WITH SPEAKING TO WITNESSES?

9    **A.**  YES.  I TALKED TO A RETIRED FIRE CHIEF COREY NUNES WHO WAS

10   RETIRED FROM THE FERNDALE FIRE DEPARTMENT.  HE WAS NEXT DOOR AT

11   THE TIME.  THE FIRE OCCURRED IN THE EARLY MORNING HOURS ABOUT

12   7:27 I THINK WAS WHEN THE FIRST CALL CAME IN, AND THERE WERE

13   SOME WITNESSES THAT FIRST SAW SMOKE AND INCLUDING MR. NUNES.

14        AND HE WENT OUTSIDE AND PEERED THROUGH THE WINDOW OF

15   THE CANDY STICK GRILL AND OBSERVED THE FIRE ALONG THE COOKING

16   LINE ON THE NORTH SIDE OF THE BUILDING.

17   **Q.**  I ASK YOU TO MARK THIS AS 11?

18        **THE CLERK:**  YES.

19        **THE COURT:**  COUNSEL, THIS IS ONE OF THE ONES THAT WERE

20   SHOWN THIS MORNING BEFORE COURT?

21        **MR. SULLIVAN:**  CORRECT.

22        **THE COURT:**  THOSE THIS MORNING HAD CERTAIN NUMBERS ON

23   THEM, IS THAT NUMBERING NOW --

24        **MR. SULLIVAN:**  NO, THIS IS EXHIBIT PLAINTIFF'S 11, BUT

25   WE CAN -- THOSE NUMBERS THAT REFERRED TO EXHIBIT NUMBERS, THEY

1  WERE JUST REFERRED TO NUMBERS THIS CAMERA ROLL.

2         **THE COURT:**  COULD YOU JUST FOR THE RECORD IDENTIFY

3  THOSE NUMBERS BEFORE YOU PUT ONE UP.

4         **MR. SULLIVAN:**  YES.

5         **THE COURT:**  34, I THINK.

6         **MR. SULLIVAN:**  YES, THIS IS 34.

7  **Q.**  MR. PERKINS IN FRONT OF YOU WHAT'S BEEN MARKED AS

8  PLAINTIFFS 11 AND DID YOU TAKE THAT PICTURE?

9  **A.**  YES, I DID.

10  **Q.**  AND WHAT DOES THAT PICTURE DEPICT?

11  **A.**  I TOOK THIS PICTURE FROM THE FRONT WINDOW WHICH IS WHERE

12  CHIEF NUNES WAS LOOKING, SO THIS IS HIS LINE OF VIEW.

13  **Q.**  NOW, WHAT DAY DID YOU TAKE THIS PICTURE?

14  **A.**  IT WOULD HAVE BEEN THE 15TH OR 16TH OF DECEMBER.

15  **Q.**  AND DOES IT ACCURATELY DEPICT WHAT YOU SAW ON THAT DAY?

16  **A.**  YES, IT DOES.

17         **MR. SULLIVAN:**  YOUR HONOR, PERMISSION TO MOVE THIS

18  INTO EVIDENCE?

19         **THE COURT:**  ANY OBJECTION?

20         **MR. TOLIVER:**  NO.

21         **THE COURT:**  VERY GOOD EXHIBIT 11 IS ADMITTED.

22                             (PLAINTIFF'S EXHIBIT 11

23                            RECEIVED IN EVIDENCE)

24  **BY MR. SULLIVAN:  Q.**  MR. PERKINS, IS THAT EXHIBIT 11, WHICH I

25  THINK WAS NUMBER 34 IN YOUR CAMERA ROLL?

1    **A.**  YES.

2    **Q.**  AND CAN YOU EXPLAIN TO THE JURY WHAT THEY'RE LOOKING AT?

3    **A.**  I'D -- LIKE I SAID, THAT WAS THE PHOTOGRAPH I TOOK IN FRONT

4    OF THE STORE ZOOMED IN IN THE AREA ANTICIPATING WHAT THE CHIEF

5    HIS POINT OF VIEW HAD BEEN.

6    **Q.**  AND CAN YOU DESCRIBE TO THE JURY IS THAT THE KITCHEN OF THE

7    CANDY STICK?

8    **A.**  THAT'S THE INFERIOR NORTH WALL, MY VIEW TO THE WEST.  I HAD

9    MY POINTER HERE.  SO THE KITCHEN AREA, THE COOKING LINE IS IN

10   THIS AREA RIGHT HERE.  WE'RE SEEING COUPLE THINGS.

11         NUMBER ONE, THIS IS WHERE THE CHIEF OBSERVED THE FIRE

12   FROM THAT POINT OF VIEW.  THIS IS THE ROOF STRUCTURE THAT HAD

13   COLLAPSED DOWN OVER THAT AREA, AND THAT WAS REPORTED TO ME TO

14   BE THE SAME AS IT WAS AFTER THE FIREFIGHTERS FINISHED

15   SUPPRESSING THE FIRE.

16         WHAT'S INTERESTING TO ME IS THE FACT THAT FIRE DID NOT

17   COMMUNICATE TOWARDS THE FRONT OF THE STORE EVEN THOUGH THE

18   FIREFIGHTERS REPORTED A LOT OF SMOKE.

19         WE CAN SEE THE PAINT ON THE SERVING BAR THERE AND WE

20   DON'T START SEEING ANY REAL STRUCTURAL DAMAGE UNTIL WE GET BACK

21   THERE TO THE AREA AROUND THE COOKING GRILL AREA WHICH IS ABOUT

22   7 FEET IN LENGTH.

23         THIS IS THE HOOD SYSTEM THAT WE'LL TALK ABOUT LATER ON

24   AND THEN TOWARDS THE BACK IS LIKE A LITTLE FOOD PREPARATION

25   AREA.

1          SO WHAT'S IMPORTANT TO ME, NUMBER ONE, IS THE ROOF

2     STRUCTURE IS WHAT WE CALL LEAN TO COLLAPSED AND IT ACTUALLY

3     BURN THROUGH ON THE OPPOSITE SIDE OF THE WALL WHERE IT ATTACHED

4     AND DROPPED DOWN GIVING US WHAT WE CALL A LEAN TO COLLAPSE AS

5     OPPOSED TO FLAT COLLAPSE.

6          SO THE FIRE REALLY DIDN'T -- IT BURNED UP IN THIS AREA

7     A LITTLE BIT, BUT DIDN'T CAUSE THE STRUCTURE MEMBERS IN THE

8     ATTIC SPACE ABOVE THERE TO COLLAPSE.

9     **Q.**  CAN YOU EXPLAIN TO THE JURY HOW YOU RELY ON THIS PHOTO TO

10    COME TO YOUR CONCLUSION THE FIRE ORIGINATED IN THE DEEP FAT

11    FRYER?

12    **A.**  FIRST OF ALL, REMEMBER I SAID THE AREA OF LEAST DAMAGE, THE

13    MOST DAMAGE, INSIDE THE FRONT OF THE STORE WAS RELATIVELY

14    UNDAMAGED OTHER THAN LIGHT SMOKE.

15         DIRECT FIRE DAMAGE ON THE FIRST FLOOR WAS CONFINED TO

16    THIS AREA, MEANING IT WAS IMPINGED BY FLAMES.  AND THE OTHER

17    AREA THAT HAD FIRE DAMAGE WAS THE ROOF STRUCTURE THAT SUPPORTED

18    THAT.

19         SO IT'S IMPORTANT TO ME THAT WHEN I WAS TOLD THAT THEY

20    OBSERVED THE FIRE ALONG THE RIGHT SIDE OF THE RESTAURANT HERE,

21    THE NORTH SIDE, THAT IT COMPORTS WITH WHAT THE FIRE CHIEF HAD

22    TOLD ME AND OTHER WITNESSES SAID THEY SAW THE FIRE THERE.

23    **Q.**  WHERE DID THE FIRE CHIEF TELL YOU HE SAW THE FIRE?  AND I

24    THINK FIRE CHIEF YOU'RE REFERRING TO CHIEF NUNES?

25    **A.**  CHIEF NUNES.  HE JUST SAID TO ME AS I RECALL HIM SAYING THE

1    COOKING LINE, BUT I ALSO FOUND INTERESTING IN THE FIRE REPORT

2    THEY STATE THAT CHIEF NUNES TOLD THEM THAT THEY HAD A GREESE

3    FIRE IN THE RESTAURANT.

4    **Q.**  WAS HE MORE SPECIFIC ABOUT WHETHER IT STARTED, FROM HIS

5    VANTAGE POINT, WHETHER IT WAS ON THE FRYER, OR THE GRILL, OR

6    THE BURNER?

7    **A.**  IT WAS -- HE TOLD ME THE GRILL AREA.  AND AS YOU CAN SEE IF

8    YOUR STANDING HERE IT'S ALL QUITE STRAIGHT LINE, IT'S ONLY SIX,

9    SEVEN FEET IN LENGTH IN TOTAL.  SO THAT WAS HIS POINT OF VIEW

10   FROM SOME 20 FEET BACK.

11   **Q.**  WERE THERE ANY OTHER WITNESS STATEMENT THAT YOU RELIED ON

12   TO DETERMINE WHERE THIS FIRE BEGAN?

13   **A.**  THERE WERE OTHER WITNESSES THAT ARE IN -- THAT I DON'T

14   RECALL SPECIFICALLY ADDRESSING, BUT THEY WERE IN THE FIRE

15   REPORT THAT REPORTED THAT SAW THE FIRE ON THE NORTH SIDE IN THE

16   GRILL AREA.

17   **Q.**  OTHER THAN -- WHAT ELSE DO YOU RELY ON ONTO DETERMINE THE

18   ORIGIN AND CAUSE OF THE FIRE OTHER THAN WITNESS STATEMENTS?

19   **A.**  WELL, FIRST OF ALL, DOES THE FIRE PATTERN SUPPORT THE

20   WITNESS STATEMENTS?  IN THIS CASE IT DID.

21   **Q.**  BEFORE YOU GO ON, CAN YOU EXPLAIN TO THE JURY WHAT FIRE

22   PATTERN IS IN GENERAL?

23   **A.**  THE FIRE PATTERN IS JUST THE AFFECTS OF THE FIRE IT HAS ON

24   THE APPLIANCES AND STRUCTURAL MATERIALS WITHIN THE AREA THE

25   FIRE WAS FIRST OBSERVED.

1    Q.  THIS IS -- I'M GOING TO HAVE PICTURE NUMBER 92 IN HIS ROLL

2    MARKED AS EXHIBIT 12.

3            MR. PERKINS, I'M HANDING YOU WHAT'S BEEN MARKED AS

4    EXHIBIT 92.  HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

5    A.  YES, I TOOK THIS PHOTOGRAPH.

6    Q.  AND WHEN DID YOU TAKE IT?

7    A.  ON THE DAY OF MY INVESTIGATION.

8    Q.  AND WHAT DOES THIS PHOTOGRAPH DEPICT?

9    A.  IT DEPICTS -- YOU CAN PUT UP.

10   Q.  I CAN'T PUT IT UP THERE UNTIL YOU TELL US WHAT IT IS, WHAT

11   DEPICTS IN GENERAL?

12   A.  DEPICTS THE HOOD AREA BEHIND.

13   Q.  SORRY, DOES THIS ACCURATELY DEPICT THE HOOD AREA THAT YOU

14   SAW ON THAT DAY?

15   A.  YES.

16           MR. SULLIVAN:  YOUR HONOR, I MOVE EXHIBIT 12.

17           THE COURT:  ADMITTED.

18                           (PLAINTIFF'S EXHIBIT 12

19                            RECEIVED IN EVIDENCE)

20   BY MR. SULLIVAN:  Q.  OKAY.  WE WERE JUST TALKING ABOUT FIRE

21   PATTERNS, DOES EXHIBIT 12 WHICH IS IN FRONT OF JURY NOW, ARE

22   THERE ANY FIRE PATTERNS DEPICTED IN THAT PICTURE?

23   A.  OVERALL FIRE PATTERNS AND FIRE EFFECTS, THE EFFECTS OF THE

24   FIRE.  WHAT WAS REALLY INTERESTING THIS IS THE HOOD SYSTEM AND

25   THIS IS THE FUSIBLE LINK WHICH ACTIVATED, WHICH MELTED AND

1    DISCHARGED THE SUPPRESSANT FROM THE ABSENT SYSTEM ONTO THE

2    FIRE.

3         THIS IS INTERESTING BECAUSE THERE'S THREE FUSIBLE

4    LINKS IN THAT HOOD THAT WAS OVER THE COOKING AREA.  THIS IS THE

5    ONLY FUSIBLE LINK THAT FUNCTIONED, MATERIALS MELTED AND IT

6    ACTIVATED THE SYSTEM.  SO WE --

7    Q.  BEFORE YOU GO ON, CAN YOU TELL THE JURY WHERE THAT LINK IS

8    IN RELATION TO THE DEEP FAT FRYER?

9    A.  ALMOST DIRECTLY OVER TO THE BACK AND UP ABOVE IT.  WHAT'S

10   ALSO INTERESTED, THERE'S A SCREEN THAT YOU SEE AND THE SCREEN

11   THAT YOU SEE HERE TO THE LEFT, THIS IS ALUMINUM FRAME FOR THE

12   SCREEN, THE SCREEN, GREESE SCREENS THAT AS YOUR COOKING YOUR

13   MATERIALS THE GREASE LADEN VAPORS GO UP AND THEY'RE DRAWN INTO

14   THE SCREENS, WHICH ARE CLEANED PERIODICALLY.

15        SO WE'LL SEE LATER ON THAT THIS SCREEN SUSTAINED MORE

16   DAMAGE THAN THE SCREEN TO THE RIGHT SIDE OF THE HOOD SYSTEM.

17   Q.  CAN YOU EXPLAIN THE SIGNIFICANCE OF THESE PATTERNS TO COME

18   TO YOUR CONCLUSION THAT THE FIRE ORIGINATED IN THE FRYER?

19   A.  NO ONE FIRE PATTERN OR TWO FIRE PATTERNS WITHIN ITSELF

20   CLEARLY CAN IDENTIFY HOW OR WHERE A FIRE BEGAN.  SO THIS IS

21   JUST DATA THAT WE'RE SUPPORTING.

22        SO THIS IS, NUMBER ONE, THE CHIEF SAW FIRE BACK ON THE

23   RIGHT SIDE.  FIRE PATTERNS ARE CONSISTENT WITH HIS OBSERVATION,

24   SO THAT'S KIND OF INTERESTING.

25        NUMBER THREE NOW WE'RE SAYING THE FUSIBLE LINK WENT

1    OVER THE AREA WHICH IS ALSO THE AREA WHERE THE CHIEF SAW THE

2    FIRE AND OTHER WITNESSES PLACED THE FIRE.

3    Q.  AND I WILL HAND THE COURT EXHIBIT 13, WHICH IS NUMBER 68 IN

4    THE ROLE WE LOOKED AT EARLIER.

5         MR. PERKINS, I'M HANDING YOU WHAT HAS BEEN MARKED AS

6    EXHIBIT 13.  HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

7    A.  YES, SIR.

8    Q.  AND DID YOU TAKE THIS PHOTOGRAPH?

9    A.  I DID.

10   Q.  ON WHAT DAY?

11   A.  ON THE DAY OF MY INVESTIGATION, ON DECEMBER OF 2008,

12   DECEMBER 15TH AND 16TH.

13   Q.  WHAT'S DEPICT IN THIS PHOTOGRAPH?

14   A.  THIS PHOTOGRAPH DEPICTS THE PORTION OF THE GRIDDLE TOP, THE

15   BACKSPLASH AREA AND THE HOOD SYSTEM ABOVE THAT AREA.

16   Q.  DOES THIS ACCURATELY DEPICT WHAT YOU SAW ON THE DAY YOU

17   TOOK THIS PICTURE?

18   A.  YES, SIR.

19         MR. SULLIVAN:  IF I MAY, MOVE THIS INTO EVIDENCE.

20         THE COURT:  EXHIBIT 13 ADMITTED.

21                        (PLAINTIFF'S EXHIBIT 13

22                         RECEIVED IN EVIDENCE)

23   BY MR. SULLIVAN:  Q.  MR. PERKINS, CAN YOU EXPLAIN TO THE JURY

24   FIRE PATTERNS YOU RELIED ON IN THIS PICTURE TO COME TO YOUR

25   CONCLUSION?

1    **A.**  SURE.  AGAIN, WE CAN START WITH OUR SCREEN, THAT WAS MORE

2    MATERIALS WERE LEFT ON THE SCREEN ON THE RIGHT SIDE OF THE HOOD

3    SYSTEM AS OPPOSED TO LEFT.

4    **Q.**  WHAT IS THAT SCREEN?

5    **A.**  IT'S A GREASE FILTER, BASICALLY, IT SITS UP IN THE AREA,

6    ACTUALLY, RESTS RIGHT ON THIS HORIZONTAL LINE, AND THE GREASE

7    LADEN VAPORS ARE DRAWN THROUGH THE MESH SCREEN.  AND THEY CAN

8    PHYSICALLY TAKE THESE OUT AND WASH THEM ON A DAILY OR WEEKLY

9    BASIS.

10   **Q.**  WHAT IS IT THAT --

11   **A.**  WELL, THIS ONE STILL COMPARED TO THE PRIOR PHOTO WE HAVE A

12   LOT OF MATERIALS LEFT HERE.  AND THEN THE NEXT ONE OVER HAS A

13   LITTLE LESS MATERIAL, AND THEN AS WE MOVE OVER TO THE LEFT OVER

14   WHERE THE DEEP FAT FRYER WAS WAS PRETTY WELL CONSUMED.

15        SO WE SEE THE PROGRESS OF THE FIRE.  THIS IS A PATTERN

16   IN ITSELF SUPPORTING THE FIRE MOVED UP AND OUT TO THE RIGHT

17   TOWARDS THAT AREA.

18   **Q.**  WHY DO YOU SAY MOVED UP AND TOWARDS TO THE RIGHT?

19   **A.**  BECAUSE THAT'S WHAT FIRE DOES, MOVES UP AND OUTWARDS.

20   **Q.**  WHAT'S ON THE LEFT OF THAT PICTURE?

21   **A.**  WELL, WHAT'S ALSO INTERESTING HERE IS --

22   **Q.**  HOLD ON, BEFORE WE GO ON, CAN YOU ANSWER THE QUESTION, WHAT

23   IS THE LEFT OF THAT PICTURE?

24   **A.**  ARE YOU TALKING IN THIS AREA HERE?

25   **Q.**  YES.

1    **A.**  SO AS THE FIRE MOVED UP AND OUT TO THE RIGHT, THIS IS THE

2    PORTION WHAT WE CALL A V PATTERN, AND YOU CAN SEE THE OXIDATION

3    OF THE COLOR PATTERNS THERE.  THE DIFFERENCE BETWEEN THE DARK

4    ABOVE AND THE WHAT WE CALL OXIDATION OR PATTERN THAT OCCURS ON

5    THE METAL BACKING OF THE COOK AREA.

6             SO AS THE FIRE GOES UP AND OUT THAT'S DIRECT FLAME, IS

7    PHYSICALLY AFFECTING THE COLOR OF THE MATERIAL IN THE BACK

8    WALL.  SO THAT FORMS A V PATTERN, CALLED A V PATTERN.

9    **Q.**  WHERE'S THAT FLAME COMING FROM?

10   **A.**  IT'S COMING FROM THE AREA OF THE DEEP FAT FRYER.

11   **Q.**  IS THERE ANYTHING ELSE, ANY OTHER FIRE PATTERNS THAT YOU

12   WOULD LIKE TO ADDRESS?

13   **A.**  YES.  THAT WOULD BE THE AREA DIRECTLY ABOVE THE FILTER

14   AREAS OF THE SCREEN.  FILTER AREAS WE CAN SEE HOW DARK IT IS UP

15   IN THAT AREA.  THAT'S GREASE MATERIALS.

16             AND IF YOU COULD SCREEN -- GO BACK TO THE PRIOR PHOTO

17   FOR ME REAL QUICK.  JUST KEEP IN MIND THE AMOUNT OF DARKENED IN

18   HERE.  IF WE LOOKED AT PRIOR PHOTOGRAPH WHICH IS CLOSER TO THE

19   DEEP FAT FRYER, YOU'LL SEE THAT DOESN'T EXIST BECAUSE THE FIRE

20   HAD CONSUMED ALL THE MATERIALS.

21             SO WE STILL HAD MATERIALS LEFT TO THE RIGHT.  SO ALL

22   THE DARK -- ALL THE TERMS OVER IN HERE THE GREESE THAT HAD BEEN

23   UP IN THAT AREA HAD BEEN CONSUMED, BUT THE AREA TO THE RIGHT

24   HADN'T.

25             SO WHAT CAUSES THAT?  BECAUSE MY FIRE IMPINGED THERE

```
1   FIRST FOR THE LONGEST PERIOD OF TIME, THEN IT DISSIPATED TO THE

2   RIGHT, AND SO THE MATERIALS TO THE RIGHT SUSTAINED LESS FIRE

3   DAMAGE.

4   Q.  SO WE MOVE ONTO THE NEXT PHOTOGRAPH?

5   A.  YES.

6   Q.  PLAINTIFF'S NUMBER 14, PICTURE 67.

7           THE COURT:  THANK YOU.

8   BY MR. SULLIVAN:  Q.  MR. PERKINS, I'M HANDING YOU WHAT'S BEEN

9   MARKED AS PLAINTIFF 13.

10          MR. TOLIVER:  14.

11          MR. SULLIVAN:  14, SORRY, CONFUSING MYSELF WITH THESE

12  NUMBERS.

13  Q.  HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

14  A.  YES, SIR.

15  Q.  AND DID YOU TAKE THIS PHOTOGRAPH?

16  A.  YES, SIR.

17  Q.  WHAT DOES THIS PHOTOGRAPH DEPICT?

18  A.  THIS DEPICTS BOTH OF THE FRYERS IN THE IMMEDIATE AREA OF

19  FOR ORIGIN, MORE SPECIFICALLY THE AREA WHERE THE FIRE FIRST

20  BEGAN, AND THE PATTERNS EMANATED FROM THE DEEP FAT FRYER AT

21  THAT POINT.

22  Q.  DOES THIS PHOTOGRAPH DEPICT WHAT YOU SAW ON THAT DAY?

23  A.  YES, SIR.

24          MR. SULLIVAN:  YOUR HONOR, I MOVE THIS INTO EVIDENCE,

25  I THINK, NUMBER 14.
```

1          **THE COURT:**  EXHIBIT 14 ADMITTED.

2                              (PLAINTIFF'S EXHIBIT14

3                              RECEIVED IN EVIDENCE)

4     **BY MR. SULLIVAN:  Q.**  MR. PERKINS, CAN YOU EXPLAIN FOR THE JURY

5     THE FIRE PATTERNS IN THIS PHOTOGRAPH THAT YOU RELIED ON TO

6     REACH YOUR CONCLUSION THAT THE FIRE STARTED IN THE VAT OF THE

7     DEEP FAT FRYER?

8     **A.**  WHEN YOU FIRST LOOK AT THIS PHOTO WE SEE A SINGLE UNIT WITH

9     GREASE INTERIOR TO IT.  WE SEE WHAT I'M CALLING MY AREA OF MY

10    POINT OF ORIGIN, WHICH IS THE LARGER DEEP FRYER.

11          TO THE LEFT IS A DIVISION WALL BETWEEN THAT AND THE

12    KITCHEN AREA, THE FOOD PREPARATION AREA.  SO THIS IS A SOLID

13    WALL, SO IT'S RIGHT UP AGAINST THE SOLID WALL.

14          TO THE LEFT OF THE FRYER STRAIGHT AHEAD WOULD BE THE

15    BACK AREA DIRECTLY BEHIND THE FRYER.  AND BEHIND THAT IS YOUR

16    EXTERIOR WALL OF THE BUILDING.  SO YOU'RE RIGHT UP AGAINST THE

17    NORTH SIDE OF THE BUILDING.

18          WHAT WE HAVE HERE IF YOU CAN COMPARED THE TWO UNITS WE

19    SEE WHAT I CALL CLEAN BURNER HEAVY OXIDATION TO THE BACK VENT

20    AREA OF THE DOUBLE FAT FRYER.  WE SEE A PATTERN.

21          SO THIS FIRE BURNED UP AND OUT, IT BURNED UP AND

22    RADIANT HEAT IMPINGED ON THAT BACK WALL FORMING THIS PARTICULAR

23    PATTERN THAT WE SEE DIRECTLY BEHIND THE DEEP FAT FRYER.

24          FROM THEIR THE FIRE MOVED TO MY RIGHT WHICH WAS

25    TOWARDS THE EXHAUST VENT, THAT'S WHY WE SAW THAT V PATTERN

1    DEVELOP FROM THAT POINT.

2            WHAT'S ALSO INTERESTED IS THE VERY TOP OF THIS, THIS

3    IS OUR SUPPRESSION EQUIPMENT AND ITS APPROXIMATE LOCATION OVER

4    THE DEEP FAT FRYER AREA.  THIS WHOLE AREA HERE IS A SHELF AND

5    THAT WHERE THE GREASE FILTER SAT IN.  SO THIS WAS ACTUALLY

6    BELOW THAT AREA.

7            TO YOUR RIGHT WE SEE THE EDGE OF THE KITCHEN RANGE

8    TOP, THE GRIDDLE TOP AND THE TWO BURNER STOVE.  AND WE CAN TELL

9    HERE THAT WE HAVE NO SPACE BETWEEN THE TWO UNITS.  WE HAVE A

10   LITTLE CAGE OR PLATFORM HERE THAT SEPARATES THE EDGE OF THE

11   STOVE TO THE EDGE OF THE DEEP FAT FRYER.

12           WHAT'S ALSO INTERESTING HERE FOR ME IS WE SEE HOW THE

13   FIRE AS IT BURNED IN THIS VAT THE FLAME FRONT WAS DIRECTLY UP

14   AGAINST THE VENT THERE AND IT CONSUMED MOST OF THE OIL IN

15   THERE.  DOWN HARDLY ANY OIL LEFT AND ABOUT AN INCH OR SO LEFT?

16           RIGHT -- KEEP MY HAND STEADY -- HERE THAT IS THE OIL

17   LINE, THAT CLEAN LINE THERE, WHERE IT NATURALLY SO HAVE BEEN.

18           SO FOR THE DURATION OF THE FIRE THAT MATERIAL BURNED

19   DOWN.  WHEREAS THE OTHER VAT IS PRETTY MUCH FULL OF BOTH GREASE

20   AND WATER COMBINED.

21           NOTICE THE FIRE PATTERN AND THE CLEAN BURN HERE.

22           **MR. TOLIVER:**  YOUR HONOR, MAY WE PROCEED WITH QUESTION

23   AND ANSWER FORMAT?

24           **THE COURT:**  I'LL ALLOW SOME LEEWAY.  I UNDERSTAND.

25           **MR. SULLIVAN:**  WE'RE ALMOST DONE WITH THE PHOTOGRAPHS,

1   I PROMISE.

2            **THE COURT:**  KEEP GOING.

3            **THE WITNESS:**  THE LAST IMPORTANT INFORMATION FOR ME IS

4   DID THE FIRE START IN THE VAT OR DID IT START BELOW?

5            IF THE FIRE STARTED BELOW WE WOULD SEE THE FIRE COMING

6   UP ALONG THE FRONT OF THAT VAT AND WE DON'T SEE THAT AT ALL.

7   THE FIRE IS ALL BURNING IN THE VAT ITSELF AS OPPOSED TO THE

8   CONTROLS UNDERNEATH.

9            **MR. SULLIVAN:**  YOU MARK THIS AS 15, PLEASE.  YOUR

10  HONOR, THIS IS NUMBER 64.

11           **THE COURT:**  THANK YOU.

12  **BY MR. SULLIVAN:  Q.**  MR. PERKINS, I'M HANDING YOU WHAT'S BEEN

13  MARKED AS EXHIBIT 15.  HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

14  **A.**  I HAVE.

15  **Q.**  AND DID YOU TAKE THIS PHOTOGRAPH?

16  **A.**  I DID.

17  **Q.**  AND CAN YOU TELL ME WHAT THIS PHOTOGRAPH DEPICTS?

18  **A.**  DEPICTS THE HOOD SYSTEM, THE HOOD AREA OVER THE COOKING

19  LINE.

20  **Q.**  AND DOES -- YOU TOOK THIS PHOTOGRAPH ON THE DAY OF THE

21  DECEMBER 2008 INSPECTION?

22  **A.**  I DID, DECEMBER 15 AND 16TH, YES.

23  **Q.**  DOES THIS PHOTOGRAPH ACCURATELY DEPICT WHAT YOU SAW ON THAT

24  DAY?

25  **A.**  YES.

1          **MR. SULLIVAN:** I MOVE EXHIBIT 15 INTO EVIDENCE.

2          **THE COURT:** 15 IS ADMITTED.

3                              (PLAINTIFF'S EXHIBIT 15

4                              RECEIVED IN EVIDENCE)

5     **BY MR. SULLIVAN: Q.** MR. PERKINS, CAN YOU DESCRIBE TO THE JURY

6     THE FIRE PATTERNS IN THIS PHOTOGRAPH YOU RELIED ON IN COMING TO

7     YOUR CONCLUSIONS?

8     **A.** YES. STARTING AT THE VERY TOP, THIS IS THE MAJORITY OF THE

9     HOOD SYSTEM AND THAT COVERED ALL MY COOKING APPLIANCES, COVERED

10    THE GRIDDLE, THE TWO BURNERS AND THE TWO DEEP FAT FRYERS.

11         AND WHAT WE SEE ON THE TOP OF THIS IS WHAT WE CALL

12    HEAVY LIFTING OXIDATION BECAUSE WHEN THE FIRE FIRST STARTED WAS

13    REALLY CONTAINED IN THAT AREA FOR A PERIOD OF TIME.

14         WE CAN SEE THE BACK WALL TO THE LEFT AND WE SEE --

15    WHICH IS THE WEST WALL, AND TO THE RIGHT WE SEE THE NORTH WALL.

16    AND WE CAN SEE PORTIONS OF THAT PATTERN WE TALKED ABOUT EARLIER

17    ABOUT THE V PATTERN, AND HOW IT DEVELOPED DIRECTLY BEHIND THE

18    DEEP FAT FRYERS OF ORIGIN AND SPREAD OUT TOWARDS, IF YOU WILL,

19    TOWARDS ME OR TOWARDS THE EAST ALONG BEHIND THE GRIDDLE SURFACE

20    AREA, THE GRIDDLE AREA.

21         AND WE CAN SEE, AGAIN, WE CAN SEE THE REMAINS OF THE

22    GREASE FILTERS AND WE CAN SEE EACH OF THE THREE SUPPRESSION

23    SYSTEM NOZZLES ABOVE THAT AREA.

24    **Q.** SO AFTER YOU PERFORMED YOUR INSPECTION, INTERVIEWED

25    WITNESSES AND LOOKED AT THESE PHOTOGRAPHS YOU DETERMINED WHERE

1    THE FIRE BEGAN, CORRECT?

2    **A.**  I DID.

3    **Q.**  THAT WAS IN THE VAT OF THE DEEP FAT FRYER, CORRECT?

4    **A.**  YES.

5    **Q.**  WHAT DID YOU DO NEXT IN YOUR INVESTIGATION?

6    **A.**  WELL, BESIDES TAKING MORE PHOTOGRAPHS, WE FORMED HYPOTHESIS

7    BASED ON OUR FIRE PATTERNS AS TO WHERE THIS FIRE BEGAN.  AND

8    THAT WE CONCLUDED THAT THE FIRE DID ORIGINATE FROM THE DEEP FAT

9    FRYER NUMBER TWO, THE ONE CLOSEST TO THE EAST.

10   **Q.**  AND AFTER YOU DETERMINED THAT DID YOU UNDERTAKE TO

11   DETERMINE THE CAUSE OF THE FIRE?

12   **A.**  RIGHT.  SO NOW WE LOOK AT THE HEAT SOURCE AND THE FUEL

13   SOURCE AND THE EVENT THAT BROUGHT THE TWO TOGETHER.

14          SO THERE WAS NO ELECTRICAL APPLIANCES IN THAT

15   IMMEDIATE AREA.  THERE WAS NO ELECTRICITY PER SE.  MY ONLY FUEL

16   IN THAT AREA WAS THE -- WELL, NOT EVEN FUEL, EVERYTHING WAS

17   STAINLESS STEEL OR OTHER MATERIALS THAT DON'T BURN VERY GOOD,

18   OTHER THAN THE GREASE ITSELF.

19          SO WE IDENTIFIED THE GREASE AS THE FUEL IGNITED, FIRST

20   FUEL IGNITED.  SO NEXT WE WANTED TO LOOK FOR THE HEAT SOURCE.

21   **Q.**  BEFORE WE GO ON, THAT FUEL SOURCE DOES THAT HAVE A

22   TEMPERATURE WHICH IT AUTO IGNITES?

23   **A.**  RIGHT.  THE IGNITION SEQUENCE FOR THIS, YOU HAVE TO HEAT

24   THAT GREASE UP TO OR OIL UP TO A CERTAIN TEMPERATURE TO CAUSE

25   WHAT THEY CALL AUTO IGNITION.

1          SO YOU CAN HEAT THAT OIL TO APPROXIMATELY -- DEPENDING

2     ON THE OIL, IF IT'S BRAND NEW OIL IT TAKES A LOT MORE

3     TEMPERATURE TO AUTO IGNITE, SO OVER 700 DEGREES FAHRENHEIT.

4          IF IT'S DIRTY, WHAT I MEAN BY DIRTY, IF -- IF YOU USE

5     IT AND YOU PUT FOOD PRODUCTS IN THERE, THAT LOWERS THE AUTO

6     IGNITION TEMPERATURE, AND TO ABOVE 500 AND 23, 25 DEGREES

7     FAHRENHEIT, SO CAN BE THAT LOW.

8          SO THAT WAS MY AUTO IGNITION.  SO WHAT WE SAID WAS

9     THAT GREASE OR OIL WITHIN THAT VAT REACHED IT'S AUTOIGNITION

10    TEMPERATURE.

11    Q.  DID YOU DETERMINE THE HEAT SOURCE THAT CAUSED IT TO REACH

12    THAT AUTOIGNITION TEMPERATURES?

13    A.  YES, THE BURNERS UNDERNEATH THE FRYER ITSELF.

14    Q.  HOW DID YOU DETERMINE THAT?

15    A.  THAT WAS MY ONLY REAL COMPETENT HEAT SOURCE AVAILABLE.

16    THERE WAS NO OTHER HEAT SOURCE.  YOU GOT YOUR MATERIALS IN THAT

17    VAT AND YOU HAVE TO HEAT THAT.

18         IT'S ALMOST LIKE BOWLING WATER.  WHEN YOU TURN YOUR

19    BURNER ON THE GAS STOVE YOU TURN IT UP REALLY HIGH IT BOILS AND

20    VAPOR COMES OFF.

21         YOU CAN TURN THAT CONTROL BACK DOWN, AND THE BOILING

22    MOTION GOES AWAY AND THE VAPORS ARE A LITTLE BIT LESS.  ALMOST

23    THE SAME WAY HERE WITH THE BURNERS ON EVENTUALLY THAT

24    TEMPERATURE REACHED, AUTO IGNITION TEMPERATURE ITSELF IGNITES

25    WITHOUT BEING IN TOUCH WITH THE FLAME WHATSOEVER, IT BURSTS

1    INTO FIRE.

2    **Q.**  AND AFTER YOU HAVE YOUR HEAT SOURCE, YOU HAVE YOUR FUEL

3    SOURCE, YOU NEEDED AN EVENT, CORRECT?

4    **A.**  RIGHT.  SO THE EVENT WAS THAT THE CONTROLS FOR THIS UNIT

5    WERE OBSERVED TO BE ON A 20-DEGREE ANGLE, APPROXIMATELY ALMOST

6    ON, BUT ALMOST OFF, EXCUSE ME, ALMOST ON OR ALMOST OFF, JUST

7    20 DEGREES.  JUST TWISTED A LITTLE BIT.  SO SOMEBODY HAD LEFT

8    THE CONTROLS IN THE ON POSITION.

9    **Q.**  AND THOSE CONTROLS AND THOSE BURNERS EVENTUALLY HEATED THAT

10   OIL TO THE POINT IT AUTO IGNITED, CORRECT?

11   **A.**  CORRECT, WE HAVE THE DURATION OF PRETTY CLOSE TO 14 HOURS

12   FROM THE TIME THE OCCUPANT LEFT AND LOCKED THE PLACE UP FOR

13   THAT EVENING UNTIL THE TIME THE FIRE THE NEXT MORNING.

14          SO IT BASICALLY, I BELIEVE, IT WAS -- IT JUST SORT OF

15   WAS LIKE A BRING WATER TO A BOIL VERY SLOWLY.  THE TEMPERATURE

16   WAS VERY LOW AND IT JUST TOOK A LONG TIME TO HEAT UP THAT OIL.

17   **Q.**  ONCE THE OIL IS HEATED TO THE EXTENT IT REACHES ITS AUTO

18   IGNITION TEMPERATURE, DOES IT IGNITE SLOWLY OR QUICKLY?

19   **A.**  IT WILL BE A FLASH FIRE AND YOU'LL PRODUCE FLAMES OF FOUR,

20   FIVE, SIX FEET IN HEIGHT AND BURN VERY VIGOROUSLY FOR A PERIOD

21   OF TIME.

22   **Q.**  IT WILL DO THAT IMMEDIATELY UPON IGNITION, CORRECT?

23   **A.**  THAT'S CORRECT.

24   **Q.**  UNTIL IT BURNS UP ALL THE FUEL?

25   **A.**  WELL, NOT NECESSARILY.  YOU'LL SEE PRETTY VIGOROUS FIRE

1    RIGHT UP-FRONT AND IT'S LIKE A -- THEN SORT OF GOES WHAT WE

2    CALL K OR SPREAD TO OTHER FUELS IN THE AREA, WE CALL THOSE

3    TARGET FUELS.

4            SO MY FIRST FUEL IGNITED IS THE VAT, THE GREASE WITHIN

5    THE VAT.  IF THERE'S OTHER GREASE -- THE MATERIALS AROUND IT,

6    THERE'S ENOUGH HEAT OR ENERGY FROM THAT FIRE TO IGNITE THE

7    MATERIALS AROUND IT.

8            JUST LIKE STANDING IN FRONT OF A FIREPLACE.  YOU CAN'T

9    GET TOO CLOSE OR IT'S TOO HOT, SO YOU MOVE AWAY.  BUT IF OTHER

10   COMBUSTIBLES AROUND IT CAN SPREAD THAT FIRE AND IGNITE THOSE

11   OTHER MATERIALS.

12   **Q.**  WERE YOU EVER ABLE TO FIGURE OUT THE ANOMALY IN THE FRYER

13   THAT CAUSED THE BURNERS TO AUTO IGNITE THIS OIL?

14   **A.**  NO.  THERE WAS JUST TOO MUCH DESTRUCTION.  THE HEAT FROM

15   THE FIRE BASICALLY COOKED ALL THE APPLIANCES UNDERNEATH THE

16   CONTROLS.

17           AND WE COULD TELL THE CONTROL WAS IN THE ON POSITION,

18   OR APPEARED TO BE IN THE ON POSITION, AND THERE WAS JUST TOO

19   MUCH DAMAGE TO ASCERTAIN WHAT FAILED.  IN THE CECILWARE

20   COOKWARE.

21   **Q.**  I BELIEVE YOU TESTIFIED EARLIER THAT THE FRYER SURROUNDED

22   BY STAINLESS STEEL?

23   **A.**  YES.

24   **Q.**  STAINLESS STEEL WON'T BURN?

25   **A.**  NO.

1   **Q.**  MATERIAL ON STAINLESS STEEL MAY BURN, CORRECT?

2   **A.**  YOU MEAN GREASE ON TOP OF THE STAINLESS STEEL OR ANYTHING

3   ON IT, YES.

4   **Q.**  ANY TYPE MUCH FUEL?

5   **A.**  YES.

6   **Q.**  THE STAINLESS STEEL ALONE WON'T BURN?

7   **A.**  EVENTUALLY MELT.

8   **Q.**  THE FACT THAT YOU NEVER DETERMINED THE EXACT CAUSE OF THE

9   ANOMALY WITHIN THE FRYER, DOES THAT CAUSE YOU TO DOUBT YOUR

10  OPINION IN ANY WAY ABOUT HOW THIS FIRE BEGAN AND WHERE THE FIRE

11  BEGAN?

12  **A.**  NO.

13  **Q.**  WHY NOT?

14  **A.**  THE ONLY OTHER IGNITION SOURCE I IDENTIFIED WAS AN OPEN

15  FLAME FROM THE PILOT LIGHT.  AND THAT WAS UNDERNEATH THE BURNER

16  AREA.

17  **Q.**  DO YOU CONSIDER THE POSSIBILITIES THAT THE FIRE COULD HAVE

18  STARTED AS A RESULT OF THAT PILOT LIGHT?

19  **A.**  NO, WAS NOT WHAT I CALL IT.  I SAID HEAT SOURCE FUEL

20  SOURCE, I USE ANOTHER WORD, I USE COMPETENT HEAT SOURCE

21  COMPETENT FUEL SOURCE.

22       SO THE PILOT LIGHT DOESN'T PRODUCE ENOUGH ENERGY TO

23  BRING THAT GREASE UP TO ITS AUTO IGNITION TEMPERATURE.  THE

24  PILOT LIGHT IS UP BETWEEN THE BURNERS AWAY FROM ANY GREASE

25  LATENT VAPORS THAT MAYBE ON THE VERY BOTTOM OF THAT AREA.

1          **MR. SULLIVAN:**  YOUR HONOR, I HAVE TWO MORE PHOTOGRAPHS

2     TO GO THROUGH, BUT I DON'T KNOW IF YOU WANT TO TAKE A BREAK.

3          **THE COURT:**  LET'S DO YOUR LAST TWO, THEN WE'LL TAKE A

4     BREAK.

5     **BY MR. SULLIVAN:  Q.**  PLAINTIFFS 16.  THIS IS 109.

6     MR. PERKINS, YOU HAVE IN FRONT OF YOU WHAT'S BEEN MARKED AS

7     EXHIBIT 16?

8     **A.**  YES.

9     **Q.**  AND HAVE YOU SEEN THIS PHOTOGRAPH BEFORE?

10    **A.**  YES.

11    **Q.**  AND DID YOU TAKE THIS PHOTOGRAPH?

12    **A.**  YES, I DID.

13    **Q.**  WHEN DID YOU TAKE THIS PHOTOGRAPH?

14    **A.**  ON THE DAY OF MY INVESTIGATION.

15    **Q.**  WHAT DOES THIS PHOTOGRAPH DEPICT?

16    **A.**  DEPICTS THE CONTROL AREA UNDERNEATH THE DEEP FAT FRYER

17    WHERE THE FIRE BEGAN.

18    **Q.**  DOES THIS PHOTOGRAPH ACCURATELY DEPICT WHAT YOU SAW THAT

19    DAY?

20    **A.**  YES.

21          **MR. SULLIVAN:**  IF I MAY MOVE EXHIBIT 16 INTO EVIDENCE.

22          **THE COURT:**  YOU MAY.

23                              (PLAINTIFF'S EXHIBIT 16

24                               RECEIVED IN EVIDENCE)

25    **BY MR. SULLIVAN:  Q.**  DID YOU CONSIDER THIS PHOTOGRAPH IN

1  COMING TO YOUR CONCLUSION THAT THE PILOT LIGHT WAS NOT A

2  COMPETENT SOURCE TO START THIS FIRE?

3  **A.**  YES.

4  **Q.**  CAN YOU EXPLAIN TO THE JURY HOW THIS PHOTOGRAPH FACTORS

5  INTO YOUR CONCLUSION?

6  **A.**  SURE.  THIS IS ALL THE -- POINTING WITH THE LASER ALL THE

7  BURNER AREA AND THESE ARE YOUR FOUR MAIN BURNERS UNDERNEATH THE

8  VAT, AND DIRECTLY BETWEEN THE CENTER TWO IS YOUR PILOT LIGHT.

9         AND WE CAN SEE THE DISTANCE BETWEEN THAT AND ANY

10  VAPORS THAT YOU WOULD ACCUMULATE WOULD BE IN THE PAN BELOW

11  THAT.

12         THESE BURNERS ARE VERY HOT, ANY GREASE VAPORS THAT YOU

13  HAD THAT MAY ENTER INTO THIS AREA WOULD BE CONSUMED RIGHT AWAY.

14  IN OTHER WORDS, THERE WOULD BE NO ACCUMULATION OF GREASE ON

15  THOSE BURNERS AT ANY POINT BECAUSE THEY WOULD BE BURNED AWAY.

16         WHAT'S ALSO INTERESTING IS WE TALKED ABOUT PATTERNS

17  THE FIRE EMANATED FROM THIS AREA.  I WOULD SEE PATTERNS ABOVE

18  AND ALSO TO FAR LEFT WE SEE A BLACK LINE.

19         THERE'S A DOOR ON THE FRONT OF THIS AND IT WAS IN THE

20  CLOSED POSITION ACCORDING TO THE FIRE REPORT AND THAT WAS

21  SUPPORTED BY THE GASKET THAT WAS STILL VISIBLE HERE ON A

22  PORTION OF IT.

23         IF THE FIRE STARTS IN HERE WE HAVE TO PRODUCE ENOUGH

24  HEAT FOR A LONG PERIOD OF TIME TO GET THE VAT GOING OR WE HAVE

25  TO GET THAT OIL OUT OF HERE, GO UP TO THE TOP AND GET THE VAT

1    GOING.

2          AND YOU JUST DON'T HAVE THAT.  WE HAVE ALUMINUM

3    MATERIALS IN HERE THAT ARE STILL SOMEWHAT IN PLACE.  ALUMINUM

4    IS AN ALLOY THAT MELTS AT A VERY LOW TEMPERATURE, AROUND 1,100

5    DEGREES FAHRENHEIT.

6          SO WHAT WE HAVE HERE ARE PORTIONS OF THE BALLOON THAT

7    ARE STILL SOMEWHAT INTACT.  WE HAVE OUR COPPER LINE TO OUR

8    PILOT LIGHT, AND THIS VALVE HERE CONTROLS THE DRAIN PORT THE

9    DEEP FAT FRYER.  YOU CHANGE YOUR OIL, LIKE A GARDEN HOSE YOU

10   JUST OPEN IT UP AND DRAIN IT INTO A CONTAINERS?

11         THAT'S WHAT WE'RE SEEING HERE.  SO FOR THAT REASON

12   JUST BY THIS PHOTO ALONE I CAN ELIMINATE THE FACT THE FIRE

13   ORIGINATED IN THERE.  THE DAMAGES THAT WE SEE ARE STRICTLY FROM

14   RADIANT HEAT.

15         AS THAT FIRE ABOVE IT AND THE VAT'S BURNING THAT HEAT

16   TRANSMITTED CONDUCTED DOWN AND CAUSING THE DAMAGE THAT WE SEE.

17         WITH MAY HAVE SOME MINOR IGNITION.  WE SEE SOME BLACK

18   SOOTING IN THE BACK, BUT GIVEN THE FACT THAT MATERIALS WERE

19   STILL LEFT THE WAY THEY ARE, GIVEN THE FACT THAT THE DOOR WAS

20   CLOSED, BECAUSE WE NEED OXYGEN OR AIR TO COMPLETE THE

21   COMBUSTION SCENARIO.  IN OTHER WORDS, WE NEED THAT AIR TO HAVE

22   A GOOD FIRE.

23         SO WE HAVE A CLOSED COMPARTMENT.  SO IF THE FIRE

24   STARTS UNDERNEATH THE SMOKE ITSELF IS GOING TO DEPLETE A LOT OF

25   THE AIR AND IT'S NOT GOING TO BURN VERY VIGOROUSLY OR THE

```
1    TEMPERATURE HIGH ENOUGH TO IGNITE THE GREASE IN THE BACK.

2    Q.  SO BASED ON YOUR REVIEW OF THESE PHOTOGRAPHS, YOUR

3    INSPECTION AND YOUR COMMUNICATIONS WITH THE WITNESSES, YOU CAME

4    TO THE CONCLUSION THE FIRE STARTED IN THE VAT IN THE DEEP FAT

5    FRYER, CORRECT?

6    A.  YES.

7             MR. TOLIVER:  ASKED AND ANSWERED.

8             MR. SULLIVAN:  I'M NOT THAT TECH SAVVY, BUT I'M DONE

9    WITH THE EXAMINATION.  I'LL TRY TOP GET IT UP ON THE BOARD AT

10   THE BREAK.

11            THE COURT:  COUNSEL, YOU CAN USE IT TO DO CROSS IF YOU

12   WISH TO.

13            MR. TOLIVER:  THANK YOU.

14            THE COURT:  SO YOU ARE DONE WITH THE EXAM?

15            MR. SULLIVAN:  I AM.

16            THE COURT:  GREAT TIME FOR OUR AFTERNOON RECESS.  COME

17   BACK IN 10 MINUTES.  THANK YOU VERY MUCH.

18                    (RECESS TAKEN.)

19         (PROCEEDINGS HELD IN OPEN COURT, JURY PRESENT.)

20            THE COURT:  WELCOME BACK.  MR. PERKINS, YOU'RE STILL

21   UNDER OATH AND WE'LL GIVE EUREKA AN OPPORTUNITY FOR

22   CROSS-EXAMINATION.

23            MR. TOLIVER:  THANK YOU, YOUR HONOR.

24                  **CROSS-EXAMINATION**

25   BY MR. TOLIVER:  Q.  GOOD AFTERNOON, MR. PERKINS.  HOW ARE YOU?
```

1    **A.**  DOING WELL, THANKS.

2    **Q.**  GOOD TO SEE YOU?

3    **A.**  GOOD TO SEE YOU, TOO.

4    **Q.**  YOU FIRST WENT TO THE FIRE SCENE IN FERNDALE IN DECEMBER OF

5    2008, THREE, NOT TWO, BUT THREE MONTHS AFTER THE FIRE, RIGHT?

6    **A.**  YES, SIR.

7    **Q.**  AND THAT'S WHEN YOU TOOK THE PHOTOGRAPHS?

8    **A.**  THAT'S CORRECT.

9    **Q.**  YOU'VE NEVER SEEN ANY PART OF THE RESTAURANT OR EVEN A FIRE

10   SCENE PRIOR TO DECEMBER 2008?

11   **A.**  THAT'S CORRECT.

12   **Q.**  YOU SAID IN YOUR INVESTIGATION YOU TOOK THE PHOTOGRAPHS AND

13   YOU TALKED TO THE FIRE DEPARTMENT PERSONNEL?

14   **A.**  CORRECT.

15   **Q.**  YOU DID NOT READ ANY DEPOSITION TRANSCRIPTS FROM ANY OF THE

16   PARTIES IN THIS CASE, DID YOU?

17   **A.**  NO, SIR.

18   **Q.**  YOU LEARNED SOME INFORMATION FROM THE PARTIES ABOUT WHAT

19   HAPPENED, YOU WOULD BE WITHOUT THAT INFORMATION IN COMING TO

20   YOUR OPINIONS BECAUSE YOU NEVER READ THOSE TRANSCRIPTS?

21   **A.**  THAT MAYBE TRUE.

22   **Q.**  YOU SAID YOU SPOKE WITH A GUY NAMED -- I'M LOOKING AT YOUR

23   REPORT WHERE YOUR LETTER DECEMBER 17TH 2008, YOU WROTE IT RIGHT

24   AFTER YOUR VISIT TO THE FIRE SCENE, DO YOU REMEMBER THAT?

25   **A.**  YES, SIR.

1    Q.  IN FACT, WE TALKED ABOUT THIS AT YOUR DEPOSITION?

2    A.  WE DID.

3    Q.  AND YOU GAVE YOUR DEPOSITION IN THIS CASE?

4    A.  YES.

5    Q.  YOU CHARGED US FOR THAT?

6    A.  YES.

7    Q.  AND YOU GOT PAID FOR YOUR TESTIMONY TODAY BY AMCO?

8    A.  YES.

9    Q.  HOW MUCH YOU GET PAID PER HOUR?

10   A.  275.

11   Q.  $275 AN HOUR?

12   A.  MY COMPANY GETS PAID THAT.

13   Q.  YOU'RE THE OWNER OF THE COMPANY?

14   A.  I'M A SALARY EMPLOYEE.

15   Q.  YOU'RE ONE OF THE OWNERS OF THE COMPANY?

16   A.  I AM.

17   Q.  SO YOU WROTE THIS REPORT DECEMBER 17TH AFTER THE -- YOUR

18   INSPECTION AND PHOTOGRAPHS OF DECEMBER 15TH AND 16TH?

19   A.  I WROTE THIS LETTER TO MY CLIENT, IT'S NOT A REPORT, IT'S A

20   BUNCH OF MY NOTES I HAD PUT TOGETHER.

21   Q.  AS YOU -- COMPANY NAME FIRE CAUSE ANALYSIS ON IT, RIGHT?

22   A.  YES.

23   Q.  DIVISION OF IFT, INC.?

24   A.  CORRECT.

25   Q.  IS THAT YOUR COMPANY?

1    A.  YES.

2    Q.  AND YOU SENT THIS, AS YOU TOLD US IN YOUR DEPOSITION, TO

3    THE RECIPIENT TO GIVE THEM ACCURATE INFORMATION?

4    A.  IT SAYS WRITTEN BRIEF OF MY NOTES TAKEN DURING MY

5    INVESTIGATION.

6    Q.  YOU SENT THIS INTENDING TO BE ACCURATE AS YOU TOLD US IN

7    YOUR DEPOSITION?

8    A.  BASED ON WHAT I HAD DONE, CORRECT.

9    Q.  IT WAS WRITTEN ON OR BEFORE DECEMBER 17TH 2008

10   CONTEMPORANEOUS WITH WHEN YOU ACTUALLY SAW THE SCENE?

11   A.  CORRECT.

12   Q.  THAT WOULD HAVE BEEN THE TIME WHEN YOU SPOKE WITH THE

13   INVESTIGATORS AS WELL?

14   A.  ON THE SCENE, CORRECT.

15   Q.  AND FIREFIGHTERS?

16   A.  CORRECT.

17   Q.  YOU WROTE IN HERE, "FIRE OBSERVED BY EMPLOYEE NEXT DOOR

18   GARY NUNES, PAREN RETIRED FIRE CHIEF END PAREN," HIS NAME IS

19   REALLY COREY NUNES, ISN'T IT?

20   A.  THAT'S CORRECT.

21   Q.  WOULD IT SURPRISE YOU THAT HE IS NOT A RETIRED FIRE CHIEF?

22   A.  THAT'S THE INFORMATION I GOT, AS I RECALL.

23   Q.  WOULD IT SURPRISE YOU HE BELONGED TO A VOLUNTEER FIRE

24   DEPARTMENT, BUT HE'S NEVER BEEN A FIRE CHIEF?

25   A.  ALL RIGHT.

1    Q.   YOU WROTE ON HERE "911 TAPE, FIRE ON THE GRILL AS OBSERVED

2    FROM THE FRONT DOOR," DID I READ THAT CORRECTLY?

3    A.   YES.

4    Q.   NOW, YOU TESTIFIED EARLIER AND TOLD THE JURORS YOU BELIEVE

5    IT'S ON THE COOKING LINE IN THAT AREA, BUT A DAY AFTER YOUR

6    INSPECTION YOU WROTE FIRE ON THE GRILL, CORRECT?

7    A.   CORRECT.

8    Q.   NOW, IN THAT KITCHEN WE'RE LOOKING AT THE COOKING AREA, IF

9    THE JURY'S LOOKING AT COOKING AREA YOU HAVE TWO FRYERS TO THE

10   LEFT AND THEY'RE ON A TABLE?

11   A.   CORRECT.

12   Q.   AND THE FRYERS ARE MOVABLE ON THAT TABLE?

13   A.   TO A DEGREE.

14   Q.   THEN YOU HAVE SOME BURNERS, GAS BURNERS?

15   A.   CORRECT.

16   Q.   AND THE FRYERS ARE GAS FUELED, PROPANE GAS FUELED, DID YOU

17   KNOW THAT?

18   A.   YES.

19   Q.   AND SO YOU GET THE GAS BURNERS HERE TO THE CENTER, CORRECT?

20   A.   CORRECT.

21   Q.   THEN YOU GOT TO THE RIGHT THE GRILL?

22   A.   CORRECT.

23   Q.   AND YOU REPORTED, I KNOW YOU DON'T LIKE THE WORD REPORT,

24   YOU WROTE IN A LETTER WHICH YOU INTENDED TO BE ACCURATE ONE DAY

25   AFTER INSPECTION THAT THE FIRE WAS FIRST OBSERVED FROM THE

```
 1    FRONT DOOR ON THE GRILL, CORRECT?

 2    A.  911 TAPE FIRE ON GRILL AS OBSERVED FROM THE FRONT DOOR.

 3    Q.  THAT'S CORRECT?

 4    A.  THAT'S WHAT IT READS, YES.

 5    Q.  THAT'S WHAT YOU WROTE?

 6    A.  THAT'S WHAT I DID.

 7    Q.  INTENDING TO BE ACCURATE?

 8    A.  YES.

 9    Q.  YOU SAID IN YOUR DEPOSITION YOU LISTENED TO THE 911 TAPE?

10    A.  YES.

11    Q.  BUT I ASKED YOU HOW LONG IT TOOK, AND YOU WEREN'T SURE IF

12    IT TOOK FIVE MINUTES, 20 MINUTES, 45 MINUTES, 30 MINUTES, YOU

13    HAD NO IDEA HOW LONG THAT TAPE LASTED?

14    A.  YES, I DID NOT RECALL.

15    Q.  THE 911 TAPE?

16    A.  THAT'S CORRECT.

17    Q.  NOW, YOU WERE ASKED TO DO TWO THINGS.  ONE, DETERMINE THE

18    CAUSE AND, TWO, DETERMINE THE ORIGIN?

19    A.  CORRECT.

20    Q.  THAT WAS YOUR ASSIGNMENT?

21    A.  CORRECT.

22    Q.  AS TO THE CAUSE YOU TOLD US IN DEPOSITION THAT YOU COULDN'T

23    DETERMINE THE CAUSE, NO ONE HAS DETERMINED A PRECISE CAUSE,

24    CORRECT?

25    A.  THE CAUSE BEING THE EVENT THAT RESULTED IN THE FIRE BECAUSE
```

1   OF THE DESTRUCTION TO THE MATERIALS, CORRECT.

2   **Q.** YOU WERE UNABLE TO DETERMINE A CAUSE AND YOU'RE NOT AWARE

3   THAT ANYONE HAS?

4   **A.** THAT'S CORRECT.  WITHIN THE DEEP FAT FRYER, THAT IS

5   CORRECT.

6   **Q.** AS TO THE ORIGIN -- WELL, STRIKE THAT.

7         I'M TALKING ABOUT THE CAUSE OF THE FIRE AT THE

8   RESTAURANT?

9   **A.** CORRECT.

10  **Q.** I WASN'T LIMITING IT TO THE FRYER OR ANYWHERE ELSE, THE

11  GRILL OR WHEREVER ELSE AT THE SCENE, NO ONE KNOWS THE CAUSE?

12  **A.** OF THE INCIDENT THAT RESULTED IN THE DEEP FAT FRYER, THAT

13  IS CORRECT.  THE ORIGIN'S FIRST, THE CAUSE IS SECOND.

14  **Q.** I'M ONLY TALKING ABOUT CAUSE.

15  **A.** OKAY.

16  **Q.** ISN'T IT TRUE, NO ONE KNOWS THE CAUSE OF THE FIRE?

17  **A.** TRUE.

18  **Q.** THANK YOU.  NOW, YOU ALSO BELIEVE YOU DETERMINED ORIGIN,

19  THOUGH, YOU BELIEVED THAT WAS IN OR AROUND THE FRYER, CORRECT?

20  **A.** YES.  IN THE FRYER.

21  **Q.** AND YOU BELIEVED THAT BASED ON WHAT YOU TOLD THOSE LAWYERS

22  WHO ARE PAYING YOU TO TESTIFY?

23  **A.** YES.

24  **Q.** NOW, YOU WROTE A REPORT WHICH PROVIDES AUTHORITIES WITH

25  YOUR THOUGHT PROCESS, DO YOU REMEMBER THAT?

1    **A.**  WHAT'S YOUR QUESTION, SIR?

2    **Q.**  DO YOU REMEMBER YOUR REPORT YOU PROVIDED?

3    **A.**  YES.

4    **Q.**  THIS REPORT ACTUALLY MAY 1, 2012, THREE AND A HALF, ALMOST

5    FOUR YEARS LATER, RIGHT?

6    **A.**  YES.

7    **Q.**  THIS IS WHAT YOU PROVIDED TO AMCO'S LAWYERS, YOU BELIEVE OR

8    AT LEAST HYPOTHESIZE THAT A POTENTIAL CAUSE OF THE FIRE THE

9    ONLY ONE YOU COULD COME UP WITH WAS THAT THE CECILWARE FRYER

10   HAD AN UNDETERMINED ANOMALY?

11   **A.**  CORRECT.

12   **Q.**  AN ANOMALY AS WE AGREED IN YOUR DEPOSITION IS SOMETHING

13   UNUSUAL THAT IS NOT EXPECTED OR ANTICIPATED?

14   **A.**  CORRECT.

15   **Q.**  THAT'S ANOTHER WAY OF SAYING IT HAD A FAILURE, PRODUCT

16   FAILURE?

17   **A.**  IT COULD HAVE, YES.

18   **Q.**  WELL, IN FACT, THAT'S YOUR EXPLANATION FOR HOW THIS FIRE

19   STARTED, YOUR EXPLANATION WAS THAT THE CECILWARE FRYER FAILED?

20   **A.**  CORRECT.  I JUST DON'T KNOW HOW IT FAILED.

21   **Q.**  THAT'S RIGHT.  YOU BELIEVE THAT IT FAILED IN ANY NUMBER OF,

22   AT LEAST, THREE DIFFERENT WAYS, PERHAPS, MORE?

23   **A.**  CORRECT.

24   **Q.**  YOU BELIEVE THAT COULD HAVE BEEN ANOTHER ANOMALY WITHIN THE

25   BURNER CONTROLS OF THE FRYER, CORRECT?

```
1    A.  YES.

2    Q.  AND OR ANOTHER ANOMALY WITHIN THE THERMOSTAT OF THE FRYER?

3    A.  CORRECT.

4    Q.  THESE ANOMALIES ARE ANOTHER WAY OF SAYING THE FRYER, THE

5    CECILWARE FRYER MALFUNCTIONED?

6    A.  MORE LIKELY THAN NOT, CORRECT.

7    Q.  THAT'S WHAT YOU BELIEVE IS THE CAUSE OF THE FIRE?

8    A.  CORRECT.

9

10   Q.  WHAT YOU HAVE OPINED IS THAT WITH THE PROPANE GAS FUELING

11   THE PILOT LIGHT AND YOU BELIEVE THAT IT WAS FOUND THAT THE

12   FRYER WAS ON AT 20 DEGREES?

13   A.  CORRECT.

14   Q.  AND YOU UNDERSTAND THAT RESTAURANT WAS CLOSED THE AFTERNOON

15   BEFORE?

16   A.  THE EVENING BEFORE, CORRECT.

17   Q.  IF YOU WERE TO READ YOUR DEPOSITION TRANSCRIPT OF

18   MS. ELLEBRECHT YOU WOULD LEARN IT WAS CLOSED AROUND 5:30?

19   A.  THAT EVENING, EARLY EVENING, YES.

20   Q.  IF YOU READ HER DEPOSITION YOU'D ALSO LEARN SHE TURNED THE

21   FRYER OFF?

22   A.  YES.

23   Q.  SHE TURNED THE FRYER OFF THAT WOULD BE A PROBLEM WITH YOUR

24   CONCLUSION ABOUT THE BURNER BEING ON?

25   A.  IT WAS ON.  THAT'S THE WAY WE FOUND IT.
```

1   **Q.**  YOU BELIEVE IT WAS AT 20 DEGREES WHEN YOU FOUND OUT THREE

2   MONTHS AFTER THE FIRE?

3   **A.**  CORRECT.

4   **Q.**  AND SO YOUR THEORY IS THAT THAT BURNER 20 DEGREES SOMEHOW

5   MALFUNCTIONED, THE BURNER, THERMOSTAT, SOMETHING ELSE IN THE

6   CECILWARE FRYER MALFUNCTIONED, SUCH THAT IT INCREASED THE

7   TEMPERATURE OF THE OIL INSIDE THE VAT TO WHERE IT AUTO IGNITED,

8   AUTOMATICALLY JUST TOOK OFF IN FLAMES?

9   **A.**  CORRECT.

10  **Q.**  NOW, THE NORMAL COOKING TEMPERATURE OF THE OIL IN THE VAT

11  YOU TOLD US IS 375 DEGREES, DO YOU REMEMBER THAT?

12  **A.**  THAT'S HIGH SETTING, CORRECT.

13  **Q.**  OKAY.  THAT'S WHAT?

14  **A.**  THE SETTING, THE UPPER SETTING, YES.

15  **Q.**  SO IT'S NORMALLY 375 DEGREES IT'S NOT GOING TO IGNITE THEN,

16  IS IT?

17  **A.**  NO.

18  **Q.**  SO YOU FOUND IT 20 DEGREES, IF IT WERE ON, AS YOU BELIEVE

19  IT WAS, DESPITE CONTRARY TESTIMONY, THEN IT'S 355 DEGREES BELOW

20  NORMAL COOKING TEMPERATURE, WE AGREED TO THAT?

21  **A.**  YES.

22  **Q.**  SOMEHOW IT GOES WELL BEYOND THAT ON ITS OWN?

23  **A.**  CORRECT.

24  **Q.**  NOBODY PRESENT?

25  **A.**  THAT'S CORRECT.

1    **Q.**  AND WHAT TEMPERATURE DOES IT HAVE TO GET AT TO IGNITE THE

2    OIL INSIDE THE VAT?

3    **A.**  ABOUT ANYWHERE FROM BETWEEN 525 TO 700 PLUS DEGREES

4    FAHRENHEIT.

5    **Q.**  AS MUCH AS 800 DEGREES?

6    **A.**  SEVEN SOMETHING, YES.

7    **Q.**  SO YOUR THEORY IS SOMETHING HAPPENED WITHIN THE FRYER THAT

8    CAUSED THIS TO JUST GET WAY TOO HOT TO THE POINT WELL BEYOND

9    THE COOKING POINT, EVEN THOUGH IT WAS -- THE ONLY WITNESS

10   TESTIFIED SHE TURNED IT OFF TO WHERE JUST ERUPTED INTO A BIG

11   FLAME?

12   **A.**  THAT'S CORRECT.

13   **Q.**  NOW, YOU AGREE THAT EUREKA OR OXYGEN HAD NOTHING TO DO WITH

14   THE CECILWARE FRYER?

15   **A.**  WHAT, SIR?

16   **Q.**  EUREKA OXYGEN HAD NOTHING TO WITH THE CECILWARE FRYER?

17   **A.**  IT DOES NOT.

18   **Q.**  IF YOU'RE RIGHT, THE CECILWARE FRYER IS RESPONSIBLE FOR

19   CAUSING THIS FIRE, YOU AGREE THAT'S NOT EUREKA OXYGEN'S FAULT?

20   **A.**  IT'S NOT, YES.  IT WOULD NOT BE THEIR FAULT IF THE FIRE

21   FAILED.

22   **Q.**  NOW, WE ALSO KNOW BASED ON THE LAST PHOTOGRAPH, I'M GOING

23   TO ASK AMCO'S LAWYER WHOSE GRACIOUSLY PREVIOUSLY GOING TO TURN

24   HIS MACHINE BACK ON AND PUT IT BACK UP FOR US.

25        **MR. SULLIVAN:**  I'M GOING TO TRY.

1        **MR. TOLIVER:** THANK YOU, SIR.

2   **Q.** WHILE HE'S SETTING THAT UP IN THE INTEREST OF TIME, WE ALSO

3   KNOW THAT FROM YOUR TESTIMONY, SIR, AMONG OTHERS, THAT THE FIRE

4   WAS UNDERNEATH THE VAT; IN OTHER WORDS, THERE WAS A FIRE

5   UNDERNEATH THE OIL VAT WHERE YOU NORMALLY DO YOUR COOKING?

6   **A.** I DON'T UNDERSTAND YOUR QUESTION, FIRE UNDERNEATH THE VAT.

7   **Q.** LET ME BREAK IT DOWN FOR YOU.  YOU HAVE THE VAT OF OIL,

8   THAT'S THE CONTAINER WHERE THE HOT OIL IS, IF IT'S ON?

9   **A.** THAT'S CORRECT.

10  **Q.** IF IT'S OFF IT'S NOT HOT IT'S NEUTRAL ROOM TEMPERATURE?

11  **A.** CORRECT.

12  **Q.** SO UNDERNEATH THAT YOU HAVE THE CONTROLS?

13  **A.** CORRECT.

14  **Q.** UNDERNEATH THAT IS WHAT HAS BEEN REFERRED TO AS A PROTECTED

15  AREA?

16  **A.** CORRECT.

17  **Q.** AND IT'S PROTECTED AREA MEANING THERE'S A DOOR THAT OPENS

18  AND SHUTS?

19  **A.** CORRECT.

20  **Q.** AND YOU CAN -- THAT DOOR IS, BY THE WAY, AS YOU KNOW THAT'S

21  ATTACHED BY A MAGNET?

22  **A.** YES, IT IS INVISIBLE THERE.

23  **Q.** NOW, THIS IS THE ENTIRE PICTURE THAT -- LET ME GET OUT OF

24  THE WAY, SO EVERYONE CAN SEE THAT, THIS IS THE UNDER

25  COMPARTMENT UNDER THE FRYER, ISN'T IT?

1   **A.**  YES.

2   **Q.**  YOU TOLD US IN YOUR DEPOSITION THAT THIS ENTIRE AREA

3   BURNED, THERE WAS A FIRE DOWN HERE?

4   **A.**  EXTENSIVE HEAT, YES, FIRE.

5   **Q.**  EXTENSIVE HEAT AND A FIRE?

6   **A.**  YES.

7   **Q.**  IN FACT, IT MELTED THE CONTROLS RIGHT OFF, DIDN'T IT?

8   **A.**  THAT'S CORRECT.

9   **Q.**  IT'S MISSING, THIS IS ALL FIRE DAMAGE WE SEE HERE?

10  **A.**  THAT'S CORRECT.

11  **Q.**  NOW, FIRE NORMALLY GOES UP, YOU TOLD US THAT, DO YOU

12  REMEMBER THAT?

13  **A.**  SURE.

14  **Q.**  AND THIS PARTICULAR DOOR THAT YOU'RE AWARE THAT SOMETIMES

15  THESE DOORS THEY HAVE PROBLEMS STAYING SHUT?

16  **A.**  I'M NOT AWARE OF THAT.

17  **Q.**  YOU'RE AWARE THERE ARE SOME FIRES THAT ORIGINATE IN THIS

18  AREA WHERE IT'S DETERMINED THE DOORS DON'T STAY SHUT BECAUSE

19  THE MAGNET IS NOT WORKING VERY WELL?

20  **A.**  I HAVEN'T TESTED OR LOOKED INTO THAT.

21  **Q.**  YOU TESTIFIED EARLIER THAT THERE WAS NO OXYGEN ABLE TO GET

22  TO THIS AREA BECAUSE IT WAS ENCLOSED, DO YOU REMEMBER THAT?

23  **A.**  YES.

24  **Q.**  ACTUALLY, THERE WAS A LOT OF GREASE UNDERNEATH HERE, RIGHT?

25  **A.**  THERE WAS SOME GREASE UNDERNEATH.

1    Q.  YOU HYPOTHESIZED THAT IT DID NOT START HERE EVEN THOUGH --

2    THE ONLY SOURCE OF IGNITION, BY THE WAY, THAT YOU HAVE

3    IDENTIFIED, THE ONLY SOURCE OF IGNITION IS THE PILOT LIGHT, DO

4    YOU REMEMBER THAT?

5    A.  RIGHT.

6    Q.  NOW, WE HAVE SEVERAL DIFFERENT POTENTIAL FUELS TO START

7    THIS FIRE, ONE IS THE GREASE AND ANOTHER IS THE OIL IN THE VAT,

8    CORRECT?

9    A.  SIMILAR, YES.

10   Q.  CORRECT?

11   A.  YES.

12   Q.  NOW, YOUR THEORY IS THAT THIS IS NO SOURCE OF IGNITION FROM

13   THE VAT, SOMEHOW THIS CECILWARE FRYER WHICH HAD WORKED FINE FOR

14   YEARS THAT NIGHT WENT HAYWIRE ON ITS OWN AND TEMPERATURE ROSE

15   TO THE POINT WHERE THE OIL INSIDE THE VAT ERUPTED SPONTANEOUSLY

16   INTO THE FIRE, CORRECT?

17   A.  CORRECT.

18   Q.  THE OTHER ALTERNATIVE THAT OTHERS HAVE SAID IS A

19   POSSIBILITY IS THAT THE ACTUAL SOURCE OF FIRE, THE PILOT LIGHT,

20   MAY HAVE HAD GREASE AROUND IT AND IT IGNITED, CORRECT?

21        YOU'RE AWARE OF THAT?

22   A.  ONE PERSON SAID THAT, YES.

23   Q.  ACTUALLY, YOU SAID, YOU TESTIFIED, IN FACT, IN YOUR

24   DEPOSITION, THAT YOU TALKED TO THE FIRE DEPARTMENT PERSONNEL,

25   DO YOU REMEMBER THAT?

1          AND, IN FACT, YOU WERE AWARE THAT THE FIRE MARSHAL,

2   ASSISTANT FIRE CHIEF HAD, IN FACT, COME TO SEVERAL CONCLUSIONS,

3   DO YOU REMEMBER THIS, YOU TOLD US THAT HE CONCLUDED THE

4   PROBABLE CAUSE OF THE FIRE WAS ACCIDENTAL, YOU AGREED WITH

5   THAT?

6   **A.**  YES.

7   **Q.**  HE TOLD US THAT THE ISOLATED DAMAGE TO THE INSIDE OF THE

8   CONTROL AREA OF THE FRYER, WHICH IS WHAT WE'RE LOOKING AT NEXT

9   TO THE RANGE INDICATES THIS AREA AS A POSSIBLE SOURCE OF

10  IGNITION, YOU AGREED WITH THAT STATEMENT?

11  **A.**  YES, HE DID SAY THAT.

12  **Q.**  YOU AGREED WITH IT?

13  **A.**  YEP.

14  **Q.**  AND HE SAID A HYPOTHESIS FOR THE FIRES ORIGIN AND

15  DEVELOPMENT COULD BE THAT THE FRYER WAS LEFT ON, BOILED OFF THE

16  OIL OVER A LONG PERIOD OF TIME AND THE HEAT BUILT UP, IGNITED

17  GREASE IN THE CONTROL AREA.  THE SUPPRESSION IS SYSTEM COULD

18  HAVE KNOCKED THE FIRE DOWN, BUT DID NOT EXTINGUISH THE FIRE

19  PROTECTED IN THE ENCLOSED CONTROL AREA, DO YOU REMEMBER THAT?

20          AND YOU AGREED WITH THAT POSSIBILITY AS WELL?

21  **A.**  THAT'S WHAT HE SAID.

22  **Q.**  YOU AGREED THAT WAS A POSSIBILITY?

23  **A.**  SURE, IT'S SOMETHING THAT I'VE TAKEN UNDER CONSIDERATION.

24  **Q.**  THE PROTECTED AREA -- THIS IS EXPECTED, ACTUALLY, INSPECTED

25  THIS FIRE FROM THE FIRE DEPARTMENT, SAID PROTECTED FIRE COULD

1   HAVE CONTINUED TO BURN EVENTUALLY BOWLING OUT, OTHERWISE

2   OVERCOME THE AFFECTS OF THE EXTINGUISHING AGENT, SUBSEQUENTLY

3   REIGNITING GREASE AND THE PLENUM, ALTERNATIVE HYPOTHESIS

4   INCLUDE FIRE IN OTHER PROTECT AREAS, IN ON THE WORDS, MEANING

5   NOT GOING TO BE SUBJECT TO ANY SUPPRESSION DISCHARGE?

6   **A.**   OKAY.

7   **Q.**   WHICH COULD HAVE CONTINUE TO BURN AFTER SUPPRESSION SYSTEM

8   ACTIVATED, DO YOU REMEMBER YOU AGREED WITH THAT, TOO?

9   **A.**   I AGREED THAT'S WHAT HE SAID, TOO.

10  **Q.**   YOU AGREED THAT WAS A POSSIBILITY AS WELL?

11  **A.**   POSSIBILITY A HYPOTHESIS WHICH I TOOK INTO CONSIDERATION IN

12  FORMING MY FINAL HYPOTHESIS.

13  **Q.**   YOU WERE ALSO AWARE SINCE YOU SPOKE WITH HIM THAT HE

14  BELIEVES THE GREASE IN THE AREA OF THE CONTROLS UNDERNEATH THE

15  FRYER, THERE'S GREASE THERE, THAT THE CONTROLS ARE IN SMALL

16  CABINET UNDER THE FRYER PROTECTED FROM THE FIRE SUPPRESSION

17  SYSTEM, HE BELIEVES THE FIRE EITHER STARTED THERE DUE TO

18  MECHANICAL FAILURE UNDERNEATH THE FRYER OR MIGRATED TO THIS

19  AREA AFTER STARTING IN THE FRYER.  AND HE BELIEVES THAT THE

20  FIRE SUPPRESSION SYSTEM ACTIVATED.  THIS AREA WHEN ACTIVATED

21  THE AREA PROTECTED FROM THE FIRE SUPPRESSION SYSTEM, COULDN'T

22  REACH IT, AND THEN THIS LITTLE FIRE REIGNITED THE FIRE THAT THE

23  SYSTEM PUT OUT AND THE FIRE SPREAD FROM THERE.

24          DO YOU REMEMBER HIM TELLING YOU THAT, TOO?

25  **A.**   I REMEMBER READING THAT IN HIS REPORT, YES.

1    Q.   NOW, THE REASON THAT YOU PERSONALLY BELIEVE THAT IT STARTED

2    IN THE FRYER, EVEN THOUGH THERE'S NO EXPLANATION AS TO WHY THE

3    CECILWARE FRYER WENT HAYWIRE ON ITS OWN, IS BECAUSE YOU BELIEVE

4    THAT THESE BURNERS AROUND THE PILOT LIGHT, YOU SAID WERE HOT

5    AND THEY BURNED OFF THE GREASE, DO YOU REMEMBER THAT TESTIMONY?

6    A.   YES.

7    Q.   NOW IF, IN FACT, MS. ELLEBRECHT TURNED OFF THE FRYER AS SHE

8    TESTIFIED THAT SHE DID, THOSE WERE OFF?

9    A.   THAT'S CORRECT.

10   Q.   THOSE ARE OFF, THERE'S NO HEAT?

11   A.   THAT'S CORRECT.

12   Q.   DISSIPATES TO GREESE DRIPS DOWN IN THERE OR GREASE IN THERE

13   NEXT TO PILOT LIGHT THEY'RE NOT GOING TO BURN OFF?

14   A.   IT'S A WRONG HYPOTHESIS.

15   Q.   DO YOU UNDERSTAND THAT?

16   A.   I DO.  NOT CORRECT.

17   Q.   WHAT WE'VE COVERED SO FAR IS THE EXTENT OF YOUR INFORMATION

18   ABOUT THE CAUSE AND ORIGIN, YOU BELIEVE THE CAUSE WAS THE

19   CECILWARE FRYER, CECILWARE NOT HERE, A CECILWARE FRYER AND WE

20   KNOW THAT EUREKA OXYGEN IS NOT RESPONSIBLE FOR THAT, BUT YOU'RE

21   NOT -- YOU CAN'T EXPLAIN WHY THE CAUSE IS THAT WAY AND YOU ALSO

22   KNOW, BY THE WAY, YOU ADMITTED IN YOUR DEPOSITION THAT THE

23   CLOCK IN THE RESTAURANT STOPPED OPERATING ABOUT AN HOUR

24   BEFOREHAND BECAUSE THE HEAT, SMOKE DAMAGE, DO YOU REMEMBER

25   THAT?

1    A.   YES.

2    Q.   AND INDICATED TO YOU THAT THE FIRE WAS BURNING FOR AN HOUR

3    BEFORE IT WAS DISCOVERED?

4    A.   CORRECT.

5    Q.   SO IF IT'S DISCOVERED AROUND 7:30 YOU BELIEVE STARTED

6    AROUND 6:30 IN THE MORNING?

7    A.   SOONER.

8    Q.   SOONER?

9    A.   BEFORE 6:30, EARLIER MAYBE.

10   Q.   HOW MUCH EARLIER?

11   A.   WE HAD A FIRE GENERATE ENOUGH ENERGY TO GET THE INTERIOR

12   WALLS GOING IN THE ATTIC SPACE, AND THE HEAT IN THE UPPER LAYER

13   BANKED DOWN EVENTUALLY THAT CAUSED THE CLOCK TO STOP.

14   Q.   ALL RIGHT.  SO SOME TIME MORE THAN AN HOUR BEFOREHAND?

15   A.   THAT POSSIBILITY PROBABLY EXISTS, YES.

16   Q.   AND YOU TOLD US THAT YOU HAVE NO KNOWLEDGE PRECISELY WHERE

17   IN THE RESTAURANT THAT FIRE MAY HAVE BEEN AT ANY GIVEN TIME?

18   A.   I DID.  STARTED IN THE VAT AREA OF THE DEEP FAT FRYER.

19   Q.   ISN'T IT TRUE, MR. PERKINS, AS YOU WEREN'T THERE AND

20   THERE'S NO WITNESSES, THAT YOU HAVE NO SPECIFIC INFORMATION

21   FROM ANY WITNESSES AS TO WHERE THE FIRE WAS AT ANY POINT IN

22   TIME?

23   A.   FIRE PATTERN SUPPORT THAT FIRE STARTED IN THE VAT, WHICH

24   TOOK PLACE NO OTHER PLACE IN THAT RESTAURANT.

25   Q.   I'M NOT TALKING ABOUT WHERE, I'M NOT TALKING ABOUT ORIGIN,

1   TALKING ABOUT LOCATION OF THE FIRE AT ANY GIVEN TIME.

2   **A.**  I DON'T UNDERSTAND YOUR QUESTION.

3   **Q.**  LET ME BREAK IT DOWN A LITTLE BIT THEN.

4         YOU DON'T KNOW WHEN THE FIRE SUPPRESSION SYSTEM

5   ACTIVATED?

6   **A.**  NO.  I DON'T.

7   **Q.**  BUT YOU KNOW IT DID?

8   **A.**  YES.

9   **Q.**  AND YOU KNOW IT DID PROPERLY, AS EXPECTED, SO WHAT WE HAVE

10  THEN IS THAT SYSTEM ACTIVATES SOME TIME BEFORE THE FIRE IS

11  DISCOVERED?

12  **A.**  CORRECT.

13  **Q.**  SO THAT SYSTEM ACTIVATED SOME TIME WITHIN THE HOUR TO WHAT

14  HOUR AND A HALF MAYBE?

15  **A.**  YES.

16  **Q.**  THAT THE FIRE IS GOING BEFORE ANYONE FINDS OUT THAT THERE'S

17  A FIRE?

18  **A.**  CORRECT.

19  **Q.**  AND YOU TOLD US IN YOUR DEPOSITION THAT YOU DON'T KNOW

20  WHERE THE FIRE WAS INSIDE THE RESTAURANT AT THE TIME OF THE

21  ACTIVATION OF THAT FIRE SUPPRESSION SYSTEM, THERE WOULD BE

22  SPECULATION, YOU COULD HYPOTHESIZE, YOU COULD GUESS, BUT YOU

23  DON'T KNOW?

24  **A.**  I KNOW IT STARTED IN THE AREA OF THE DEEP FAT FRYER BASED

25  ON THE FIRE PATTERNS AND THE ACTIVATION THE FUSIBLE LINK.

1    Q.  YOU HAVE NO KNOWLEDGE, LET'S ASSUME YOU'RE RIGHT, LET'S

2    ASSUME IT STARTED THERE, CONTRARY TO WHAT THE ACTUAL FIRE

3    INVESTIGATORS CONCLUDED, LET'S ASSUME YOU'RE RIGHT, EVEN THOUGH

4    WE CAN'T UNDERSTAND HOW THE CECILWARE FRYER BECAME POSSESSED,

5    SUDDENLY JUST ERUPTED FIRE, YOU DON'T KNOW HOW QUICKLY THAT

6    FIRE TRAVELED WITHIN THE RESTAURANT, AGREED?

7    A.  I KNOW THAT IT WAS CONFINED TO THAT ONE AREA INITIALLY,

8    YES.  AND SPREAD UPWARDS FROM THERE.

9    Q.  STICK WITH MY QUESTION.  ISN'T IT TRUE, YOU DO NOT KNOW,

10   YOU WEREN'T THERE, THERE'S NO WITNESSES, THERE'S NO WAY TO KNOW

11   PRECISELY HOW QUICKLY THAT FIRE TRAVELED?

12   A.  YES.  I COULD TELL YOU IT DID TRAVEL QUICKLY.  BECAUSE I'VE

13   SEEN FIRES IN KITCHEN WARE BEFORE.

14   Q.  THEY TRAVEL QUICKLY?

15   A.  THEY DO.

16   Q.  GREAT.  OKAY.  WE DON'T KNOW HOW FAST OR HOW FAR AND HOW

17   MUCH TIME?

18   A.  EXACTLY, NO, WE DON'T.

19   Q.  WE DON'T KNOW WHERE THE FIRE WAS AT THE TIME OF THE

20   DISCHARGE OF THE SUPPRESSION SYSTEM, WE DON'T KNOW WHERE THE

21   FIRE WAS AT ANY POINT IN TIME UNTIL SOMEONE ACTUALLY ARRIVES AT

22   THE SCENE AND SAYS I SEE A FLAME, RIGHT?

23   A.  PARTIALLY RIGHT, YES.  THE FIRE HAD TO TAKEOFF THE FEASIBLE

24   LINKS, THE FIRE WAS RIGHT THERE.

25   Q.  THANK YOU FOR REMINDING ME ABOUT THAT.  YOU MENTIONED

1  EARLIER ONLY ONE FEASIBLE LINK FUNCTIONED, I DON'T WANT TO

2  MISLEAD ANYBODY HERE, ONCE ONE LINK, ONE FUSIBLE LINK BREAKS

3  THE SYSTEM ACTIVATES, AND SO THERE'S NO NEED FOR ANY OTHER

4  FUNCTION, IT'S NOT GOING TO FUNCTION BECAUSE IT'S BROKEN, THE

5  SYSTEM DONE, FIRE SUPPRESSANT, RIGHT?

6  **A.**  THAT'S CORRECT.

7  **Q.**  I WANT TO MAKE SURE.  THERE WAS NO PROBLEM THERE, THE

8  FUSIBLE LINK FUNCTIONED?

9  **A.**  CORRECT.

10  **Q.**  AND YOU ONLY NEED ONE AND IT DID?

11  **A.**  CORRECT.

12  **Q.**  GOOD, OKAY, JUST WANT TO DISPEL THAT.  THANK YOU.  ALL

13  RIGHT.  YOU'VE BEEN VERY HELPFUL.

14          WE DON'T KNOW -- WE DON'T KNOW HOW THE FIRE STARTED,

15  WE BELIEVE IT STARTED AROUND THE FRYER, WE DON'T KNOW HOW

16  QUICKLY IT MOVED, BUT IT MOVED FAST, AND WE DON'T KNOW WHERE IT

17  WAS AT ANY POINT IN TIME UNTIL SOMEONE ARRIVED, RIGHT?

18  **A.**  OKAY.

19          **MR. TOLIVER:**  THANK YOU.  NO FURTHER QUESTIONS.

20          **THE COURT:**  MR. TIMMONS, ANY QUESTIONS?

21          **MR. TIMMONS:**  YES.

22                    **CROSS-EXAMINATION**

23  **BY MR. TIMMONS:  Q.**  GOOD AFTERNOON.

24  **A.**  GOOD AFTERNOON.

25  **Q.**  I'M DUANE TIMMONS FOR JANICE ELLEBRECHT.  GOOD AFTERNOON.

1   I MADE A NOTE WHILE YOU WERE TESTIFYING I WANTED TO TELL YOU

2   WHAT MY NOTES SAYS AND MAKE SURE THAT I WROTE DOWN CORRECTLY

3   WHAT YOU STATED HERE.

4          YOU STATED, AS I UNDERSTAND IT, THE MOST PROBABLE

5   CAUSE OF THE FIRE WAS THE ANOMALY IN THE CECILWARE FRYER, AM I

6   CORRECT?

7   **A.**  YES.

8   **Q.**  ALL RIGHT.  MORE PROBABLE THAN NOT THE MOST PROBABLE CAUSE

9   AN ANOMALY?

10  **A.**  SOMETHING WENT WRONG.

11  **Q.**  RIGHT.  SOMETHING WENT WRONG WITH THE CECILWARE DEEP FAT

12  FRYER SYSTEM?

13  **A.**  CORRECT.

14  **Q.**  AND, BY THE WAY, YOU WERE HIRED AND SENT OUT THERE BY

15  CECILWARE, WEREN'T YOU?

16  **A.**  CORRECT.

17  **Q.**  SO YOU DIDN'T COME TO ANY OPINION THAT EXONERATED CECILWARE

18  FROM BEING THE CAUSE OF THIS FIRE, ISN'T THAT CORRECT?

19  **A.**  YES, I DID SAY THAT.

20  **Q.**  AND YOU ARE A CAUSE AND ORIGIN EXPERT, BUT WHAT YOU DID IS

21  YOU DETERMINED IN YOUR MIND THE ORIGIN AREA OF THE FIRE, BUT

22  YOU NEVER DETERMINED AN EXACT CAUSE, BUT YOU KNEW IT WAS MOST

23  PROBABLY A MALFUNCTION?

24  **A.**  CORRECT.  AND YOU TURN IT OVER TO YOUR ENGINEERS AND LET

25  THEM DECIPHER FOR YOU.

1   **Q.**  AT THIS POINT YOU STEPPED OUT OF IT AND SAID, CECILWARE,

2   YOU NEED ENGINEERS, ISN'T THAT CORRECT?

3   **A.**  YES, SIR.

4   **Q.**  AND DID YOU GO OUT YOURSELF AND BUY ANY EXEMPLAR CECILWARE

5   EQUIPMENT OR GET IT FREE FROM THE COMPANY TO TEST AND SEE HOW

6   THE CECILWARE SYSTEM SUPPOSED TO OPERATE?

7   **A.**  NO.  THEY TOLD ME THAT WAS ENOUGH FOR NOW, THAT'S ALL THEY

8   WANT TO HEAR.

9   **Q.**  THEY TOLD YOU THAT'S ALL THEY WANT TO HEAR?

10   **A.**  THEY DIDN'T WANT A REPORT.  I GAVE THEM MY NOTES AND THAT

11   WAS IT.

12   **Q.**  ALL RIGHT.  THAT'S WHY YOU REFERRED TO THAT LETTER AS A

13   LETTER SETTING FORTH YOUR NOTES AS OPPOSED TO A FORMAL REPORT?

14   **A.**  IT'S WRITTEN BRIEF OF MY NOTES TAKEN DURING MY INSPECTION,

15   CORRECT.

16   **Q.**  THEY DIDN'T WANT A REPORT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  NOW, YOU WERE AWARE, OF COURSE, THAT THE CECILWARE FRYER

19   WAS EQUIPPED INITIALLY, WELL, WAS EQUIPPED WITH A THERMOSTAT;

20   IS THAT CORRECT?

21   **A.**  YES.

22   **Q.**  THE CECILWARE FRYER WOULD HAVE TO BE EQUIPPED WITH A

23   THERMOSTAT, SO THAT 18 GALLONS OF FLAMMABLE COOKING OIL

24   WOULDN'T BURN OUT OF CONTROL, ISN'T THAT CORRECT?

25   **A.**  THERMOSTAT WAS IN POSITION, YES.

1    Q.  IN OTHER WORDS -- WELL, LET'S BACKUP.  I THINK YOU TOLD US

2    WHAT THE HIGHEST SETTING WAS IN YOUR UNDERSTANDING ON THE

3    CECILWARE SYSTEM, WASN'T IT, 375 DEGREES?

4    A.  I BELIEVE THAT'S CORRECT.

5    Q.  SO IF MRS. ELLEBRECHT WENT TO SET IT AT 600 DEGREES SHE

6    COULDN'T DO THAT, COULD SHE?

7    A.  NO.  UNLESS THE THERMOSTAT BROKE.

8    Q.  RIGHT.  IF THE THERMOSTAT BROKE AND IT WAS, HYPOTHESIZE FOR

9    A MOMENT, ALTHOUGH I THINK WE KNOW IT WASN'T ON, IF IT WAS ON

10   IT COULDN'T HAVE REACHED THE POINT OF AUTO IGNITION, COULD IT,

11   UNLESS THE THERMOSTAT MALFUNCTIONED?

12   A.  CORRECT.

13   Q.  AND SO EVERYTHING THAT YOU MIGHT SAY ABOUT HOW THE FIRE

14   BEGAN OTHER THAN THAT THE MOST PROBABLE CAUSE WAS AN ANOMALY IN

15   THE CECILWARE FRYER, EVERYTHING ELSE WOULD BE SPECULATION ON

16   YOUR PART, WOULDN'T IT?

17   A.  NO.

18   Q.  BUT YOU CAME UP WITH THE MOST PROBABLE CAUSE, DIDN'T YOU?

19   A.  I HAD TWO HEAT SOURCES.

20   Q.  AND THE MOST PROBABLE CAUSE WAS THE ANOMALY SOMEWHERE IN

21   THAT CECILWARE FRYER SYSTEM?

22   A.  THAT RESULTED IN THE BURNERS STAYING ON AND PROVIDING THE

23   TEMPERATURES TO AUTO IGNITE THE GREASE, THAT'S CORRECT.

24   Q.  AND YOU -- YOUR VIEW OF THE FIRE IS THAT IT AUTO IGNITED,

25   CORRECT?

1    **A.**  THAT'S THE TERM THEY USE.

2    **Q.**  THEREFORE, THE WAY IT CAN AUTO IGNITE, IN YOUR OPINION, IS

3    IF THE THERMOSTAT MALFUNCTIONS?

4    **A.**  ONE OF THE POTENTIAL CAUSES, YES.

5    **Q.**  THERE ARE OTHER WAYS A THERMOSTAT COULD MALFUNCTION AND

6    AUTO IGNITE THE SYSTEM?

7    **A.**  I'M NOT AN ENGINEER, SO I HEAR PEOPLE SAY THAT, BUT I DON'T

8    KNOW FOR SURE.

9    **Q.**  DID YOU EVER TALK TO MY CLIENT JANICE ELLEBRECHT BEFORE

10   THERE WAS A SUIT?

11   **A.**  I -- SHE MAY HAVE BEEN OUT THERE THAT DAY, I DON'T RECALL

12   SPECIFICALLY.

13   **Q.**  YOU DON'T HAVE ANY FACTS FROM HER ABOUT THE CECILWARE

14   FRYER?

15   **A.**  OTHER THEN WHAT'S IN THE REPORT FROM THE FIRE DEPARTMENT.

16   **Q.**  I THINK, YOU MAY HAVE -- I THINK, INADVERTENTLY SOMETIMES

17   REFERRED TO OIL AS GREASE, AND I WANT TO MAKE SURE ABOUT THAT.

18   WHAT WAS IN THE VAT WAS COOKING OIL NOT GREASE, WE'RE AGREEING

19   ON THAT, AREN'T WE?

20   **A.**  WE ARE.

21          **MR. TIMMONS:**  YOUR HONOR, NO FURTHER QUESTIONS.

22          **THE COURT:**  THANK YOU, MR. TIMMONS.

23          MR. SULLIVAN, ANY FURTHER REDIRECT?

24          **MR. HOOK:**  TWO QUESTIONS.  TWO POINTS OF

25   CLARIFICATION, I SHOULD SAY.

1          **REDIRECT EXAMINATION**

2     **BY MR. SULLIVAN:  Q.**  MR. TOLIVER ASKED YOU ABOUT A FIRE

3     FIGHTER NUNES, AND FIREFIGHTER NUNES IS A -- VOLUNTEER

4     FIREFIGHTER NUNES, HIS STATEMENT THE FIRE ORIGINATED AT THE

5     GRILL AREA WHAT ORIGINALLY LEAD YOU TO THE COOKING AREA,

6     CORRECT?

7     **A.**  CORRECT.

8     **Q.**  AND WHEN YOU GOT TO THE COOKING AREA YOU DECIDED THAT THE

9     BURN PATTERNS INDICATED THAT IT WAS NOT -- THE FIRE DID NOT

10    ORIGINATE AT THE GRILL AREA, MAY HAVE GOTTEN THERE AT SOME

11    POINT, BUT ORIGINATED AT THE FRYER, CORRECT?

12    **A.**  CORRECT.

13    **Q.**  ONE OTHER THING.  MR. TOLIVER WAS REFERRING TO THE NOB

14    BEING AT 20 DEGREES AND THAT BEING, I THINK 375 TO 350 DEGREE

15    DIFFERENCE BETWEEN WHAT THE OIL IS COOKED AT?

16    **A.**  YES.

17    **Q.**  AND WHEN YOU REFER TO 20 DEGREES ON THE NOB, IT WAS NOT AT

18    20 DEGREES TEMPERATURE WISE, IT WAS 20 DEGREES IN TERMS OF THE

19    90-DEGREE ANGLE?

20    **A.**  TOWARD THE OPPOSITION, YES.

21          **MR. SULLIVAN:**  THAT'S THE ONLY QUESTION I HAD.

22          THANK YOU.

23          **THE COURT:**  FURTHER CROSS-EXAM.

24          **CROSS-EXAMINATION**

25    **BY MR. TOLIVER:  Q.**  MR. PERKINS, IN YOUR DEPOSITION ON THAT

```
1    ISSUE 20 DEGREES, YOU DESCRIBE IT AS YOU FOUND IT TO BE

2    20 DEGREES ON AND, IN FACT, WE DISCUSSED THIS IN QUITE SOME

3    DETAIL --

4    A.  YES.

5    Q.  -- AND YOU THOUGHT 20 DEGREES ON WHICH IS 355 DEGREES BELOW

6    WHAT WOULD BE NORMALLY COOKING TEMPERATURE?

7    A.  CORRECT.

8    Q.  AND YOU AGREE THAT THE PERSON WHO WOULD HAVE THE BEST

9    INFORMATION ABOUT WHETHER IT'S ACTUALLY LEFT ON WOULD BE THE

10   OWNER OF THE RESTAURANT MS. ELLEBRECHT?

11   A.  I AGREE TO THAT.

12   Q.  AND YOU HAVE NO REASON TO DISBELIEVE HER, CORRECT?

13   A.  PHYSICAL EVIDENCE SHOWED IT APPROXIMATELY 20 DEGREES,

14   THAT'S ALL I COULD SAY.

15   Q.  YOU HAVE NO REASON TO DISBELIEVE SHE TESTIFIED SHE TURNED

16   IT OFF THE AFTERNOON BEFORE?

17   A.  I HAVE NO REASON JUST DISAGREE WITH THAT.

18            MR. TOLIVER:  NO FURTHER QUESTIONS.

19            THE COURT:  THANK YOU, MR. PERKINS, YOU'RE EXCUSED.

20            THE WITNESS:  THANK YOU.

21                 (WITNESS EXCUSED.)

22            THE COURT:  AMCO CALL ITS NEXT WITNESS PLEASE.

23            MR. SULLIVAN:  WE'RE GOING TO ACTUALLY RECALL

24   MS. ELLEBRECHT BRIEFLY.

25            MR. TIMMONS:  I AGREE, YOUR HONOR, THEY ASKED ME.
```

1          **THE COURT:**  THANK YOU MR. TIMMONS.

2          MS. ELLEBRECHT, COME ON FORWARD.

3          COUNSEL, MAYBE WHILE WE'RE TRANSITIONING HERE, THERE'S

4     A NUMBER OF ORIGINAL DOCUMENTS STILL UP HERE AT THE WITNESS

5     PODIUM, I DON'T KNOW THEY STILL NEED TO BE HERE OR MAKE THEIR

6     WAY INTO THE COURT FILE.

7          MS. ELLEBRECHT, YOU REMAIN UNDER OATH.

8                            **DIRECT EXAMINATION**

9     **BY MR. SULLIVAN:  Q.**  GOOD AFTERNOON.

10          I APOLOGIZE FOR RECALLING YOU BACK UP HERE, JUST A FEW

11    POINTS OF CLARIFICATION.

12          THE FIRST, THE ANSUL SYSTEM WAS INSTALLED IN 1997,

13    CORRECT?

14    **A.**  YES.

15    **Q.**  AND AFTER YOU PURCHASED THE SECOND FRYER THERE WAS A PERIOD

16    TIME WHERE YOU CONTINUED TO USE THE OLD FRYER AS WELL, CORRECT?

17    **A.**  I DID NOT PURCHASE THE SECOND FRYER.

18    **Q.**  LET ME REPHRASE THE --

19    **A.**  THE SECOND FRYER WAS THERE WHEN I WORKED THERE.

20    **Q.**  AT SOME POINT IN TIME WHILE YOU WERE THERE THERE WERE TWO

21    FRYERS OPERATING, CORRECT?

22    **A.**  NO, ONCE THEY GOT THE LARGE FRYER, THE SMALL FRYER WAS NO

23    LONGER USED.

24          **MR. SULLIVAN:**  YOUR HONOR, MAY I APPROACH THE WITNESS

25    AND SEE IF I CAN REFRESH HER RECOLLECTION WITH HER DEPOSITION

1    TESTIMONY?

2          **THE COURT:** SHE DIDN'T SAY SHE HAD AN INABILITY TO

3    RECALL.

4    **BY MR. SULLIVAN: Q.** LET ME ASK YOU, THAT'S PROBABLY A BAD --

5    MAYBE I'LL JUST READ IT INTO THE RECORD, AND IT IS AT --

6          **THE COURT:** YOU DON'T GET TO JUST READ IT INTO THE

7    RECORD, WHAT ARE YOU REFERRING TO?

8          **MR. SULLIVAN:** I'LL GIVE IT TO YOU FIRST. IT IS 13,

9    23 TO 25 OF MS. ELLEBRECHT'S TESTIMONY.

10         **THE COURT:** I DON'T HAVE THAT BEFORE ME.

11         **MR. SULLIVAN:** DID WE TAKE THEM BACK?

12         **THE CLERK:** WHICH ONE?

13         **MR. SULLIVAN:** JANICE ELLEBRECHT. 13, 23 TO 25.

14         **MR. TOLIVER:** THANK YOU.

15         **THE COURT:** YOU NEED TO GO ALL THE WAY THROUGH PAGE 14

16   LINE 4.

17         **MR. SULLIVAN:** OKAY.

18         **THE COURT:** GO AHEAD.

19         **MR. SULLIVAN:** OKAY.

20         "QUESTION. OKAY. ONCE THE NEW FRYER WAS BOUGHT WAS

21   THE OLD FRYER PUT OUT OF SERVICE?

22         "ANSWER: NO.

23         "QUESTION: WHEN DID YOU STOP USING THE OLD FRYER?

24         "ANSWER: I DON'T EVEN REMEMBER.

25         "QUESTION: DO YOU RECALL WHY YOU STOPPED USING IT?

```
1            "ANSWER:  JUST DIDN'T NEED BOTH OF THEM."

2    Q.  DO YOU RECALL GIVING THAT TESTIMONY?

3    A.  I GUESS SO.

4    Q.  WHEN THE CANDY STICK PURCHASED THE SECOND FRYER THEY DID

5    NOT ADD A SECOND FRYER SUPPRESSION SYSTEM; IS THAT CORRECT?

6    A.  NOT THAT I'M AWARE OF, NO.  I WAS NOT THE OWNER AT THE

7    TIME.  I DIDN'T HAVE ANYTHING TO DO WITH THAT.

8    Q.  FROM MAY 23RD TO THE DAY OF THE FIRE YOU WERE THE OWNER OF

9    THE CANDY STICK, CORRECT?

10   A.  YES.

11   Q.  AND YOU WERE THE ONLY ONE AT THE CANDY STICK RESTAURANT WHO

12   HAD AUTHORITY TO TAMPER WITH THE NOZZLE OF THE SYSTEM?

13           MR. TIMMONS:  OBJECTION.  ARGUMENTATIVE, VAGUE,

14   AMBIGUOUS.

15           THE COURT:  SUSTAINED.  CAN YOU REPHRASE THAT.

16   BY MR. SULLIVAN:  Q.  YEAH.  YOU DIDN'T UNDERSTAND IF ANYBODY

17   COULD GET UP AND TOUCH THE ANSUL SYSTEM WITHOUT YOUR AUTHORITY,

18   CORRECT?

19   A.  NO.

20   Q.  YOU WOULDN'T EXPECT SOMEBODY TO GO TOUCH THE ANSUL SYSTEM,

21   TO REALIGN IT OR TO ALTER IT IN ANYWAY WITHOUT RUNNING IT BY

22   YOU FIRST, CORRECT?

23   A.  CORRECT.

24   Q.  AND FROM MAY 23RD TO 2008 TO THE DATE OF THE FIRE DID YOU

25   EVER GET UP TO THE NOZZLE OF THE DEEP FAT FRYER WITH A WRENCH
```

1   AND TRY TO MOVE IT?

2   **A.**  NO.

3   **Q.**  DID YOU EVER HAVE SOMEONE GO UP TO THE NOZZLE ABOVE THE

4   DEEP FAT FRYER WITH A WRENCH AND TRY TO MOVE IT AND ALTER IT IN

5   ANY WAY?

6   **A.**  NO.

7   **Q.**  DID YOU EVER ALLOW ANYONE TO ALTER THE NOZZLE COVERING THE

8   DEEP FAT FRYER WITH A WRENCH IN ANY WAY?

9   **A.**  THE ONLY ONE THAT EVER TOUCHED ANY OF THE SYSTEM WAS ROSS.

10  **Q.**  YOU DON'T RECALL HIM DOING IT ANY TIME BETWEEN MAY 23RD AND

11  2008 THE DATE OF HIS LAST INSPECTION BEFORE THE FIRE AND THE

12  FIRE, DO YOU?

13  **A.**  NO.

14  **Q.**  AS FAR AS YOU KNOW NOBODY TOUCHED THAT NOZZLE THAT WAS

15  COVERING THE DEEP FAT FRYER FOLLOWING MR. WILLIAMS' MAY 23RD

16  2008 INSPECTION, CORRECT?

17  **A.**  NO.  NOT THAT I'M AWARE.

18  **Q.**  IF I COULD JUST SHOW YOU A PHOTO, IT'S EXHIBIT 6, NUMBER

19  28.

20          MS. ELLEBRECHT, TO THE BEST OF YOUR KNOWLEDGE, DOES

21  THIS PHOTOGRAPH DEPICT THE ORIENTATION OF THE NOZZLE OVER THE

22  DEEP FAT FRYER PRIOR TO THE FIRE?

23  **A.**  AS FAR AS I KNOW, I DON'T KNOW, I NEVER REALLY EVEN PAID

24  ANY ATTENTION TO IT.

25  **Q.**  DO YOU HAVE ANY REASON TO BELIEVE IT DOES NOT?

1    **A.**  NO.

2              **MR. SULLIVAN:**  THANK YOU VERY MUCH.

3              **THE COURT:**  ANY CROSS-EXAM FROM EUREKA.

4              **MS. GREENBERG:**  YES.

5                        **CROSS-EXAMINATION**

6    **BY MS. GREENBERG:  Q.**  MS. ELLEBRECHT, WHEN ROSS CAME TO

7    SERVICE YOUR RESTAURANT EVERY SIX MONTHS YOU WEREN'T STANDING

8    THERE WATCHING HIM FOR THE HOUR HE WAS THERE SERVICING IT,

9    CORRECT?

10   **A.**  NO.

11   **Q.**  YOU WERE OUT DOING YOUR BUSINESS IN THE RESTAURANT, RIGHT?

12   **A.**  YES.

13   **Q.**  SO YOU DON'T KNOW WHAT ROSS DID EXACTLY WHEN HE WAS THERE,

14   CORRECT?

15   **A.**  NO.

16   **Q.**  AND, AGAIN, YOUR TESTIMONY, I THINK, COUPLE DAYS AGO, WAS

17   ESSENTIALLY YOU'RE NOT PAYING ATTENTION TO THE SUPPRESSION

18   SYSTEM, CORRECT?

19   **A.**  CORRECT.

20   **Q.**  AND YOU'RE NOT PAYING ATTENTION TO THE POSITIONING OF THE

21   NOZZLE AND THE PIPES, ESSENTIALLY, CORRECT?

22   **A.**  THAT'S CORRECT.

23              **MS. GREENBERG:**  THAT'S IT.  THANK YOU.

24              **THE COURT:**  MR. TIMMONS, ANYTHING FURTHER FROM YOU?

25              **MR. TIMMONS:**  VERY BRIEFLY.  BY THE WAY, THE WITNESS

1    WILL BE GOING HOME TONIGHT AND IS ON CALL FOR NEXT WEEK.

2              **THE COURT:**  THANK YOU.

3                        **CROSS-EXAMINATION**

4    **BY MR. TIMMONS:  Q.**  JUST ONE QUESTION:  YOU WERE CALLED TO THE

5    FIRE AT WHAT TIME, NOTIFIED OF IT?

6    **A.**  LIKE 6:30 SOMETHING.

7    **Q.**  AND YOU STAYED UNTIL IT WAS TOTALLY --

8    **A.**  OR 7:30, I'M SORRY.

9    **Q.**  AND YOU STAYED UNTIL WHAT, IT WAS TOTALLY COMPLETELY OUT?

10   **A.**  YEAH.

11   **Q.**  AND WHAT TIME WAS THAT?

12   **A.**  I'M -- IT WAS IN THE -- LIKE AFTERNOON TIME.

13             **MR. TIMMONS:**  ALL RIGHT.  THANK YOU.

14            **THE COURT:**  THANK YOU, MS. ELLEBRECHT, YOU'RE EXCUSED

15   UNTIL NEXT WEEK.

16                      (WITNESS EXCUSED.)

17            **THE COURT:**  AMCO COULD PLEASE CALL IT'S NEXT WITNESS.

18            **MR. HOOK:**  YES, YOUR HONOR.

19                        **LOWELL DANIELS**,

20   CALLED AS A WITNESS FOR THE PLAINTIFF, HAVING BEEN DULY SWORN,

21   TESTIFIED AS FOLLOWS:

22            **THE WITNESS:**  I DO.

23            **THE CLERK:**  PLEASE BE SEATED.  STATE YOUR FULL NAME

24   AND SPELL YOUR LAST NAME FOR THE RECORD.

25            **THE WITNESS:**  MY NAME IS LOWELL DANIELS.

1                        <u>**DIRECT EXAMINATION**</u>

2    **BY MR. HOOK:  Q.**  MR. DANIELS, WHERE DO YOU RESIDE?

3    **A.**  IN FERNDALE, CALIFORNIA.

4    **Q.**  I'M GOING TO CALL YOUR ATTENTION TO SEPTEMBER 18TH 2008 AND

5    THE FIRE WHICH OCCURRED AT THE TWO CANDY STICK RESTAURANT, WERE

6    YOU THE OWNER OF THE BUILDING AT THIS TIME?

7    **A.**  YES, I WAS.

8    **Q.**  APPROXIMATELY, WHEN DID YOU ACQUIRE THE BUILDING?

9    **A.**  IN 2004.

10   **Q.**  AND AFTER ACQUIRING THE BUILDING DID YOU MAKE ANY

11   IMPROVEMENTS TO THE BUILDING?

12   **A.**  YES, KIND OF JUST IN THE COURSE OF OWNING IT AND FIXING

13   THINGS THAT -- IN THE APARTMENT THEY NEEDED TO BE DONE.

14   **Q.**  WHEN YOU ACQUIRED THE BUILDING WAS THE CANDY STICK IN

15   OPERATION AT THAT TIME?

16   **A.**  YES.

17   **Q.**  AND WHAT PORTION OF THE BUILDING WAS OCCUPIED BY CANDY

18   STICK?

19   **A.**  IT WAS THE GROUND FLOOR AND ON THE -- FACING THE MAIN

20   STREET.

21   **Q.**  AND AT THE TIME THAT YOU ACQUIRED IT THE CANDY STICK WAS

22   UNDER LEASE, WAS IT NOT, TO THE PRIOR OWNER?

23   **A.**  YES, IT WAS.

24   **Q.**  YOU ASSUMED THE LEASE OF THE PRIOR OWNER, CORRECT?

25   **A.**  YES.

1    **Q.**  AND WHEN -- DID THAT LEASE EXPIRE?

2    **A.**  YES, IT DID.

3    **Q.**  AND AFTER IT EXPIRED OTHER THAN CONTINUING TO RENT AT THE

4    SAME PRICE WAS THERE ANY AGREEMENT THE TERMS OF THE LEASE WOULD

5    CONTINUE?

6    **A.**  NO.

7    **Q.**  WHILE YOU WERE OPERATING OR WHILE CANDY STICK WAS BEING

8    OPERATED DID YOU EVER GO INTO THE RESTAURANT AS A CUSTOMER?

9    **A.**  YES.

10   **Q.**  AT ANY TIME WHEN YOU WERE IN THE RESTAURANT AS A CUSTOMER

11   DID YOU EVER NOTICE ANYTHING THAT SEEMED OUT THE ORDINARY OR

12   ANY KIND OF DANGEROUS CONDITION?

13   **A.**  NO.  WE, I THINK, WE HAD A LEAK ONE TIME IN THE BATHROOM,

14   THAT THE OPERATOR, THE TENANT MENTIONED, AND I THINK WE WENT IN

15   THERE AND LOOKED AT THAT ONCE.

16   **Q.**  DID ANYONE EVER COMPLAIN TO YOU ABOUT THE WAY THE

17   RESTAURANT WAS BEING OPERATED?

18   **A.**  NO.

19   **Q.**  DO YOU RECALL WHAT THE RENTAL PRICE WAS TO THE RESTAURANT

20   AT THE TIME?

21   **A.**  I THINK IT WAS 825 OR 850 A MONTH, SOMETHING LIKE THAT.

22   **Q.**  AT THAT TIME DID YOU KEEP IN THE NORMAL COURSE OF YOUR

23   BUSINESS A RECORD OF THE AMOUNT OF RENTS IN THE RESTAURANT AND

24   THE APARTMENT AND THE RENT IN THE BUILDING?

25   **A.**  YES, MY WIFE AND I KEEP A CHART.  IT'S ONLY TO KEEP OUR

1    MEMORIES AS TO WHOSE PAID AND WHO HASN'T.

2    **Q.**  I'LL SHOW YOU EXHIBIT 3 FOR IDENTIFICATION.  WAS THAT CHART

3    KEPT IN THE NORMAL COURSE OF THE BUSINESS TO RECORD THE AMOUNT

4    OF RENTALS THAT WERE THERE?

5    **A.**  YES.

6              **MR. HOOK:**  I'LL OFFER THAT IN EVIDENCE, YOUR HONOR.

7              **THE COURT:**  ANY OBJECTION?

8              **MR. TOLIVER:**  WE HAVEN'T SEEN IT.

9              **THE COURT:**  YOU SHOW THEM A COPY.  I THINK YOU'VE SEEN

10    IT.

11             **MR. HOOK:**  I SHOWED IT TO THEM BEFORE, YOUR HONOR.

12             **THE COURT:**  MAKE SURE THEY SEE WHAT YOU'RE REFERRING

13    TO NOW.  PREVIOUSLY MARKED FOR IDENTIFICATION.

14             **MR. TOLIVER:**  THANK YOU.

15             **MS. GREENBERG:**  THANK YOU.

16             **THE COURT:**  NO OBJECTION.

17             **MS. GREENBERG:**  NOPE.

18             **THE COURT:**  EXHIBIT 3 ADMITTED INTO EVIDENCE.

19                                  (PLAINTIFF'S EXHIBIT 3

20                                   RECEIVED IN EVIDENCE)

21             **MR. HOOK:**  THANK YOU, YOUR HONOR.

22    **Q.**  AFTER THE FIRE DO THE RENTALS CONTINUE?

23    **A.**  AFTER THE FIRE.

24    **Q.**  YEAH.

25    **A.**  NO.

1  Q.  APPROXIMATELY, HOW LONG AFTER THE FIRE WAS IT BEFORE YOU

2  COULD RERENT THE PROPERTY?

3  A.  IT HAD TO BE OVER A YEAR.  A YEAR PLUS.

4          MR. HOOK:  I HAVE NO FURTHER QUESTIONS.

5          THE COURT:  CROSS-EXAMINATION.

6                      **CROSS-EXAMINATION**

7  BY MS. GREENBERG:  Q.  HI, MR. DANIELS.  MY NAME IS HELEN

8  GREENBURG, I REPRESENT EUREKA OXYGEN.

9          DO YOU KNOW WHO THEY ARE?

10 A.  YEP.

11 Q.  EUREKA OXYGEN ACTUALLY SERVICES ANOTHER RESTAURANT YOU

12 CURRENTLY OWN; IS THAT CORRECT?

13 A.  THAT'S CORRECT.

14          MR. HOOK:  OBJECTION, YOUR HONOR.  BEYOND THE SCOPE.

15          THE COURT:  OVERRULED.

16 BY MS. GREENBERG:  Q.  OTHER RESTAURANT THAT'S LOCATED IN THE

17 VICTORIAN INN, CORRECT?

18 A.  THAT'S CORRECT.

19 Q.  AND THE ACTUAL PERSON THAT SERVICES YOUR RESTAURANT

20 CURRENTLY IS ROSS WILLIAMS, HE'S HERE IN THE COURTROOM TODAY,

21 DO YOU RECOGNIZE HIM?

22 A.  I THINK SO.

23 Q.  SO HE'S SOMEBODY THAT CONTINUES TO SERVICE YOUR RESTAURANT

24 CURRENTLY, CORRECT?

25 A.  YES.

1    **Q.**  AND HE'S SERVICES THE FIRE SUPPRESSION SYSTEM WITHIN THE

2    RESTAURANT, CORRECT?

3    **A.**  YES.

4    **Q.**  AND YOU TOOK OVER THE OPERATION OF THE RESTAURANT INSIDE

5    THE VICTORIAN INN AFTER THE SUBJECT FIRE THAT WE'RE HERE FOR,

6    CORRECT?

7    **A.**  NOT EXACTLY.  I DIDN'T TAKE OVER, WE HAD A TENANT OF 10

8    YEARS THAT DID NOT RENEW THE LEASE AND THEN WE REBUILD THAT

9    RESTAURANT.  A LOT OF IT FOR SAFETY REASONS AND THEN STARTED A

10   NEW RESTAURANT WHICH WE NOW OPERATE AS PART OF THE VICTORIAN

11   INN.

12   **Q.**  ARE YOU AND YOUR WIFE THE OWNERS AND OPERATORS OF THAT

13   RESTAURANT?

14   **A.**  YES.

15   **Q.**  AND AFTER YOU REBUILT THIS NEW RESTAURANT YOU HAD ASKED

16   ROSS WILLIAMS TO COME AND CONTINUE TO SERVICE IT, CORRECT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  THERE WAS SOME QUESTIONS IN REGARD TO THE LEASE AGREEMENT

19   THAT YOU HAD WITH JANICE ELLEBRECHT, AND I THINK YOUR TESTIMONY

20   WAS THAT ESSENTIALLY YOU DID NOT BELIEVE THE TERMS OF THE

21   LEASED CONTINUED AFTER IT HAD EXPIRED, IS THAT YOUR TESTIMONY?

22   **A.**  THE LEASE HAD AN ENDING DATE, I CAN'T REMEMBER WHAT THAT

23   WAS.  IT WAS A LEASE FOR CERTAIN AMOUNT OF TIME, WHEN THAT TIME

24   CAME THEY JUST KEPT PAYING RENT ON A MONTH TO MONTH BASIS, AND

25   WE JUST KEPT -- WE KEPT ON THAT BASIS, NOT AS AN ANNUAL LEASE

1  TYPE OF THING.  IT WAS A MONTH TO MONTH.

2  **Q.**  AND ON THE MONTH TO MONTH BASIS YOU STILL HAD CERTAIN

3  EXPECTATIONS OF JANICE ELLEBRECHT IN RELATION TO HER TENANCY

4  INSIDE YOUR BUILDING, CORRECT?

5          **MR. HOOK:**  OBJECTION, YOUR HONOR.  BEYOND THE SCOPE.

6  AND IRRELEVANT AS TO WHAT'S HIS ECONOMIC EXPECTATION, WE'RE

7  TALKING ABOUT THE CONVERSATIONS.

8          **THE COURT:**  OVERRULED.  YOU OPEN THE DOOR TO THIS LINE

9  OF QUESTIONING.

10          PROCEED.

11  **BY MS. GREENBERG:  Q.**  DO YOU UNDERSTAND THE QUESTION?

12  **A.**  WOULD YOU SAY IT AGAIN?

13  **Q.**  SURE.  THE QUESTION WAS AFTER THE LEASE HAD EXPIRED, WHEN

14  IT TURNED INTO A MONTH TO MONTH, YOU HAD CERTAIN

15  EXPECTATIONS -- YOU HAD CERTAIN EXPECTATIONS OF JANICE

16  ELLEBRECHT AS A TENANT WITHIN YOUR MAIN STREET BUILDING,

17  CORRECT?

18  **A.**  TO PAY THE RENT?

19  **Q.**  RIGHT.  PAY THE RENT.  AND THAT WAS NOT ONLY PAY THE RENT,

20  DID YOU HAVE CERTAIN EXPECTATION OF HER IN ORDER TO MAINTAIN

21  HER RESTAURANT?

22  **A.**  I GUESS, BY JUST VIRTUE OF FACT EVERYBODY SUPPOSED TO TAKE

23  CARE OF THE PROPERTY THAT THEY'RE RENTING, I DIDN'T HAVE A

24  LIST, I DON'T QUITE UNDERSTAND.

25          YES, I EXPECTED HER TO NOT DAMAGE THE PROPERTY, AS I

1    WOULD EXPECT THAT OF ANYBODY IN ANY SITUATION.  I THINK, THAT'S

2    RIGHT.

3    **Q.**  AND I DON'T WANT TO CUT YOU OFF HERE.  I GUESS, MY QUESTION

4    IS, THE LEASE HAD A TERM THAT ESSENTIALLY THE TENANT WAS

5    RESPONSIBLE FOR MAINTAINING HER PREMISES, BUT IS IT YOUR

6    TESTIMONY THAT SHE DIDN'T -- SHE WAS NOT RESPONSIBLE FOR

7    MAINTAINING HER LEASED PREMISES ANYMORE?

8              **MR. HOOK:**  OBJECTION, YOUR HONOR.  NO FOUNDATION AS TO

9    WHAT THE LEASE SAID, THE LEASE IS NOT IN EVIDENCE.

10             **THE COURT:**  OVERRULED.

11             **THE WITNESS:**  YEAH, I WOULD HAVE EXPECTED HER TO NOT

12   DAMAGE THE PROPERTY OR TO MAINTAIN IT.  TO -- CERTAINLY -- I

13   COULD NOT HAVE -- SHE COULD NOT HAVE GONE AND START REBUILDING

14   IT OR RESHAPING IT WITHOUT OUR PERMISSION.  SO JUST THE SAME AS

15   A REGULAR MONTH TO MONTH, THOSE SAME EXPECTATIONS THAT ONE

16   WOULD HAVE OF A PERSON.

17   **BY MS. GREENBERG:  Q.**  RIGHT.  SAME EXPECTATION AS IF SHE WAS

18   UNDER A LEASE, CORRECT?

19   **A.**  THAT'S CORRECT.  I WASN'T -- I DIDN'T GO IN AND SUPERVISE

20   HER OR ANYBODY ELSE FOR THAT MATTER.

21   **Q.**  AND DURING THE TIME THAT THE LEASE TURNED INTO A MONTH TO

22   MONTH DID YOU DO ANYTHING TO MAINTAIN HER RESTAURANT?

23   **A.**  NO.  IF, LIKE I SAID, IF THERE WAS A PLUMBING LEAK, OR THE

24   ROOF LEAKED, OR SOMETHING LIKE THAT, I WOULD.  I'M SURE THEY

25   WOULD HAVE CALLED ME FOR THAT TYPE OF THING.

1   **Q.**  BUT, AGAIN, YOU DIDN'T FEEL OBLIGATED AS THE LANDLORD TO

2   MAINTAIN ANYTHING WITHIN HER RESTAURANT, CORRECT?

3   **A.**  BOY, THAT WOULD BE A HARD ONE.  STRUCTURALLY, YES, I WOULD.

4   I WOULD BE EXPECTED, I THINK, I WOULD BE EXPECTED TO FIX IT,

5   BUT THE INSIDE OF THE PROPERTY AND THAT WOULD BE HER DOMAIN.

6           WE DIDN'T -- I DIDN'T OWN IT, AS A LANDLORD OR

7   PROPERTY MANAGER, WE OWNED IT FOR A DIFFERENT REASON.  SO AS I

8   HAD FOR YEARS.

9   **Q.**  YOU MAINTAINED YOUR RIGHT TO ENTER THE LEASED PREMISES,

10  CORRECT?

11  **A.**  YES, I THINK I HAD THAT RIGHT, YES.

12  **Q.**  YOUR DEPOSITION WAS TAKEN IN THIS CASE AND IF YOU RECALL,

13  DO YOU RECALL TESTIFYING TO THE FACT THAT YOU ON SEVERAL

14  OCCASIONS WENT TO THE CANDY STICK GRILL?

15  **A.**  YES.  YEAH, I USED TO LOVE THEIR POLISH HOTDOGS.  AND SO I

16  WOULD GO IN FOR THAT ONCE IN AWHILE, BUT THAT'S PRETTY MUCH THE

17  ONLY REASON.

18  **Q.**  NEVER INSPECTED THE CONDITION OF THE KITCHEN, CORRECT?

19  **A.**  NO.

20  **Q.**  AND YOU NEVER SAID ANYTHING TO JANICE IN REGARD TO THE

21  CONDITION OF HER KITCHEN, CORRECT?

22  **A.**  NO.

23  **Q.**  BUT YOU AS THE LANDLORD AND THE OWNERS OF THE BUILDING,

24  IT'S FAIR TO SAY THAT IT'S IMPORTANT FOR YOU TO INSURE THAT

25  SHE'S OPERATING A SAFE KITCHEN, CORRECT?

1   **A.**  IN HINDSIGHT I WOULD CERTAINLY SAY THAT, BUT I -- AS FAR AS

2   I WAS CONCERNED EVERYTHING WAS OPERATING OKAY.  BEEN THERE FOR

3   A LONG TIME.  THIS WAS ICONIC CAFE THAT BEEN IN THE TOWN FOR A

4   LONG TIME AND I WASN'T ABOUT TO MESS WITH IT.  IF YOU LIVE IN A

5   SMALL TOWN YOU KNOW WHAT I MEAN.

6   **Q.**  YOU GOT PAID BY YOUR INSURANCE COMPANY FOR THE BOOTHS AND

7   COUNTER?

8   **A.**  I ASSUME SO, YES.

9   **Q.**  AND IS IT YOUR TESTIMONY THAT YOU ACTUALLY THE BOOTHS AND

10  THE COUNTERS THAT WERE IN THE RESTAURANT?

11  **A.**  I FELT ANYTHING THAT WAS ATTACHED, MY UNDERSTANDING, I

12  COULD BE WRONG, BUT MY UNDERSTANDING OF A PROPERTY, RENTAL

13  PROPERTY IS THINGS THAT ARE ATTACHED THAT CAN'T BE REMOVED

14  WITHOUT HARMING THE PREMISES ARE THE -- STAY WITH THE BUILDING.

15  IF YOU AND SO -- I'M SORRY.

16       **MR. HOOK:**  I'M GOING TO OBJECT THIS LINE OF

17  QUESTIONING, IT'S BEYOND THE DIRECT.

18       **THE COURT:**  SUSTAINED.  THAT IS BEYOND THE DIRECT.

19       **MS. GREENBERG:**  THANK YOU.

20       **THE COURT:**  MR. TIMMONS, ANY QUESTIONS?

21                 **CROSS-EXAMINATION**

22  **BY MR. TIMMONS:  Q.**  YES.  GOOD AFTERNOON.  I'M DUANE TIMMONS

23  FOR MRS. ELLEBRECHT.  A COUPLE OF QUESTIONS.

24       YOU MADE REFERENCE TO WHAT YOUR PURPOSE IN OWNING THE

25  BUILDING WAS, THAT IT WASN'T TO COLLECT RENT, ARE YOU SAYING

1   THAT YOU HAD PURCHASED IT AS AN INVESTMENT AND HAD LONG-TERM

2   PLANS THAT DIDN'T INVOLVE A RESTAURANT?

3   **A.**  POTENTIALLY, AND JUST -- I DON'T KNOW WHAT DIFFERENCE IT

4   MAKES, BUT WE OWN ANOTHER BUILDING IN TOWN THAT AT SOME POINT

5   WE ANTICIPATED IT MIGHT SELL, AND IF WE DID THAT -- WE'RE

6   JEWELERS ALSO, AND AS WELL AS INN KEEPERS AND NOW RESTAURANT

7   OWNER, BUT PRIMARILY I'M A JEWELER.

8           AND I NEVER INTEND RETIRE FROM THAT PROFESSION AND MY

9   THOUGHT WAS THAT SHOULD I SELL THE INN AND I WOULD NOT HAVE A

10  PLACE FOR MY JEWELRY STORE.  AND IF I HAD SOMEPLACE, A BUILDING

11  ON MAIN STREET THAT THAT SOME DAY WHEN SOMEBODY ELSE MIGHT WANT

12  TO RETIRE THAT I WOULD BE ABLE TO PUT MY JEWELRY STORE THERE

13  AND JUST LIVE OUT MY DAYS DOING THAT.  THAT WAS THE PURPOSE FOR

14  IT.  TO HAVE A PLACE TO LAND SOME DAY.

15  **Q.**  AND THERE IS CURRENTLY NO RESTAURANTS IN THE BUILDING,

16  CORRECT?

17  **A.**  NO, THERE IS NOT.

18  **Q.**  IT WAS NOT BUILT OUT BY YOU TO BE A RESTAURANT AGAIN?

19  **A.**  NO.

20          **MR. TIMMONS:**  THANK YOU.

21          **THE COURT:**  ANY FURTHER?

22          **MR. HOOK:**  NOTHING FURTHER.

23          **THE COURT:**  ALL RIGHT.  MAY MR. DANIELS BE EXCUSED?

24          **MR. HOOK:**  YES.

25          **THE COURT:**  THANK YOU, MR. DANIELS.

```
1              AMCO HAVE A NEXT WITNESS?

2         MR. HOOK:  NO, YOUR HONOR, WE REST.

3         THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN OF THE

4    JURY, WE'VE REACHED A LANDMARK IN THE CASE.  AMCO HAS RESTED

5    IT'S CASE, WHICH IS ONE OF THE STAGES OF THE CASE, SO WE'LL

6    RECESS FOR THE DAY.  AND WE'LL RETURN TOMORROW WITH EUREKA'S

7    FIRST WITNESS 9:00 A.M.

8              REMEMBER YOUR ADMONITION NOT TO DISCUSS THE CASE OR TO

9    REACH ANY CONCLUSION UNTIL YOU HEARD ALL THE EVIDENCE.  THANK

10   YOU VERY MUCH.

11             (THE JURY WAS EXCUSED FROM THE COURTROOM.)

12               (OPEN COURT, JURY NOT PRESENT.)

13        THE COURT:  GO AHEAD.  WHAT'S YOUR CAVEAT?

14        MR. HOOK:  I DON'T KNOW IF EVERYTHING WENT INTO

15   EVIDENCE THAT WAS MARKED, I JUST DON'T REMEMBER.  I WANT TO BE

16   ABLE ON AND GO THROUGH AND SEE WE GOT EVERYTHING.  I THINK WE

17   DO.

18        THE COURT:  WELL, I SEE A LOT DOCUMENTS UP THERE THAT

19   NEED TO MAKE SURE THEY GET IN THE FILES, SO THERE'S NOT ANY

20   CONFUSION WHAT'S IN.  CHECK THOSE MAKE SURE EVERYTHING ACTUALLY

21   IN YOU THINK IS IN.  TALK WITH COUNSEL IF THERE'S ANY

22   QUESTIONS.  IF THERE'S SOMETHING AT 8:30 TOMORROW.

23             AND IF EUREKA HAVE ANY MOTION UNDER RULE 50, IF SO,

24   THAT MIGHT BE SOMETHING WE CAN TAKE UP AT 8:30 TOMORROW.  ARE

25   THERE ANY OTHER ITEMS THAT ANYONE KNOWS WE NEED TO TAKE UP AT
```

1   8:30 TOMORROW?

2            **MR. TOLIVER:**  WELL, EUREKA OXYGEN COMPANY IS GOING TO

3   MOVE THE COURT FOR NON-SUIT.  WE'RE SUBMITTING A BRIEF ON THAT

4   AS WELL.  BUT, OF COURSE, EUREKA COUNSEL --

5            **THE COURT:**  WOULD YOU LIKE ME TO RULE ON THAT NOW OR

6   GOING TO FILE A BRIEF TONIGHT AND HAVE IT HEARD TOMORROW

7   MORNING?

8            **MR. TOLIVER:**  I UNDERSTAND IT'S BEING FILED THIS

9   AFTERNOON AND WE'RE HAPPY TO ARGUE IT NOW OR TOMORROW MORNING,

10  WHATEVER THE COURT.

11           **THE COURT:**  IF YOUR FILING SOMETHING DO IT TOMORROW AT

12  8:30.

13           **MR. HOOK:**  WE SHOULD GET AN OPPORTUNITY TO RESPOND?

14           **THE COURT:**  OF COURSE, A MOTION THAT TYPICALLY IS

15  TAKEN UNDER SUBMISSION, THERE'S POST-TRIAL BRIEFING ON IT.  SO

16  THAT MIGHT BE YOUR BEST TOMORROW MORNING AND MIGHT BE WHAT THE

17  COURT DOES.

18           WHAT'S THE EXPECTED WITNESSES, ASSUMING THE MOTION IS

19  NOT GRANTED?

20           **MS. GREENBERG:**  WE ARE COLLECTING ALL THE WITNESSES

21  FROM EUREKA.  WE HAVE MR. GOODLIVE, JAMES GOODLIVE, HE WAS THE

22  INVESTIGATOR, WE HAVE REBECCA SUEZLE WE ARE STILL TRYING TO GET

23  COREY NUNES FOR TOMORROW.  HE'S COMING IN MONDAY, BUT WE'RE

24  TRYING TO PUSH HIM UP FOR TOMORROW.  MR. WILLIAMS IS HERE

25  CLEARLY.

1          **MR. TOLIVER:**  WE HAD TO KIND OF SCRAMBLED, WE DIDN'T

2     ANTICIPATE THEY WOULD BE DONE TODAY.

3          **THE COURT:**  THAT'S WHAT TRIAL IS ALL ABOUT.  MR.

4     WILLIAMS, THERE'S ONE WITNESS WE SPOKE ABOUT EARLIER IN THE

5     WEEK I REMEMBER WAS AVAILABLE TO THURSDAY.

6          **MS. GREENBERG:**  MS. TRAVIS FRANNSELL HE HAS INDICATED

7     UNFORTUNATELY HE CANNOT BE AVAILABLE, HE'S A RANCHER.

8          **MR. TOLIVER:**  WE'RE WORKING WITH HIM.

9          **MS. GREENBERG:**  SO WE'RE TRYING TO WORK WITH HIM RIGHT

10    NOW.  HE'S OUT WITH THE CATTLE RIGHT NOW.

11         **THE COURT:**  ALL RIGHT.  SO GOODLIVE, SUEZLE, NUNES,

12    WILLIAMS.  ALL RIGHT.  ARE THERE ANY OTHER ISSUES THAT ANYONE

13    KNOWS WE SHOULD TAKE UP AT 8:30 TOMORROW?

14         **MR. TOLIVER:**  WE'LL SEND YOU AN E-MAIL WITHIN AN HOUR

15    OR SO.

16         **MS. GREENBERG:**  I'VE JUST GOT TO CONFIRM WHAT TIME

17    THEY'RE ALL GOING TO GET HERE.  ULTIMATELY WE WANT THEM TO ALL

18    HAPPEN FIRST, SO WE COULD LET THEM LEAVE.  I JUST DON'T KNOW

19    EXACTLY WHAT TIME THEY'LL BE ARRIVING.

20         **THE COURT:**  ALL RIGHT.  LET ME ASK MY DEPUTY WE HAVE

21    UPDATED TIMING COUNT.

22         **THE CLERK:**  PLAINTIFFS HAVE SIX HOURS AND 43 MINUTES

23    REMAINING AND DEFENDANTS HAVE 11 HOURS AND 24 MINUTES

24    REMAINING.  MR. TIMMONS HAS FOUR HOURS AND 52 MINUTES

25    REMAINING.

1          **THE COURT:**  I APPRECIATE EVERYONE GETTING MR. DANIELS

2    COMPLETED TODAY.  ALL RIGHT.  THANK YOU VERY MUCH.  WE'LL SEE

3    YOU IN THE MORNING.

4

5                    (PROCEEDINGS ADJOURNED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>I N D E X</u>

2

**PLAINTIFF'S WITNESSES**                          **PAGE**   **VOL.**

3

<u>WILLIAMS, ROSS</u>

4

DIRECT EXAMINATION BY MR. HIGGINBOTHAM        238
5   CROSS-EXAMINATION BY MS. GREENBERG            285
    CROSS-EXAMINATION BY MR. TIMMONS             288
6
    <u>CARLSEN, MICHAEL</u>
7
    DIRECT EXAMINATION BY MR. SULLIVAN           290
8   CROSS-EXAMINATION BY MR. TOLLIVER            332
    REDIRECT-EXAMINATION BY MR. SULLIVAN         356
9   RECROSS-EXAMINATION BY MR. TOLLIVER          360

10  <u>PERKINS, DONALD</u>

11  DIRECT EXAMINATION BY MR. SULLIVAN           364
    CROSS-EXAMINATION BY MR. TOLLIVER            404
12  CROSS-EXAMINATION BY MR. TIMMONS             423
    REDIRECT EXAMINATION BY MR. SULLIVAN         428
13  RECROSS-EXAMINATION BY MR. TOLLIVER          428

14  <u>ELLEBRECHT, JANICE</u>

15  DIRECT EXAMINATION BY MR. SULLIVAN           430
    CROSS-EXAMINATION BY MS. GREENBERG           434
16  CROSS-EXAMINATION BY MR. TIMMONS             435

17  <u>DANIELS, LOWELL</u>

18  DIRECT EXAMINATION BY MR. HOOK               436
    CROSS-EXAMINATION BY MS. GREENBERG           439
19  CROSS-EXAMINATION BY MR. TIMMONS             444

20   PLAINTIFF'S EXHIBITS                         PAGE   VOL.

21  10                                           281
    11                                           381
22  12                                           385
    13                                           387
23  14                                           391
    16                                           400
24  3                                            438

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 8TH DAY OF OCTOBER, 2012.


/S/  JAMES YEOMANS

_____

JAMES YEOMANS, CSR, RPR

JAMES YEOMANS - OFFICIAL REPORTER - (415)863-5179